MILES D. SCULLY  (SBN:  135853)
mscully@grsm.com
GABRIEL G. HEDRICK  (SBN:  220649)
ghedrick@grsm.com
GORDON REES SCULLY MANSUKHANI, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101
Telephone:  (619) 230-7422
Facsimile:  (619) 696-7124

Attorneys for Defendant
BARLEAN'S ORGANIC OILS, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL TESTONE, COLLIN SHANKS, and LAMARTINE PIERRE, on behalf of themselves, all others similarly situated, and the general public,<br><br>     Plaintiffs,<br><br> vs.<br><br>BARLEAN'S ORGANIC OILS, LLC,<br><br>     Defendant. | Case No. 3:19-cv-00169-JLS-BGS<br><br>CLASS ACTION<br><br>**DECLARATION OF GABRIEL G. HEDRICK IN SUPPORT OF DEFENDANT BARLEAN'S ORGANIC OILS, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: June 24, 2021<br>Time: 1:30 p.m.<br>Judge: Hon. Janis L. Sammartino<br>Dept.: 4D – 4th Floor |

I, Gabriel G. Hedrick, declare:

1. I am an attorney duly licensed to practice before all Courts of the State of California and in this Federal District.  I am of counsel with the law form of Gordon Rees Scully Mansukhani, LLP, attorneys of record for defendant Barlean's Organic Oils, LLC ("Defendant" or "Barlean's").

2. I have personal knowledge of the matters stated herein.  If called to testify as to any of the facts stated herein, I could and would do so competently.

3. Attached hereto as Exhibit A is a true and correct printout of portions of Barlean's website, which I printed on April 20, 2022.

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

1    4.    Attached hereto as Exhibit B is a true and correct printout of portions

2    of Barlean's website, which I printed on April 20, 2022.

3    5.    Attached hereto as Exhibit C is a true and correct copy of relevant

4    portions of the deposition transcript of Barlean's Rule 30(b)(6) designee John

5    Puckett, which took place in this litigation on December 19, 2019.  Portions of the

6    transcript that are cited in Barlean's opposition to Plaintiffs' Motion for Class

7    Certification ("Opposition") are highlighted in yellow for the Court's easy

8    reference.

9    6.    Attached hereto as Exhibit D is a true and correct copy of the April

10    20, 2021 report of Barlean's expert witness Sarah Butler, including all exhibits

11    thereto except Exhibit F.  Exhibit F to Butler's report is a spreadsheet containing

12    data obtained from Butler's survey of coconut oil purchasers described in her

13    report.  Because of the size of the spreadsheet and because Barlean's does not

14    directly cite to Exhibit F of Butler's report in its opposition, it would be impractical

15    and a waste of Court resources to convert the spreadsheet to a PDF document and

16    attach it as an exhibit.  However, Barlean's will make the spreadsheet available to

17    the Court and Plaintiffs upon request.

18    7.    Attached hereto as Exhibit E is a true and correct copy of relevant

19    portions of the deposition transcript of plaintiff Lamartine Pierre, which took place

20    in this litigation on October 13, 2019.  Portions of the transcript that are cited in

21    Barlean's Opposition are highlighted in yellow for the Court's easy reference.

22    8.    Attached hereto as Exhibit F is a true and correct copy of relevant

23    portions of the deposition transcript of plaintiff Collin Shanks, which took place in

24    this litigation on October 24, 2019.  Portions of the transcript that are cited in

25    Barlean's Opposition are highlighted in yellow for the Court's easy reference.

26    9.    Attached hereto as Exhibit G is a true and correct copy of relevant

27    portions of the deposition transcript of plaintiff Michael Testone, which took place

28    in this litigation on October 15, 2019.  Portions of the transcript that are cited in

Gordon Rees Scully Mansukhani, LLP
101 W. Broadway, Suite 2000
San Diego, CA 92101

-2-

1    Barlean's Opposition are highlighted in yellow for the Court's easy reference.

2        10.    Attached hereto as Exhibit H is a true and correct copy of the public

3    version of plaintiff Collin Shanks' Memorandum of Points & Authorities in

4    Support of Plaintiff's Motion for Class Certification filed July 22, 2019 as ECF

5    No. 36-1 in *Shanks v. Jarrow Formulas, Inc.*, Central District of California Case

6    No. 2:18-cv-09437-PA-AFMx.

7        11.    Attached hereto as Exhibit I is a true and correct copy of the July 22,

8    2019 report of Dr. Michael Greger, M.D. FACLM filed by plaintiff Collin Shanks

9    as ECF No. 36-4 in *Shanks v. Jarrow Formulas, Inc.*, Central District of California

10    Case No. 2:18-cv-09437-PA-AFMx.

11        12.    Attached hereto as Exhibit J is a true and correct copy of the public

12    version of the July 22, 2019 report of J. Michael Dennis, Ph.D. filed by plaintiff

13    Collin Shanks as ECF No. 36-5 in *Shanks v. Jarrow Formulas, Inc.*, Central

14    District of California Case No. 2:18-cv-09437-PA-AFMx.

15        13.    Attached hereto as Exhibit K is a true and correct copy of the public

16    version of the July 22, 2019 declaration of Colin B. Weir filed by plaintiff Collin

17    Shanks as ECF No. 36-6 in *Shanks v. Jarrow Formulas, Inc.*, Central District of

18    California Case No. 2:18-cv-09437-PA-AFMx.

19        14.    Attached hereto as Exhibit L is a true and correct copy of the April 22,

20    2021 report of Barlean's expert witness Stephanie Plancich.

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

**Gordon Rees Scully Mansukhani, LLP**
**101 W. Broadway, Suite 2000**
**San Diego, CA 92101**

-3-

1    I declare under penalty of perjury under the laws of the United States that

2  the foregoing is true and correct.  Executed this 22nd day of April, 2021 at San

3  Diego, California.

4

By:    */s/ Gabriel G. Hedrick*

5    Gabriel G. Hedrick

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Rees Scully Mansukhani, LLP**
**101 W. Broadway, Suite 2000**
**San Diego, CA 92101**

-4-

# **<u>TABLE OF CONTENTS OF EXHIBITS</u>**

| Exhibit | Page |
|---------|------|
| **A** | **6** |
| **B** | **13** |
| **C** | **46** |
| **D** | **59** |
| **E** | **196** |
| **F** | **220** |
| **G** | **260** |
| **H** | **284** |
| **I** | **322** |
| **J** | **346** |
| **K** | **383** |
| **L** | **407** |

*DECLARATION OF GABRIEL HEDRICK IN SUPPORT OF*
*OPPOSITION TO MOTION FOR CLASS CERTIFICATION*                    Case No. 3:19-cv-00169-JLS-BGS

**Gordon Rees Scully Mansukhani, LLP**
**101 W. Broadway, Suite 2000**
**San Diego, CA 92101**

# EXHIBIT A

PRODUCTS     ABOUT     EDUCATION          COMMUNITY     FIND A STORE

# OUR STORY

# Humble Beginnings

When he quit his job as a pipefitter and decided to become a full-time fisherman, Dave Barlean had no idea that he and his family would become manufacturers of some of America's best-selling Omega-3 supplements.

It all started in the 1970s when Dave reconfigured a traditional canoe-style boat into a catamaran-style vessel and installed live fish tanks right onboard. His homemade innovation made it possible to separate endangered species from the commercial catch and, ultimately, revolutionized the reef netting industry. It also ensured that Dave's customers always got the freshest fish possible.



Back at home, beloved matriarch Barb "Mom" Barlean, was busy raising four children and setting up a direct order system — an advanced telemarketing technique for the time — to deliver fresh salmon across the state within hours of being harvested.

EXHIBIT A
Page 7

# Pioneering Flax Oil

Dave and Barb's son grew up working in the family fishing business, but then struck out on his own. Soon, he became interested in a different source of Omega-3 fatty acids: flax oil. One day, he talked to his dad about a better way to press flaxseed. Dave put his mind to work, and soon invented a new type of press that treated the flaxseed more gently and pressed it without heat.

The result was a smaller yield of oil from each pressing, but with a flavor that was superior to anything else on the market. People loved this new flaxseed oil, and a new family business was born.

# Quality and Innovation



With a commitment to staying ahead of the innovation curve in providing the absolute highest quality product, Barlean's soon expanded their product line to include additional oils, green food concentrates and other premium supplements.

Along the more than 30-year journey, Barlean's products have earned countless awards, and the company has been named both the #1 Health Food Store Brand and Manufacturer of the Year numerous times.

EXHIBIT A
Page 8

## Meet the Barlean Family



BARB BARLEAN          DAVE BARLEAN          BRUCE BARLEAN

# Meet The Team

EXHIBIT A
Page 9





*"My time at Barlean's has offered me both opportunity and growth in my career, all while working with some of the best people I have ever met."*

Claire Beich





*"I love working for a company that creates quality products I believe in that support my health and fitness goals!"*

Erika Starr





EXHIBIT A
Page 10





*"I love the heart of Barlean's. We get to support people as they try to lead healthier lifestyles and we support amazing non-profits around the world and locally. It's rewarding to have a job that makes a difference."*

Kristen Mattila

Sign up for our monthly newsletter and get 15% off your first purchase. Plus, you'll be first to get giveaways, promos, recipes + health articles delivered right to your inbox!

| First Name* | Email address* | SUBSCRIBE |

**SHOP ALL PRODUCTS**

Flax Oils

Fish Oils

Seriously Delicious®
Omegas

Immune Support

**ABOUT US**

Our Story

Pathway to a Better
Life

Careers

Contact Us

Returns & Shipping
Policies

**COMMUNITY**

Better Life Blog

Assistance Programs



©Copyright 2021 Barlean's. Privacy Policy | Terms & Conditions

          


EXHIBIT A
Page 12

# EXHIBIT B



LOG IN      ACCOUNT                                                          VIEW CART: EMPTY

PRODUCTS      ABOUT      EDUCATION            COMMUNITY      FIND A STORE      SEARCH

# OUR PRODUCTS

| | SEARCH |
| --- | --- |

**Shop**

**ALL PRODUCTS**

**BREVAIL**

**COCONUT OILS**

**DIGESTIVE SUPPORT**

**FIBERS**

**FISH OILS**

**FLAX OILS**

**GAMMA-LINOLENIC ACID (GLA)**

**IMMUNE SUPPORT**

**OIL BLENDS**

**OLIVE LEAF COMPLEX**

**OMEGA PALS FOR KIDS**

**PETS**

**POWDERED GREENS**

**SERIOUSLY DELICIOUS EMULSIONS**

**SERIOUSLY DELICIOUS® OMEGA-3**

**SUPER SEEDS**

**WOMEN'S HEALTH**

Storefront

**Current Category:** [All Products ▾]

Sort By: [ ▾]      [1] [2] [Next ›]

Please allow 4-6 business days from the time of order to shipping.

**My Cart**

*The Shopping Cart is currently empty*

Enter Coupon

Remember, orders over $35 ship FREE!

Policies: Privacy Policy
Contact: info@barleans.com      (800) 445-3529
                    ✕



**ORGANIC CLEAR FLAX OIL**

**$12.13 - $44.77** *Price Details*

SELECT OPTIONS



**ORGANIC LIGNAN FLAX OIL**

**$12.58 - $45.88** *Price Details*

SELECT OPTIONS



**FLAX OIL SOFTGELS**

**$13.99 - $33.68** *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 15



**LIGNAN FLAX OIL SOFTGELS**

**$14.77 - $34.22** *Price Details*

SELECT OPTIONS



**SERIOUSLY DELICIOUS® VITAMIN D3**

**$9.99**

Ship To:  yourself

Whats This?

☐   Subscribe & Save
Every Month (20% off)
More Information

1   ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 16



**SERIOUSLY DELICIOUS® CBD
CHOCOLATE MINT 25MG**

**$47.98**

Ship To:  [ yourself ▾ ]

Whats This?

☐    Subscribe & Save
[ Every Month (20% off) ▾ ]
More Information

[ 1 ]    ADD TO CART

VIEW PRODUCT DETAILS



**SERIOUSLY DELICIOUS® CBD LEMON
DROP 25MG**

**$47.98**

Ship To:  [ yourself ▾ ]

Whats This?

☐    Subscribe & Save
[ Every Month (20% off) ▾ ]
More Information

[ 1 ]    ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 17



**IDEAL CBD HEMP OIL 25MG EXTRA STRENGTH**

**$53.98** *Price Details*

SELECT OPTIONS



**IDEAL CBD HEMP OIL 15MG**

**$41.98**

Ship To: yourself
Whats This?

Subscribe & Save
☐   Every Month (20% off)
More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS

EXHIBIT B
Page 18



**IDEAL CBD HEMP OIL SOFTGELS 25MG**

**$41.98**

Ship To: yourself

Whats This?

☐  Subscribe & Save
Every Month (20% off)

More Information

[ 1 ]  ADD TO CART

VIEW PRODUCT DETAILS



**CBD MORE! 25MG DROPS**

**$47.98**

Ship To: yourself

Whats This?

☐  Subscribe & Save
Every Month (20% off)

More Information

[ 1 ]  ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 19



**CBD MORE! SOFTGELS 25MG CBD**

**$47.98**

Ship To:  yourself ▾

Whats This?

☐    Subscribe & Save
Every Month (20% off) ▾
More Information

[ 1 ]    ADD TO CART

VIEW PRODUCT DETAILS



**SERIOUSLY DELICIOUS® OMEGA-3
HIGH POTENCY FISH OIL KEY LIME PIE**

**$18.78 - $35.33** *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 20



**SERIOUSLY DELICIOUS® OMEGA-3
HIGH POTENCY FISH OIL CITRUS
SORBET**

**$35.33**

Ship To:   yourself
Whats This?

Subscribe & Save
☐   Every Month (20% off)
More Information

| 1 |   ADD TO CART

VIEW PRODUCT DETAILS



**SERIOUSLY DELICIOUS® OMEGA-3
HIGH POTENCY FISH OIL PASSION
PINEAPPLE SMOOTHIE**

**$35.33**

Ship To:   yourself
Whats This?

Subscribe & Save
☐   Every Month (20% off)
More Information

| 1 |   ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 21



**SERIOUSLY DELICIOUS® OMEGA-3 FISH OIL LEMON CRÈME**

**$16.53 - $30.99** *Price Details*

SELECT OPTIONS



**SERIOUSLY DELICIOUS® OMEGA-3 FISH OIL MANGO PEACH SMOOTHIE**

**$16.53 - $30.99** *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 22



**SERIOUSLY DELICIOUS® OMEGA-3 FISH OIL PIÑA COLADA**

**$30.99**

Ship To: yourself
Whats This?

☐   Subscribe & Save
Every Month (20% off)
More Information

| 1 | | ADD TO CART |

VIEW PRODUCT DETAILS



**SERIOUSLY DELICIOUS® TOTAL OMEGA® ORANGE CREME**

**$18.90 - $35.33** *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 23



**SERIOUSLY DELICIOUS® TOTAL OMEGA® VEGAN POMEGRANATE BLUEBERRY SMOOTHIE**

**$35.33**

Ship To:  [ yourself ▾ ]
Whats This?

Subscribe & Save
☐  [ Every Month (20% off) ▾ ]
More Information

[ 1 ]    ADD TO CART

VIEW PRODUCT DETAILS



**SERIOUSLY DELICIOUS® OMEGA-3 FLAX OIL STRAWBERRY BANANA SMOOTHIE**

**$13.85 - $25.97**

SELECT OPTIONS

EXHIBIT B
Page 24



**SERIOUSLY DELICIOUS® OMEGA-3 FLAX OIL BLACKBERRY SMOOTHIE**

**$25.97**

Ship To: yourself

Whats This?

☐ Subscribe & Save
Every Month (20% off)

More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS



**SERIOUSLY DELICIOUS® ESSENTIAL WOMAN® CHOCOLATE MINT**

**$35.33**

Ship To: yourself
Whats This?

Subscribe & Save
☐ Every Month (20% off)

More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS



**OLIVE LEAF COMPLEX - PEPPERMINT**

**$21.87 - $39.63** *Price Details*

SELECT OPTIONS



**SERIOUSLY DELICIOUS® EYE REMEDY™ - TANGERINE SMOOTHIE**

**$37.23**

Ship To: yourself ▾
*Whats This?*

☐    Subscribe & Save
Every Month (20% off) ▾
*More Information*

[ 1 ]    ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 26



**OLIVE LEAF COMPLEX - NATURAL OLIVE LEAF**

**$21.87 - $39.63** *Price Details*

SELECT OPTIONS



**OLIVE LEAF COMPLEX SOFTGELS**

**$27.27 - $49.37** *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 27



**OLIVE LEAF COMPLEX THROAT SPRAY - PEPPERMINT**

**$15.28**

Ship To:  yourself

Whats This?

☐  Subscribe & Save

Every Month (20% off)

More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS





**INTESTINAL REPAIR - MIXED BERRY**

**$40.75**

Ship To:  yourself

Whats This?

☐  Subscribe & Save

Every Month (20% off)

More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS

EXHIBIT B
Page 28



**STOMACH REPAIR - VANILLA CHAI**

**$40.75**

Ship To:  yourself

Whats This?

Subscribe & Save
Every Month (20% off)

More Information

1    ADD TO CART

VIEW PRODUCT DETAILS

1  2  Next ›

**PRODUCTS**

Flax Oils

Fish Oils

Seriously Delicious

Omega-3

**ABOUT**

Our Story

Pathway to a Better Life

Careers

Contact Us

Returns and Shipping

**COMMUNITY**

Better Life Blog

Assistance Programs



©Copyright 2021 Barlean's. | Terms & Conditions

      



LOG IN    ACCOUNT

VIEW CART: EMPTY

PRODUCTS    ABOUT    EDUCATION            COMMUNITY    FIND A STORE    SEARCH

# OUR PRODUCTS

SEARCH

**Shop**

**ALL PRODUCTS**

**BREVAIL**

**COCONUT OILS**

**DIGESTIVE SUPPORT**

**FIBERS**

**FISH OILS**

**FLAX OILS**

**GAMMA-LINOLENIC ACID (GLA)**

**IMMUNE SUPPORT**

**OIL BLENDS**

**OLIVE LEAF COMPLEX**

**OMEGA PALS FOR KIDS**

**PETS**

**POWDERED GREENS**

**SERIOUSLY DELICIOUS EMULSIONS**

**SERIOUSLY DELICIOUS® OMEGA-3**

**SUPER SEEDS**

**WOMEN'S HEALTH**

Storefront

**Current Category:** All Products

Sort By:                    ‹ Prev  1  2

Please allow 4-6 business days from the time of order to shipping.
**My Cart**

*The Shopping Cart is currently empty*

Enter Coupon

Remember, orders over $35 ship FREE!

Policies: Privacy Policy
Contact: info@barleans.com    (800) 445-3529
✕

EXHIBIT B
Page 30



**OMEGA PALS CHIRPIN' SLURPIN' LEMONADE FISH OIL**

**$16.22**

Ship To:  yourself

Whats This?

Subscribe & Save
☐  Every Month (20% off)
More Information

1      ADD TO CART

VIEW PRODUCT DETAILS



**OMEGA PALS HOOTY FRUITY TANGERINE FISH OIL + EYE NUTRITION**

**$18.40**

Ship To:  yourself
Whats This?

Subscribe & Save
☐  Every Month (20% off)
More Information

1      ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 31



**OMEGA PALS LIPSMACKIN' CITRUS HIGH POTENCY FISH OIL**

**$18.40**

Ship To: yourself ▾

Whats This?

☐　Subscribe & Save

Every Month (20% off) ▾

More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS



**OMEGA PALS SENSATIONAL STRAW-NANA FLAX OIL**

**$13.58**

Ship To: yourself ▾

Whats This?

☐　Subscribe & Save

Every Month (20% off) ▾

More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS

EXHIBIT B
Page 32



**CHOCOLATE SILK GREENS™ POWDER**

**$37.85**

Ship To: yourself

Whats This?

Subscribe & Save
☐ Every Month (20% off)

More Information

1     ADD TO CART

VIEW PRODUCT DETAILS



**SUPERFRUIT STRAWBERRY KIWI GREENS™ POWDER**

**$37.85**

Ship To: yourself

Whats This?

Subscribe & Save
☐ Every Month (20% off)

More Information

1     ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 33



**ORGANIC GREENS™ POWDER - NATURAL FLAVOR**

**$44.99**

Ship To:  yourself

Whats This?

☐  Subscribe & Save

Every Month (20% off)

More Information

1    ADD TO CART

VIEW PRODUCT DETAILS



**ORGANIC FORTI-FLAX™ FLAXSEED**

**$7.23 - $8.93**  *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 34



**ORGANIC CHIA SEED**

**$17.95**

Ship To: yourself

Whats This?

Subscribe & Save
Every Month (20% off)
More Information

1    ADD TO CART

VIEW PRODUCT DETAILS




**ORGANIC FLAX·CHIA·COCONUT SEED BLEND**

**$12.99**

Ship To: yourself

Whats This?

Subscribe & Save
Every Month (20% off)
More Information

1    ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 35



**ORGANIC DIGESTIVE SEED BLEND**

**$12.78**

Ship To:   yourself

Whats This?

Subscribe & Save
Every Month (20% off)

More Information

| 1 |

ADD TO CART

VIEW PRODUCT DETAILS



**FRESH CATCH® ORANGE FLAVOR FISH
OIL**

**$27.58**

Ship To:   yourself

Whats This?

Subscribe & Save
Every Month (20% off)

More Information

| 1 |

ADD TO CART

VIEW PRODUCT DETAILS



**FRESH CATCH® FISH OIL SOFTGELS
ORANGE FLAVOR**

**$13.68 - $29.80** *Price Details*

SELECT OPTIONS



**IDEAL OMEGA® 3 SOFTGELS**

**$24.65 - $44.99** *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 37



**FRESH CATCH® ULTRA EPA-DHA FISH
OIL SOFTGELS**

**$29.80**

Ship To:  yourself
Whats This?

☐  Subscribe & Save
Every Month (20% off)
More Information

1    ADD TO CART

VIEW PRODUCT DETAILS



**TOTAL OMEGA® 3-6-9 LEMONADE
FLAVOR**

**$35.33**

Ship To:  yourself
Whats This?

☐  Subscribe & Save
Every Month (20% off)
More Information

1    ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 38



**TOTAL OMEGA® 3-6-9 LEMONADE FLAVOR SOFTGELS**

**$28.32**

Ship To: yourself

Whats This?

Subscribe & Save
☐  Every Month (20% off)
More Information

1    ADD TO CART

VIEW PRODUCT DETAILS



**LIGNAN OMEGA TWIN**

**$32.99**

Ship To: yourself

Whats This?

Subscribe & Save
☐  Every Month (20% off)
More Information

1    ADD TO CART

VIEW PRODUCT DETAILS



**BREVAIL® CAPSULES**

**$22.95**

Ship To:  yourself

Whats This?

☐   Subscribe & Save
Every Month (20% off)
More Information

1   ADD TO CART

VIEW PRODUCT DETAILS



**ESSENTIAL WOMAN® OIL BLEND**

**$33.25**

Ship To:  yourself

Whats This?

☐   Subscribe & Save
Every Month (20% off)
More Information

1   ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 40



**ESSENTIAL WOMAN® SOFTGELS**

**$34.40**

Ship To: yourself

Whats This?

☐ Subscribe & Save
Every Month (20% off)

More Information

| 1 | ADD TO CART |

VIEW PRODUCT DETAILS



**EVENING PRIMROSE OIL SOFTGELS**

**$20.55 - $37.87** *Price Details*

SELECT OPTIONS

EXHIBIT B
Page 41



**BORAGE OIL SOFTGELS**

**$31.57**

Ship To:  yourself

Whats This?

Subscribe & Save

Every Month (20% off)

More Information

| 1 |    ADD TO CART

VIEW PRODUCT DETAILS



**ORGANIC VIRGIN COCONUT OIL**

**$17.62 - $31.48**

SELECT OPTIONS

EXHIBIT B
Page 42



**SERIOUSLY DELICIOUS® CLA - FRESH APPLE**

**$37.23**

Ship To: yourself

Whats This?

Subscribe & Save

Every Month (20% off)

More Information

1    ADD TO CART

VIEW PRODUCT DETAILS



**SERIOUSLY DELICIOUS® MCT - COCONUT**

**$25.97**

Ship To: yourself

Whats This?

Subscribe & Save

Every Month (20% off)

More Information

1    ADD TO CART

VIEW PRODUCT DETAILS

EXHIBIT B
Page 43



**CBD FOR DOGS**

**$57.58**  *Price Details*

SELECT OPTIONS



**FLAX OIL FOR ANIMALS**

**$14.80**

Ship To:  yourself ▾
Whats This?

☐        Subscribe & Save
Every Month (20% off) ▾
More Information

1        ADD TO CART

VIEW PRODUCT DETAILS



**FRESH CATCH® COD LIVER OIL
LEMONADE FLAVOR**

**$25.97**

*Sold Out*



‹ Prev | 1 | 2

**PRODUCTS**

Flax Oils

Fish Oils

Seriously Delicious

Omega-3

**ABOUT**

Our Story

Pathway to a Better Life

Careers

Contact Us

Returns and Shipping

**COMMUNITY**

Better Life Blog

Assistance Programs

©Copyright 2021 Barlean's. | Terms & Conditions

   

# EXHIBIT C

EXHIBIT C
Page 46

Page 1

1                 UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3

4

5   MICHAEL TESTONE, COLLIN SHANKS,    )
    and LAMARTINE PIERRE, on behalf    )
6   of themselves, all others         )
    similarly situated, and the       )
7   general public,                    )
                                       )
8              Plaintiffs,            ) Case No.
                                       ) 19-CV-0169 JLS BGS
9              vs.                      )
                                       )
10  BARLEAN'S ORGANIC OILS, LLC,       )
                                       )
11             Defendant.             )
    ----------------------------------)

12

13

14                  CONFIDENTIAL

15

16   VIDEOTAPED DEPOSITION OF JOHN THOMAS PUCKETT

17              Greensboro North Carolina

18            Thursday, December 19, 2019

19

20

21

22

23   Reported by:

24   Cindy A. Hayden, RMR-CRR

25   JOB NO. 173843

1    the question.

2              So, mainly, just because there's no

3    judge here to kind of rule on the objections,

4    she makes her objection on the record, and the

5    court can sort it out later, except for issues

6    of privilege, in which case she will instruct

7    you not to answer, okay?

8         A.    Yes, sir.

9         Q.    All right.   You understand you're

10   here to testify on behalf of Barlean's?

11        A.    Yes, sir.

12        Q.    Okay.  And what did you do to

13   prepare for your deposition today?

14        A.    I read documents.  I talked to

15   people within the company.  I met with Marylin

16   yesterday and before yesterday.  So there's

17   been a lot of preparation work --

18        Q.    Okay.

19        A.    -- to get us to here.

20        Q.    Okay.  When did you learn that you

21   would be deposed as the 30(b)(6) witness in

22   this case?

23        A.    Probably several months ago.  Three

24   months ago.

25        Q.    Okay.  And who did you talk to to

EXHIBIT C
Page 48

Confidential

Page 28

1        Q.      And when did you join Barlean's?

2        A.      2009.   Well, let me clarify.   As a

3    full-time employee, 2009.   I worked as a 1099

4    worker two years prior to that as a

5    consultant --

6            MS. JENKINS:   I'm going to ask you

7        to take your hand down so that the court

8        reporter can hear you better.

9            THE WITNESS:   Sorry.

10           MS. JENKINS:   Okay.   That's all

11       right.

12       Q.      Okay.   And what positions did you

13   hold when you first joined Barlean's as a 1099

14   in 2007?

15       A.      Bruce Barlean was bringing in the

16   technology of softgel manufacturing.   So I was

17   a consultant to design and purchase and

18   implement the entire facility to be able to

19   manufacture softgels.

20       Q.      Okay.   And when you joined full-time

21   in 2009, what position were you hired into?

22       A.      General manager of encapsulation.

23           MS. JENKINS:   That's a great title.

24           THE WITNESS:   Uh-huh.

25       Q.      And does that position mainly deal

Confidential

Page 29

1   with basically softgels as well or

2   encapsulating products?

3          A.      Just -- just encapsulation.   I built

4   a facility on the site, but I literally was

5   isolated to that facility.

6          Q.      Okay.   And what is encapsulation?

7          A.      So, basically, taking gelatin and

8   encapsulating liquid-fill products, like flax

9   oil or anything.

10         Q.      Okay.   And what -- how long were you

11  in that position for?

12         A.      Probably two years.

13         Q.      Uh-huh.   And what was the next

14  position you held?

15         A.      Vice president of operations.

16         Q.      And how long were you in that

17  position for?

18         A.      Again, probably about two years.

19         Q.      So about 2013?

20         A.      Yes.

21         Q.      And what were you promoted to after

22  that?

23         A.      COO.

24         Q.      And how long were you the COO for?

25         A.      Probably a year or so.

Page 30

1        Q.    Okay.  And you were promoted to what

2   after that?

3        A.    CEO.

4        Q.    Is that the current position you

5   hold?

6        A.    No.

7        Q.    What is your current position?

8        A.    C -- sorry.  President/COO.  Bruce

9   is now the CEO.

10        Q.    And when did that change occur?

11        A.    Probably about six, seven months

12   ago.  Probably seven months ago.

13        Q.    How many employees does Barlean's

14   have?

15        A.    125 to 135.

16        Q.    And in 2013, do you know

17   approximately how many employees Barlean's had?

18        A.    2013?  I'm going to -- because we

19   had a -- we had a -- a -- what do you call

20   it? -- a fad product that we were doing a lot

21   of business for in private label, so we were

22   probably up to about 185 at that time.

23        Q.    Okay.  Of those 125 employees

24   that -- to 135 that Barlean's currently

25   employs, how many of those employees are

Page 56

1        A.      No.

2        Q.      -- since 2015?

3        A.      Sure.  No, they've been pretty

4    consistent with the ones you've just asked me

5    about.  That is correct.

6        Q.      Okay.  And are there others that --

7    well, haven't we just discussed all the SKUs

8    that are at issue?

9        A.      No, because you're bringing up the

10   Sam's Club and the other products.  So I

11   wouldn't -- the margins aren't the same on a

12   Club product as they are on a -- on a straight

13   to a mom-and-pops.

14       Q.      Okay.  So, yeah, let's -- okay.

15   That's a good point because these aren't

16   complete.

17               So with respect to the virgin

18   coconut oil that was sold to Sam's --

19       A.      The margin on the virgin and the RBD

20   would have been around 25 to 30 percent, at

21   best.

22       Q.      Okay.

23       A.      Yeah.  Sorry.  I don't want to get

24   myself in trouble for --

25               MS. JENKINS:  No.  I mean, if you

Page 67

1   we went over in regards to Supplemental

2   Interrogatory Response Number 5, do you know if

3   returns have been subtracted from those

4   numbers?

5        A.   I can't factually say, but my

6   assumption would be absolutely, because it

7   comes out of the system that way.

8        Q.   Okay.

9            MS. JENKINS:  Are you doing okay?

10  Do you need a break or anything?

11           THE WITNESS:  I'm good right now.

12           MS. JENKINS:  Okay.

13           THE WITNESS:  Do you need one?

14           MS. JENKINS:  No.  I'm fine.

15           THE WITNESS:  You tell me, too.

16           MS. JENKINS:  I will.

17       Q.   Does Barlean's have set prices --

18  and I'm talking about wholesale prices -- for

19  its coconut oil products?

20       A.   We do.

21       Q.   Okay.  And how does it go about

22  setting those wholesale prices?

23       A.   So, basically, obviously, you take

24  the cost of the material itself or the finished

25  product going to the market.  They do a market

Confidential

Page 68

1    analysis.  They compare SPIN datas.  They come

2    up with a suggested retail.  Off that suggested

3    retail, we're usually about a 40 percent brand.

4    That's where the wholesale number comes from.

5        Q.    So there was a lot in there.  So let

6    me try to unpack it a little bit.  So you start

7    with your costing information, correct?

8        A.    Yes, sir.

9        Q.    And then you come up with a

10   suggested retail price that is approximately

11   40 percent higher than --

12       A.    Can --

13       Q.    Yeah.

14       A.    So we go out to the market and we

15   look at what is a retail price out there in the

16   market and what do we think we can compete

17   against.  Then we reverse engineer to a

18   wholesale.  So if they're selling 16 ounces of

19   coconut for $20, then we'll back 40 percent off

20   of that and come up with a wholesale.

21       Q.    Okay.  Any other factors that

22   Barlean's considers in setting the prices for

23   its coconut oil products?

24       A.    No.

25       Q.    Okay.  And is that 40 percent just a

EXHIBIT C
Page 54

Page 73

1          Q.     Okay.   Do you know which channel is

2     the largest channel?

3          A.     Natural.

4          Q.     Okay.   Is it -- is that the -- the

5     majority of sales are through the natural

6     channel?

7          A.     Yes.

8          Q.     I'm not going to hold you to the

9     hard numbers, but do you -- would you believe

10    it's -- is your best estimate that it's, you

11    know -- above 80 percent of the coconut oil

12    sales are through the natural channel?

13         A.     Yes.

14         Q.     You think it's higher than

15    80 percent?

16         A.     No.   I'd say about 80 percent.

17         Q.     About 80.   Okay.   So roughly

18    80 percent.   Okay.

19               And of the approximately 20 percent

20    remaining, how was that split between mass and

21    grocery?

22         A.     Probably 15 percent mass, 5 percent

23    grocery.

24         Q.     Okay.   Does the pricing of the

25    coconut oils vary by channel?

EXHIBIT C
Page 55

Page 74

1        A.     No.   Well, sorry.   No, but the

2   discounts we give along with the product would

3   change.

4        Q.     Okay.   And how would they change?

5        A.     Well, you've got your large chains

6   that, you know, they want the wholesale minus

7   10 percent ongoing.   You've got your

8   mom-and-pops that we give it through wholesale,

9   those types of things.   So there is different

10  programs for different levels of identities.

11       Q.     Does Barlean's sell directly to end

12  consumers or only through retailers or other

13  third parties?

14       A.     We don't -- today, we don't have a

15  platform to sell directly to consumers.  Do we

16  do it?  Yes.  Do we get call-ins and people

17  saying -- but it's a very, very, very, very

18  small number.  But we are not actively selling

19  the product that way, no.

20       Q.     Okay.  Does Barlean's sell its

21  coconut oils online?

22       A.     Yes.

23       Q.     And when we're talking about mass,

24  natural and grocery, does the online sales,

25  like Amazon or Swanson's -- do those fall

Page 76

1    little.   Vitacost might do a lit -- I mean, a

2    little.   But the main one for coconut oil is

3    Amazon.

4            Q.     Is Barlean's sold at Walmart?

5            A.     No, never.

6            Q.     Never has been?

7            A.     Bad word.   Sorry.

8            Q.     Okay.   And why is "Walmart" a bad

9    word?

10           A.     So my -- I've had three careers in

11   my life, one being pharmaceutical

12   manufacturing, and we did all of the generic

13   products for pain and allergens for Sam's Club

14   and for Walmart.   And I was the technical

15   person, and I did not like doing business with

16   them.

17               So when Bruce approached me about

18   it, I'll do business with Sam's Club, but I

19   will not do business with Walmart.   I am not

20   managing that business.   That's why.   And my

21   retailers would fricking kill me, meaning the

22   mom-and-pops.   Holy moly.

23           Q.     Does Barlean's sell any product --

24   manufacture coconut oil on behalf of other

25   private labels?

Page 204

1                    C E R T I F I C A T E

2

3    STATE OF NORTH CAROLINA      )

4                                 ) ss.:

5    COUNTY OF CABARRUS           )

6

7            I, Cindy A. Hayden, a Notary Public

8       within and for the State of North Carolina,

9       do hereby certify:

10           That John Thomas Puckett, the witness

11      whose deposition is hereinbefore set forth,

12      was duly sworn by me and that such

13      deposition is a true record of the

14      testimony given by such witness.

15           I further certify that I am not

16      related to any of the parties to this

17      action by blood or marriage; and that I am

18      in no way interested in the outcome of this

19      matter.

20           IN WITNESS WHEREOF, I have hereunto

21      set my hand this 2nd day of January, 2020.

22                    *Cindy Hayden*

23           ---------------------------

24                    Cindy A. Hayden

25

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and the general public, Plaintiff,<br><br>v.<br><br>Barlean's Organic Oils, LLC., Defendant. | Case No: 19-cv-0169-JLS-BGS |

# EXPERT REPORT OF SARAH BUTLER

# Table of Contents

I.  QUALIFICATIONS ................................................................................................2

II. DOCUMENTS REVIEWED ................................................................................3

III. ASSIGNMENT AND SUMMARY OF OPINIONS .......................................4

IV. BACKGROUND ....................................................................................................6

V.  SURVEY METHODOLOGY ...............................................................................8
    A.  Survey Population ..........................................................................................8
    B.  Sampling of the Relevant Population ...........................................................9
    C.  Quality Control Measures for the Survey .................................................10
    D.  Screening Questionnaire ..............................................................................11
    E.  Main Questionnaire ......................................................................................12

VI. SURVEY RESULTS ...........................................................................................14
    A.  All Brand Purchasers ...................................................................................15
    B.  Barlean's Brand Purchasers ........................................................................30

VII. DENNIS PROPOSAL ........................................................................................32
    A.  Dennis Survey Would Not Establish Barlean's is the Source of Information ......................33
    B.  Dennis' Proposed Survey Population is Underinclusive ..........................34
    C.  WTP is Not a Measure of an Actual Marketplace "Price Premium" ....................35

VIII.   CONCLUSIONS ...............................................................................................37

# I.     QUALIFICATIONS

1.     I am a Managing Director at NERA Economic Consulting ("NERA"), where I am the Chair of the Survey and Sampling Practice and a member of the Intellectual Property, Product Liability, Antitrust, and Labor Practices. My business address is 4 Embarcadero Center, San Francisco, CA 94111. NERA is a firm providing expert statistical, survey, economic, and financial research analysis.

2.     Among my responsibilities, I conduct survey research and market research, and design and implement statistical samples for matters involving business and consumer decision making, consumer choice, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving issues of patent infringement, false advertising, trademark and trade dress confusion, and secondary meaning, as well as in antitrust and employment-related litigation. I am a member of the American Association of Public Opinion Research, the American Statistical Association, the Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

3.     I have also worked as a market researcher conducting surveys of consumers and professionals, focus groups, and in-depth interviews. I worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

4.      I have substantial experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services including purchase processes, product attributes, branding and positioning, new product research, and communications strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including large-scale surveys, in-depth interviews, focus groups and observational studies.

5.      I have submitted expert reports, been deposed, and have testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit A**.

6.      NERA is being compensated for my services in this matter at my standard rate of $675 per hour. Members of the staff at NERA have worked at my direction to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## II.    DOCUMENTS REVIEWED

7.      As part of my work, I reviewed the *Complaint* in this matter[1] and other materials, including the Declaration and Expert Report of J. Michael Dennis, Ph.D.[2] A list of the specific materials I reviewed can be found in **Exhibit B**.

---

[1] Class Action Complaint and Demand for Jury Trial, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.* United States District Court, Southern District of California, Case No. 19CV0169 JLS BGS, dated January 24, 2019 (hereinafter "*Complaint*"); Response to Plaintiffs' Second Set of Interrogatories, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.*, United States District Court, Southern District of California, Case No. 3:19-cv-00169-JLS-BGS, dated January 29, 2021.

[2] Declaration and Expert Report of J. Michael Dennis, Ph.D., dated March 1, 2021 (hereinafter "*Dennis Report*").

## III.   ASSIGNMENT AND SUMMARY OF OPINIONS

8.      I was retained by Defendant, Barlean's Organic Oils, LLC (hereinafter
"Barlean's"), to conduct a survey of consumers to understand their perceptions of coconut oil and
what features of the product or information may have influenced their decisions to purchase this
type of oil.

9.      My survey provides empirical evidence demonstrating that consumers of coconut
oil learn about the product from a range of sources and few, if any, rely on the product label to
inform their purchasing decisions. More specifically, the results of my study demonstrate the
following:

- Very few respondents, only 6 of the 501 coconut oil purchasers, indicated that they first
  purchased the product because they saw it in the store, or they saw the product
  advertised. Many consumers indicated that they purchased coconut oil for use in a recipe,
  for hair or skin care, or for pet health.

- Respondents first learned about coconut oil from a variety of sources – most commonly
  family and friends or from general information found online. Even when provided with a
  list, less than 20 percent of respondents (18.0 percent) indicated that they first learned
  about coconut oil by seeing the product in the store. Moreover, the majority of
  respondents who said they saw the product in the store also learned about coconut oil
  from some other source. Only 35 respondents, or 7.0 percent, indicated that the only
  source of information for first leaning about coconut oil was from seeing the product
  advertised, seeing a brand's website, or seeing the product in the store.

- When asked how they typically use coconut oil, many respondents indicated that the
  product was used for cooking or baking particular foods and 44.7 percent of respondents

indicated that they typically used the product for cosmetic purposes like hair or skincare or for pet health. Moreover, when provided with a list of items, 62.5 percent of respondents indicated that their typical use of the product does not involve ingesting it, and 13.2 percent of respondents *only* use the product for cosmetic purposes.

- When asked why they selected a particular brand of coconut oil, only 30.1 percent of respondents indicated that the product label or information on the product's website had any influence on their decision to purchase. In other words, for approximately 70 percent of respondents, the product labeling had no influence on their selection of coconut oil brand.

- More importantly, even when presented with a list of the health claims Plaintiffs have alleged to be at issue, only 11.0 percent of respondents indicated that any of these claims were influential. In other words, 89.0 percent of consumers purchasing coconut oil were not influenced by alleged health claims either because the label itself is not relevant to purchasing behavior or because the specific claims were not influential.

- The results for Barlean's purchasers are comparable to results for the total sample. My survey included 306 (of the 501 total respondents) consumers who have purchased Barlean's.

    10.    These results demonstrate that consumers are not relying on the product labels or brand specific advertising to first purchase or continue purchasing coconut oil. The survey data also show that typical uses of coconut oil do not involve ingesting the product and many respondents report that the product is used for hair, skin, and/or pet care.

    11.    I also reviewed the proposal put forward by Dr. Dennis. Dr. Dennis has not conducted any research in this matter. Instead, based on his work in other cases, Dr. Dennis

asserts that he can measure a price premium associated with claims on Barlean's product labels. Of course, Dr. Dennis' proposed methodology cannot determine what proportion of respondents, if any have learned about or rely on product labels for information about coconut oil. Additionally, even if Dr. Dennis had proposed an appropriate survey, it would only measure consumer demand and would not address supply side issues.

12.   The rest of this report provides the details of the survey I designed and conducted and responds to Dr. Dennis' proposed research.

## IV.   BACKGROUND

13.   Defendant, Barlean's Organic Oils, LLC, is a Washington Corporation, with its principal place of business in Ferndale, Washington.[3] Barlean's is a successful and respected company in the health food and supplement industry, marketing supplements based on quality and innovation,[4] including a variety of coconut oil products.[5]

14.   Plaintiff Michael Testone, a resident of the State of California, purchased Barlean's coconut oil on approximately a monthly basis during the Class Period.[6] Mr. Testone claims he read and relied on the following label claims when purchasing Barlean's Organic Virgin Coconut Oil:[7]

   a) "Harvested at the Peak of Flavor & Nutritional Value;"
   b) "Coconut Oil Nutrition [:] – Rich in Lauric Acid & Caprylic Acid- Great Source of Medium Chain Triglycerides;"
   c) "Coconut Oil Nutrition [:] – Contains in Lauric Acid, Caprylic Acid, & Acid- Natural Source of Medium Chain Triglycerides;"
   d) "NON-HYDROGENATED;"

---

[3] *Complaint*, ¶8.

[4] https://www.barleans.com/our-story, accessed April 13, 2021.

[5] *Complaint*, ¶48.

[6] First Amended Class Action Complaint and Demand for Jury Trial, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.* United States District Court, Southern District of California, Dated August 26, 2019 (hereinafter "*First Amended Complaint*"), ¶124.

[7] *First Amended Complaint*, ¶125.

e) 'COCONUT OIL: A SMART FAT;"
f) "A natural source of medium chain triglycerides (MCTs), coconut oil boosts the metabolism, supports the heart and immune system and provides quick energy"; and
g) "CHOLESTEROL FREE."

15.     I understand that, based on these label statements, Mr. Testone believed that the consumption of Barlean's Organic Virgin Coconut Oil would benefit his health.[8] Specifically, he believed that the product was "healthier than other fats, cooking oils and butter," and that consumption "would not increase his risk of CHD, stroke, and other morbidity."[9]

16.     Plaintiff Collin Shanks (purchased Barlean's Organic Virgin Coconut Oil and Barlean's Butter Flavored Coconut Oil)[10] and Plaintiff Lamartine Pierre (purchased Barlean's Organic Virgin Coconut Oil)[11] similarly assert that, based on statements on the product labels, they believed Barlean's Coconut Oil products were healthier than butter and other fats and cooking oils.[12]

17.     Named plaintiffs Testone, Shanks, and Pierre allege that the representations and statements made on Barlean's Coconut Oil products are false and misleading and have caused them to pay more for the products than they otherwise would, had the label statements not been made at all.[13]

18.     To evaluate Plaintiffs' claims that the specifically referenced "health claims" information on Barlean's labels caused consumers' to purchase the product, I designed and conducted a survey.

---

[8] *First Amended Complaint*, ¶86.

[9] *First Amended Complaint*, ¶127.

[10] *First Amended Complaint*, ¶128.

[11] *First Amended Complaint*, ¶133.

[12] *First Amended Complaint*, ¶130, 131, 134, 135.

[13] *First Amended Complaint*, ¶142.

## V.    SURVEY METHODOLOGY

19.    I have designed, implemented, and analyzed the data from a survey of 501 coconut oil purchasers. The design of my research follows the generally accepted principles for the design of surveys to be used as evidence in litigation.[14] In general, the design of a reliable survey requires careful attention to the following key areas:

- The definition of the relevant population;

- The procedures for sampling from the relevant population;

- The survey questions used;

- The stimuli shown to respondents; and

- The protocol for calculating the results from the survey.[15]

20.    The discussion of the survey I conducted is organized around each of the key areas.

### A.    Survey Population

21.    The relevant population for this matter is U.S. consumers 18 years or older who have purchased coconut oil in the last five years.[16] My survey includes purchasers of Barlean's coconut oil, as well as purchasers of other brands of coconut oil. The survey includes residents of New York and California, as well as relevant consumers living in other states.

---

[14] Diamond, Shari S. (2011) "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Edition, pp. 359-423 (hereinafter "*Diamond*").

[15] The Federal Judicial Center's (2004) *Manual for Complex Litigation, Fourth Edition*, §11.493, p. 103 phrases these key areas as such:
- the population was properly chosen and defined;
- the sample chosen was representative of that population;
- the data gathered were accurately reported; and
- the data were analyzed in accordance with accepted statistical principles.

[16] *First Amended Complaint*, ¶154.

## B.     Sampling of the Relevant Population

22.     Potential survey respondents were contacted using an internet panel hosted by Dynata.[17] Dynata complies with the standards for online survey data panels set forth by ESOMAR (The European Society for Opinion and Market Research). Dynata holds industry memberships with AAPOR (The American Association of Public Opinion Research), the Insights Association, and ESOMAR.[18]

23.     Dynata uses a variety of quality control measures to ensure the reliability and integrity of the responses it provides. For example, Dynata uses digital fingerprinting that creates a "fingerprint" for each respondent based on computer characteristics (like IP addresses), which can then be used to identify respondents and to exclude individuals who attempt to take the same survey more than once. Dynata's standard quality control measures were undertaken in this study.

24.     Data for the survey were collected between March 11, 2021 and April 9, 2021. Potential survey respondents were randomly selected and were sent a generic invitation to participate in the survey. Potential respondents were unaware of the purpose or the topic of the survey and needed to meet the screening criteria outlined below in order to qualify for participation.

25.     A total of 7,506 potential respondents opened the invitation and began the survey and of these, 501 respondents qualified for and completed the survey.[19] The complete

---

[17] For additional information about Dynata online surveys, see file Dynata-Panel-Book-2019-2.19.pdf. *"Panel Book: Delivering online B2B and B2C sample from a robust collection of high-quality data for maximum feasibility, sustainability, representativeness and consistency,"* http://info.researchnow.com/rs/105-ZDT-791/images/Dynata_Panel%20Book_2.19.pdf, last accessed April 13, 2021.

[18] ESOMAR (2012), "28 Questions to Help Research Buyers of Online Samples," https://www.esomar.org/uploads/public/knowledge-and-standards/documents/ESOMAR-28-Questions-to-Help-Buyers-of-Online-Samples-September-2012.pdf, accessed April 20, 2021.

[19] A copy of the invitation is provided in **Exhibit C**.

9

questionnaire is provided in **Exhibit D**, and screenshots of the survey as it appeared to respondents are provided in **Exhibit E**.

## C.    Quality Control Measures for the Survey

26.    To ensure that my data are of the highest quality, I implemented quality control measures in addition to those undertaken by Dynata:

    a.    As is standard survey practice for litigation, the survey was conducted in a "double-blind" fashion; that is, neither the staff at Dynata nor any of the respondents was aware of the survey sponsor or the ultimate intention of the survey.[20]

    b.    Respondents had to correctly answer a Google reCAPTCHA question to ensure that a person, and not a computer or "bot," was taking the survey.[21]

    c.    Respondents were able to take the survey either on a desktop, laptop, or tablet computer, or on their smartphone. The survey program was tested separately on both computer/tablet and smartphone in order to ensure that the survey questions appeared correctly on the different device types.

    d.    Respondents were required to enter their state of residence and zip code, and if these data conflicted with one another, the respondent was excluded.

    e.    Respondents who work for or have a household member who works for a company that produces edible oils (for example, canola, coconut, or olive oil)

---

[20] *Diamond*, pp. 410-411.

[21] "reCAPTCHA uses an advanced risk analysis engine and adaptive challenges to keep automated software from engaging in abusive activities." https://www.google.com/recaptcha/intro/v3.html, accessed April 6, 2021.

were screened out. Respondents were also screened out if they worked for a market research or advertising company or indicated they did not know.[22]

f.   Respondents who had completed a survey on edible oils in the past six months or who indicated that they did not understand or were unwilling to adhere to the survey instructions were also screened out of the survey.

## D.   Screening Questionnaire

27.   To ensure that panel respondents were part of the relevant population as defined for this case, a series of screening questions was asked. Only respondents who met these qualifying conditions continued with the main survey. To qualify for the survey, respondents had to meeting the following criteria:

a.   Be 18 years of age or older;

b.   Live in the U.S.;

c.   Report that neither they, nor anyone in their households, are employed in any of the following: a market research or advertising company, a company that produces edible oils (for example, canola, coconut, or olive oil), or indicated they didn't know;

d.   Report that in the past five years they had purchased coconut oil for their own personal use.[23]

---

[22] This is a standard research approach to avoid including respondents who are likely to have specialized knowledge about the survey topic or the survey methodology.

[23] Respondents were provided with a list of products they may have purchased in the past five years. This list included edible oils as well as other products to ensure that respondents could not guess the intention of the survey. If a respondent indicated that she had purchased edible oils, she was asked to select which types of oil had been purchased. The list of oils included coconut oil as well as other types of oils to again ensure that the specific intention of the survey was not obvious in the screening questions.

28.     Respondents were also asked to select from a list which brand or brands of coconut oil they had purchased in the last five years. Respondents qualified for the study if they had purchased Barlean's brand coconut oil. Respondents could also qualify if they had purchased another brand of coconut oil, including Nature's Way, Nutiva, Kirkland/Costco, or other store or non-store brands. If a respondent indicated that she had purchased more than one brand of coconut oil in the past five years, she was asked to indicate which brand was purchased most often, and subsequent questions asked each respondent about the brand of oil they purchased most. If a respondent indicated that she had purchased Barlean's (regardless of most frequent brand purchased), the remainder of the survey questions related to the Barlean's brand.

## E.     Main Questionnaire

29.     Respondents were then asked to indicate the month and year they had most recently purchased the brand of coconut oil and the number of times they purchased the brand. If they had purchased more than once, they were asked what year they first purchased the brand. All respondents were then asked if their most frequently purchased brand was the first brand they had purchased.

30.     Next, respondents were asked to think about the first time they purchased coconut oil. Respondents were asked to describe why they decided to purchase the product and how they first learned about coconut oil. These questions were asked as open-ended questions to allow respondents to articulate their own responses. I also included a closed-ended question which allowed respondents to select from a list how they first learned about coconut oil.

31.     After the series of questions that was focused on understanding how consumers learned about and decided to first purchase coconut oil, I asked a series of questions about how the specific brand of oil is used and what factors influenced the respondent to select that particular

brand. First, respondents were asked to indicate in their own words how they typically use coconut oil. Respondents were next asked to select from a list the ways they typically use the product.

32.     Similarly, respondents were asked to explain in response to an open-ended question why they selected the particular brand of oil for purchase, and then were provided with a closed-ended question which included a list of potential reasons for purchasing. The list of reasons for purchase included two information sources Plaintiffs have claimed provided consumers with false or misleading information: statements or descriptions on the product label and information on the brand's website.

33.     Respondents who indicated that statements or descriptions on the product label or information on the brand's website were factors that influenced their purchasing decision were asked a series of follow up questions. First, respondents were asked an open-ended question, asking them to describe what specific statements or information on the label/website influenced their purchasing decision. Next, respondents were asked a closed-ended question that provided a list of possible information on the label/website that may have influenced their purchase. The list included statements Plaintiffs have alleged to be false or misleading, as well as other, not at issue statements. The specific questions for the label and the website are shown below.

> Q13/Q15. You may have already mentioned this, but [which of the following statements or product descriptions on the label]/[what information discussed on the website], if any, do you recall as having influenced your decision to purchase **[INSERT BRAND]** coconut oil? (***Please select all that apply***)
> 1. No trans fatty acids / No trans fat
> 2. Nutrition Facts (label information about calories, fats, sugars, etc)
> 3. Health benefits of coconut oil
> 4. Source of Medium Chain Triglycerides (MCTs)
> 5. Non-hydrogenated
> 6. Cold pressed
> 7. Organic
> 8. Solvent and chemical free

9.  Kosher
10. Non-GMO / No GMOs
11. Gluten free / no gluten
12. Soy free / no soy
13. Virgin / Extra virgin
14. Unrefined
15. A smart fat
16. Contains Lauric Acid & Caprylic Acid
17. Neutral taste / neutral flavor
18. Fair trade
19. Ideal for cooking
20. Vegan
21. Dairy-free / non-dairy
22. No cholesterol / cholesterol-free
23. Raw whole food
24. Superfood
25. Healthy alternative to butter
26. Harvested at the peak of nutritional value
27. Coconut flavor
28. Effective skin moisturizer / hair conditioner
29. Other *(Please Specify)*
30. None of these **[EXCLUSIVE]**
31. Don't know / unsure **[EXCLUSIVE]**

34.    Finally, respondents were asked whether they believe coconut oil is healthier than other oils, just as healthy as other oils, or less healthy than other oils, and why they think so. Respondents were also asked where they would look or how they would get information about the product's nutrition if they wanted to find out. After this question, the survey was complete, and respondents were thanked for their time.

## VI.  SURVEY RESULTS

35.    I surveyed 501 U.S. coconut oil consumers.[24] As shown below in Table 1, survey respondents were a mix of ages, with approximately 34 percent of the sample between ages 18

---

[24] Data can be found in **Exhibit F**.

and 34 years old, 45 percent between ages 35 and 54, and the remainder of the sample 55 years or older. The majority of the survey respondents, or 59.1 percent, were women.

**Table 1: Age by Gender**

| Age Group | Male | | Female | | Total | |
|---|---|---|---|---|---|---|
| | Count | Percent | Count | Percent | Count | Percent |
| 18-34 | 66 | 33.0% | 99 | 33.4% | 170 | 33.9% |
| 35-54 | 97 | 48.5% | 129 | 43.6% | 226 | 45.1% |
| 55+ | 37 | 18.5% | 68 | 23.0% | 105 | 21.0% |
| **Total Respondents** | **200** | **100.0%** | **296** | **100.0%** | **501** | **100.0%** |

Note: 'Other' category not shown above includes 5 respondents who identify as 'non-binary', 'other', or 'prefer not to say'.

Source: NERA Coconut Oil Survey, March-April 2021

36.     Respondents were from across the United States. While the demographic distribution of respondents' geographies generally matches the distribution of the U.S. population, my survey specifically included an oversample of California and New York residents, thereby increasing the proportion of respondents from these regions. The results in Table 2 below reflect the distribution of respondents, including the 220 oversample of California and New York residents.

**Table 2: Region**

| Region | Count | Percent |
|---|---|---|
| Northeast | 167 | 33.3% |
| Midwest | 73 | 14.6% |
| South | 117 | 23.4% |
| West | 144 | 28.7% |
| **Total Respondents** | **501** | **100.0%** |

Source: NERA Coconut Oil Survey, March-April 2021

## A.  All Brand Purchasers

37.     I first asked a series of questions to understand and evaluate why respondents purchase coconut oil and how they learned about the product. In response to an open-ended question, respondents provided a range of reasons why they first purchased coconut oil. While

some respondents made references to health benefits they believe to be associated with coconut oil, many respondents indicated that the reason they first purchased coconut oil was unrelated to "health." In fact, many respondents indicated that the reason for first purchase was for reasons such as a specific recipe or for hair or skin care. For example, Respondent 499853059 indicated that his first purchase was because he wanted to use the products as "A natural deodorant and I also use it to shave me [sic] beard," and Respondent 497545227 explained, "Because I heard it was amazing for your hair so i wanted to give it a shot." Other respondents mentioned specific recipes, like Respondent 498041412 who explained, "Called for in a receipe [sic]" and Respondent 497547967 who explained, "I wanted to make coconut pastries." Some respondents indicated that the product was not purchased to ingest, but rather was for other purposes. For instance, Respondent 497604248 explained that she first purchased the oil because the "breeder of my girl pug dog said it was great to go with her kibble twice a day," and Respondent 497782980 said "For my dogs skin." Respondent 500646038 stated "I tried it as an alternative for protection from the sun," Respondent 498042318 said "I wanted to use it to make sugar scrubs for Christmas gifts," and Respondent 497756227 explained that the product was purchased because "[m]y dog had allergy related itching and irritation on her face."

38.    Respondents who first purchased the product for skin or haircare or for use with pets were unlikely to be influenced by the label statements in the manner suggested by the Plaintiffs.[25] Since these respondents were not purchasing the product to eat or for use in cooking/baking, claims about the health benefits when ingested were far less likely to be relevant. Additionally, respondents who were purchasing because of a specific recipe requirement were

---

[25] As discussed later in this report, small percentages of respondents overall are affected by the purported label claims.

unlikely to be driven by health claims and were more likely to simply be looking for the product type.

39.    In contrast to Plaintiffs' claims, only six respondents, out of the 501 consumers surveyed, when asked an open-ended question, indicated that they first purchased coconut oil because they saw the product advertised or on a shelf in the store. Moreover, even amongst this small number of consumers, most were making general references and were not emphasizing "health" claims.[26] As shown in Table 3 below, even when I look at "health" more broadly (i.e. health claims that may have come from other sources like recommendations of family, friends or doctors, or health blogs), less than one third of respondents (32.3 percent) reference "health benefits" as a reason for first purchasing the product.

---

[26] For example, Respondent 498043798 said "in store and wife needed oil," and Respondent 497544818 stated "it was the one on the shelf." The other four respondents who mentioned seeing the product in the store were Respondents 497739851, 497766602, 498932480, and 503440540.  In addition, four respondents also mentioned the label and/or packaging (Respondent 497537081 said "the packaging/label looked appealing", Respondent 503012734 said "the package desing and price and brand", Respondent 503763296 said "I liked the packaging and the qualities", and Respondent 503104066 said "I liked the attractive labeling and the fresh scent").

**Table 3: Reasons for First Purchasing Coconut Oil (Verbatim)**

| Reasons | Count | Percent[1] |
|---|---|---|
| Health/benefits/good for you or similar | 164 | 32.7% |
| Consumption (cooking, flavor, etc.) | 147 | 29.3% |
| Other reasons | 72 | 14.4% |
| Skin, hair or cosmetic reasons | 68 | 13.6% |
| Recommended/word of mouth | 53 | 10.6% |
| Wanted to try | 37 | 7.4% |
| High quality | 17 | 3.4% |
| Price or on sale | 14 | 2.8% |
| Advertisement/packaging | 9 | 1.8% |
| Teeth treatment, including oil pulling | 8 | 1.6% |
| Available/Saw product in store | 6 | 1.2% |
| Animal health or care | 6 | 1.2% |
| Don't know / unsure | 4 | 0.8% |
| **Total Respondents** | **501** | |

*Q5. Thinking back to the **first time** you purchased coconut oil, why did you decide to purchase coconut oil?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

40.     When asked how they first learned about coconut oil, respondents provided a variety of sources including recommendations from friends and family or word of mouth, online sources like social media, recipes or cookbooks, and programs on TV. A number of respondents indicated that they have "always known" about coconut oil.[27] Recommendations from friends and family or word of mouth was the most common response (35.5 percent) followed by general information found on the internet (22.8 percent). The respondents who mentioned the internet often indicated that they were reading blogs or had seen the product on Facebook, TikTok, or

---

[27] See, e.g., Respondent 497541712 who said "I feel like I've always known about it" and Respondent 497545787 who said "I have always been aware".

other social media accounts. Only one respondent mentioned reviewing or reading a product's or brand's website.[28]

41.    In total, when given a list of options to choose from, only 20 respondents (4.0 percent) indicated they first learned about coconut oil by seeing the product in a store. Almost all of the respondents who mentioned seeing the product in the store made no reference to "health" as a reason for purchasing. For example, Respondent 497760195 stated that she first learned about the product because she "Saw it in a display," and also indicated that she first tried the product "For a different flavor and texture." Similarly, Respondent 498044149 explained that he saw it on the shelf at the store and purchased the product because he "…wanted to try a new type of oil to use with cooking." Respondent 498407181 simply indicated "Shop" as to how he learned about the product and indicated that he first purchased the product "Because my family used this." These open-ended answers demonstrate that respondents who first learned of coconut oil by seeing the product in the store were not purchasing the product because particular health claims were on the label.[29] The coded responses are shown below in Table 4.

---

[28] Respondent 503546313 said "Watch the blog on YouTube and go to the website."

[29] In fact, only 3 of these 20 respondents later indicated that the product label or product website was influential to their purchase.

**Table 4: How Respondents First Learned About Coconut Oil (Verbatim)**

| Categories | Count | Percent[1] |
|---|---|---|
| Recommendation/word of mouth | 178 | 35.5% |
| Internet/online | 114 | 22.8% |
| Recipe, cooking or cookbook | 36 | 7.2% |
| Tv program/cooking channel | 27 | 5.4% |
| Magazine/article or newsletter | 25 | 5.0% |
| Saw product in store | 20 | 4.0% |
| Youtube | 19 | 3.8% |
| Advertisements and customer reviews | 15 | 3.0% |
| Doctor | 13 | 2.6% |
| Other responses | 53 | 10.6% |
| Don't know / unsure | 26 | 5.2% |
| **Total Respondents** | **501** | |

*Q6. If you recall, how did you* ***first learn*** *about coconut oil?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

42.    As a follow-up to these open-ended questions, respondents were asked to select how they first learned about coconut oil from a list of possible sources. This included a variety of ways in which a respondent might have come to learn about coconut oil, including seeing it in a store. When provided with a list, 90 respondents (18.0 percent) indicated they first learned about coconut oil by seeing the product in a store. Even fewer respondents indicated they first learned about coconut oil from a specific brand's advertisement (16.0 percent) or website (12.6 percent). These results are shown in Table 5.

**Table 5: How Respondents First Learned about Coconut Oil (Aided)**

| Categories | Count | Percent[1] |
|---|---|---|
| A family member or friend | 256 | 51.1% |
| A social media or a blog post about coconut oil generally | 162 | 32.3% |
| A TV show, magazine or news article about coconut oil generally | 103 | 20.6% |
| In a recipe | 99 | 19.8% |
| Saw product in store | 90 | 18.0% |
| An advertisement for a specific brand of coconut oil (e.g., TV, magazine, web) | 80 | 16.0% |
| A website for a specific brand of coconut oil | 63 | 12.6% |
| A healthcare professional | 56 | 11.2% |
| An esthetician, skincare or haircare professional | 44 | 8.8% |
| Other | 20 | 4.0% |
| Don't know / unsure | 12 | 2.4% |
| None of these | 8 | 1.6% |
| **Total Respondents** | **501** | |

*Q7. You may have already mentioned this but, which of the following, if any, were ways in which you **first learned** about coconut oil?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

43.     Respondents were able to select multiple sources of information from the list. When I include any mention of an advertisement or website for a specific brand or seeing the product in the store, the majority of respondents (64.3 percent[30]) first learned about coconut oil in some way other than seeing the product in a store or seeing a particular brand advertised. Moreover, of the 167 respondents who indicated that they first learned about coconut oil from a product specific advertisement or website or from seeing the product in the store, 132 also indicated that they learned about the product from some other source. In total there are only 35 respondents, or less than 7 percent, who indicated that they first learned about coconut oil *only* from an advertisement, website, or in a store. These results demonstrate that, contrary to Plaintiffs' allegations, the majority of consumers do not first see the product (either in store or

---

[30] This excludes the 2.4 percent of respondents who said they didn't know or were unsure.

advertised) and come to believe, based on the label or advertising including the label, that the product is healthier than other edible oils.

44.     After answering questions about their first purchase and how they came to learn about coconut oil, respondents were next asked about their typical uses and purchasing behaviors. When asked an open-ended question, respondents indicated that they typically use coconut oil for a variety of reasons, including; cooking and baking particular foods, specific recipes, hair or skin care, for pets, for massages, or for homemade beauty products. While a slight majority of respondents indicated that they use the product for cooking or in food, 224 respondents, or 44.7 percent, indicated that they typically use the product for hair or skin care or for other non-ingestible purposes (e.g. pet health).[31] These results demonstrate that for 45 percent of consumers the most important, and top of mind use for the product, does not involve ingesting the product.[32]

45.     Respondents were also provided with a closed-ended question with a list of possible ways in which they might typically use the product. As shown in Table 6 below, more than half of respondents (53.5 percent) indicated that they typically use the product for skincare, and 39.9 percent say they typically use the product for haircare.

---

[31] Even respondents who use the product for cooking may consider non-ingestible uses to be more important. For example, Respondent 497799592 said they use coconut oil for "Oil pulling, sometimes baking", Respondent 497974336 said they use coconut oil "on the skin, hair and some foods", and Respondent 503419257 said they "use it on my skin.  sometimes in cooking."

[32] This figure includes 4 respondents (Respondents 499984633, 503167341, 503211838, and 503822771) who indicated that they use the product only for oral care or that their only non-ingestible use of the product is for oral care. These uses likely do not involve ingesting the product.

### Table 6: Typical Uses of Coconut Oil

| Categories | Count | Percent[1] |
|---|---|---|
| For cooking, baking or in recipes | 398 | 79.4% |
| For skincare / body oil | 268 | 53.5% |
| For haircare | 200 | 39.9% |
| As an addition to foods or beverages (for example, bulletproof coffee) | 131 | 26.1% |
| As a dietary supplement | 122 | 24.4% |
| As a vegan / dairy-free butter substitute | 108 | 21.6% |
| Some other way | 18 | 3.6% |
| Don't know / unsure | 2 | 0.4% |
| **Total Respondents** | **501** | |

*Q9. You may have alredy mentioned this, but which of the following, if any, describes how you typically use [brand from S12 or S13] coconut oil?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

46.     When I count the number of respondents who indicated that they typically use the product for either hair or skincare, I find that approximately two thirds of all surveyed respondents, or 62.5 percent, typically use coconut oil for reasons that do not involve ingesting the product. In fact, a total of 13.2 percent of respondents (or 66 consumers) indicated that they *only* use the product for hair or skin care purposes. These results suggest that the potential impact (if any) of statements on the label is likely to vary by how the consumer actually uses the product and whether the product is primarily considered as a cooking/edible oil or is primarily used for other purposes.

47.     Respondents were also asked about why they purchase their particular brand of coconut oil. In answering an open-ended question, respondents gave a range of answers including; the price of the product, an awareness or familiarity with the brand, a recommendation, or reading reviews. Other respondents indicated that the product was the best quality, or that it was the brand

or product available to them when doing their regular shopping. Only one respondent of the 501 indicated that they purchased the particular brand because of the product label.[33]

48.     When asked a closed-ended question about which factors influenced their purchase, most respondents indicated price (39.7 percent), flavor or taste (39.1 percent), or availability at the store (35.7 percent) as factors influencing their decision. Respondents were far less likely to indicate that information on the brand's website (22.2 percent) or that statements or descriptions on the product label (14.0 percent) were factors in their decision to purchase the specific brand of coconut oil. Of the thirteen items listed, statements or descriptions on the label was ranked eleventh in terms of number of respondents selecting it as a reason – respondents were more likely to select the size of the container, recommendations from family and friends, or a sale a promotion as a reason for purchase. In total, only 30.1 percent of respondents indicated that either the product label or information on the brand's website had *any* influence on their decision to purchase a specific brand of coconut oil. These results are shown in Table 7.

---

[33] See Respondent 498325480. Respondents 497541326, 497543062, 498045336, 503431216, 503514652, 503742054, and 503763296 also mentioned the product's packaging or appearance.

**Table 7: Influence on Decision to Purchase Brand of Coconut Oil**

| Categories | Count | Percent[1] |
|---|---|---|
| Price | 199 | 39.7% |
| Flavor / taste | 196 | 39.1% |
| Availability at store / online retailer | 179 | 35.7% |
| Brand name / reputation | 170 | 33.9% |
| Recommendation from a family member or friend | 167 | 33.3% |
| Size of container / quantity | 130 | 25.9% |
| Information on brand's website | 111 | 22.2% |
| Look and design of the package or label | 94 | 18.8% |
| Product reviews on third party websites | 94 | 18.8% |
| Sale or promotion | 92 | 18.4% |
| Statements or descriptions on the product label | 70 | 14.0% |
| Recommendation from a healthcare professional | 59 | 11.8% |
| Recommendation from an esthetician, skincare or haircare professional | 54 | 10.8% |
| Other | 16 | 3.2% |
| Don't know / unsure | 3 | 0.6% |
| None of these | 2 | 0.4% |
| **Total Respondents** | **501** | |

*Q11. You may have already mentioned this, but which of the following, if any, have influenced your decision to purchase [brand from S12 or S13] coconut oil?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

49.    Perhaps more importantly, when asked to describe what information on the label was influential, the majority of respondents identified things other than what Plaintiffs have alleged to be misleading. Only nine respondents of the total 501 (or 1.8 percent) indicated that something on the label was influential and described the label as indicating that the product was "healthy," "good for you," or offers "benefits."[34]  In fact, respondents who mentioned the label were more likely to reference that the product was "organic," "natural," or that it was "cold pressed." Only 26 respondents of the total 501 (or 5.2 percent) indicated that the brand's website influenced their decision to purchase and further indicated that the website described the product

---

[34] See respondents 497582001, 498043566, 499984633, 502784068, 503122637, 503406388, 503742853, 503833221, 503963459.

as "healthy," "good for body," or "having benefits."[35] In total, only 33 respondents, or 6.6 percent, said that either the product label or the product/brand's website was influential and also indicated that the label or the website said the product was "healthy."

50.　　　Even when presented with a list of health claims present on the product label, 21.4 percent (15 of 70) of those who said the label was influential did not select *any* of the at issue health claims. As shown in Table 8, this means that only 11.0 percent of respondents indicated that the label was influential and selected at least one of the at-issue statements. Said another way, 89.0 percent of respondents were not influenced by any of the health statements on the label that Plaintiffs have claimed are at issue.[36]

**Table 8: Whether Respondents were Influenced by At-Issue Claims on the Label Description**

| Categories | Count | Percent |
|---|---|---|
| Only selected at-issue claims[1] | 0 | 0.0% |
| Only selected claims not at-issue | 12 | 2.4% |
| Selected both at-issue claims and claims not at-issue | 55 | 11.0% |
| Selected no claims | 3 | 0.6% |
| Not asked | 431 | 86.0% |
| **Total Respondents** | **501** | **100.0%** |

*Q13. You may have already mentioned this, but which of the following statements or product descriptions on the label, if any, do you recall as having influenced your decision to purchase [brand from S12 or S13] coconut oil?*

Note: [1]At-issue claims includes "No trans fatty acids / No trans fat", "Health benefits of coconut oil", "Source of Medium Chain Triglycerides (MCTs)", "Non-hydrogenated", "A smart fat", "Contains Lauric Acid & Caprylic Acid", "No cholesterol / cholesterol-free", "Superfood", "Healthy alternative to butter", and "Harvested at the peak of nutritional value".

Source: NERA Coconut Oil Survey, March-April 2021

51.　　　In total, few respondents indicated that the product label or brand website was influential (14.0 percent and 22.2 percent respectively) and even fewer indicated that the label or

[35] See respondents 497541441, 497771634, 498046776, 498454978, 498895761, 499984633, 499994037, 499994166, 500026957, 500058062, 501440471, 502578354, 502948177, 503116796, 503274934, 503309639, 503360286, 503401796, 503406388, 503413955, 503522933, 503549569, 503785579, 503787897, 503822771, 504098391.

[36] For the website, 82% of respondents were not influenced by any of the at issue health claims.

website was influential and also selected the at issue health claims. These findings contradict Plaintiffs allegations and demonstrate that consumers do not see the product on a shelf and purchase because of health statements made on the label. Moreover, given the lack of importance of label claims, these findings suggest that, to the extent consumers perceive health benefits associated with coconut oil, these perceptions are coming from sources other than the product packaging.

52.      Respondents were also asked directly about their perceptions of the healthiness of their brand of coconut oil. Overall, 45.3 percent of respondents indicated that they believe that coconut oil is just has healthy as other brands of oil and 48.7 percent of respondents indicated that coconut oil is healthier than other brands of oil. These results are shown in Table 9.

**Table 9: Brand Healthiness**

| Categories | Count | Percent |
|---|---|---|
| **Healthier** than other brands of oil | 244 | 48.7% |
| **Just as healthy** as other brands of oil | 227 | 45.3% |
| **Less healthy** than other brands of oil | 2 | 0.4% |
| Don't know / unsure | 28 | 5.6% |
| **Total Respondents** | **501** | **100%** |

*Q16. If you have an opinion, do you think [brand from S12 or S13] coconut oil is…?*

Source: NERA Coconut Oil Survey, March-April 2021.

53.      The survey results consistently demonstrate, across both open-ended and closed-ended questions, that consumers are not getting information about coconut oil by walking into a store and seeing the product label. These results are in contrast to Plaintiffs' assertion that consumers are misled and purchase coconut oil because they have read information on the product label. My research demonstrates that most consumers of coconut oil are influenced by and are

drawing on information from other sources, including; recommendations from family and friends, recommendations from doctors, and cooking websites, as seen in the examples in Figure 1 below.

**Figure 1. Examples of Where Consumers First Learned About Coconut Oil**

| Respondent ID | Response |
| --- | --- |
| 497541189 | From my mom |
| 497541441 | my grandmother use to make it |
| 497541544 | online researching about benefits learn a blog |
| 497541712 | I feel like I've always known about it. |
| 497542217 | I read a magazine article. |
| 497542257 | I heard about it in a YouTube video. |
| 497542440 | i saw it on a recipe |
| 497543045 | A friend of mine told me |
| 497543062 | probably just seeing people on the internet talk about it |
| 497543728 | Watching Dr. Oz |
| 497543870 | Through a medical specialist |
| 497544054 | online sites and social media accounts related to food, health, and wellness |
| 497544665 | Post on facebook |
| 497545227 | Youtube video hair tutorial |
| 497548560 | tiktok |
| 497549657 | I first learned about it from a friend who told me about adding it to protein drinks. |
| 497550775 | The cookbook I was reading mentioned it |
| 497550881 | My friend had told me about it pryer to giving meca recipe that used it. |
| 497551551 | keto diet |
| 497551629 | An online article that popped up on some news site. |
| 497554206 | I was learning how to eat gluten free and lactose free |
| 497558811 | I saw it on a cooking show |

| | |
|---|---|
| 497561129 | I saw it on Tv and at my friends house |
| 497573073 | A magazine |
| 497591533 | Have been using for generations |
| 497652146 | on a trip overseas |
| 497767250 | I learnt about it when I was  a teenager at the college |
| 497771990 | Through a health podcast. |
| 497779997 | Hair dresser |
| 503394270 | Again, it was suggested to me by a friend who knew that my daughter could not tolerate the dairy in butter and that she didn't like the taste of other butter substitutes. |

Source: NERA Coconut Oil Survey, March-April 2021.

54.     My own background research also confirms that there is information regarding coconut oil available in a variety of sources.[37] A simple search for "coconut oil" yields numerous examples of stories, articles, posts, and testimonials on the health benefits of coconut oil. Many sources discussing coconut oil include references to, or at least a mention of, the counter arguments to the product's claimed health benefits.[38] My brief review suggests that consumers could easily learn about both the potential health benefits and health concerns related to coconut oil.

55.     Given the wide variety of sources of information cited by respondents and the very small number of purchasers who identified the statements on the product label or the brand website as either how they first learned of coconut oil or what influenced their decision to purchase their specific coconut oil, it is clear the vast majority of consumers learn about and make purchasing decisions based on other sources.

---

[37] See **Exhibit G** for examples.

[38] Named Plaintiff indicated that he became aware of the potentially negative effects of coconut oil by "reading articles online," *Deposition of Colin Shanks Deposition,* dated July 25, 2019 (hereinafter "*Shanks Deposition*"), p. 35: ln. 8-17.

56.     Finally, respondents were asked what they would do to get nutrition information about their brand of coconut oil. Nearly three quarters of respondents (74.7 percent) indicated they would look at the nutrition facts panel on the back of the label. The back of the Barlean's label includes information about the amount of saturated fat contained in the product. Thus, the majority of consumers looking to understand the nutritional composition of the product could have readily accessed this information when looking at the nutrition facts panel. The results for this question are displayed in Table 10.

**Table 10: Find Nutrition Information**

| Categories | Count | Percent[1] |
|---|---|---|
| Look at the nutrition facts label on back of product (label information about calories, fat, sugar, etc.) | 374 | 74.7% |
| Search for product information online | 287 | 57.3% |
| Look at front of label | 195 | 38.9% |
| Ask nutritionist / doctor | 98 | 19.6% |
| Ask salesperson / store clerk | 58 | 11.6% |
| Other | 2 | 0.4% |
| Don't know / unsure | 6 | 1.2% |
| **Total Respondents** | **501** | **202%** |

*Q18. If you wanted to get nutrition information about [brand from S12 or S13] coconut oil, which of the following would you do?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

## B.  Barlean's Brand Purchasers

57.     The key results for Barlean's purchasers lead to the same conclusions as those above. For example, when I examine the results from the closed-ended question with a list of possible ways in which they might typically use the product Barlean's purchasers use the product for skin and haircare. As shown in Table 11 below, more than half of Barlean's purchasers (58.5 percent) indicated that they typically use the product for skincare, and 47.4 percent say they

typically use the product for haircare. These percentages are directly comparable to those observed for my full sample of coconut oil purchasers.

### Table 11: Typical Uses of Coconut Oil (Barlean's)

| Categories | Count | Percent[1] |
|---|---|---|
| For cooking, baking or in recipes | 242 | 79.1% |
| For skincare / body oil | 179 | 58.5% |
| For haircare | 145 | 47.4% |
| As an addition to foods or beverages (for example, bulletproof coffee) | 98 | 32.0% |
| As a dietary supplement | 94 | 30.7% |
| As a vegan / dairy-free butter substitute | 83 | 27.1% |
| Some other way | 8 | 2.6% |
| Don't know / unsure | 1 | 0.3% |
| **Total Barleans Purchasers** | **306** | |

*Q9. You may have alredy mentioned this, but which of the following, if any, describes how you typically use Barleans coconut oil?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

58.     Similar to purchasers of other brands of coconut oil, more than half of Barlean's purchasers, or 68.3 percent, typically use coconut oil for hair or skincare, which are reasons that do not involve ingesting the product. In fact, a total of 12.4 percent of Barlean's purchasers (or 38 consumers) indicated that they *only* use the product for hair or skin care purposes.

59.     Barlean's purchasers indicated a number of different factors influencing their purchase decision including; flavor or taste (47.1 percent), recommendation from a family member or friend (43.5 percent), or brand name/reputation (37.9 percent). Fewer Barlean's purchasers indicated that information on the brand's website (30.4 percent) or statements or descriptions on the product label (16.7 percent) were factors in their decision to purchase their specific brand of coconut oil. As with the full sample of all brand purchasers, statements or descriptions on the product label is one of the least selected items. These results are shown in Table 12.

**Table 12: Influence on Decision to Purchase Brand of Coconut Oil (Barlean's)**

| Categories | Count | Percent[1] |
|---|---|---|
| Flavor / taste | 144 | 47.1% |
| Recommendation from a family member or friend | 133 | 43.5% |
| Brand name / reputation | 116 | 37.9% |
| Price | 104 | 34.0% |
| Availability at store / online retailer | 98 | 32.0% |
| Information on brand's website | 93 | 30.4% |
| Look and design of the package or label | 74 | 24.2% |
| Product reviews on third party websites | 72 | 23.5% |
| Size of container / quantity | 71 | 23.2% |
| Sale or promotion | 59 | 19.3% |
| Statements or descriptions on the product label | 51 | 16.7% |
| Recommendation from a healthcare professional | 49 | 16.0% |
| Recommendation from an esthetician, skincare or haircare professional | 42 | 13.7% |
| Other | 7 | 2.3% |
| Don't know / unsure | 1 | 0.3% |
| None of these | 1 | 0.3% |
| **Total Barleans Purchasers** | **306** | |

*Q11. You may have already mentioned this, but which of the following, if any, have influenced your decision to purchase Barleans coconut oil?*

Note: [1]Percent does not sum to 100 because respondents could select multiple answers.

Source: NERA Coconut Oil Survey, March-April 2021

60.    These results confirm the overall findings that Barlean's purchasers and purchasers of coconut oil generally are not relying on descriptions on the product label.

## VII.  DENNIS PROPOSAL

61.    Dr. Dennis has not conducted any survey in this matter. He has not conducted focus groups, nor has he conducted any survey pretests or pilot surveys. Dr. Dennis indicates that he has "the necessary documents required for me to design and execute a reliable conjoint survey to measure the price premium, if any, that is attributable to the challenged claims," yet, he has not executed such a survey.[39] Instead, Dr. Dennis has submitted a proposal outlining the possible

---

[39] It is unclear why Dr. Dennis has not conducted the actual research he proposes in this matter. He asserts he has experience in the product category and states he has the necessary documents to conduct a "reliable conjoint survey to measure the price premium." *Dennis Report*, ¶36.

research he could do if asked by Plaintiffs, consisting of three separate conjoint surveys for the different labels at issue: butter flavored, virgin, and culinary/refined coconut oil. Even without being able to review an actual questionnaire and data, it is apparent that there are a number of flaws in Dr. Dennis' proposed conjoint surveys.

## A.  Dennis Survey Would Not Establish Barlean's is the Source of Information

62.    Dr. Dennis' research design assumes that consumers' awareness and perceptions of the at issue health claims would be the result of their exposure to the Barlean's product label.[40] But, as demonstrated by my survey research, consumers learn about coconut oil from a wide range of sources, the vast majority of which are unrelated to the product label or the brand website. Dr. Dennis' survey cannot determine how consumers came to be aware of the characteristics associated with coconut oil. Instead, Dr. Dennis' proposed approach simply assumes that any measured "premium" associated with the label claims is a result of the product label and is not based on information or perceptions coming from some other source.

63.    Moreover, Dr. Dennis' survey would not provide any evidence that consumers do not correctly understand the allegedly misleading labeling claim statements. For instance, I understand that coconut oil does, in fact, contain MCTs, is not hydrogenated, and has no trans fatty acids.[41] Therefore, it is possible that the only thing Dr. Dennis' survey will measure, depending on the combination of attributes shown, is consumers' preferences for actual attributes of coconut oil, as opposed to perceptions about coconut oil that consumers may have seen on product packaging.

---

[40] Dr. Dennis provides a full list of the subset of "Challenged Claims" that he proposes to test in his conjoint survey. *Dennis Report,* ¶31.

[41] Response to Plaintiffs' Second Set of Interrogatories 13(d), 15(c), 16(c), 17(c), and 18(c), dated January 29, 2021.

64.    Nor does Dr. Dennis' survey compare preferences for coconut oil relative to other products such as butter or shortening which may be less preferable to consumers. A number of respondents in my survey reported using coconut oil for baking or cooking in place of butter and 27.1 percent of Barlean's purchasers selected the brand because it is vegan or a dairy-free alternative to butter. Consumer preferences for coconut oil relative to butter and other products may reflect some reviews or articles which argue coconut oil is an acceptable alternative. [42]

65.    Finally, while Dr. Dennis asserts he will include "Nutrition Facts" as an attribute,[43] his proposed survey design will *not* show this information to respondents when making actual choices. Rather than treat nutrition information like all of the other survey attributes, Dr. Dennis' proposed design will only provide product nutrition information to respondents if they "hover over" this information when making choices. Dr. Dennis does not explain why nutrition information will be treated differently than the other attributes tested – he certainly could have included calories and fat content just as he included health claims. And, while nutrition information is on the back of the package, so too are many of the health claims Dr. Dennis proposes to test without requiring a "hover over."[44]

## B.  Dennis' Proposed Survey Population is Underinclusive

66.    Dr. Dennis's proposed survey incorrectly restricts the population and underrepresents the relevant market of consumers. Specifically, Dr. Dennis defines the population as California or New York residents (or nationwide) over the age of 18, who purchased coconut

---

[42] "But of course, we don't eat fats or cholesterol or antioxidants — we eat food. So while coconut oil certainly isn't the magic bullet some claim, there's no need to avoid it completely, especially if it is used instead of butter or shortening in baked goods or to impart flavor in something like a curry dish." https://www.nytimes.com/2018/08/21/well/eat/coconut-oil-good-bad-health.html. Last accessed April 15, 2021.

[43] *Dennis Report*, ¶82.

[44] For example, Barlean's 16 oz. butter flavored organic coconut oil references MCTs and no cholesterol on the back, not the front of the package (BAR044373) and the only at issue claim on the front of the 16 oz. organic virgin coconut oil is "non-hydrogenated." (BAR044359).

oil in the past 12 months for personal or household use. However, he plans to include only coconut oil purchases that were made at health food stores. Based on the results of my survey, excluding people who purchase coconut oil from other types of stores would remove a large portion of the relevant population, in particular it may exclude those who are purchasing coconut oil not to ingest but for hair or skincare or for their pets. In fact, one of the named Plaintiffs (Pierre Lamartine) indicated that he had specifically purchased Barlean's coconut oil at Walmart and had purchased other types of coconut oil from the Vitamin Shoppe and Amazon.[45]

67.    As described above, most consumers learn about coconut oil from sources other than reading the product packaging in a store. Therefore, coconut oil consumers appear to have multiple information sources and could potentially shop at wide range of retailers if there was a specific brand or claim they preferred – not just at health food stores. Additionally, it is possible that individuals who prefer to purchase non-health food store brands more frequently are more price sensitive and would be less affected by specific label claims.[46] Therefore, by excluding these relevant purchasers Dr. Dennis' proposed survey would potentially increase the value associated with any label claims tested.

## C.  WTP is Not a Measure of an Actual Marketplace "Price Premium"

68.    Dr. Dennis' proposed conjoint survey will not provide an estimate of the class-wide "price premium" consumers purportedly paid. A willingness to pay survey (like Dr. Dennis' proposed conjoint) is a measure of consumers' subjective preferences. These preferences generally should not be used to estimate an actual price that a product with or without the allegedly misleading claims would command in a functioning market. A measure of willingness

---

[45] October 13, 2019 Deposition of Pierre Lamartine, 16:19-17:25.

[46] My survey results demonstrate that price is an important factor for consumers when deciding which coconut oil to purchase.

to pay is not a measure of actual product prices because prices in the real world are determined not only by consumers' preferences, but also by many other factors. Other than the single input of consumers' subjective preferences, Dr. Dennis' conjoint survey and market simulation does not account for any other factors that determine the prices consumers actually pay in the marketplace for a coconut oil product with or without the claimed statements.

69.     Survey experts and economists who use conjoint analysis generally understand that the values calculated using conjoint data and market simulators like that proposed by Dr. Dennis reflect *consumers' subjective* preferences[47] which are not the same as a "price premium" observed in the actual marketplace.[48] A consumer's subjective value for a product attribute measured in a conjoint survey does not equate to an actual "price premium" that a company would charge for a product based on the presence of a given feature, because this calculation only takes into account consumer preferences and does not account for the market response or supply side constraints a company may face. Dr. Dennis' proposed "market simulation" does not address or ameliorate the omitted supply-side problem and simply using real world prices does not change the fact that a conjoint survey is measuring consumer demand. As described, Dr. Dennis's market simulator simply compares a world in which the Barlean's product does or does not have the at-issue claims and uses only consumer demand as an input. Thus, the model as proposed by Dr. Dennis acts as though the only thing that has an impact on market share for products is consumers' subjective preferences. Of course, in the real world, many factors can affect market

---

[47] Bryan Orme explains, "Willingness to pay is a characteristic of buyers or consumers. A measure of willingness to pay shows how much value an individual consumer places on a good or service." *See* p. 88 of Orme, B.K. (2014) *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Third Ed.* Research Publishers, LLC (hereinafter, "*Orme*").

[48] As Professor Greg Allenby and colleagues note: "Neither [willingness to pay] WTP nor [willingness to buy] WTB take into account equilibrium adjustments in the market as one of the products is enhanced by addition of a feature. For this reason, we cannot view WTP as what a firm can charge for a feature-enhanced product, nor can we view WTB as the market share that can be gained by feature enhancement." *See* p. 649 of Allenby, G., Brazell, J., Howell, J.R., and Rossi, P.E. (2014) "Economic Valuation of Patented Features." *Journal of Law and Economics*, 57(3):629-663.

share and prices, and Dr. Dennis does not appear to take any of these potential factors into account.[49]

70.    Dr. Dennis has not conducted any focus groups, survey pilots, or pretests in this matter. Instead, he has submitted a proposal for research which cannot demonstrate that consumers relied on or were misled by the Barlean's label. His survey design wrongly assumes that any value associated with the at issue health claims are wholly attributable to the Barlean's product label, despite the fact that he has conducted surveys of other brands of coconut oil containing similar claims. Dr. Dennis' proposed research does not represent a reliable method for evaluating Plaintiffs allegations in this matter.

## VIII.    CONCLUSIONS

71.    My survey of 501 consumers demonstrates that that the product label and/or a brand's website does not have a significant impact on purchasers of coconut oil. The survey demonstrates that consumers purchase and use coconut oil for many reasons, including reasons unrelated to ingesting the product such as for hair or skincare, teeth, or pet health. My results also demonstrate that rather than relying on product labels, consumers have learned about coconut oil from family and friends, health care professionals, third-party articles, blogs, magazines, social media, and reading about the oil in a cookbook or recipe.

72.    My opinions and conclusions as expressed in this report are to a reasonable degree of professional and scientific certainty. My conclusions have been reached through the

---

[49] As noted by B. Orme, "While conjoint simulators are excellent tools for revealing strategic moves that can improve the success of a product, they are not infallible market share predictors. Many other factors, such as awareness, distribution, advertising, and product life cycles, drive market share in the real world. Conjoint models can be fine-tuned to account partially for these elements, but we must avoid thinking that adjusted conjoint models can consistently and accurately predict volumetric absolutes such as market share." See *Orme*, pp. 26-27.

proper application of survey methods, and using standard methodologies relied upon by experts in the field of survey and market and consumer research. My opinions will continue to be informed by any additional material that becomes available to me. I reserve the right to update and or supplement my opinions if Plaintiffs provide additional information. I declare under penalty of perjury that the foregoing is true and correct.

Sarah Butler, Managing Director

April 20, 2021

# Exhibit A

**NERA**
Economic Consulting

**Sarah Butler**
Managing Director

National Economic Research Associates, Inc
4 Embarcadero, Suite 400
San Francisco, CA 94111
+ 1 415 291 1000 Fax + 1 415 291 1010
Direct dial: + 1 415 291 1022
sarah.butler@nera.com
www.nera.com

# SARAH BUTLER, M.A.
## MANAGING DIRECTOR

Ms. Butler is an expert in survey research, market research, sampling, and statistical analysis. She has applied her expertise in a wide range of litigation and strategic business cases. Her litigation and project experience includes survey research, market research, the design of samples, and the statistical and demographic analysis of large data files in a number of areas including:

Intellectual Property

- Trademark and Trade Dress Infringement:  Design, analysis, and critique of surveys used to measure consumer confusion, secondary meaning, and dilution in trademark and trade design infringement cases.

- False and Misleading Advertising: Design, analysis and critique of surveys used to measure consumer perceptions and the materiality of advertising claims.

- Patent Infringement:  Sample designs and surveys to the value of patented feature of a larger product and to establish rates at which infringing material exist in populations of products.

- Copyright infringement:  Sampling plans and analysis of the rates of infringing material in populations of shared information (such as through websites or other sharing medium).

Mass Torts/Class Actions

- Conduct surveys and design samples providing evidence on issues of commonality and consumers' awareness of key documents or facts and reliance on representations.

- Analyze large databases of claims files to generate invoices, estimate future liabilities and calculate policy shares for insurer liabilities in asbestos, tobacco and pharmaceuticals.

- Design, analyze and critique surveys and sampling plans used to evaluate employment and promotion records. Review and design surveys for purposes of estimating key facts

Sarah Butler

in labor class actions including time to complete activities, exempt/nonexempt activities, and meal and rest break issues.

Antitrust

- Design, analysis and critique of surveys and other market research used as evidence of consumer purchasing and switching behavior in the areas of CPG, entertainment, automobiles, public transportation, sports and consumer electronics.

- Design, analysis and critique of surveys used to demonstrate consumer price sensitivities and willingness to pay.

Prior to joining NERA, Ms. Butler worked in market research, conducting survey research, focus groups and in-depth interviews.

## Education

**Temple University**
Applied Sociology, coursework, exams and dissertation proposal complete (2005).

**Temple University**
M.A. Sociology, (2000).

**Trinity College, Dublin Ireland**
M.Phil. (1997).

**Wellesley College**
B.A. Sociology and History (with honors). (1995).

## Professional Experience

July 2006 - Present        **Senior Consultant – Managing Director**
NERA Economic Consulting
San Francisco, California, USA

Oct 2005 – May 2006        **Special Consultant**
NERA Economic Consulting
London, England

Jan 2003 – Oct 2005        **Senior Analyst - Consultant**
NERA Economic Consulting
Philadelphia, Pennsylvania, USA

Sarah Butler

| | |
|---|---|
| 2002 - 2003 | **Consultant**<br>Integrated Marketing Associates<br>Bryn Mawr, PA, USA |
| Oct 1998 - Jan 2002 | **Research Associate – Analyst**<br>NERA Economic Consulting<br>Philadelphia, Pennsylvania, USA |
| Sept 1998 – May 2003 | **Adjunct Professor**<br>Temple University<br>Philadelphia, Pennsylvania, USA |
| Jan 1997 – Feb 1998 | **Manager of Member Research**<br>Society for Neuroscience<br>Washington DC, USA |

## Expert Analysis and Testimony

Susan Wang Rene Lee v. StubHub, Inc.* Superior Court of the State of California for the County of San Francisco. Survey and report regarding consumer understandings of and responses to fee disclosures. [Expert Report: April 7, 2021.]

Michael Madeda and Rick Smith, et. al, v. Kennedy Endeavors, Inc.* United States District Court for the District of Hawai'i. Surveys and rebuttal report concerning behavior and preferences of potato chip purchasers. [Expert Report: February 19, 2021. Deposition: March 16, 2021.]

Shelly Benson and Lisa Caparelli, et. al, v. Newell Brands, Inc.* United States District Court for the Northern District of Illinois. Report responding to survey conducted of pacifier purchasers. [Expert Report: February 17, 2021. Deposition: March 10, 2021.]

Thomas Bailey, et. al, v. Rite Aid Corporation.* United States District Court for the Northern District of California. Survey and rebuttal report to evaluate consumer purchasing of acetaminophen products. [Expert Report: January 14, 2021. Deposition: March 5, 2021.]

Clear Imaging Research, LLC v. Samsung Electronics Co. LTD and Samsung Electronics America.* United States District Court for the Eastern District of Texas Marshall Division. Report in patent matter. [Expert Report: December 23, 2020. Deposition: January 8, 2021.]

Patagonia, Inc. and Patagonia Provisions, Inc. v. Anheuser-Busch, LLC dba Patagonia Brewing Co.* United States District Court for the Central District of California Western Division, Los Angeles. Rebuttal report evaluating likelihood of confusion claims. [Expert Report: December 4, 2020.]

In the Matter of Certain Audio Players and Controllers, Components Thereof, and Products Containing the Same. United States International Trade Commission, Washington DC. Surveys to evaluate consumer interest in patented features of wireless speaker products. [Expert Report: November 13, 2020. Deposition: December 2, 2020. Trial testimony: February 25, 2021.]

Vicky Maldonado, et. al., v. Apple, Inc.* United States District Court, Northern District of California, San Francisco Division. Rebuttal conjoint survey testing damages claims. [Expert Report: March 13, 2020. Deposition: November 19, 2020]

Jason DeCarlo v. Costco Wholesale Corporation and MBNR.* United States District Court Southern District of California. Survey and expert report to evaluate consumer perceptions of optometrists located at Costco. [Expert Report: November 13, 2020.]

Javier Cardenas et al., Plaintiffs v. Toyota Motor Corporation et al., Defendants.* United States District Court Southern District of Florida. Survey and expert report to evaluate impact of disclosure about allegedly defective product feature. [Expert Report: October 20, 2020. Deposition: November 10, 2020.]

Nirvana LLC v. Marc Jacobs International LLC.* United States District Court Central District of California. Survey related to secondary meaning. [Expert Report: September 8, 2020. Deposition: October 20, 2020.]

Girl Scouts of the United States of America* v. Boy Scouts of America. United States District Court Southern District of New York. Review of survey report in a likelihood of confusion matter. [Expert Report: September 9, 2020. Deposition: October 16, 2020.]

TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Strum Foods, Inc.,* v. Keurig Green Mountain, Inc. United States District Court for the Southern District of New York. Surveys related to false advertising, and antitrust claims. Report on testing evidence. [Expert Reports: August 28, 2020. Rebuttal Reports: January 26, 2021. Deposition: February 2-3, 2021.]

American Dairy Queen Corporation v. W. B. Mason Co. Inc.* United States District Court for the District of Minnesota. Surveys related to fame, dilution, and likelihood of confusion. [Expert Report: August 28, 2020. Deposition: October 26, 2020.]

Seven Networks, LLC v. Apple Inc.* United States District Court for the Eastern District of Texas Marshall Division. Conjoint survey and expert report related to mobile phone features. [Expert Report: July 13, 2020. Deposition: July 23, 2020.]

Brian Gozdenovich et al., v. AARP Inc., AARP Services, Inc., AARP Insurance Plan, UnitedHealth Group, Inc., and UnitedHealthCare Insurance Company.* United States District Court District of New Jersey. Expert rebuttal report of survey related to estimating value. [Expert Report: July 9, 2020.]

Barbara Lewis, et al., v. Rodan & Fields, LLC.* United States District Court Northern District of California Oakland Division. Survey and expert report to assess consumer perception about eyelash serum. [Expert Report: July 2, 2020. Deposition: July 20, 2020.]

Austin Rugg v. Johnson & Johnson Consumer Inc.* United States District Court Norther District of California San Jose Division. Survey and expert report in a false advertising matter. [Expert Report: June 22, 2020.]

New NGC, Inc. d/b/a National Gypsum Company, NGC Industries, LLC, and National Gypsum Properties,* LLC v. Alpinebay, Inc. Survey and expert report to evaluate likelihood of consumer confusion. [Expert Report: June 18, 2020. Deposition: August 6, 2020]

Glaxo Group Limited* v. Respirent Pharmaceuticals Co., LTD. United States District Court Southern District of New York. Survey and expert report on likelihood of consumer confusion. [Expert Report: June 15, 2020.]

Caryn Gorzo, et al., v. Rodan & Fields, LLC.* The Superior Court of California County of San Francisco. Survey and expert report to assess consumer perception about eyelash serum. [Expert Report: June 15, 2020.]

Kaifi LLC v. AT&T Inc.; AT&T Corp.; AT&T Communications, LLC; AT&T Mobility, LLC; and AT&T Services, Inc.* United States District Court Eastern District of Texas Marshall Division. Survey and expert report related to patent infringement matter. [Expert Report: June 1, 2020. Deposition: June 8, 2020.]

CFA Institute v. American Society of Pension Professionals & Actuaries, et. al.* United States District Court for the Western District of Virginia, Charlottesville Division. Rebuttal survey evaluating claims of likelihood of confusion. [Expert Report: April 14, 2020. Deposition: May 14, 2020.]

Match Group LLC* v. Bumble Trading Inc., Bumble Holding, LTD., Badoo Trading Limited, Magic Lab Co., Worldwide Vision Limited, Badoo Limited, Badoo Software Limited, and Badoo Technologies Limited. United States District Court for the Western District of Texas, Waco Division. Secondary meaning survey and rebuttal report. [Expert Report: March 3, 2020. Rebuttal Report: March 27, 2020. Deposition: May 20, 2020.]

ClearPlay, Inc. v. Dish Network, L.L.C. and Echostar Technologies, L.L.C.* United States District Court, District of Utah, Central Division. Expert report evaluating surveys used to inform allocation in patent infringement matter. [Expert Report: February 21, 2020.]

Toya Edwards and Jamal Erakat, et al., v. Walmart, Inc.* United States District Court, Central District of California. Survey and expert report to evaluate label statements on acetaminophen products. [Expert Report: January 23, 2020. Deposition: February 7, 2020.]

Sarah Butler

Ohio State Troopers Association, Inc., et al., & Miguel Porras v. Point Blank Enterprises, Inc.*
United States District Court, Southern District of Florida. Survey and expert report to evaluate
impact of disclosure about allegedly defective product feature. [Expert Report: January 17, 2020.
Deposition: January 27, 2020.]

In re: Windstream Holdings, Inc., et al., Debtors. Windstream Holdings Inc., et. al.* v. Charter
Communications, Inc. and Charter Communications Operating, LLC. United States Bankruptcy
Court, Southern District of New York. Chapter 11, Case No. 19-22312 (RDD). Review of survey
report in a bankruptcy matter. [Expert Report: December 5, 2019.]

Paul Stockinger, et al., v. Toyota Motor Sales, U.S.A., Inc.* United States District Court, Central
District of California. Survey and expert report to evaluate impact of disclosure about allegedly
defective product feature. [Expert Report: October 21, 2019. Deposition: November 5, 2019.]

Thomas Allegra, et. al.* v. Luxottica Retail North America, d/b/a LensCrafters, United States
District Court, Eastern District of New York, Brooklyn Division. Survey to evaluate consumers'
willingness to pay for Accufit measurement system. [Expert Report: September 10, 2019.
Deposition: December 5, 2019.]

Sazerac Brands, LLC* v. Bullshine Distillery, LLC. In the United States Patent and Trademark
Office Before the Trademark and Trial Appeal Board. Opposition No. 91227653. Survey to
assess consumer perception and association with alcohol brand. [Expert Report: September 4,
2019. Deposition: October 30, 2019.]

Collin Shanks v. Jarrow Formulas, Inc.* United States District Court Central District of
California. Survey of coconut oil purchasers and response to conjoint survey in false advertising
matter. [Expert Report: August 4, 2019.]

X One* v. Uber Technologies, Inc. United States District Court Northern District of California.
Survey of ride share app features. [Expert Report: August 2, 2019. Deposition: September 19,
2019.]

Belcher Pharmaceuticals, LLC v. Hospira, Inc.* United States District Court for the Middle
District of Florida, Tampa Division. Review of survey report in false advertising matter. [Expert
Report: June 28, 2019. Deposition: July 11, 2019.]

NIKE, Inc. v. Skechers U.S.A., Inc.* United States District Court, Central District of California.
Survey and expert report related to design patent infringement. [Expert Report: June 20, 2019.
Deposition: September 12, 2019.]

State of Washington* v. TVI, INC., d/b/a Value Village. State of Washington King County
Superior Court. Survey and expert report evaluating consumer perceptions of for-profit thrift
store and donation center. [Expert Report: May 24, 2019. Deposition: July 17, 2019. Trial
testimony: October 8, 2019.]

Sarah Butler

Vital Pharmaceuticals, Inc. v. Monster Energy Company and Reign Beverage Company, LLC.*
United States District Court Southern District of Florida. Survey and expert report related to
consumer perception of names associated with energy drinks. [Expert Report: May 23, 2019.
Deposition: July 15, 2019.]

Mahindra & Mahindra, Ltd. and Mahindra Automotive North America, Inc.* v. FCA US LLC.
United States District Court, Eastern District of Michigan. Survey and expert report on
secondary meaning. [Expert Report: May 10, 2019. Deposition: May 30, 2019. ITC Trial
testimony: August 22, 2019.]

Rex Real Estate I., L.P., v. Rex Real Estate Exchange, Inc.* United States District Court for the
Eastern District of Texas, Sherman Division. Survey and expert report in trademark matter.
[Expert Report: April 24, 2019.]

adidas America, Inc., et al. v. Forever 21 Inc., et al.* United States District Court District of
Oregon Portland Division. Survey and expert report in trade dress matter. [Expert Report: April
4, 2019.]

Crystal Hilsley vs. Ocean Spray Cranberries, Inc.*, Arnold Worldwide LLC. United States
District Court Western District Southern District of California. Survey, expert report and rebuttal
in false advertising matter. [Expert Report: April 1, 2019. Deposition: May 26, 2019.]

Erin Allen et al. v. Conagra Foods Inc.* United States District Court Northern District of
California San Francisco Division. Survey, expert report and rebuttal in false advertising matter.
[Expert Report: March 30, 2019. Deposition: April 25, 2019. Rebuttal Report: May 6, 2020.
Deposition: May 30, 2020.]

Tortilla Factory, LLC vs. GT's Living Foods, LLC*. United States District Court for The Central
District of California. Expert report in false advertising matter. [Expert Report: March 29, 2019.]

Obagi Cosmeceuticals LLC* v. ZO Skin Health, Inc. and Zein E. Obagi, M.D. JAMS Arbitration
Proceeding. Survey and expert report in arbitration. [Expert Report: March 13, 2019. Deposition:
April 18, 2019. Arbitration testimony: May 17, 2019.]

Lodestar Anstalt v. Bacardi & Company Limited, Bacardi U.S.A., Inc., and Bacardi Limited.*
United States District Court Central District of California, Western Division. Survey and expert
report in trademark matter. [Expert Report: January 11, 2019. Deposition: April 5, 2019.]

James Pudlowski, Louis C. Cross, III, Gail Henry, Steve Henry v. St. Louis Rams, LLC, St.
Louis Rams Partnership, ITB Football Company, LLC*. United States District Court for the
Eastern District of Missouri Eastern Division. Survey and affidavit to evaluate consumer
perceptions of information related to the Los Angeles Rams. [Affidavit: January 11, 2019.]

People of the State of California vs. The Hertz Corporation, American Traffic Solutions, Inc.,
ATS Processing Services, L.L.C., American Traffic Solutions Consolidated, L.L.C., PlatePass,

L.L.C.* Superior Court of the State of California County of San Francisco. Survey and expert report on unfair competition and false advertising issues. [Deposition: January 10, 2019.]

Riley Johannessohn, Daniel C. Badilla, James Kelley, Ronald Krans, Kevin R. Wonders, William Bates, James Pinion* v. Polaris Industries, Inc. United States District Court District of Minnesota. Conjoint survey and expert report related to ATVs. [Expert Report: November 16, 2018. Expert Rebuttal Report: March 21, 2019. Deposition: January 15, 2019.]

Spangler Candy Company vs. Tootsie Roll Industries, LLC*. United States District Court Northern District of Ohio Western Division Toledo. Survey and expert report in trademark matter. [Expert Report: November 5, 2018. Deposition: December 4, 2018.]

Kaylee Browning and Sarah Basile v. Unilever United States, Inc.* United States District Court Central District of California. Expert Report in false advertising matter. [Expert Report: November 5, 2018. Deposition: November 19, 2018.]

American Automobile Association of Northern California, Nevada & Utah and A3 Mobility LLC v. General Motors LLC and Maven Drive LLC*. United States District Court Northern District of California San Jose Division. Survey and expert reports to evaluate likelihood of confusion. [Expert Report: November 1, 2018. Expert Rebuttal Report: November 28, 2018. Deposition: December 6, 2018.]

Merck & Co., Inc., and Merck Sharp & Dohme Corp. v. Merck KGaA*. United States District Court District of New Jersey. Expert report to evaluate likelihood of confusion. [Expert Report: October 30, 2018. Deposition: February 6, 2019.]

Scott R. Bernard v. Public Power, LLC*. In the Circuit Court of Cook County, Illinois County Department, Chancery Division. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: October 17, 2018.]

MZ Wallace Inc. v. Sue Fuller, d/b/a/ The Oliver Thomas, and Black Diamond Group, Inc.* United States District Court Southern District of New York. Survey and expert report to evaluate likelihood of confusion. [Expert Report: September 14, 2018. Deposition: October 22, 2018.]

Kristian Zamber v. American Airlines, Inc.* United States District Court Southern District of Florida Miami Division. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: September 10, 2018. Deposition: October 19, 2019.]

Thomas Blitz v. Monsanto Company.* United States District Court Western District of Wisconsin. Survey and expert report to evaluate liability and harm claims related to consumer perceptions in labeling matter. [Expert Report: July 30, 2018. Deposition: August 8, 2018.]

State of Washington* v. Johnson & Johnson, Ethicon, Inc. Ethicon US, LLC. King County Superior Court State of Washington. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: July 27, 2018.]

Newmark Realty Capital, Inc.* v. BCG Partners, Inc. United States District Court Northern District of California San Jose Division. Expert report in trademark matter. [Expert Report: July 6, 2018. Supplemental Report: July 20, 2018. Deposition: September 18, 2018.]

Steven A. Conner DPM, P.C. v. Optum 360, LLC.* United States District Court Eastern District of Pennsylvania. Expert report in Telephone Consumer Protection Act case. [Expert Report: June 28, 2018. Deposition: July 17, 2018.]

Advice Interactive Group, LLC* v. Web.Com Group, Inc. United States District Court for the Middle District of Florida Jacksonville Division. Expert report in copyright apportionment case. [Expert Rebuttal Report: June 18, 2018. Deposition: June 29, 2018.]

State of Washington* v. Comcast Cable Communications Management, LLC, et. al. State of Washington King County Superior Court. Survey and expert report to evaluate unfair and deceptive trade practices. [Expert Report: June 4, 2018. Deposition: July 31, 2018. Trial Testimony: December 11-12, 2018.]

Global Brand Holdings, LLC* v. Church & Dwight Co., Inc. United States District Court Southern District of New York.  Survey and expert report in trademark infringement matter. [Expert Report: May 21, 2018.  Rebuttal Report: June 15, 2018. Deposition: July 11, 2018.]

Josephine James Edwards v. Hearst Communications, Inc.* United States District Court for the Southern District of New York. Survey and expert report to evaluate consumer perceptions of information sharing. [Expert Report: April 16, 2018. Deposition May 25, 2018.]

Forever 21, Inc.* v. Gucci America, Inc., and Guccio Gucci S.p.A. United States District Court Central District of California Western Division. Survey and expert report in trade dress claims matter. [Expert Report: March 23, 2018. Supplemental Report: April 12, 2018. Deposition May 30, 2018.]

Masterbuilt Manufacturing, LLC v. Wal-Mart Stores, Inc.* United States District Court for the Middle District of Georgia Columbus Division. Expert report in patent infringement matter relating to consumer demand. [Expert Report: February 23, 2018. Deposition: March 27, 2018.]

Strategic Partners, Inc.* v. Koi Design, LLC. United States District Court Central District of California. Survey and expert report in trademark infringement matter. [Expert Report: February 13, 2018.]

Hard Rock Café International (USA), Inc., and Tarsadia Hotels v. RockStar Hotels, Inc.* United States District Court for the Southern District of Florida Fort Lauderdale Division. Survey and expert report in trademark infringement matter. [Expert Report: February 12, 2018.]

Ghostbed, Inc. and Werner Media Partners, LLC d/b/a Nature's Sleep, LLC v. Casper Sleep, Inc., Red Antler, LLC and ICS, Inc.* United States District Court for the Southern District of Florida. Survey of awareness of mattress companies and advertising slogans. [Expert Report: January 2, 2018. Deposition: January 23, 2018.]

Sarah Butler

Shelia Dashnaw, et. al. v. New Balance Athletics, Inc.* United States District Court Southern District of California. Review of expert report and contingent valuation/conjoint survey to evaluate consumer perceptions in false advertising claim. [Expert Report: November 8, 2017. Deposition: November 28, 2017.]

State of Arizona v. Volkswagen AG, et. al.* Superior Court of the State of Arizona – Maricopa County. Declaration and research on purchasing behavior for luxury, specifically Porsche buyers. Survey of advertising materials and material impact on purchasing decisions. [Expert Report: November 10, 2017. Expert Report: December 14, 2017]

Tri-Union Seafoods, LLC v. Otis McAllister, Inc.* United States Patent and Trademark Office before the Trademark Trial and Appeal Board. Survey and expert report on market parameters and customer perceptions. [Expert Report: September 27, 2017.]

Martin Schneider, et. al. v. Chipotle Mexican Grill, Inc.* United States District Court Northern District of California. Review of expert report and contingent valuation/conjoint survey to evaluate consumer perceptions in false advertising claim. [Expert Report: September 15, 2017. Deposition: November 22, 2017.]

ADT LLC, and ADT US Holdings, Inc., v. Vivint, Inc.* United States District Court Southern District of Florida Palm Beach Division. Expert report on sampling and data analysis. [Expert Report: July 24, 2017. Deposition: August 18, 2017.]

Michael Kors, L.L.C.* v. Chunma USA, Inc. United States District Court Central District of California. Expert report on likelihood of confusion. [Expert Report: August 4, 2017. Deposition: October 31, 2017.]

Weems Industries, Inc. v. Plews, Inc.* United States District Court for Northern District of Iowa, Cedar Rapids Division. Expert report on likelihood of confusion. [Expert Report: May 1, 2017. Deposition: August 1, 2017.]

Trevor Singleton et. al. v. Fifth Generation, Inc. d/b/a Tito's Handmade Vodka.* United States District Court for the Northern District of New York. Survey and expert report on false advertising issues. [Expert Report: April 21, 2017. Deposition: July 10, 2017.]

Mars Incorporated and Mars, Petcare US, Inc. v. The J. M. Smucker Company and Big Heart Pet, Inc.* United States District Court for the Eastern District of Virginia. Survey and expert report on likelihood of confusion. [Expert Report: April 6, 2017. Deposition: June 30, 2017.]

Professional Liability Insurance Services, Inc. v. U.S. Risk, Inc. and Crystal Jacobs.* United States District Court for Western District of Texas, Austin Division. Expert report on likelihood of confusion. [Expert Report: April 4, 2017. Deposition: June 22, 2017.]

Sarah Butler

Luxe Hospitality Company, Inc.* v. SBE Entertainment Group.  United States District Court Central District of California. Survey and expert report on genericness. [Expert Report: March 6, 2017. Deposition: March 30, 2017.]

Desiccare, Inc. v. Boveda, Inc.* and Charles Rutherford. United States District Court for the Central District of California. Survey and expert report on false advertising issues. [Expert Report: December 5, 2016. Deposition: January 25, 2017.]

Scat Enterprises, Inc. v. FCA US LLC.* United States District Court for the Central District for California Western Division. Survey and expert report on likelihood of confusion. [Expert Report: November 21, 2016.]

YETI Coolers, LLC v. RTIC Coolers, LLC.* United States District Court Western District of Texas, Austin Division. Survey and expert report on secondary meaning. Rebuttal of reports on fame, secondary meaning and likelihood of confusion. [Expert Report: November 18, 2016. Deposition: January 13, 2017.]

Lifeway Foods Inc. v. Millennium Products, Inc. d/b/a GT'S Kombucha/ Synergy Drinks/ CocoKeifer LLC.* United States District Court Central District of California. Rebuttal report to Plaintiff's counsel's survey. [Expert Report: October 17, 2016.]

adidas America, Inc. et. al. v. Skechers USA, Inc.* District of Oregon. Portland Division. Surveys and expert reports to evaluate secondary meaning, likelihood of confusion, and brand recognition. [Expert Report: October 14, 2016. Deposition: January 10, 2016. Expert Report: November 6, 2015. Deposition: November 24, 2015. Preliminary Injunction testimony: December 15, 2015.]

In the Matter of Certain Potassium Chloride Powder Products. United States International Trade Commission, Washington DC. Survey to evaluate false advertising claims associated with pharmaceuticals. [Expert Report: October 13, 2016.]

AMID, Inc.* v. Medic Alert Foundation United States, Inc. d/b/a Medic Alert Foundation and Justin Noland. Southern District of Texas. Houston Division. Expert report in trade dress infringement matter. [Expert Report: September 22, 2016. Preliminary Injunction Hearing Testimony: October 11, 2016.]

Surgiquest, Inc. v. Lexion Medical LLC*. District Court of Delaware. Expert report evaluating evidence in false advertising matter. [Expert Report: August 19, 2016. Deposition: October 7, 2016. Trial testimony: April 10, 2017.]

GIT-R-DONE Productions Inc.* v. GITERDONE C Store LLC. Southern District of Mississippi. Southern Division. Survey and expert report evaluating recognition and association of phrase with celebrity. [Expert Report: July 29, 2016.]

State of Oregon* v. Living Essentials LLC and Innovation Ventures LLC. Circuit Court of the State of Oregon. Survey and analysis used as evidence in false advertising matter. [Trial Testimony: July 6, 2016. Rebuttal testimony: July 19, 2016.]

Teferi Abebe Bikila. et. al. v. Vibram USA, Inc. et. al.* District of Washington at Tacoma.
Survey and expert report to evaluate awareness and potential confusion related to athlete
endorsement. [Expert Report: June 21, 2016. Rebuttal Report: August 23, 2016.]

Noah Silver-Sky, Fabian Lozano, and Jorge Rodriguez; and ROES 1-400 v. SRAC Holdings I,
INC., Strategic Restaurants Acquisition Company, LLC, Strategic Restaurants Acquisition
Company II, LLC, Strategic Restaurants Acquisition Corp.* American Arbitration Association –
Commercial Arbitration Tribunal. Statistical sample, analysis, and expert report on the impact
and commonality of edits to workers time. [Expert Report: May 23, 2016. Deposition: August
30, 2016.]

Homeland Housewares, LLC and Nutribullet, LLC v. SharkNinja Operating LLC.* Central
District of California, Western Division. Survey and expert report to evaluate misleading
advertising claims. [Expert Report: February 19, 2016. Deposition: April 18, 2016.]

QuickChek Corporation* v. Gold Associates, Inc. District of New Jersey. Survey and Report on
likelihood of confusion. [Preliminary Report: January 5, 2016.]

TOD'S S.p.A.* v. Mycoskie, LLC Respondent. United States Patent and Trademark Office -
TTAB. Survey and Expert report on likelihood of confusion. [Expert Report: December 15,
2015.]

Razor USA LLC* vs. Vizio, INC. Central District of California. Survey and expert report to
evaluate likelihood of confusion. [Expert Report: August 13, 2015. Deposition: September 14,
2015.]

In Connection with Sprint Communications Company L.P. and Sprint Spectrum L.P.* v.
Comcast Cable Communication LLC et al. Eastern District of Pennsylvania. Conjoint survey and
expert report to evaluate consumer preferences for particular features of cable packages. [Expert
Report: June 17, 2015. Reply Report: July 29, 2015. Deposition: April 14, 2015.]

Select Comfort Corporation; and Select Comfort SC Corporation* v. John Baxter; Dires LLC;
Scott Stenzel; and Craig Miller and Digi Craft Agency and Direct Commerce. District of
Minnesota. Survey and expert report for evidence of secondary meaning. [Expert Report: May
20, 2015. Deposition: June 16, 2015. Trial testimony: October 9, 2017.]

In the Matter of Certain Footwear Products. United States International Trade Commission,
Washington DC. Survey to evaluate secondary meaning associated with footwear. [Expert
Report: April 17, 2015. Rebuttal Report: May 13, 2015. Deposition: May 19, 2015. Testimony
before the International Trade Commission: August 6, 2015.]

Circle Click Media LLC, Metro Talent LLC, and CTNY Insurance Group v. Regus Management
Group, LLC, Regus Business Centre LLC, Regus PLC and HQ Global Workplaces LLC.*
Northern District of California. Survey of business consumers used to address class certification
and false advertising claims. [Expert Report: April 1, 2015. Deposition: May 6, 2015.]

Sarah Butler

<u>In re</u> Determination of Royalty Rates and Terms for Ephemeral Recording and Digital Performance of Sound Recordings.  Before the United States Copyright Board. Survey and Expert Report on consumer substitution of various music listening options. [Expert Report: February 24, 2015. Deposition: March 27, 2015. Hearing Testimony: May 29, 2015.]

<u>Larry Butler, Joseph Leonard, Kevin Barnes, Victor Matos, Alfred Blair, and Martin Champion, Individually and On Behalf of All Others Similarly Situated\* v. Sears, Roebuck and CO.</u> Northern District of Illinois – Eastern Division. Surveys, statistical analysis and Expert Report on issues of experienced rates and consumer preference for machines with product defects. [Expert Report: February 2, 2015.]

\* Retaining party

## Publications and Presentations

"A tale of two cups: Acquired distinctiveness and survey evidence before the TTAB." (May-June 2020), with Healey Whitsett. *The Trademark Reporter.*

"Survey response bias and the 'privacy paradox': Evidence from a discrete choice experiment." (May, 2020), with Garrett Glasgow in *Applied Economics Letters.* DOI: 10.1080/13504851.2020.1770183.

NAD Panel – "Consumer Perception Survey Design Safeguards & Pitfalls." National Advertising Division Annual Meeting, New York, NY (September, 2019).

INTA Panel – "Surveys in the Brave New World: Designing and Using Survey Evidence in the Age of Online Shopping, Influencers and Hashtags." Annual Meeting, Boston MA (May, 2019).

"The value of non-personally identifiable information to consumers of online services: evidence from a discrete choice experiment," (2016) with Garrett Glasgow in *Applied Economics Letters*, DOI: 10.1080/13504851.2016.1197357.

"Using Survey Methods to Demonstrate the Value of Personal Information and Privacy" (May 2015) *Panel on Privacy, Security and IRBs – American Association for Public Opinion Research,* Annual Meeting, Hollywood Florida.

"Battle of the Experts—Deploying the Proper Scientific Methodology for Supporting or Challenging Claims" (March 13, 2015) invited panelist at the *Advanced Forum on Resolving & Litigating Advertising Disputes.*

"Effective Use of Surveys in Trademark Litigation," (August, 2014) *Knowledge Group Webinar.*

"The Use of Statistical Sampling Post-Duran," (August, 2014) *Law360.*

Sarah Butler

"The Value of Personal Information to Consumers of Online Services: Evidence from a Discrete Choice Experiment," (June 19, 2014). *National Economic Research, Inc.*

"An assessment of the nonmarket benefits of the Water Framework Directive for households in England and Wales," with Metcalfe, Baker, Andrews, Atkinson, Bateman, Carson, East, Gueron, Sheldon and Train in *Water Resources Research,* 48:W10516. (Paper awarded Editor's Choice Award for 2013).

ABA Webinar "The Use of Surveys in Advertising Substantiation" (June 23, 2011).

"Meeting the New Standards for Reasonable Royalties," (February, 2011) with Mario Lopez. *Law360.*

"Survey Evidence in False Advertising Cases," (Winter, 2010). *The Antritrust Trial Practice Newsletter.*

"The Use of Surveys in Litigation: Recent Trends," (April, 2010) with Kent Van Liere. National Economic Research Associates, Inc.

"Emerging Issues in the Use of Surveys in Trademark Infringement on the Web," with Kent Van Liere. Paper published in the *Advanced Trademark & Advertising Law Conference* proceedings, September 2007, Seattle, WA.

"An Analysis of the Hypothetical Situations in Willingness to Pay Studies." Paper presented at the July 2006 Thematic Seminar "Quality Criteria in Survey Research," hosted by World Association for Public Opinion Research, Lake Como, Italy.

"Use of Surveys in Intellectual Property Disputes," (2005) with Eugene P. Ericksen, in *Economic Approaches to Intellectual Property Policy, Litigation and Management Issues,* Gregory K. Leonard and Lauren J. Stiroh (eds.) National Economic Research Associates, Inc.

"Response Rate Standards: Lessons from the 2004 Presidential Polls." Paper presented at the 2005 Annual Meeting of American Association of Public Opinion Research, Miami Beach, FL.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, March 2004 Charlotte, NC.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, January 2004 San Diego, CA.

"Using Surveys to Determine Damages in Patent Infringement Cases" presented at *Calculating and Proving Patent Damages* workshop, June 2003, McLean, VA.

Sarah Butler

## Professional Associations

Member, American Association of Public Opinion Research and World Association for Public Opinion Research, Member, American Statistical Association, Member, American Bar Association, Intellectual Property Section, Member, International Trademark Association (INTA), Reviewer for *Trademark Reporter*, Member, American Marketing Association.

# Exhibit B

# Exhibit B

# Materials Considered

## Court Documents

- Class Action Complaint and Demand for Jury Trial, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.* United States District Court, Southern District of California, Case No. 19CV0169 JLS BGS, dated January 24, 2019.

- Deposition of Colin Shanks, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.* United States District Court, Southern District of California, Case No. 3:19-cv-00169-JLS-BGS , dated July 25, 2019.

- Deposition of Lamartine Pierre, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.* United States District Court, Southern District of California, Case No. 3:19-cv-00169-JLS-BGS , dated October 13, 2019.

- First Amended Class Action Complaint and Demand for Jury Trial, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.* United States District Court, Southern District of California, Case No. 19-cv-0169-JLS-BGS, dated August 26, 2019.

- Response to Plaintiffs' Second Set of Interrogatories, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and general public, v. Barlean's Organic Oils, LLC.* United States District Court, Southern District of California, Case No. 3:19-cv-00169-JLS-BGS, dated January 29, 2021.

## Expert Reports and Declarations

- Declaration and Expert Report of J. Michael Dennis, Ph.D., dated March 1, 2021.

## Survey Literature

- Allenby, G., Brazell, J., Howell, J.R., and Rossi, P.E. (2014) "Economic Valuation of Patented Features." *Journal of Law and Economics*, 57(3):629-663.

- Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 395-420.

- Federal Judicial Center. 2004. *Manual for Complex Litigation, Fourth Edition*, §11.493.

1

- Orme, B.K. (2014). *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research, Third Ed.* Research Publishers, LLC.

## Bates Stamped Documents

- BAR044359

- BAR044373

## Websites

- http://info.researchnow.com/rs/105-ZDT-791/images/Dynata_Panel%20Book_2.19.pdf

- https://www.barleans.com/our-story

- https://www.esomar.org/uploads/public/knowledge-and-standards/documents/ESOMAR-28-Questions-to-Help-Buyers-of-Online-Samples-September-2012.pdf

- https://www.google.com/recaptcha/about/

- https://www.nytimes.com/2018/08/21/well/eat/coconut-oil-good-bad-health.html

Exhibit C

From:       Club Opinions
Sent:       **[DATE]**
To:         **[PARTICIPANT]**
Subject:    We're dropping by with a new survey offer.  Check it out!



null

Take the survey below and help influence future products.

**START SURVEY**

Your opinions are cherished at ClubOpinions.

We thought you might like this new survey. Check it out now!

**Reward offer:**

**Average length:** -- minutes

You can also access surveys by clicking on the following link:
**[SURVEY URL]**

Thank you for your participation!
**The ClubOpinions Team**

Privacy Policy | Terms and Conditions | Unsubscribe | Contact

You received this e-mail as a member of ClubOpinions.Please do not reply to this e-mail.For help contact us.
ClubOpinions is a product of Dynata, LLC f/k/a Survey Sampling International, LLC, 6 Research Drive,
Shelton,Connecticut 06484 USA.

# Exhibit D

# *Coconut Oil Survey*

**[DO NOT ALLOW ROUTED SURVEY TRAFFIC]**
**[PROGRAMMER: DISABLE RESUME LATER BUTTON FOR ENTIRE SURVEY]**

**INTRO:** Thank you for your willingness to participate in our study. This is a brief study that should take no more than 10 minutes of your time. The responses you give to our questions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please indicate this in your response. Do not guess. Your answers will only be used in the aggregate and your personal information will be kept confidential. The results of this study will not be used to try to sell you anything. When you are ready to get started, please click the ">" button.

S1.   Before continuing with this survey, please carefully read these instructions:
   ▪ Please take the survey in one session.
   ▪ While taking this survey, please do not, at any time, open any other windows or tabs on this computer or any other computer.
   ▪ Please do not view any other written material while taking this survey.
   ▪ Please do not consult or talk with any person while taking this survey.
   ▪ You will not be able to go back to previous screens to change your answers.

   1. I have read the above instructions and understand them, and I will adhere to these instructions.
   2. I do not understand the above instructions, or I don't wish to adhere to them.
      **[SCREEN OUT]**

S2.   What type of device are you using to complete this survey? **[RANDOMIZE 1-4]**
   1. Desktop computer
   2. Laptop computer
   3. Tablet computer
   4. Mobile phone or cell phone
   5. Other **[SCREEN OUT]**

S3.   Please verify that you are human.
      **[INSERT Re-CAPTCHA]**

S4.   Are you…?
   1. Male
   2. Female
   3. Non- binary
   4. Other *(Please specify)*
   5. Prefer not to say

[**FLAG IF GENDER DOES NOT MATCH PANEL DATA**]

S5.    Please select your age. [**PROVIDE DROP DOWN BOX WITH AGE RANGE 1-99**]
Prefer not to answer [**SCREEN OUT**]

[**TERMINATE IF RESPONDENT IS UNDER 18**]
[**TERMINATE IF AGE DOES NOT MATCH PANEL DATA**]

S6.    In which state do you currently reside?
[**INSERT DROP DOWN BOX WITH STATE**] OVERSAMPLE CA and NY – 400 total, 100 CA, 100 NY

S7.    Please enter your zip code.
[**TERMINATE IF ZIP DOES NOT MATCH STATE**]

S8.    Do you or does anyone in your family work for any of the following?
(*Please select all that apply*) [**RANDOMIZE 1-5**]
1.    A company that produces dairy products
2.    A company that produces edible oils (for example, canola, coconut, or olive oil)
[**SCREEN OUT**]
3.    A market research or advertising company [**SCREEN OUT**]
4.    A company that produces alcoholic beverages
5.    A company that produces coffee or tea
6.    None of these [**EXCLUSIVE**]
7.    Don't know / unsure [**EXCLUSIVE; SCREEN OUT**]

S9.    In the <u>past six months</u>, have you taken a survey on any of the following types of products?
(*Please select all that apply*) [**RANDOMIZE 1-5**]
1.    Dairy products (milk, cheese, yogurt, etc.)
2.    Edible oil (canola oil, olive oil, coconut oil, etc.) [**SCREEN OUT**]
3.    Alcoholic beverages (wine, beer, liquor, etc.)
4.    Coffee (ground, whole bean, instant, etc.)
5.    Tea (bagged, loose, iced, etc.)
6.    None of these [**EXCLUSIVE**]
7.    Don't know / unsure [**EXCLUSIVE; SCREEN OUT**]

S10.    Which of the following products, if any, have you purchased for your own use in the <u>past five years</u>?
(*Please select all that apply*) [**RANDOMIZE 1-5**]
1.    Dairy products (milk, cheese, yogurt, etc.)
2.    Edible oil (canola oil, olive oil, coconut oil, etc.)
3.    Alcoholic beverages (wine, beer, liquor, etc.)
4.    Coffee (ground, whole bean, instant, etc.)
5.    Tea (bagged, loose, iced, etc.)
6.    None of these [**ANCHOR; EXCLUSIVE**]

7.  Don't know / unsure **[ANCHOR; EXCLUSIVE; SCREEN OUT]**

**[RESPONDENT MUST SELECT 2. "EDIBLE OIL"; OTHERWISE TERMINATE]**

S11.  You said that you have purchased edible oil in the past five years.

Which of the following types of edible oil, if any, have you purchased in the <u>past five years</u>?
(***Please select all that apply)*** **[RANDOMIZE 1-6]**
1.  Olive oil
2.  Canola oil
3.  Coconut oil
4.  Peanut oil
5.  Soybean oil
6.  Palm oil
7.  Other (***Please specify***) **[ANCHOR]**
8.  None of these **[ANCHOR; EXCLUSIVE; SCREEN OUT]**
9.  Don't know / unsure **[ANCHOR; EXCLUSIVE; SCREEN OUT]**

**[TO QUALIFY, RESPONDENT MUST SELECT S11=3 – "COCONUT OIL"; OTHERWISE TERMINATE]**

S12.  You said that you have purchased coconut oil in the past five years.

Which of the following brand(s) of <u>coconut oil,</u> if any, have you purchased in the <u>past five years</u>?
(***Please select all that apply)*** **[RANDOMIZE 1-11]**
1.  Barlean's
2.  Jarrow
3.  Nutiva
4.  Nature's Way
5.  Kirkland / Costco
6.  Dr. Bronner's
7.  Spectrum
8.  Viva Naturals
9.  Vita Coco
10. Carrington Farms
11. Store brand (365 brand, Trader Joes, etc.)
12. Other ***(Please specify)*** **[ANCHOR; INCLUDE TEXT BOX]**
13. None of these **[ANCHOR; EXCLUSIVE; SCREEN OUT]**
14. Don't know / unsure **[ANCHOR; EXCLUSIVE; SCREEN OUT]**

S13.   **[IF MORE THAN 1 BRAND IN S12 ASK S13 OTHERWISE GO TO MAIN
QUESTIONNAIRE]** You mentioned purchasing more than one brand of coconut oil in
the past five years. Which ==brand(s)== of coconut oil have you purchased most often?
**[INSERT SELECTIONS FROM S12]**

==QUOTA [HIDE FROM RESPONDENTS]:==

==BARLEAN'S PURCHASERS: MIN 200 AND CAN QUALIFY IN TWO WAYS==

> ==(1) IF S12 = 1 [BARLEAN'S] ONLY,==
> ==(2) <u>OR</u> IF MULTIPLE BRANDS LISTED IN S12 BUT BARLEAN'S LISTED
> IN S13.==

==ALL ELSE QUALIFY AS GENERAL.==

==FILL BRACKETS IN NEXT SECTION AS FOLLOWS:==
- ==BARLEAN'S PURCHASERS: Fill "Barlean's" (without quotes)==
- ==GENERAL PURCHASERS: Insert brand selected in S12.  If more than one brand
  selected in S12 select brand from S13. If more than one brand in S13, randomly
  select. If S12 is = 12 "Other" use write in text==

**[SHOW ALL QUESTIONS ON SEPARATE SCREENS]**

Q1. You said that you have purchased **[INSERT BRAND]** coconut oil.  If you can recall,
when was your most recent purchase of this brand? **[DROP DOWNS – 2015
THROUGH MARCH 2021 TO MATCH APPROX PAST 5 YEARS]**

_____ **MONTH** _____ **YEAR**

Don't know / unsure

Q2. Approximately how many times have you purchased **[INSERT BRAND]** coconut oil?
**[INSERT DROP DOWN BOX FOR 1 – 50+]**

Q3. **[IF Q2 = 2 OR MORE ASK Q3 OTHERWISE GO TO Q4]** If you can recall, in what
year did you first purchase **[INSERT BRAND]**?
**[ROTATE ENDS SO THAT HALF SEE 1-8 AND HALF SEE 8-1]**
1. 2021
2. 2020
3. 2019
4. 2018
5. 2017
6. 2016
7. 2015
8. Before 2015
9. Don't know / unsure **[ANCHOR]**

Q4. Was **[INSERT BRAND]** the **first brand** of coconut oil you ever purchased?
   **[RANDOMIZE ANSWERS 1 AND 2]**
   1. Yes
   2. No
   3. Don't know / unsure

Q5. Thinking back to the **first time** you purchased coconut oil, why did you decide to purchase coconut oil? *(Please type in your response)* **[INSERT LARGE MANDATORY TEXT BOX]**

Q6. If you can recall, how did you **first learn** about coconut oil? *(Please type in your response)* **[INSERT LARGE MANDATORY TEXT BOX]**

Q7. You may have already mentioned this, but which of the following, if any, were ways in which you **first learned** about coconut oil? *(Please select all that apply)*
   **[RANDOMIZE 1-9]**
   1. An advertisement for a specific brand of coconut oil (e.g., TV, magazine, web)
   2. A website for a specific brand of coconut oil
   3. A social media or a blog post about coconut oil generally
   4. A family member or friend
   5. A healthcare professional
   6. A TV show, magazine or news article about coconut oil generally
   7. An esthetician, skincare or haircare professional
   8. Saw product in store
   9. In a recipe
   10. Other *(Please specify)*
   11. None of these
   12. Don't know / unsure **[EXCLUSIVE]**

Q8. Please now think about your current coconut oil purchasing. You said that you have purchased **[INSERT BRAND]** coconut oil. How do you typically use this product? *(Please type in your response)*
   **[LARGE MANDATORY TEXT BOX]**

Q9. You may have already mentioned this, but which of the following, if any, describes how you typically use **[INSERT BRAND]** coconut oil? *(Please select all that apply)*
   **[RANDOMIZE 1-6]**
   1. For cooking, baking or in recipes
   2. As an addition to foods or beverages (for example, bulletproof coffee)
   3. For haircare
   4. For skincare / body oil
   5. As a vegan / dairy-free butter substitute
   6. As a dietary supplement
   7. Some other way *(Please specify)*

5

8. Don't know / unsure **[EXCLUSIVE]**

Q10.      Why have you purchased this particular brand, **[INSERT BRAND]** coconut oil? ***(Please type in your response)* [LARGE MANDATORY TEXT BOX]**

Q11.      You may have already mentioned this, but which of the following, if any, have influenced your decision to purchase **[INSERT BRAND]** coconut oil? (***Please select all that apply*) [RANDOMIZE 1-13]**
1. Price
2. Sale or promotion
3. Availability at store / online retailer
4. Brand name / reputation
5. Size of container / quantity
6. Flavor / taste
7. Statements or descriptions on the product label **[GO TO Q12]**
8. Look and design of the package or label
9. Information on **[INSERT BRAND]**'s website **[GO TO Q14]**
10. Product reviews on third party websites
11. Recommendation from a family member or friend
12. Recommendation from a healthcare professional
13. Recommendation from an esthetician, skincare or haircare professional
14. Other (***Please specify*)**
15. None of these **[EXCLUSIVE]**
16. Don't know / unsure **[EXCLUSIVE]**

  **[IF Q11 DOES NOT = 7 OR 9, SKIP TO Q16]**

Q12.      **[ASK IF Q11=7 / Statements or descriptions]** You mentioned that statements or descriptions on the product label influenced your decision to purchase **[INSERT BRAND]** coconut oil. If you can recall, what specific statement(s) or description(s) influenced your decision? ***(Please type in your response)***
**[INSERT LARGE MANDATORY TEXT BOX]**

Q13.      You may have already mentioned this, but which of the following statements or product descriptions on the label, if any, do you recall as having influenced your decision to purchase **[INSERT BRAND]** coconut oil? (***Please select all that apply*)**
**[RANDOMIZE 1-28]**
1. No trans fatty acids / No trans fat
2. Nutrition Facts (label information about calories, fats, sugars, etc)
3. Health benefits of coconut oil
4. Source of Medium Chain Triglycerides (MCTs)
5. Non-hydrogenated
6. Cold pressed
7. Organic
8. Solvent and chemical free
9. Kosher

10. Non-GMO / No GMOs
11. Gluten free / no gluten
12. Soy free / no soy
13. Virgin / Extra virgin
14. Unrefined
15. A smart fat
16. Contains Lauric Acid & Caprylic Acid
17. Neutral taste / neutral flavor
18. Fair trade
19. Ideal for cooking
20. Vegan
21. Dairy-free / non-dairy
22. No cholesterol / cholesterol-free
23. Raw whole food
24. Superfood
25. Healthy alternative to butter
26. Harvested at the peak of nutritional value
27. Coconut flavor
28. Effective skin moisturizer / hair conditioner
29. Other *(Please Specify)*
30. None of these **[EXCLUSIVE]**
31. Don't know / unsure **[EXCLUSIVE]**

Q14.    **[ASK IF Q11=9 / website]** You mentioned that the website influenced your decision to purchase **[INSERT BRAND]** coconut oil. If you can recall, what specific information influenced your decision? *(Please type in your response)* **[INSERT LARGE MANDATORY TEXT BOX]**

Q15.    You may have already mentioned this, but what information discussed on the website, if any, do you recall as having influenced your decision to purchase **[INSERT BRAND]** coconut oil? *(Please select all that apply)* **[RANDOMIZE 1-28]**
    1. No trans fatty acids / No trans fat
    2. Nutrition Facts (label information about calories, fats, sugars, etc)
    3. Health benefits of coconut oil
    4. Source of Medium Chain Triglycerides (MCTs)
    5. Non-hydrogenated
    6. Cold pressed
    7. Organic
    8. Solvent and chemical free
    9. Kosher
    10. Non-GMO / No GMOs
    11. Gluten free / no gluten
    12. Soy free / no soy
    13. Virgin / Extra virgin
    14. Unrefined
    15. A smart fat

16. Contains Lauric Acid & Caprylic Acid
17. Neutral taste / neutral flavor
18. Fair trade
19. Ideal for cooking
20. Vegan
21. Dairy-free / non-dairy
22. No cholesterol / cholesterol-free
23. Raw whole food
24. Superfood
25. Healthy alternative to butter
26. Harvested at the peak of nutritional value
27. Coconut flavor
28. Effective skin moisturizer / hair conditioner
29. Other *(Please Specify)*
30. None of these **[EXCLUSIVE]**
31. Don't know / unsure **[EXCLUSIVE]**

Q16.    If you have an opinion, do you think **[INSERT BRAND]** coconut oil is…?
**[ROTATE 1 & 3]**
1. __Healthier__ than other brands of oil
2. __Just as healthy__ as other brands of oil
3. __Less healthy__ than other brands of oil
4. Don't know / unsure

Q17.    What makes you say that? *(Please type in your response)*

**[INSERT LARGE MANDATORY TEXT BOX]**
Q18.    If you wanted to get nutrition information about **[INSERT BRAND]** coconut oil, which of the following would you do? *(Please select all that apply)* **[RANDOMIZE 1-5]**
1. Look at front of label
2. Look at the nutrition facts label on back of product (label information about calories, fat, sugar, etc.)
3. Search for product information online
4. Ask salesperson / store clerk
5. Ask nutritionist / doctor
6. Other *(Please Specify)*
7. Don't know / unsure

**[END]** Those are all the questions we have for you today. Thank you for your time.

# Exhibit E

EXHIBIT D
Page 131

# Survey Screenshots

EXHIBIT D
Page 132

Thank you for your willingness to participate in our study. This is a brief study that should take no more than 10 minutes of your time. The responses you give to our questions are very important to us. If you don't know an answer to a question or if you don't have an opinion, please indicate this in your response. Do not guess. Your answers will only be used in the aggregate and your personal information will be kept confidential. The results of this study will not be used to try to sell you anything. When you are ready to get started, please click the ">" button.

EXHIBIT D
Page 133

Before continuing with this survey, please carefully read these instructions:

- Please take the survey in <u>one</u> session.
- While taking this survey, please do <u>not</u>, at any time, open any other windows or tabs on this computer or any other computer.
- Please do <u>not</u> view any other written material while taking this survey.
- Please do <u>not</u> consult or talk with any person while taking this survey.
- You will not be able to go back to previous screens to change your answers.

○ I have read the above instructions and understand them, and I will adhere to these instructions.

○ I do not understand the above instructions, or I don't wish to adhere to them.



EXHIBIT D
Page 134

What type of device are you using to complete this survey?

○ Tablet computer

○ Mobile phone or cell phone

○ Laptop computer

○ Desktop computer

○ Other

EXHIBIT D
Page 135



Please verify that you are human.



I'm not a robot

reCAPTCHA
Privacy - Terms

Are you...?

○ Male

○ Female

○ Non-binary

○ Other *(Please specify)*

○ Prefer not to say

EXHIBIT D
Page 137

Please select your age.

-- Select --

EXHIBIT D
Page 138



In which state do you currently reside?

-- Select --

EXHIBIT D
Page 139

^

Please enter your zip code.

EXHIBIT D
Page 140

Do you or does anyone in your family work for any of the following?

*(Please select all that apply)*

- [ ] A company that produces dairy products
- [ ] A company that produces edible oils (for example, canola, coconut, or olive oil)
- [ ] A market research or advertising company
- [ ] A company that produces alcoholic beverages
- [ ] A company that produces coffee or tea
- [ ] None of these
- [ ] Don't know / unsure

In the past six months, have you taken a survey on any of the following types of products?

*(Please select all that apply)*

☐ Dairy products (milk, cheese, yogurt, etc.)

☐ Alcoholic beverages (wine, beer, liquor, etc.)

☐ Coffee (ground, whole bean, instant, etc.)

☐ Tea (bagged, loose, iced, etc.)

☐ Edible oil (canola oil, olive oil, coconut oil, etc.)

☐ None of these

☐ Don't know / unsure

EXHIBIT D
Page 142

Which of the following products, if any, have you purchased for your own use in the past five years?

*(Please select all that apply)*

☐ Tea (bagged, loose, iced, etc.)

☐ Dairy products (milk, cheese, yogurt, etc.)

☐ Coffee (ground, whole bean, instant, etc.)

☐ Alcoholic beverages (wine, beer, liquor, etc.)

☐ Edible oil (canola oil, olive oil, coconut oil, etc.)

☐ None of these

☐ Don't know / unsure

EXHIBIT D
Page 143

You said that you have purchased edible oil in the past five years.

Which of the following types of edible oil, if any, have you purchased in the <u>past five years</u>?

*(Please select all that apply)*

☐ Olive oil

☐ Palm oil

☐ Coconut oil

☐ Peanut oil

☐ Canola oil

☐ Soybean oil

☐ Other *(Please specify)*

☐ None of these

☐ Don't know / unsure



EXHIBIT D
Page 144

You said that you have purchased coconut oil in the past five years.

Which of the following brand(s) of <u>coconut oil</u>, if any, have you purchased in the <u>past five years</u>?

*(Please select all that apply)*

- [ ] Viva Naturals
- [ ] Store brand (365 brand, Trader Joes, etc.)
- [ ] Kirkland / Costco
- [ ] Dr. Bronner's
- [ ] Spectrum
- [ ] Vita Coco
- [ ] Jarrow
- [ ] Nutiva
- [ ] Carrington Farms
- [ ] Barlean's
- [ ] Nature's Way
- [ ] Other *(Please specify)*
- [ ] None of these
- [ ] Don't know / unsure

EXHIBIT D
Page 145

You mentioned purchasing more than one brand of coconut oil in the past five years. Which brand(s) of coconut oil have you purchased most often?

- [ ] Viva Naturals
- [ ] Store brand (365 brand, Trader Joes, etc.)
- [ ] Kirkland / Costco
- [ ] Dr. Bronner's
- [ ] Spectrum
- [ ] Vita Coco
- [ ] Jarrow
- [ ] Nutiva
- [ ] Carrington Farms
- [ ] Barlean's
- [ ] Nature's Way

^

EXHIBIT D
Page 146

You said that you have purchased **Barlean's** coconut oil. If you can recall, when was your most recent purchase of this brand?

MONTH:

-- Select --  ›

YEAR:

-- Select --  ›

☐ Don't know / unsure



EXHIBIT D
Page 147



Approximately how many times have you purchased **Barlean's** coconut oil?

EXHIBIT D
Page 148

If you can recall, in what year did you first purchase **Barlean's**?

○ 2021

○ 2020

○ 2019

○ 2018

○ 2017

○ 2016

○ 2015

○ Before 2015

○ Don't know / unsure

EXHIBIT D
Page 149

Was **Barlean's** the <u>**first brand**</u> of coconut oil you ever purchased?



○ No

○ Yes

○ Don't know / unsure

EXHIBIT D
Page 150

Thinking back to the **first time** you purchased coconut oil, why did you decide to purchase coconut oil?

*(Please type in your response)*



EXHIBIT D
Page 151

If you can recall, how did you **first learn** about coconut oil?

*(Please type in your response)*



EXHIBIT D
Page 152

You may have already mentioned this, but which of the following, if any, were ways in which you **first learned** about coconut oil?

*(Please select all that apply)*

☐ An esthetician, skincare or haircare professional

☐ A TV show, magazine or news article about coconut oil generally

☐ An advertisement for a specific brand of coconut oil (e.g., TV, magazine, web)

☐ In a recipe

☐ A website for a specific brand of coconut oil

☐ A healthcare professional

☐ A family member or friend

☐ A social media or a blog post about coconut oil generally

☐ Saw product in store

☐ Other *(Please specify)*

☐ None of these

☐ Don't know / unsure

˄

EXHIBIT D
Page 153

Please now think about your current coconut oil purchasing. You said that you have purchased **Barlean's** coconut oil. How do you typically use this product?

*(Please type in your response)*



EXHIBIT D
Page 154

You may have already mentioned this, but which of the following, if any, describes how you typically use **Barlean's** coconut oil?

*(Please select all that apply)*

☐ For haircare

☐ As a vegan / dairy-free butter substitute

☐ For skincare / body oil

☐ As an addition to foods or beverages (for example, bulletproof coffee)

☐ For cooking, baking or in recipes

☐ As a dietary supplement

☐ Some other way *(Please specify)*

☐ Don't know / unsure

EXHIBIT D
Page 155

Why have you purchased this particular brand, **Barlean's** coconut oil?

*(Please type in your response)*





EXHIBIT D
Page 156

You may have already mentioned this, but which of the following, if any, have influenced your decision to purchase **Barlean's** coconut oil?

*(Please select all that apply)*

☐ Recommendation from an esthetician, skincare or haircare professional

☐ Look and design of the package or label

☐ Product reviews on third party websites

☐ Information on **Barlean's** website

☐ Brand name / reputation

☐ Price

☐ Sale or promotion

☐ Statements or descriptions on the product label

☐ Recommendation from a healthcare professional

☐ Recommendation from a family member or friend

☐ Availability at store / online retailer

☐ Flavor / taste

☐ Size of container / quantity

☐ Other *(Please specify)*

☐ None of these

☐ Don't know / unsure

EXHIBIT D
Page 157

You mentioned that statements or descriptions on the product label influenced your decision to purchase **Barlean's** coconut oil. If you can recall, what specific statement(s) or description(s) influenced your decision?

*(Please type in your response)*



EXHIBIT D
Page 158

You may have already mentioned this, but which of the following statements or product descriptions on the label, if any, do you recall as having influenced your decision to purchase **Barlean's** coconut oil?

*(Please select all that apply)*

☐ Nutrition Facts (label information about calories, fats, sugars, etc)

☐ Superfood

☐ Non-GMO / No GMOs

☐ Soy free / no soy

☐ Solvent and chemical free

☐ Unrefined

☐ Contains Lauric Acid & Caprylic Acid

☐ Healthy alternative to butter

☐ Ideal for cooking

☐ Neutral taste / neutral flavor

☐ A smart Fat

☐ Virgin / Extra virgin

☐ Coconut Flavor

☐ Source of Medium Chain Triglycerides (MCTs)

☐ Effective skin moisturizer / hair conditioner

☐ Kosher

- ☐ No cholesterol / cholesterol-free
- ☐ Raw whole food
- ☐ No trans fatty acids / No trans fat
- ☐ Fair trade
- ☐ Non-hydrogenated
- ☐ Organic
- ☐ Harvested at the peak of nutritional value
- ☐ Cold pressed
- ☐ Vegan
- ☐ Health benefits of coconut oil
- ☐ Gluten free / no gluten
- ☐ Dairy-free / non-dairy
- ☐ Other *(Please Specify)*
- ☐ None of these
- ☐ Don't know / unsure

EXHIBIT D
Page 160

You mentioned that the website influenced your decision to purchase **Barlean's** coconut oil. If you can recall, what specific information influenced your decision?

*(Please type in your response)*



EXHIBIT D
Page 161

You may have already mentioned this, but what information discussed on the website, if any, do you recall as having influenced your decision to purchase **Barlean's** coconut oil?

*(Please select all that apply)*

☐ Gluten free / no gluten

☐ Superfood

☐ Unrefined

☐ Cold pressed

☐ Dairy-free / non-dairy

☐ Fair trade

☐ Nutrition Facts (label information about calories, fats, sugars, etc)

☐ Neutral taste / neutral flavor

☐ Solvent and chemical free

☐ Coconut Flavor

☐ Ideal for cooking

☐ No cholesterol / cholesterol-free

☐ Soy free / no soy

☐ Healthy alternative to butter

☐ Health benefits of coconut oil

☐ Organic

EXHIBIT D
Page 162

- [ ] A smart fat
- [ ] Kosher
- [ ] Raw whole food
- [ ] Source of Medium Chain Triglycerides (MCTs)
- [ ] Contains Lauric Acid & Caprylic Acid
- [ ] Virgin / Extra virgin
- [ ] Harvested at the peak of nutritional value
- [ ] Effective skin moisturizer / hair conditioner
- [ ] Vegan
- [ ] Non-GMO / No GMOs
- [ ] Non-hydrogenated
- [ ] No trans fatty acids / No trans fat
- [ ] Other *(Please Specify)*
- [ ] None of these
- [ ] Don't know / unsure

If you have an opinion, do you think **Barlean's** coconut oil is....?

○ **Less healthy** than other brands of oil

○ **Just as healthy** as other brands of oil

○ **Healthier** than other brands of oil

○ Don't know / unsure

EXHIBIT D
Page 164



What makes you say that?

*(Please type in your response)*



EXHIBIT D
Page 165

If you wanted to get nutrition information about **Barlean's** coconut oil, which of the following would you do?

**(Please select all that apply)**

☐ Ask salesperson / store clerk

☐ Look at the nutrition facts label on back of product (label information about calories, fat, sugar, etc.)

☐ Search for product information online

☐ Look at front of label

☐ Ask nutritionist / doctor

☐ Other **(Please Specify)**

☐ Don't know / unsure

# Exhibit F

Data produced in native format

# Exhibit G

# Table of Contents

Page

Article 1……………………………………………………………………………………2

    Top 10 Evidence-Based Health Benefits of Coconut Oil...……………………………………2-8

    URL: https://www.healthline.com/nutrition/top-10-evidence-based-health-benefits-of-coconut-oil#TOC_TITLE_HDR_11

Article 2………………………………………………………………………………………...9

    What to know about coconut oil…………………………………………………………..9-14

    URL: https://www.medicalnewstoday.com/articles/282857

Article 3………………………………………………………………………………....15

    The Truth About Coconut Oil…………………………………….......…………………15-16

    URL:https://www.webmd.com/diet/features/coconut-oil-and-health#1

Article 4………………………………………………………………….…………………...17

    Is Coconut Oil Good or Bad for You?…..……………………………...…………….17-19

    URL: https://www.nytimes.com/2018/08/21/well/eat/coconut-oil-good-bad-health.html

Article 5…………………………………………………………………………………….20

    Coconut Oil Health Benefits And Uses………….....……………………………….……20-28

    URL: https://www.organicfacts.net/health-benefits/oils/health-benefits-of-coconut-oil.html



healthline

NUTRITION    ✓ Evidence Based

# Top 10 Evidence-Based Health Benefits of Coconut Oil

Written by Kris Gunnars, BSc on February 12, 2020 — Medically reviewed by Atli Arnarson BSc, PhD

Coconut oil is widely marketed as a superfood.

The unique combination of fatty acids in coconut oil may have positive effects on your health, such as boosting fat loss, heart health, and brain function.

Here are 10 evidence-based health benefits of coconut oil.



We include products we think are useful for our readers. If you buy through links on this page, we may earn a small commission. Here's our process.

## 1. Contains healthy fatty acids

Coconut oil is high in certain saturated fats. These fats have different effects in the body compared with most other dietary fats.

The fatty acids in coconut oil can encourage your body to burn fat, and they provide quick energy to your body and brain. They also raise HDL (good) cholesterol in your blood, which may help reduce heart disease risk (1).

Most dietary fats are categorized as long-chain triglycerides (LCTs), while coconut oil contains some medium-chain triglycerides (MCTs), which are shorter fatty acid chains (2 ).

When you eat MCTs, they tend to go straight to your liver. Your body uses them as a quick source of energy or turns them into ketones.

Ketones can have powerful benefits for your brain, and researchers are studying ketones as a treatment for epilepsy, Alzheimer's disease, and other conditions.

> **SUMMARY**
> Coconut oil is high in MCTs, a type of fat that your body metabolizes differently than most other fats. MCTs are responsible for many of the health benefits of coconut oil.

## 2. May boost heart health

Coconut is an uncommon food in the Western world, with health-conscious people being the main consumers.

However, in some parts of the world, coconut — which is loaded with coconut oil — is a dietary staple that people have thrived on for generations.

For example, a 1981 study noted that the population of Tokelau, an island chain in the South Pacific, obtained over 60% of their calories from coconuts. Researchers reported not only good overall health but also very low rates of heart disease (3).

Kitavan people in Papua New Guinea also eat a lot of coconut, alongside tubers, fruit, and fish,

EXHIBIT D
Page 169

SUMMARY

Several populations around the world have thrived for generations eating a substantial amount of coconut, and studies show they have good heart health.

# 3. May encourage fat burning

Obesity is one of the biggest health conditions affecting the Western world today.

While some people think obesity is just a matter of how many calories someone eats, the source of those calories is important, too. Different foods affect your body and hormones in different ways.

The MCTs in coconut oil can increase the number of calories your body burns compared with longer-chain fatty acids (6).

One study found that eating 15–30 grams of MCTs per day increased 24-hour energy expenditure by 5% (6).

However, these studies didn't specifically look at the effects of coconut oil. They examined the health effects of MCTs, excluding lauric acid, which make up only about 14% of coconut oil (7).

There's currently no good evidence to say that eating coconut oil itself will increase the number of calories you expend.

Keep in mind that coconut oil is very high in calories and can easily lead to weight gain if eaten it in large amounts.

SUMMARY

Research notes that MCTs can increase the number of calories burned over 24 hours by as much as 5%. However, coconut oil itself may not have the same effect.

# 4. May have antimicrobial effects

Lauric acid makes up about 50% of the fatty acids in coconut oil (7).

When your body digests lauric acid, it forms a substance called monolaurin. Both lauric acid and monolaurin can kill harmful pathogens, such as bacteria, viruses, and fungi (8).

For example, test-tube studies show that these substances help kill the bacteria *Staphylococcus aureus*, which causes staph infections, and the yeast *Candida albicans*, a common source of yeast infections in humans (9, 10).

There's also some evidence that using coconut oil as a mouthwash — a process called oil pulling — benefits oral hygiene, though researchers consider the evidence weak (11).

There's no evidence that coconut oil reduces your risk of the common cold or other internal infections.

SUMMARY

Using coconut oil as a mouthwash may prevent mouth infections, but more evidence is needed.

HEALTHLINE NEWSLETTER

Get our twice weekly Women's Wellness email

To help you be well, we'll send you honest talk about women's bodies, and beauty, nutrition, and fitness advice.

Enter your email

SIGN UP NOW

Your privacy is important to us

# 5. May reduce hunger

One interesting feature of MCTs is that they may reduce hunger.

This may be related to the way your body metabolizes fats, because ketones can reduce a

In one study, 6 healthy men ate varying amounts of MCTs and LCTs. Those who ate the most MCTs ate fewer calories per day (13 ).

Another study in 14 healthy men reported that those who ate the most MCTs at breakfast ate fewer calories at lunch (14 ).

These studies were small and had a very short timescale. If this effect were to persist over the long term, it could lead to reduced body weight over several years.

Although coconut oil is one of the richest natural sources of MCTs, there's no evidence that coconut oil intake reduces appetite more than other oils.

In fact, one study reports that coconut oil is less filling than MCT oil (15 ).

> **SUMMARY**
>
> MCTs can significantly reduce appetite, which may lead to reduced body weight over the long term.

## 6. May reduce seizures

Researchers are currently studying the ketogenic diet, which is very low in carbs and high in fats, to treat various disorders.

The best known therapeutic use of this diet is treating drug-resistant epilepsy in children (16).

The diet dramatically reduces the rate of seizures in children with epilepsy, even those who haven't had success with multiple types of drugs. Researchers aren't sure why.

Reducing carb intake and increasing fat intake leads to greatly increased concentrations of ketones in the blood.

Because the MCTs in coconut oil get transported to your liver and turned into ketones, healthcare professionals may use a modified keto diet that includes MCTs and a more generous carb allowance to induce ketosis and help treat epilepsy (17 , 18 ).

> **SUMMARY**
>
> The MCTs in coconut oil can increase blood concentration of ketone bodies, which can help reduce seizures in children with epilepsy.

## 7. May raise HDL (good) cholesterol

Coconut oil contains natural saturated fats that increase HDL (good) cholesterol levels in your body. They may also help turn LDL (bad) cholesterol into a less harmful form.

By increasing HDL, many experts believe that coconut oil may boost heart health compared with many other fats.

In one study in 40 women, coconut oil reduced total and LDL (bad) cholesterol while increasing HDL, compared with soybean oil (19 ).

Another study in 116 adults showed that following a diet program that included coconut oil raised levels of HDL (good) cholesterol in people with coronary artery disease (20).

> **SUMMARY**
>
> A few studies have shown that coconut oil can raise blood levels of HDL (good) cholesterol, which is linked to improved metabolic health and a lower risk of heart disease.

## 8. May protect your skin, hair, and teeth

Coconut oil has many uses that have nothing to do with eating it.

Many people use it for cosmetic purposes to improve the health and appearance of their skin and hair.

EXHIBIT D
Page 171

Studies show that coconut oil can improve the moisture content of dry skin and reduce the symptoms of eczema (22).

Coconut oil can also protect against hair damage. One study shows that it may work as a weak sunscreen, blocking about 20% of the sun's ultraviolet (UV) rays (23, 24).

Oil pulling, which involves swishing coconut oil in your mouth like mouthwash, may kill some of the harmful bacteria in the mouth. This may improve dental health and reduce bad breath, though more research is needed (25, 26).

> **SUMMARY**
>
> People can apply coconut oil to their skin, hair, and teeth. Studies suggest it works as a skin moisturizer, protects against skin damage, and improves oral health.

## 9. May boost brain function in Alzheimer's disease

Alzheimer's disease is the most common cause of dementia. It usually affects older adults (27).

This condition reduces your brain's ability to use glucose for energy.

Researchers have suggested that ketones can provide an alternative energy source for these malfunctioning brain cells to reduce symptoms of Alzheimer's disease (28).

The authors of a 2006 study reported that MCTs improved brain function in people with milder forms of Alzheimer's disease (29).

Yet, research is still preliminary, and no evidence suggests that coconut oil itself combats this illness.

> **SUMMARY**
>
> Early studies suggest that MCTs can increase blood levels of ketones, potentially relieving Alzheimer's symptoms. Yet, further studies are needed.

**Was this article helpful?**

 Yes     No

## 10. May help reduce harmful abdominal fat

As some of the fatty acids in coconut oil can reduce appetite and increase fat burning, it may also help you lose weight.

Abdominal fat, or visceral fat, lodges in the abdominal cavity and around your organs. MCTs appear to be especially effective at reducing belly fat compared to LCTs (5).

Abdominal fat, the most harmful type, is linked to many chronic diseases.

Waist circumference is an easy, accurate marker for the amount of fat in the abdominal cavity.

In a 12-week study in 40 women with abdominal obesity, those who took 2 tablespoons (30 mL) of coconut oil per day had a significant reduction in both Body Mass Index (BMI) and waist circumference (19).

Meanwhile, a 4-week study in 20 men with obesity noted a reduction in waist circumference of 1.1 inches (2.86 cm) after they took 2 tablespoons (30 mL) of coconut oil per day (30).

Coconut oil is still high in calories, so you should use it sparingly. Replacing some of your other cooking fats with coconut oil could have a small weight loss benefit, but the evidence is inconsistent overall (31).

## 11. The bottom line

The oil derived from coconuts has a number of emerging benefits for your health.

In order to get the most out of it, make sure to choose organic, virgin coconut oil rather than refined versions.

Shop for coconut oil online.

**Was this article helpful?**

 Yes     No

ADVERTISEMENT

**Start a custom weight loss program**

Noom helps you adopt healthy habits so you can lose weight and keep it off. Your program is customized to your goals and fitness needs. Just take a quick assessment and get started today.



EXHIBIT D
Page 172




Last medically reviewed on February 12, 2020

FEEDBACK:

Yes    No

**READ THIS NEXT**



### Milk Protein Isolate: Overview, Nutrition, and Comparisons


READ MORE →



### What's the Difference Between Pedialyte and Gatorade?

 Written by Ariane Lang, BSc, MBA

Maintaining adequate hydration levels is essential for your health, and insufficient water intakes or excessive water losses may lead to dehydration...

READ MORE →



### Does Uva Ursi Work for Urinary Tract Infections?

 Written by Anne Danahy, MS, RDN

Urinary tract infections or UTIs happen to nearly half of all women at some point in their life. This article examines the research and...

READ MORE →



### What Are Sprouted Nuts? Nutrition and Benefits

 Written by Lauren Panoff, MPH, RD

Sprouted nuts are raw nuts that have been soaked in water in order to germinate, or begin to sprout. This article reviews the benefits of eating...

READ MORE →



### Grapefruit Seed Extract: Benefits, Myths, and Dangers

 Written by Erica Julson, MS, RDN, CLT

Rich in powerful antioxidants, grapefruit seed extract is sometimes touted as a natural cure-all. This article reviews the potential benefits and...

READ MORE →



### What's the Difference Between Kcal and Calories?

 Written by Gavin Van De Walle, MS, RD

Calories are a unit of energy, but in diet and exercise, the term is used to mean kilocalories (kcal). Learn the difference and what...

EXHIBIT D
Page 173



## What Is Barbary Fig? Benefits, Uses, and How to Eat It

 Written by Jillian Kubala, MS, RD

This article reviews Barbary fig, explores its uses and potential health benefits, and explains how you can add this fruit to your diet. This plant is...

READ MORE →



## 10+ Tasty Low Carb or Keto Options at The Cheesecake Factory

 Written by SaVanna Shoemaker, MS, RDN, LD

The Cheesecake Factory has a few good menu options suitable for low carb and keto diets. This article lists 10-plus low carb and keto at The...

READ MORE →



## Does Serrapeptase Work for Weight Loss? Benefits and Downsides

 Written by Gavin Van De Walle, MS, RD

Serrapeptase is an enzyme produced from the bacterium Serratia marcescens. This article explains whether serrapeptase can help you lose weight and...

READ MORE →



## Can Bananas Help You Sleep?

 Written by Ariane Lang, BSc, MBA

You may find countless tips and tricks when looking for ways to improve your sleep, especially if you tend to have episodes of insomnia. This article...

READ MORE →

**healthline**   f   t   p   i   F

### Get our wellness newsletter

Filter out the noise and nurture your inbox with health and wellness advice that's inclusive and rooted in medical expertise.

Enter your email    SIGN UP

About Us                Advertising Policy
Newsletters             Privacy Policy
Health Topics           Terms of Use
License Our Content     Do Not Sell My Info

EXHIBIT D
Page 174

Your privacy is important to us

Find an Online Doctor

Contact Us

© 2005-2021 Healthline Media a Red Ventures Company. All rights reserved. Our website services, content, and products are for informational purposes only. Healthline Media does not provide medical advice, diagnosis, or treatment. See additional information.

**HEALTHLINE MEDIA**

About | Careers | Advertise with us

OUR BRANDS    Healthline    Medical News Today    Greatist    Psych Central

MEDICAL NEWS TODAY 

# What to know about coconut oil

Medically reviewed by Natalie Butler, R.D., L.D. — Written by Yvette Brazier on November 8, 2019

Benefits | Nutrition | Types | Controversy | Tips | The bottom line

Coconut oil has grown in popularity in recent years, amid claims that it can do everything from supporting weight loss to slowing the progression of Alzheimer's disease.

Many manufacturers have begun to use coconut oil in packaged products, and many people use it for cooking. Many products, such as fried foods, sweets, shampoos, coffee, smoothies, contain coconut oil.

In July 2016, results of a survey in the United States showed that 72% of people believed that coconut oil was healthful, but only 37% of nutritionists agreed.

Coconut oil contains over 80% saturated fat. Some experts have linked saturated fats with cardiovascular and other diseases.

The *2015–2020 Dietary Guidelines for Americans* recommend limiting consumption of saturated fats to less than 10% of a day's calories. This means that someone following a 2000-calorie per day diet should eat no more than 20 grams (g) of saturated fat each day.

Find out more about the controversy, and if you should make coconut oil a staple in your diet.

## Possible benefits

Supporters claim coconut oil provides various health benefits.

### Increasing good cholesterol



The MCTs in coconut oil may help preserve insulin sensitivity.

There are two types of cholesterol: high-density lipoprotein (HDL), or good cholesterol, and low-density lipoprotein (LDL), or bad cholesterol. HDL appears to help reduce levels of LDL, and high levels of HDL may help boost cardiovascular health.

Some researchers have argued that medium-chain triglycerides (MCTs), a component in coconut oil, may help boost levels of good cholesterol. Participants took 1 tablespoon of coconut oil twice daily for 8 weeks.

However, results have varied. One small study in 2004 found the opposite. In research, dietary MCT increased bad cholesterol in 17 healthy young men. The scientists did not study any other indicators of heart health.

A 2016 study found no clear evidence that coconut oil either benefits or harms cholesterol levels.

However, findings published in 2018 suggested that extra virgin coconut oil's impact on cholesterol may be similar to that of olive oil. So far, the results remain inconclusive, and more studies are needed.

## Latest news

 Research reveals how tea may lower blood pressure

 Antibody 'cocktails' effective against SARS-CoV-2 variants

 My experience having twins during the COVID-19 pandemic

 1 year of COVID-19 in a critical care department

 COVID-19 live updates: Total number of cases passes 118 million

### Controlling blood sugar

Findings from a 2009 animal study suggested that MCTs, present in coconut oil, may help preserve insulin sensitivity. The review also listed the specific beneficial health effects of MCT oil, not coconut oil, in 29 studies.

However, other investigations have not found the same results. This study on mini pigs, however, looked at an excess calorie, high fat diet that also included hydrogenated fats and high fructose.

Which foods help manage blood sugar levels? Find out here.

### Reducing stress

Virgin coconut oil may have antioxidant properties. In a rodent study, it appeared to reduce stress resulting from exercise and chronic cold. Researchers believe that virgin coconut oil could be useful in treating some kinds of depression.

Many plant based foods provide antioxidants. Learn more here.

### Shiny hair

Some people apply coconut oil to their hair to increase shine and protect it from damage. It may penetrate the scalp better than mineral oils.

However, one study of people with similar hair types found no difference in hair condition between those who used coconut oil and those who did not.

### Healthy skin

Applying a coconut extract to human skin may enhance its protective barrier functions and have an anti-inflammatory effect, says a 2017 study.

These findings could have implications for medicine but not for the diet.

Some foods may help boost skin health. Get some tips here.

### Fighting candida

In an in vitro study, coconut oil was active against *Candida albicans (C. albicans)*, suggesting it could be a treatment for candida.

This may be due to the extract's barrier functions and anti-inflammatory properties. However, this is not the same as consuming regular coconut oil since it is not fermented.

Can coconut oil fight candida? See this article for more details.

### Preventing liver disease

In a 2017 study, rats with liver disease consumed a high glucose diet either with or without coconut oil. Those who consumed coconut oil had better measures of liver health after 4 weeks than those who did not.

This suggests that some elements in coconut oil may help protect the liver.

### Reducing asthma symptoms

Inhaling coconut oil has helped reduce asthma symptoms in rabbits.

However, no studies have taken place in humans, so people should not inhale coconut oil.

### Improving satiety

Some people have argued that coconut oil leaves people feeling fuller after eating, which means they will not eat so much.

However, one study compared MCT oil to coconut oil and confirmed that MCT oil exerts effects on satiety, not coconut oil.

### Dental health

A 2017 review discusses the importance of oil pulling for dental health. Oil pulling is a traditional oral treatment. It involves swishing an oil around the oral cavity, in a similar way to the modern mouthwash.

Studies have found coconut oil pulling to protect against cavities, improve gingivitis, and influence the oral bacterial balance.

EXHIBIT D
Page 177

**Weight loss**

A study comparing two products found that coconut oil was helpful for people with diabetes and weight gain in mice. Some have interpreted this as meaning coconut oil can help people lose weight.

One reason weight gain occurs is when people consume more calories than they use for energy.

All high fat foods and oils are high in calories. One tablespoon of coconut oil, weighing 13.6 grams (g) contains 121 calories, which is more than lard and butter and slightly less than sunflower oil.

Adding more high fat, calorie dense foods to a diet that contains carbohydrates and plenty of calories may not result in weight loss.

Which breakfast foods can help people lose weight? Find out here.

**Cautions**

Several investigations have looked into coconut oil and its possible benefits, but many of these are small, inconclusive, and animal- or lab-based.

Some human studies have confirmed several benefits, but other studies on people show conflicting results. More research is needed to confirm the effects of daily coconut oil use.

## Nutrition

1 tbs of coconut oil contains:

- 121 calories
- 0 g of protein
- 13.5 g of fat, of which 11.2 g is saturated
- 0 milligrams (mg) of cholesterol

Coconut oil contains vitamin E, but no fiber and little to no other vitamins or minerals.

Coconut oil is almost 100% fat, most of which is saturated fat. However, the structure of fat in coconut oil differs from that of many animal products, which mainly consist of long-chain fatty acids.

Coconut oil is high in MCTs. These are harder for the body to convert into stored fat and easier to burn off than long-chain triglycerides (LCTs). Supporters of coconut oil attribute many of its benefits to the high MCT content.

However, researchers have questioned these perceived benefits from coconut oil itself because many of the reported benefits stem from MCT oil itself. Experts have called on people to treat coconut oil as they would any other saturated fat until there is enough evidence to prove otherwise.

## Types

Not all coconut oils are the same, and the impact on health may vary according to type.

Overall, the less processed a food is, the more likely it is to offer health benefits, and the same is probably true of coconut oil.

Extra virgin coconut oil comes from the fruit of fresh, mature coconuts. Processing does not involve high temperatures or added chemicals.

People who choose to use coconut oil should opt for the least processed type.

Learn more about which oils to choose and which to avoid.

## Controversy

The main argument against coconut oil is its high saturated fat content.

In June 2015, a *Cochrane review* found that, in some ways, saturated fats may be less harmful than previously believed. It did not suggest, however, that saturated fats were healthful, and the authors urged people to continue reducing their intake of saturated fat.

In June 2017, the American Heart Association (AHA) issued new advice against using saturated

EXHIBIT D
Page 178

### Incorrect interpretation of a study?

In 2008, one  made people think that coconut oil might be healthful. In this investigation, 31 people consumed MCT oil or olive oil during a 16-week weight loss program.

The team found that the body processes MCT oil, such as coconut oil, differently from other oils. They concluded that MCT could have the same impact on CVD risk factors as olive oil.

Some people interpreted this to mean that if MCTs can have a positive effect on HDL and total cholesterol levels, coconut oil must be healthful.

However, the original study did not use coconut oil, but a special oil that was 100% MCT. The MCT content of coconut oil is around 14%. Butter is about 9.2% MCT.

A person would have to eat 150 gr or 10 tbs. of coconut oil each day to get the benefits. Consuming this much oil would not be healthful.

The *Dietary Guidelines* recommend limiting the intake of saturated fats to 10% or less of total calories. For those monitoring their cholesterol, the AHA recommend a maximum of 5–6%.

Most studies that show positive health benefits use MCT oil, not coconut oil. Studies supporting coconut oil have often been short term, small scale investigations involving animals rather than humans. The results have not been significant enough to warrant advising people to switch to coconut oil.

Research supporting a switch to unsaturated fatty acids has produced more reliable results.

MEDICAL NEWS TODAY newsletter

### Stay in the know. Get our free daily newsletter

Expect in-depth, science-backed toplines of our best stories every day. Tap in and keep your curiosity satisfied.

Enter your email | SIGN UP NOW

Your privacy is important to us

## Tips

Fats and oil provide essential nutrients, but people should always use them in moderation. If people use coconut oil, they should look for extra virgin coconut oil.

Here are some tips for buying, storing, and using coconut oil.

Check the label and avoid oils that contain partially hydrogenated coconut oil.

Store coconut oil in a cool, dark place. Like other saturated fats, it is solid when at room temperature and liquefies when heated.

Use coconut oil in baking for a light, sweet, "coconutty" flavor. It substitutes well for butter and shortening, and it is suitable for vegan recipes.

## The bottom line

Was this article helpful?

 

Coconut oil can add flavor and variety to the diet, but research seems unlikely to prove that it is a superfood.

Consumers should remember that, while changing from one oil to another may benefit health, adding more of any oil to the diet is unlikely to help them lose weight/loss or improve their overall health.

People should always consume oils and fats in moderation, as part of a varied diet. They should also ensure that their activity levels are high enough to burn off the calories they consume.

 Q:

If coconut oil is not good for health, which oil should I use?

 A:

Was this article helpful?

 



EXHIBIT D
Page 179

While I recommend to limit all oils and choose whole food fats more often, healthy staple oils are olive and avocado. I do also keep coconut oil at home, but it is not my everyday oil.

– Natalie Butler, RD, LD

Answers represent the opinions of our medical experts. All content is strictly informational and should not be considered medical advice.

ADVERTISEMENT



**Start a custom weight loss program**

Noom helps you adopt healthy habits so you can lose weight and keep it off. Your program is customized to your goals and fitness needs. Just take a quick assessment and get started today.

LEARN MORE



We picked linked items based on the quality of products, and list the pros and cons of each to help you determine which will work best for you. We partner with some of the companies that sell these products, which means Healthline UK and our partners may receive a portion of revenues if you make a purchase using a link(s) above.

Last medically reviewed on November 8, 2019

Heart Disease     Cardiovascular / Cardiology     Nutrition / Diet

+ 25 sources

FEEDBACK:

**Was this article helpful?**

Yes     No

**Was this article helpful?**

Yes     No

---

RELATED COVERAGE



### Can a person lose 20 pounds quickly and safely?

Medically reviewed by Amy Richter, RD

How can a person lose 20 pounds safely and quickly? Read on to discover what science suggests are successful strategies and methods for weight loss.



### What to know about low blood pressure with a high pulse

Medically reviewed by Debra Sullivan, Ph.D., MSN, R.N., CNE, COI

Having low blood pressure with a high pulse can be a normal response to certain situations, such as after exercising or standing up too quickly. Learn...

READ MORE →



### What you can and cannot eat and drink while fasting

Medically reviewed by Grant Tinsley, PhD

This article explores what fasting is, its benefits, different kinds of fast, and food and drink people may wish to include or avoid when fasting

READ MORE →

## Get our newsletter

Keep up with the ever-changing world of medical science with new and emerging developments in health.

[Enter your email]    SUBSCRIBE

Your privacy is important to us

Editorial articles

Newsletters

Ad Policy

Contact us

Do Not Sell My Info

Privacy Settings

All news topics

Knowledge Center

About us

Privacy

Terms

© 2004-2021 Healthline Media UK Ltd, Brighton, UK, a Red Ventures Company. All rights reserved. MNT is the registered trade mark of Healthline Media. Any medical information published on this website is not intended as a substitute for informed medical advice and you should not take any action before consulting with a healthcare professional

HEALTHLINE MEDIA

OUR BRANDS    Healthline    Medical News Today    Greatist    Psych Central

About    |    Careers    |    Advertise with us



NOURISH by WebMD

LOW-CARB DIETS ▾    DIET & WEIGHT MANAGEMENT ▾    HEALTH & DIET GUIDE ▾    RELATED TOPICS ▾

Diet & Weight Management  ›  Feature Stories

# The Truth About Coconut Oil

By Matthew Kadey

FROM THE WEBMD ARCHIVES ⓘ

**Coconut oil:** You can't browse social media – or the grocery store shelves -- these days without running across it. The sweet-smelling tropical staple is rumored to slow aging, help your **heart** and **thyroid**, protect against illnesses like **Alzheimer's**, **arthritis** and **diabetes**, and even help you lose weight.

People are using it in everything from smoothies to bulletproof coffee, a mug of java spiked with coconut oil and butter. Should you sign up for an oil change?

### Good News, Bad News

Coconut oil is made by pressing the fat from the white "meat" inside the giant nut. About 84% of its calories come from **saturated fat**. To compare, 14% of olive oil's calories are from **saturated fat** and 63% of butter's are.

"This explains why, like butter and lard, coconut oil is solid at room temperature with a long shelf life and the ability to withstand high cooking temperatures," says registered dietitian Lisa Young, PhD. And it's the reason coconut oil has a bad rap from many health officials.

But there may be a saving grace. Coconut oil's saturated fat is made up mostly of medium-chain **triglycerides**, or MCTs. Some people say your body handles them differently than the longer-chain fats in liquid vegetable oils, dairy, and fatty meats.

### Is It Good for Your Heart?

The American **Heart** Association says to limit saturated fat to no more than 13 grams a day. That's the amount found in about one tablespoon of coconut oil.

Fans of coconut oil point to studies that suggest the MCT-saturated fat in coconut could boost your HDL or "good" **cholesterol**. This, they claim, makes it less bad for your **heart health** than the saturated fat in animal-based foods like cheese and steak or products containing trans fats.

But it also raises your **LDL** "bad" **cholesterol**.

A quick **cholesterol** lesson:

- **LDL** -- helps form plaque that blocks your **arteries**

- HDL -- helps remove **LDL**

"But just because coconut oil can raise **HDL cholesterol** doesn't mean that it's great for your heart," Young says. "It's not known if the rise in beneficial cholesterol outweighs any rise in harmful cholesterol."

**1**   2   3   View All   ◀   ▶ **NEXT PAGE**

## TODAY ON WEBMD


**Boost Your Metabolism: 10 Ways to Do It**


**Belly Fat: Best & Worst Foods**


**Worst Sandwiches: Avoid These Diet Wreckers**


**Best Diet Tips Ever: 22 Ways to Stay on Track**

## RECOMMENDED FOR YOU


**Simple Nighttime Habits to Help With Weight Loss**


**'Bad' Foods That Are Good for Weight Loss**


**Which Foods are Rich in Potassium?**

## RECOMMENDED FOR YOU


**Vitamin B12 Deficiency: Causes, Symptoms, and Treatment**


**Vitamin D Deficiency: Symptoms, Causes, and Health Risks**


**Reasons You're Not Losing That Belly Fat**

### TOP PICKS

10 Worst Sandwiches and Better Choices

Guide to Eating Healthy Carbs

Becoming a Vegetarian: Foods to Choose From

### FURTHER READING

Low-Carb Snacks

Your Guide to Eating Healthy Carbs

An Interview With Low-Carb Advocate Dr. Atkins

EXHIBIT D
Page 182

**Why Am I Always Hungry?**

Surprising Reasons You're Gaining Weight

**Diet Tips for Knee Osteoarthritis**

**To Carb, or Not to Carb?**

Low-Carb



### Get Diet and Fitness Tips In Your Inbox

Eat better and exercise smarter. Sign up for the Food & Fitness newsletter.

Enter your email address    **SUBSCRIBE**

By clicking Subscribe, I agree to the WebMD Terms & Conditions & Privacy Policy and understand that I may opt out of WebMD subscriptions at any time.

**Health Solutions** FROM OUR SPONSORS

Penis Curved When Erect
Could I have CAD?
Treat Bent Fingers
Discover hATTR Symptoms

Discover Immunotherapy
Relapsing MS Options
Rethink MS Treatment
AFib-Related Strokes

Risk of a Future DVT/PE
Is My Penis Normal?
Weight-Loss Surgery
Liver Transplants Save Lives

Finance Plastic Surgery
Bent Finger Causes
Trouble Urinating?
Missing Teeth?

**More from WebMD**

Finding the Care You Need for MS
How to Thrive With Narcolepsy
Relief for Blocked Hair Follicles
Psoriatic Arthritis and Your Sleep

What Psoriasis Feels Like
First Psoriatic Arthritis Flare
Talking to Your Doctor About RA
Common Psoriasis Triggers

Avoiding Crohn's Flares
Living With Ankylosing Spondylitis
When RA Symptoms Get Worse
Types of B-Cell Therapy for MS

Living Better With T2 Diabetes
Why Prostate Cancer Spreads
When Ulcerative Colitis Flares
Where Breast Cancer Spreads

**WebMD**

### POLICIES
Privacy Policy
Cookie Policy
Editorial Policy
Advertising Policy
Correction Policy
Terms of Use

### ABOUT
Contact Us
About WebMD
Careers
Newsletter
Corporate
WebMD Health Services
Site Map
Accessibility

### WEBMD NETWORK
Medscape
Medscape Reference
MedicineNet
eMedicineHealth
RxList
OnHealth
WebMDRx
First Aid
WebMD Magazine
WebMD Health Record
Dictionary
Physician Directory

### OUR APPS
WebMD Mobile
WebMD App
Pregnancy
Baby
Allergy
Medscape

### FOR ADVERTISERS
Advertise with Us
Advertising Policy





© 2005 - 2021 WebMD LLC. All rights reserved.
WebMD does not provide medical advice, diagnosis or treatment.
See additional information.

EXHIBIT D
Page 183

The New York Times

SUBSCRIBE FOR $1/WEEK    LOG IN

# Is Coconut Oil Good or Bad for You?

A Harvard professor called coconut oil "pure poison." Not everyone takes such a harsh stand.





iStock

 By Roni Caryn Rabin and Sophie Egan

Aug. 21, 2018

In an online video that has gone viral, a Harvard professor takes on the popular food coconut oil, calling it "pure poison."

Is it really that bad for you?

The lecture, by Karin Michels, a professor at the Harvard T.H. Chan School of Public Health, was delivered in German. It was translated by Business Insider Deutschland and called "Coconut Oil and Other Nutritional Errors." While not everyone takes such a harsh view against coconut oil, many experts are skeptical about its rising popularity as a purported health food. The New York Times health writer Roni Rabin and food writer Sophie Egan both answered readers' questions about the health benefits of coconut oil. Here's what they had to say.

**Q. Why is coconut oil suddenly considered healthy after being declared unhealthy for three decades?**

**A.** Coconut oil's image has gotten a makeover in recent years, and many natural food stores stock the product. But despite "a lot of hype about it," said Dr. Alice H. Lichtenstein, a Tufts University professor of nutrition science and policy who is vice chair of the federal government's dietary guidelines advisory committee, "there's virtually no data to support the hype."

Coconut oil is high in saturated fatty acids, and saturated fat has been linked to high cholesterol levels and heart disease. Though critics have recently raised questions about the scientific evidence for the link, longstanding dietary guidelines urge Americans to reduce saturated fat intake to less than 10 percent of daily calories, or about 20 grams for a 2,000-calorie-a-day diet.

ADVERTISEMENT

EXHIBIT D
Page 184

There is little research on the health effects in people of coconut oil, Dr. Lichtenstein said, but "there appears to be no independent benefit of consuming it."

**Make sense of the moment.**
24 hours only: Subscribe for $1 a week.

That said, there are different kinds of coconut oil, and virgin coconut oil, which is gently processed, may not have the same harmful effects as highly processed oils, even though the fatty acid composition is similar, said Dr. Tom Brenna, a professor of human nutrition at Cornell University. Refined, bleached and deodorized, or R.B.D., coconut oil, which has been treated with solvents and subjected to intense heat, raises cholesterol so reliably that scientists have used it as a control when running experiments on different fats. The harsh processing may destroy some of the good essential fatty acids and antioxidants, such as lauric acid, a medium chain fatty acid believed to raise good H.D.L. cholesterol.

"If you're going to use coconut oil, make sure you get virgin oil," Dr. Brenna said. "And, of course, everything in moderation."

By Roni Caryn Rabin. Originally published Dec. 24, 2015

**Q. Is it better to cook with coconut oil or olive oil?**

**A.** In terms of health impacts, it is better to cook with olive oil.

Compared to a tablespoon of olive oil, a tablespoon of coconut oil contains about six times the amount of saturated fat, nearly meeting the daily limit of about 13 grams that the American Heart Association recommends. High saturated fat intake has been tied to increased levels of LDL, or "bad," cholesterol, which raises the risk of heart disease.

Furthermore, olive oil, a main component of the heart-healthy Mediterranean diet, contains beneficial polyunsaturated and monounsaturated fats.

"Between the two, olive oil is a better choice, since monounsaturated fats can have a beneficial effect on your heart when eaten in moderation and when used to replace saturated and trans fats in your diet," said Annessa Chumbley, a registered dietitian and spokeswoman for the A.H.A., in an email. Earlier this year, the organization issued an advisory that firmly reiterated its guidance to consumers to replace saturated fats with unsaturated fats to help prevent heart disease. Consumers were also urged to keep in mind the bigger picture of an overall healthy eating pattern.

While some research has linked the main type of saturated fatty acid in coconut oil, lauric acid, to increased levels of HDL, or "good," cholesterol, it still appears to raise LDL cholesterol. Yet

**Editors' Picks**


What Is a Ballet Body?


More Than You Need to Know About Harry, Meghan and Oprah


Triangulating Math, Mozart and 'Moby-Dick'

EXHIBIT D
Page 185

coconut oil may be a better choice than some other sources of saturated fat. And it appears that coconut oil may not appear to raise heart disease risk factors as much as other types of saturated fatty acids, such as palmitic acid, which is substantial in butter.

Proponents of coconut oil point out that it is rich in phytochemicals that have healthful antioxidant properties. While it's true that extra-virgin coconut oil, like extra-virgin olive oil, contains phytochemicals, most of the coconut oil on the market is refined and provides few of those antioxidants, said Dr. Qi Sun, an associate professor of medicine at Harvard Medical School. But even if the coconut oil you are using is extra-virgin, "the saturated



The New York Times

| NEWS | OPINION | ARTS | LIVING | MORE | SUBSCRIBE |
|------|---------|------|--------|------|-----------|
| Home Page | Today's Opinion | Today's Arts | At Home | Reader Center | Home Delivery |
| World | Op-Ed Columnists | Art & Design | Automobiles | Wirecutter | Digital Subscriptions |
| Coronavirus | Editorials | Books | Games | Live Events | Games |
| Politics | Op-Ed Contributors | Dance | Education | The Learning Network | Cooking |
| New York | Letters | Movies | Food | Tools & Services | |
| Business | Sunday Review | Music | Health | Multimedia | Email Newsletters |
| Tech | Video: Opinion | Pop Culture | Jobs | Photography | Corporate Subscriptions |
| Science | | Television | Love | Video | Education Rate |
| Sports | | Theater | Magazine | Newsletters | |
| Obituaries | | Video: Arts | Parenting | Times Machine | Visual Applications |
| | | | Real Estate | NYT Store | |

**Make sense of the moment.** 24 hours only / Subscribe for $1 a week.    VIEW OFFER

Search for benefits Articles & Recipes

**FOOD    BEVERAGE    RECIPES    ESSENTIAL OILS    WEIGHT LOSS    WELLNESS    VIDEOS**

Home › Oils › Coconut Oil

# Coconut Oil Health Benefits And Uses

by **Meenakshi Nagdeve** last updated - October 07, 2020 Medically reviewed by **Vanessa Voltolina (MS, RD)** ( ✓ Evidence Based )

The health benefits of coconut oil include improving heart health by increasing the HDL cholesterol levels, promoting **weight loss**, **relieving symptoms of yeast infections**, skin and hair care, improving digestion, and boosting immunity. The oil is not only used in tropical countries, where coconut plantations are abundant, but also in the U.S., Canada, Europe, and Australia. Now, we rediscover the wonders this oil creates and why does it gain popularity throughout the world.

Let us have a look at some of the known benefits of coconut oil.

## Health Benefits

AdChoices ▷ ✕

**Natural & Cruelty-Free**

Effective & Affordable

Skin Script offers effective skincare products at an excellent price.

artofskincare.com

OPEN

Coconut oil has several health benefits, the most important ones being its usefulness in hair care and skincare.

### Increases HDL Cholesterol Levels

According to a report in the journal *Harvard Health Publishing*, coconut oil helps to increase the levels of HDL cholesterol (good cholesterol) that aids in improving heart health. However, the report advised using coconut oil sparingly as the bulk of current findings conducted on this oil and its effect on cholesterol levels are based on short-term studies. [1]

### Promotes Weight Loss

Research published in the journal *Lipids* suggests that coconut oil can appear to be useful for promoting weight loss, particularly for reducing abdominal obesity. [2]



## Sign-up for our wellness newsletter

Do you want the best of science-backed health & nutrition information in your inbox? If yes, please share your email to subscribe.

Enter your email here

We'll never share your email with anyone else.

Subscribe

## Popular Articles

 **12 Proven Health Benefits of Apple Cider Vinegar**

 **12 Proven Health Benefits of Dates**

 **Top 16 Proven Benefits of Ginger**

 **Calamansi Juice: Benefits, Recipe, and Side Effects**

 **Hibiscus Tea: Benefits, How to Make, & Side Effects**

## Recent Articles

 **Pomelos: Benefits & How To Eat Them (Pummelo)**

 **Is Turmeric Good For Weight Loss**

 **Are Rice Noodles Gluten-Free**

 **How To Use Lemongrass**

 **How To Get Oil Out Of Clothes**

EXHIBIT D
Page 187

Look for organically sourced coconut oil whenever you can. Photo Credit: Shutterstock

It is also easier to digest as compared to other edible oils. Another pilot study published in the journal *ISRN Pharmacology* states that coconut oil increases the body's metabolic rate by removing stress on the pancreas, thereby, burning energy helping obese and overweight people (especially males) lose weight. However, further research is needed to back up these findings. [3]

## Improves Heart Health

There are multiple studies that show coconut oil as one of the most beneficial fats for heart health. A 2016 review published in the *Ghana Medical Journal* found that 50 percent of fats found in coconut oil are medium-chain triglycerides (MCTs), such as lauric acid. These acids are absorbed easily by the intestine and can be used by the body to produce energy. [4]

Research published in the journal *Nutricion Hospitalaria* conducted a study on 116 coronary artery disease patients. It was observed that a diet rich in extra virgin coconut oil led to an increase in good cholesterol levels (HDL cholesterol) and a decrease in bad cholesterol levels (LDL cholesterol). [5]

Another study suggests that the intake of this oil may help in maintaining healthy lipid profiles in pre-menopausal women. However, anything in excess can be bad. If you are using coconut oil often, check your cholesterol levels regularly. If you find them increasing, it is better to stop or cut down on it. In any case, consult a professional medical practitioner before you start consuming it extensively. [6]

## Promotes Healthy Hair

Coconut oil is used extensively in the tropical, coastal regions for hair care. Many women apply oil regularly for a thick and lustrous mane. This dense, butter-like oil helps in the healthy growth of your hair and adds luster to those strands. A study published in the *Journal of Cosmetic Science* found compared coconut oil to other oils like sunflower and mineral oils. Of the three, coconut oil was the only oil that reduced protein loss when used as a pre-wash or post-wash product. This held true for both damaged and undamaged hair. Due to low molecular weight, it is able to penetrate the hair shaft and prevent hair damage. [7] [8]

The best variety for healthy hair is organic extra virgin coconut oil. Just apply it topically to your hair or use a coconut oil hair mask.

Worried about damaged hair? Again coconut oil is one solution. It is an excellent conditioner and helps the re-growth process of damaged hair. It also provides the essential proteins required for nourishing and healing damaged hair. Another research published in the *Journal of Cosmetic Science* indicates that this oil provides better protection to

EXHIBIT D
Page 188

hair from damage caused by too much moisture. [9]

By regularly massaging your head with it, you can ensure that your scalp is **dandruff** free, even if your scalp is chronically dry. It also helps in keeping your hair and scalp **free from lice infestation**.

### Watch Video: 9 Best Benefits Of Coconut Oil



### All-Purpose Skin Care Aid

Did you know that coconut oil **works great for skin**? According to a 2018 study published in the *International Journal of Molecular Science*, coconut oil **is found to be rich in antibacterial**, anti-aging, antioxidant, and anti-inflammatory properties. [11]

It may also aid in treating various skin problems that include the following:

- **Eczema & psoriasis**: The topical application can reduce the severity of these conditions. [12]

- **UV radiation**: Research suggests that the use of coconut oil protects the skin against the harmful effects of UV rays. [13]

- **Dermatitis**: A study published in *Evidence-Based Complementary and Alternative Medicine* suggests that coconut oil is effective in relieving symptoms of atopic dermatitis (as compared to mineral oil). This was backed up by another *study* published in the *International Journal of Dermatology* which found that virgin coconut oil is more beneficial than mineral oil-based formulations when treating children suffering from mild to moderate atopic dermatitis. [14] [15]

- **Skin wound**: Virgin coconut oil helps to speed up wound healing given its indicated skincare properties. [16]

- **Xerosis or dry skin**: Research shows that coconut oil is a safe and effective moisturizer for the skin. Pure cold-pressed, organic, non-GMO coconut oil is an excellent massage oil that can be used for all types of skin, including dry skin. [17]

- **Antimicrobial activity**: Monolaurin is an active component of coconut oil found to be antibacterial, antiviral, and antifungal in nature. It protects against the harmful effects of bacteria, such as Staphylococcus aureus that causes pimples and other skin infections. [18]

- **Burns**: The use of coconut oil helps in providing relief from burns. [19]

EXHIBIT D
Page 189

Unlike mineral oil, there is little chance of any adverse side effects because of the use of coconut oil for skin care. It has been safely used for thousands of years for preventing dryness and flaking of skin. Additionally, it also delays the appearance of wrinkles and sagging of skin, which normally accompany aging. It is today preferred by natural skincare brands as the base ingredient for various body care products like soaps, lotions, and creams.

- **Other**: It also helps repair the skin barrier. [20]

### Relieving Symptoms of Dementia

A 2017 research published in the journal *Nutricion Hospitalaria* suggests that the use of coconut oil improves the cognitive abilities of Alzheimer's patients, specifically in

Thinning Hair

language and orientation areas. Another study published in the *Annals of the New York Academy of Sciences* indicates that MCTs found in coconut oil are a great source of ketone associated with improving memory. But more clinical and scientific data is needed to ascertain whether this oil actually boosts the functioning of the brain. [21] [22] [23]

### Preventing Yeast Infection – Candida

Candida, also known as systemic candidiasis, is a tragic disease caused by an excessive and uncontrolled growth of yeast called **Candida albicans** in the stomach. A study published in the *Journal of Medicinal Food* suggests that coconut oil provides relief from the inflammation caused by **candida**, both externally and internally. Its high moisture retaining capacity keeps the skin from cracking or peeling off. Capric acid, caprylic acid, caproic acid, myristic acid, and lauric acid found in coconut oil help in eliminating Candida albicans. [24]

Further, unlike other pharmaceutical treatments for candida, the effect of coconut oil is gradual, which gives the patient an appropriate amount of time to get used to the withdrawal symptoms. However, when using it for candida, one should systematically and gradually increase their dosages and start with smaller quantities.



- Increases good cholesterol
- Aids in relieving skin problems

EXHIBIT D
Page 190

Coconut oil has a high melting point — about 24 to 25 degrees Celsius, or 76-78 Fahrenheit

## Promotes Dental Care

Many research studies suggest that the use of oil pulling is effective against various dental issues such as plaque and halitosis. There is limited evidence that supports the topical use of coconut oil for the prevention and treatment of atopic dermatitis. Similarly, more studies are required to confirm "oil pulling" for the prevention of dental caries. [25] [26] [27]

### Effective in Treatment of Epilepsy

MCT ketogenic diets are effective in treating refractory childhood epilepsy. According to research in the *Journal of the Medical Association of Thailand*, MCT diets have effectively treated Thai children also who suffered from intractable epilepsy. This shows that as an effective source of the MCT diet, coconut oil is a good addition to ketogenic diets that counter seizures and sensations. [28]

## Other Benefits

- **Antimicrobial Effects:** According to the *Coconut Research Center*, [29] coconut oil kills the viruses that cause influenza, measles, hepatitis, herpes, SARS, and other serious health risks. It also kills bacteria that cause ulcers, throat infections, urinary tract infections, pneumonia, and gonorrhea. Finally, coconut oil may also aid in eliminating fungi and yeast that cause ringworm, athlete's foot, thrush, and diaper rash. [30]

- **Kidney & Liver Health**: The presence of medium-chain triglycerides and fatty acids in coconut oil may help in preventing kidney, liver, and gallbladder diseases. However, more scientific research is needed to establish these benefits. [31]

- **Digestive & Immune System**: The saturated fats such as lauric acid and monolaurin present in coconut oil have antimicrobial, antibacterial, and antiviral properties. These properties help combat various bacteria, fungi, and parasites that cause various health issues. [32]

Using this oil has been shown to mildly help the following:

- **Stress relief:** Pure coconut carrier oil for aromatherapy is very soothing and helps remove stress. Applying it to the head, followed by a gentle massage, helps eliminate mental fatigue. Research shows that virgin coconut oil gives relief from stress and has antioxidant properties. [33] [34]

- **Wound healing:** When applied to infected areas, coconut oil forms

EXHIBIT D
Page 191

a chemical layer that protects the infected body part from external cause and, if high bacteria or moisture extra high concentration is also effective and safe when used as a skin moisturizer.

- **Diabetes:** Pure coconut oil helps in controlling blood sugar and improves the secretion of insulin. It also promotes the effective utilization of blood glucose, thereby, preventing and managing diabetes. [37] [38]

- **Bones:** As mentioned earlier, coconut oil improves the ability of our body to absorb important minerals. These include calcium and magnesium, which are necessary for the development of bones. Thus, it is very useful for women who are prone to osteoporosis after middle age. [39]

- **Boosts Energy:** Coconut oil is often used by athletes, bodybuilders, and by those who are dieting. This is because it contains fewer calories than other oils. Its fat content is easily converted into energy, and it does not lead to the accumulation of fat in the heart and arteries. By boosting energy and endurance, it can improve an athlete's performance. [40]

## How do The Fats in Coconut Oil Help You?

According to the USDA National Nutrient Database for Standard Reference, coconut oil is a good source of energy, lipids, and various other nutrients. It contains vitamins and minerals such as vitamin E, vitamin K, calcium, zinc, and iron. [42]

More than 90% of coconut oil consists of FFAs or free fatty acids, saturated fats (Don't panic! It's not as bad as it sounds, read until the

### Nutrition Facts
### Oil, coconut

Serving Size : 100 g

| Nutrient | Value |
|---|---|
| Water [g] | 0.03 |
| Energy | 892 |
| Energy [kJ] | 3730 |
| Total lipid (fat) [g] | 99.06 |
| Ash [g] | 0.03 |
| Calcium, Ca [mg] | 1 |
| Iron, Fe [mg] | 0.05 |
| Zinc, Zn [mg] | 0.02 |
| Choline, total [mg] | 0.3 |
| Vitamin E (alpha-tocopherol) [mg] | 0.11 |
| Tocopherol, beta [mg] | 0.6 |
| Tocopherol, delta [mg] | 0.18 |
| Tocotrienol, alpha [mg] | 2.17 |

Sources include : USDA [41]

end of this and your opinion may change). A 2016 study suggests that coconut oil also contains a few unsaturated fatty acids, such as monounsaturated fatty acids and polyunsaturated fatty acids. Virgin coconut oil is no different from this. [43]

**Saturated fatty acids:** Most of them are medium-chain triglycerides, which are supposed to assimilate well into the body's systems.

- **Lauric acid**: It is the chief contributor, representing more than 40% of the total, followed by capric acid, caprylic acid, myristic acid, and palmitic acid. The human body converts lauric acid into monolaurin. Lauric acid is helpful in dealing with viruses and diseases. [44]

EXHIBIT D
Page 192

bacteria, which subsequently converts it into a powerful antimicrobial agent, monocaprin. [45]

- **Caprylic acid, caproic acid, and myristic acid:** They are rich in antimicrobial and antifungal properties [46]

- **Stearic acid:** This acid has cleansing and solidifying properties. Hence, it is used for skincare products.

- **Unsaturated fatty acids:** The oil contains polyunsaturated fatty acids, linoleic acid, monounsaturated fatty acids, oleic acid.

- **Polyphenols:** Coconut contains gallic acid, which is also known as phenolic acid. These polyphenols are responsible for the fragrance and the taste of coconut oil. Virgin coconut oil is rich in these polyphenols.

- **Derivatives of fatty acid:** It also contains betaines, ethanolamide, ethoxylates, fatty esters, fatty polysorbates, monoglycerides, and polyol esters.

- **Derivatives of fatty alcohols:** Apart from the above mentioned fatty acids it also contains fatty chlorides, fatty alcohol sulfate, and fatty alcohol ether sulfate.

## Uses of Coconut Oil

Top uses of coconut oil include:

- Skin moisturizer
- Nourish scalp and increase hair growth
- Culinary applications
- Carrier oil

**Use as a carrier oil:** Carrier oils easily penetrate or absorb into the skin, facilitating seepage or absorption of other oils (such as essential oils) and herbal extracts when mixed into it. It is easily absorbed through the skin's pores and thus is used as a carrier oil.

Coconut oil is expensive in several countries; however, in tropical countries, its cost is low enough to make it affordable as a carrier oil. It is best to use pure and fractionated coconut massage oil for skincare. [47]

### Where to buy?

Coconut oil is easily available online and in supermarkets. All you need to do is choose the right product based on your requirements

- Organic extra virgin coconut oil, unrefined
- Organic virgin coconut oil, unrefined
- Fractionated coconut oil



Etsy Mother's Day Gifts
Etsy

- Refined coconut oil
- Pure coconut oil for hair and skin

## How to use and store?

Unlike most other oils, coconut oil has a high melting point – about 24 to 25 degrees Celsius, or 76-78 Fahrenheit. Therefore, it turns solid whenever the temperatures lower below 76°F. You will often find it is in this form. It does not have to be kept in the refrigerator. If you want to liquify the solidified oil, just melt it under heat.

- If you are using it for topical purposes, especially hair care, just melt the oil (if it is solid) by keeping the bottle in the sun or soaking it in warm water. You can also take some oil out and put it in a small bowl and warm it. Then, take the oil on your palm and apply it to your hair.

- You can use coconut oil **for cooking** your favorite recipes. It can easily replace butter or vegetable oil.

- Coconut oil often comes in wide-mouthed containers. You also get it in a pack (tetra-pack or plastic pouch). After opening the pack, be sure to keep the oil in containers with a tight lid and wide mouth. This will help you scoop it out with a spoon if it solidifies. Also, be sure you seal the container well to avoid any attention of insects or rodents.

- Despite its benefits, a complete dietary switch to coconut oil is not recommended. This will mean that you will lose other benefits from more traditional oils and dairy products. However, it is a nice addition and flavor to add to any cook's repertoire.



👍 Like     🔗 Share



**About the Author**

Meenakshi Nagdeve, Co-Founder, Organic Facts is a health and wellness enthusiast and is responsible for managing it. She has completed the Nutrition And Healthy Living Cornell Certificate Program, Cornell University, US. She holds a Post Graduate Diploma in Management from IIM Bangalore and B. Tech in Metallurgical Engineering and Materials Science from IIT Bombay. Prior to this, she worked for a few years in IT and Financial services. An ardent follower of naturopathy, she believes in healing with foods. In her free time, she loves to travel and taste different types of teas.

**Report Error in this Article**

**Rate this article**

⭐⭐⭐⭐⭐

Average rating 4.3 out of 5.0 based on 7072 user(s).





Soursop tea is made from the leaves of the soursop plant. It is antioxidant-rich & may help with obesity, cough, nausea, & parasitic infections. Read for soursop tea

READ MORE



## 19 Health Benefits of Dragon Fruit (Pitaya)

Dragon fruit, rich in nutrients & low in calories, may be beneficial for fighting chronic illnesses, improving gut health, & boosting immunity. It is high in fiber & iron.

READ MORE



## 9 Proven Benefits & Uses of Aloe Vera

Aloe vera has long been used for skin conditions like sunburns, acne, & dermatitis, due to its rich antioxidant properties. It also helps lower blood sugar. Read more!

# EXHIBIT E

In the Matter Of:

TESTONE vs BARLEAN'S ORGANIC OILS

19CV0169 BTM MDD

---

# LAMARTINE PIERRE

*October 13, 2019*

---

*Non-Confidential*



800.211.DEPO (3376)
*EsquireSolutions.com*

EXHIBIT E
Page 197

1            UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4   MICHAEL TESTONE, COLLIN SHANKS, and  )Case No.
    LAMARTINE PIERRE, on behalf of      )19CV0169 BTM MDD
5   themselves, all others similarly     )
    situated, and the general public,    )
6                           )
                 Plaintiffs,      )
7                           )
    vs.                                  )
8                           )
    BARLEAN'S ORGANIC OILS, LLC,          )
9                           )
                  Defendant.       )
10 _____)

11

12

13        DEPOSITION OF LAMARTINE PIERRE

14         NONCONFIDENTIAL PORTIONS

15           October 13, 2019

16              9:39 a.m.

17

18         402 West Broadway, Suite 1550

19          San Diego, California 92101

20

21

22

23

24

25        Dalia R. Smith, CSR No. 8486



LAMARTINE PIERRE  Non-Confidential                    October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                  7

```
 1       A.  No.

 2       Q.  I know you flew in from New York, and that's

 3   taxing enough, but you feel rested and ready to give a

 4   deposition?

 5       A.  Yes.

 6       Q.  Okay.  If you want to take a break at any time

 7   feel free to do it.  I'm sure we'll have to take breaks

 8   from time to time, too.  I'd ask you not to do while

 9   there's a question pending.

10            Okay.  Where do you live?

11       A.  I live in Valley Stream, New York.

12       Q.  Is that on Long Island?

13       A.  Correct.

14       Q.  Or as we say Long Island.  How long have you

15   lived there?

16       A.  Fourteen years.

17       Q.  Okay.  So you lived in Valley Stream during the

18   entire class action period of this case, which is four

19   years from the time, back from the time the complaint was

20   filed; is that right?

21       A.  Yes, that's correct.

22       Q.  Okay.  Have you lived at the same address in

23   Valley Stream that entire time?

24       A.  Yes.

25       Q.  And what is that address?
```



LAMARTINE PIERRE  Non-Confidential                    October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                      13

```
 1        A.  Yes.

 2        Q.  Chicken?

 3        A.  Yeah.  Beef, goat.

 4        Q.  When did you first buy a jar of coconut oil made

 5   by anybody?

 6        A.  About five years ago.

 7        Q.  So about 2014 --

 8        A.  Correct.

 9        Q.  -- would that be right?  Okay.

10            Do you recall where you bought that coconut oil?

11        A.  I don't remember.

12        Q.  Okay.  Do you recall the brand of the coconut

13   oil that you bought in 2014?  First one.

14        A.  I don't recall the brand.

15        Q.  Do you know if it was Barlean's?

16        A.  No.  Actually, no, it wasn't.  It wasn't

17   Barlean's.

18        Q.  So since we've been talking about it has that

19   refreshed your recollection as to what brand it was?

20        A.  No, it doesn't refresh my recollection.

21        Q.  Do you remember the size that you bought?  Was

22   it a little jar?  I'm holding my hands about six inches

23   apart, or was it a big one, about 12 inches apart?

24        A.  It was a small jar.

25        Q.  Small jar.  Why did you buy the coconut oil the
```



LAMARTINE PIERRE  Non-Confidential                                October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                              14

1   first time?

2        A.  I was led to believe of the health benefits of

3   coconut oil.

4        Q.  Who led you to believe the health benefits of

5   coconut oil?

6        MR. JOSEPH:  Objection, assumes facts not in

7   evidence.

8   BY MS. JENKINS:

9        Q.  I'll rephrase the question.  How did you learn

10  of the health benefits of coconut oil that induced you to

11  buy it for the first time?

12       A.  Just the packaging and label of the coconut oil

13  products.

14       Q.  Had you read any articles about coconut oil

15  before you bought it the first time?

16       A.  Yes.

17       Q.  Do you recall where you read those articles?

18       A.  Online, but I can't recall the exact site and

19  source.

20       Q.  Had you spoken with anyone else who had used

21  coconut oil and recommended it?

22       A.  No.

23       Q.  What did you use for cooking before you bought

24  the first jar of coconut oil in 2014?

25       A.  I used cooking oil.



LAMARTINE PIERRE  Non-Confidential                    October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                    16

1      Q.  Okay.  What kind of cheese?

2      A.  Swiss cheese primarily.

3      Q.  How many separate purchases of coconut oil did

4  you make between 2014 and the time you got involved in

5  this case?

6      A.  I don't recall the number of times.

7      Q.  Was it a number of times, though?

8      A.  Yes.

9      Q.  More than 10?

10     A.  Yes.

11     Q.  More than 20?

12     A.  I don't think so.

13     Q.  Okay.  I'm just looking for your best estimate.

14  I'm not going to hold you to the number.  So you think

15  probably more than 10, but less than 20?

16     A.  Yes.

17     Q.  Okay.  Did you buy them all at the same place?

18     A.  No.

19     Q.  Do you remember any of the places where you

20  bought coconut oil during that period?

21     A.  Regardless of the brands?

22     Q.  Regardless of the brand.

23     A.  Vitamin Shoppe.

24     Q.  Is that the name of the store?

25     A.  Correct.



LAMARTINE PIERRE  Non-Confidential                      October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                    17

1          Q.   Where is that located in?

2          A.   In Valley Stream.

3          Q.   Valley Stream?

4          A.   Green Acres Mall.

5          Q.   Okay.  We won't sing the song from Green Acres.

6   Any other place?

7          A.   Amazon.

8          Q.   Amazon.  Okay.  When you bought coconut oil at

9   the Vitamin Shoppe at Valley Stream do you recall what

10  brand or brands you bought?

11         A.   No.

12         Q.   Do you remember if you bought Barlean's from the

13  coconut -- I'm sorry -- from the Vitamin Shoppe?

14         A.   I did not buy Barlean's at the Vitamin Shoppe.

15         Q.   Okay.  What brands of coconut oil did you buy

16  from Amazon?

17         A.   I don't recall.

18         Q.   Do you recall if you bought Barlean's Coconut

19  Oil from Amazon?

20         A.   I did not buy Barlean's from Amazon.

21         Q.   Okay.  I take it you did buy Barlean's at some

22  point?

23         A.   Yes.

24         Q.   And where did you buy it and when?

25         A.   Walmart.



LAMARTINE PIERRE  Non-Confidential                                    October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                                18

```
 1        Q.  Also in Valley Stream?

 2        A.  Correct.

 3        Q.  When was the first time that you bought

 4   Barlean's brand coconut oil from Walmart?

 5        A.  I believe four to five years ago.

 6        Q.  Was that before the first time that we talked

 7   about in 2014 or after?

 8        A.  Can you rephrase the question?

 9        Q.  Yeah.  You told me -- I asked you before about

10   your first purchase of coconut oil, and you told me that

11   it wasn't Barlean's, and it was about 20- -- in 2014.  So

12   I'm asking you was your purchase of Barlean's from

13   Walmart before that or after that?

14        A.  After.

15        Q.  After.  How many times did you buy Barlean's

16   brand coconut oil from the Walmart in Valley Stream?

17        A.  About five.

18        Q.  And, again, did you buy the small jar which is,

19   I'm indicating with my hands about six inches apart, or

20   the large jar which is about, my hands are about 12

21   inches apart?

22        MR. JOSEPH:  Objection, vague and ambiguous.

23        THE WITNESS:  I bought the 32 ounce.

24   BY MS. JENKINS:

25        Q.  The big one?
```



LAMARTINE PIERRE  Non-Confidential                        October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                      19

```
 1        A.  Yes.

 2        Q.  On each occasion?

 3        A.  Correct.

 4        Q.  Okay.  What led you to buy Barlean's brand

 5   coconut oil as opposed to any other brands of coconut oil

 6   when you bought it at Walmart in Valley Stream?

 7        A.  I was relying on the health benefits on the

 8   packaging label.

 9        Q.  Can you be anymore specific about the health

10   benefits that you relied on.

11        MR. JOSEPH:  Object, vague and ambiguous.

12        THE WITNESS:  Claim such as non-hydrogenated, raw

13   whole food, vegan; things of that nature.

14   BY MS. JENKINS:

15        Q.  Did you find that the Barlean's labels were

16   different from the other brands that you had bought

17   previously to Barlean's?

18        MR. JOSEPH:  Object, vague and ambiguous.

19        THE WITNESS:  I didn't -- I didn't see anything too

20   different from other brands, but Barlean's did indicate

21   that they were healthy and that they were good for my

22   health and especially for my heart health.

23   BY MS. JENKINS:

24        Q.  Were you concerned about your heart health at

25   the time?
```



LAMARTINE PIERRE  Non-Confidential                           October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                        20

```
 1        A.   No.
 2        Q.   You were concerned about your future heart
 3   health?
 4        A.   Just concerned about my health in general.
 5        Q.   Okay.
 6        A.   Yeah.
 7        Q.   Once you started buying the Barlean's brand
 8   coconut oil from Walmart in Valley Stream did you switch
 9   back to any other brand?
10        A.   No.
11        Q.   Would it be fair to say that Barlean's was the
12   last brand of coconut oil that you bought?
13        A.   Yes.
14        Q.   Okay.  Mr. Pierre, I'm going to show you a
15   couple of labels.  And I know they're small.  I brought a
16   magnifying glass.
17        A.   Okay.
18        Q.   So let's mark the first one as Exhibit -- might
19   as well start with 1.  This is not a trick question.  And
20   then this one is going to be Exhibit 2, and then this one
21   is going to be Exhibit 3.
22             (Exhibit 1 was marked for identification)
23             (Exhibit 2 was marked for identification)
24             (Exhibit 3 was marked for identification)
25              So like I said, I couldn't see it so I brought
```



1  the magnifying glass if you'd like to have it.

2      A.  Thank you.

3      Q.  Sure.  You have nice young eyes.  My old eyes

4  couldn't see anything without my glasses on.  And my

5  question is do any of these labels look familiar to you

6  as being on the jars of Barlean's Coconut Oil that you

7  bought at Walmart?

8          This is, like I said before, this is not a trick

9  question like Where's Waldo.  It's just to see if any of

10  them refresh your recollection as to the claims you may

11  have viewed on the label of the coconut oil.

12      A.  They all are very similar, the labeling.

13      Q.  Okay.  Is there any in particular that refreshes

14  your recollection as to the label that was on the jars

15  that you bought?

16      A.  In Exhibit 2.

17      Q.  Uh-huh.

18      A.  I do recall this particular, on this part where

19  the coconut oil --

20      Q.  You are pointing to the left hand box?

21      A.  Correct.  -- where it says contains Lauric Acid,

22  Caprylic Acid, Capric Acid.  Also Natural Source of

23  Medium Chain Triglycerides.  That was one of the key

24  factors in my purchasing the Barlean's Coconut Oil

25  because of the health claims of that, you know, for as a



LAMARTINE PIERRE  Non-Confidential                    October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              22

1    good fat.

2        Q.  How did you find out that Medium Chain

3    Triglycerides, or MCTs, was something that you wanted to

4    buy?

5        A.  It goes back to my research on the benefits of

6    coconut oil.

7        Q.  Tell me a little bit about your research in the

8    benefits of coconut oil.  What sort of research did you

9    do?

10       A.  I can't recall in exact detail.  All I do

11   remember is that I went online.

12       Q.  Was this before you bought coconut oil for the

13   for the first time?

14       A.  Correct.

15       Q.  Okay.  What was your understanding of the health

16   benefits of Medium Chain Triglycerides when you first

17   bought the Barlean's Coconut Oil?

18       A.  That they were good for heart health and not

19   increasing your cholesterol.

20       Q.  Was there anything else on Exhibit 2 -- I'm

21   sorry.  I think -- Exhibit 2 was the one you said looks

22   familiar?

23       A.  Correct.

24       Q.  Anything else on there that was particularly

25   appealing to you?



LAMARTINE PIERRE  Non-Confidential                    October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              23

```
1        A.  What stuck at me was the claims of non-GMO.
2    Organic.
3        Q.  Okay.
4        A.  Raw Whole Food.
5        Q.  Okay.
6        A.  Super food claim.
7        Q.  Super food?
8        A.  Yeah, super food.
9        Q.  Uh-huh.
10       A.  And vegan.
11       Q.  Okay.  What did you understand the super food
12   claim to mean?
13       A.  That this particular product isn't just a
14   regular food, but something of a higher caliber which
15   would be beneficial to my health.
16       Q.  Can you think of any other kinds of foods that
17   you consider to be super foods?
18       A.  Green super foods.
19       Q.  Green super foods?
20       A.  Correct.
21       Q.  What do you mean by that?
22       A.  There are certain plants that would be
23   considered super foods.  I can't recall the exact
24   names.
25       Q.  Okay.  Do you have any reason to believe as you
```



```
 1        A.  I know.

 2        Q.  What other conversations with your counsel or

 3   any other expert he may have retained, what is the basis

 4   for that belief?

 5        A.  I can't recall.

 6        Q.  As you sit here today do you believe that the

 7   Barlean's Coconut Oil was not a fair trade product?

 8        A.  I believe it was not a fair trade product.

 9        Q.  And again leaving aside conversations with your

10   counsel and his experts, what is the basis for that

11   belief?

12        A.  I can't recall.

13        Q.  As you sit here today do you believe that the

14   Barlean's Coconut Oil was not non-hydrogenated?

15        A.  I believe the Barlean's Coconut Oil product was

16   not hydrogenated.

17        Q.  And again leaving aside privileged conversations

18   with counsel and experts, what is the basis for that

19   belief?

20        A.  I can't recall the exact details.

21        Q.  Was it research that you did yourself?

22        A.  Yes.

23        Q.  Online?

24        A.  Yes.

25        Q.  Do you recall any particular statements that you
```



1    discovered in that research that led you to that

2    understanding?

3         A.  No.

4         Q.  Do you recall when you did that research?

5         A.  No.

6         Q.  Did you buy Barlean's Coconut Oil after you did

7    that research at any time?

8         MR. JOSEPH:  Objection, vague and ambiguous.

9         THE WITNESS:  Can you rephrase the question?

10   BY MS. JENKINS:

11        Q.  This keeps him awake.  He's allowed to do that.

12   After you did the research and you found you were led to

13   believe in some way that the Barlean's Coconut Oil was

14   not non-hydrogenated did you continue to buy Barlean's

15   Coconut Oil?

16        A.  I did not continue to buy.

17        Q.  Did you continue to buy anybody else's coconut

18   oil?

19        A.  No.

20        Q.  You stopped using coconut oil?

21        A.  Correct.

22        Q.  Does that help refresh your recollection about

23   when you did the research that led you to these

24   understandings?

25        A.  No.



1     Q.  Yeah.

2     A.  No.

3     Q.  Did you throw them all away?

4     A.  They were all consumed.

5     Q.  Did you have any Barlean's on hand, coconut oil

6  on hand when you did the research that led you to believe

7  that coconut oil was not healthful?

8     MR. JOSEPH:  Objection, vague and ambiguous.

9     THE WITNESS: No.

10 BY MS. JENKINS:

11    Q.  You had used it all up before then?

12    A.  Correct.

13    Q.  Did you have anybody else's coconut oil on hand

14 when you did that research?

15    A.  No.

16    Q.  Would it be fair to say that the research that

17 you did, not the research that you did before you first

18 bought coconut oil, but the research that you did later

19 about coconut oil which led you to believe that it was

20 not healthy for you, that you never used coconut oil

21 after that?

22    A.  Yes.

23    Q.  Okay.  Did you perform a search for, let's try

24 E, any and all documents related to your purchase of any

25 coconut oil product other than Barlean's coconut oil?



LAMARTINE PIERRE  Non-Confidential                          October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                      35

```
1        Q.  Did you do a search for any documents such as
2   receipts or cash register strips relating to your
3   purchase of Barlean's Coconut Oil?
4        A.  Yes.
5        Q.  And you didn't find anything?
6        A.  Didn't find anything.
7        Q.  Okay.  And would the same be true of B, the
8   actual Barlean's Coconut oil product that you
9   purchased?
10        A.  Yes.
11        Q.  All the jars are gone?
12        A.  Correct.
13        Q.  All right.  Would the same be true of E, which
14   is documents related to your purchase of coconut oil
15   other than made by Barlean's?
16        A.  Yes.
17        Q.  Okay.  And you did do a search for that?
18        A.  Yes.
19        Q.  Are you participating in any class actions
20   concerning coconut oil other than this one?
21        A.  No.
22        Q.  Are you aware that there are other class actions
23   concerning other brands of coconut oil?
24        A.  I'm not aware.
25        Q.  You are now.  Have you ever participated in any
```



 1    yes.

 2        Q.  Okay.  I'm not asking you anything that was

 3    said.  In your complaint in paragraph 133 you state that

 4    you purchased the 32 ounce size of Barlean's organic

 5    version coconut oil.

 6            Did you purchase any other type of Barlean's

 7    coconut oil?

 8        A.  No.

 9        Q.  Okay.  You didn't purchase butter flavored

10    coconut oil?

11        A.  No.

12        Q.  And you didn't purchase culinary coconut oil?

13    Those labels are for the organic version.

14        A.  I only purchased the organic version.

15        Q.  Okay.  How did you first get involved in this

16    case?

17        MR. JOSEPH:  Objection to the extent the answer

18    requires you to disclose communication between you and

19    your counsel.  I'm instructing you not to answer.

20            To the extent you could answer the question

21    without divulging such communications, you can answer.

22    If you can't, you could say so.

23        THE WITNESS:  Can't answer.

24    BY MS. JENKINS:

25        Q.  Well, how did it come to your notice that this



LAMARTINE PIERRE  Non-Confidential                              October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                            47

```
 1   these health claims, you know, re-examined.
 2        Q.  Do you recall how much you typically paid for
 3   your 32 ounce bottle of Barlean's Coconut Oil?
 4        MR. JOSEPH:  Objection, vague and ambiguous.
 5        THE WITNESS:  I don't remember.
 6   BY MS. JENKINS:
 7        Q.  Ballpark.
 8        MR. JOSEPH:  Same objection.
 9   BY MS. JENKINS:
10        Q.  $30, $40?
11        A.  I can't recall.
12        Q.  No recollection at all?
13        A.  No recollection.
14        Q.  Okay.  What do you expect to get out of this
15   case in terms of financial compensation?
16        MR. JOSEPH:  Objection, vague and ambiguous.
17        THE WITNESS:  I'm not too sure as it relates to the
18   financial, you know, the award.
19   BY MS. JENKINS:
20        Q.  Do you know what the status of the case is at
21   the moment?
22        MR. JOSEPH:  Objection, vague and ambiguous.
23        THE WITNESS:  Not sure.
24   BY MS. JENKINS:
25        Q.  Do you follow it online or any other way other
```



LAMARTINE PIERRE  Non-Confidential                          October 13, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                        50

```
 1                    REPORTER'S CERTIFICATION

 2

 3           I, Dalia R. Smith, a Certified Shorthand

 4   Reporter in and for the State of California, do hereby

 5   certify:

 6

 7           That the foregoing witness was by me duly sworn;

 8   that the deposition was then taken before me at the time

 9   and place herein set forth; that the testimony and

10   proceedings were reported stenographically by me and

11   later transcribed into typewriting under my direction;

12   that the foregoing is a true record of the testimony and

13   proceedings taken at that time.

14

15           IN WITNESS WHEREOF, I have subscribed my name

16   this 20th day of October 2019.

17

18

19
                                                                
20

21   _____

22   Dalia R. Smith, CSR No. 8486

23

24

25
```



1                      DEPOSITION ERRATA SHEET

2    Our Assignment No. J4517499

3    Case Caption:  Michael Testone, Collin Shanks, and
     Lamartine Pierre

4

5

6

7            DECLARATION UNDER PENALTY OF PERJURY

8            I declare under penalty of perjury that I have

9    read the entire transcript of my Deposition taken in the

10   above captioned matter or the same has been read to me,

11   and the same is true and accurate, save and except for

12   changes and/or corrections, if any, as indicated by me on

13   the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16            Signed on the _____ day of _____, 20___.

17

18

19        _____

20        LAMARTINE PIERRE

21

22

23

24

25



LAMARTINE PIERRE  Non-Confidential
TESTONE vs BARLEAN'S ORGANIC OILS

October 13, 2019
52

```
 1              DEPOSITION ERRATA SHEET

 2    Page No. _____ Line No._____ Change to:_____

 3    _____

 4    Reason for change: _____

 5    Page No. _____ Line No._____ Change to:_____

 6    _____

 7    Reason for change: _____

 8    Page No. _____ Line No._____ Change to:_____

 9    _____

10    Reason for change: _____

11    Page No. _____ Line No._____ Change to:_____

12    _____

13    Reason for change: _____

14    Page No. _____ Line No._____ Change to:_____

15    _____

16    Reason for change: _____

17    Page No. _____ Line No._____ Change to:_____

18    _____

19    Reason for change: _____

20    Page No. _____ Line No._____ Change to:_____

21    _____

22    Reason for change: _____

23

24    SIGNATURE:_____ DATE_____

25          LAMARTINE PIERRE - Nonconfidential Portions
```



```
 1                    DEPOSITION ERRATA SHEET

 2    Page No. _____ Line No._____ Change to:_____

 3    _____

 4    Reason for change: _____

 5    Page No. _____ Line No._____ Change to:_____

 6    _____

 7    Reason for change: _____

 8    Page No. _____ Line No._____ Change to:_____

 9    _____

10    Reason for change: _____

11    Page No. _____ Line No._____ Change to:_____

12    _____

13    Reason for change: _____

14    Page No. _____ Line No._____ Change to:_____

15    _____

16    Reason for change: _____

17    Page No. _____ Line No._____ Change to:_____

18    _____

19    Reason for change: _____

20    Page No. _____ Line No._____ Change to:_____

21    _____

22    Reason for change: _____

23

24    SIGNATURE:_____ DATE_____

25          LAMARTINE PIERRE - Nonconfidential Portions
```



# EXHIBIT F

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  MICHAEL TESTONE, COLLIN
    SHANKS, and LAMARTINE
 5  PIERRE, on behalf of themselves,
    all others similarly situated
 6  and the general public,

 7              Plaintiffs,    CASE NO 19CV0169 BTM MDD

 8         vs.

 9  BARLEAN'S ORGANIC OILS, LLC,

10              Defendant.

11  ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14                DEPOSITION OF

15                COLLIN SHANKS

16

17

18

19              OCTOBER 14, 2019

20               9:24 a.m.

21

22         402 West Broadway, Suite 1550
              San Diego, California
23

24

25         Amy L. Craychee, CSR No. 8777
```



COLLIN SHANKS                                        October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              7

```
 1   to sign the transcript, and then your counsel will let

 2   us know that you've signed it and of any changes that

 3   you have made to it.

 4          Where do you reside?

 5          A.   I reside -- my legal address is 2116 East

 6   Mardina Street, West Covina, California 91791.

 7          Q.   When you say that's your legal address, do you

 8   have a different address that --

 9          A.   Yes.

10          Q.   -- you live at?

11          A.   I'm a real estate investor.  I -- basically my

12   business model over -- been doing it for 30 years.  My

13   business model is I'll find a somewhat depressed

14   property, get a good price on it, renovate it, and I'm

15   staying at it while I'm renovating it.

16          Q.   I see.

17          A.   And then my -- I have family members -- close

18   family members and friends that also act as contractors,

19   and we all kind of go in there and slam the property to

20   get it to A paper property, and then we move on to the

21   next one.

22          Q.   Okay.

23          A.   So --

24          Q.   Where are you currently --

25          A.   My legal address is 2116 East Mardina Street,
```



COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              15

```
 1    question is what is Jarrow?  Jarrow is coconut oil.
 2        Q.  So that was a different coconut oil case?
 3        A.  Yes.
 4        Q.  Okay.
 5        A.  I don't understand why you're asking me what
 6    you already know.
 7        Q.  I just want to know what you know.
 8        A.  Oh, I'm sorry.  Continue.
 9        Q.  And were you a class representative in the
10    Jarrow case?
11        A.  Yes.
12        Q.  When did the Jarrow case -- when was the Jarrow
13    case filed, if you know?
14        A.  I don't remember the exact date.
15        Q.  I don't need the exact date.  Your best
16    estimate is fine.
17        A.  2018.
18        Q.  Do you know what the status of that case is
19    today?
20            MR. JOSEPH:  Objection.  Vague and ambiguous.
21    Calls for a legal conclusion.
22    BY MS. JENKINS:
23        Q.  Just your understanding.
24        A.  I believe it's going to some type of appeal, to
25    the best of my knowledge.  I'm not a lawyer so I don't
```



1  for the documents requested in his notice of deposition,

2  counsel for Mr. Shanks has handed me several documents

3  and put two jars of coconut oil on the table.

4        MR. JOSEPH:  For the record, the documents

5  given to defense counsel are Bates stamped Shanks 1

6  through 17.

7        MS. JENKINS:  They are.

8  BY MS. JENKINS:

9     Q.   Let me ask you first, Mr. Shanks, what are

10  these two jars of coconut oil?  Are these from you?

11     A.   Yes.

12     Q.   Okay.  Were these actual jars of coconut oil

13  that you purchased?

14     A.   Yes.

15     Q.   Okay.  Let's look at the one from Jarrow first,

16  if you would.  Do you have any recollection of when you

17  purchased that jar of coconut oil?

18     A.   It was in 2016.

19     Q.   Okay.  And you've had it since then?

20        MR. JOSEPH:  Objection.  Vague and ambiguous.

21        THE WITNESS:  Can you restate the question?

22  BY MS. JENKINS:

23     Q.   Yeah.  Do you recall when you purchased that

24  jar of coconut oil?

25     A.   My apologies.  This jar I did not purchase in



1    2016.

2        Q.    Okay.

3        A.    This would have been purchased definitely in

4    2018.

5        Q.    2018?

6        A.    Absolutely.

7        Q.    Do you recall if you purchased this jar of

8    coconut oil -- I guess we can refer to it as an exhibit.

9    What are we up to, 8?  Let's mark it as No. 8.  This is

10   the Jarrow extra virgin coconut oil, 16 fluid ounces

11   thing.

12              (Exhibit 8 marked)

13   BY MS. JENKINS:

14       Q.    Do you recall if you purchased Exhibit 8 before

15   or after you received an e-mail from Mr. Joseph's office

16   about becoming involved in the Jarrow coconut oil

17   litigation?

18       A.    Before.

19       Q.    Before?

20       A.    Yeah.

21       Q.    How often did you purchase Jarrow coconut oil

22   between 2014 and July of 2018?

23              MR. JOSEPH:  Objection.  Vague and ambiguous.

24              THE WITNESS:  Jarrow only?

25   ///



COLLIN SHANKS                                   October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              23

1    BY MS. JENKINS:

2        Q.    Jarrow only.

3        A.    I would say six to eight times.

4        Q.    Was it always this size, the same size as

5    Exhibit 8?

6        A.    Yes.

7        Q.    Was there any particular reason why you

8    purchased Jarrow coconut oil on those occasions as

9    opposed to some other brand of coconut oil?

10       A.    You're talking about the six to eight times I

11   purchased it, why --

12       Q.    Yes.

13       A.    -- did I purchase it?

14       Q.    Yes.

15       A.    I was -- because I needed more.

16       Q.    Okay.  My question goes to why you purchased

17   the Jarrow coconut oil on those occasions as opposed to

18   a different brand of coconut oil?

19            MR. JOSEPH:  Object to form.

20            THE WITNESS:  I was alternating.

21   BY MS. JENKINS:

22       Q.    You were alternating among brands of coconut

23   oil?

24       A.    Correct.

25       Q.    What other brands of coconut oil were you



 1   purchasing while you were alternating purchasing brands

 2   of coconut oil?

 3       A.   Barlean's.

 4       Q.   Any other brand?

 5       A.   No, not that I remember.

 6       Q.   What led you to purchase -- strike that.

 7            Was Jarrow the first coconut oil that you

 8   purchased?

 9       A.   Yes.

10       Q.   What induced you to purchase the Jarrow coconut

11   oil the first time?

12       A.   I was in Sprouts with my wife.  My wife is a

13   slow shopper.

14       Q.   We all are.

15       A.   I'm not so slow.  So killing time, I went to

16   the section where the coconut oil is.  Not going there

17   specifically, like, on a mission, right, for that, but

18   in that section, and then I noticed all the various

19   different coconut oils.  And then I picked up the Jarrow

20   bottle, and I read the label.  And based on my reading

21   of the label, I thought that would be a good product for

22   me.

23       Q.   Do you recall if the label that was on the

24   first bottle of Jarrow coconut oil that you purchased is

25   the same as the label on Exhibit 8?



COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              25

1    A.    You know, I'd have to have a photographic

2  memory because this -- to answer that question --

3    Q.    Yeah.

4    A.    -- really well for you.  Because for all I

5  know, they could have changed the label since the first

6  purchase in '16, and this was my last purchase in '18.

7    Q.    Okay.

8    A.    So it's kind of hard to answer that question

9  based, again, on not having a photographic memory of the

10  label from '16 to compare to this newer label.

11    Q.    If --

12    A.    Which may or may not be a newer label.

13    Q.    And I don't know because I don't represent

14  Jarrow.  Could you take a look at the label on Exhibit 8

15  and tell me if there's anything that jogs your memory

16  about something that appealed to you for your first

17  purchase of Jarrow coconut oil?

18          MR. JOSEPH:  Object to form.

19          THE WITNESS:  What appealed to me?

20  BY MS. JENKINS:

21    Q.    Yes.

22    A.    "Organic.  Unrefined.  Coconut is a source of

23  medium-chain triglycerides such as lauric acid, C12, and

24  caprylic acid, C8.  Coconut oil can be used as both

25  liquid or solid forms of cooking and baking.  Certified



COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                26

1    organic.  Source of medium-chain triglycerides.

2    Organic.  No trans fatty acids.  No hydrogenation."

3        Q.    Okay.  When you first bought Jarrow coconut

4    oil, and I think you said in 2016 when you were in

5    Sprouts waiting for your wife to finish her slow

6    shopping, did you look at any other coconut oil brand

7    labels?

8        A.    On that -- I may have picked up some others,

9    but I don't have a specific memory of that.

10       Q.    Do you recall if you bought the Jarrow product

11   because you thought it was superior to the other coconut

12   oil brands that were at Sprouts that day?

13           MR. JOSEPH:  Object to form.

14           THE WITNESS:  Ask the question one more time,

15   please.

16   BY MS. JENKINS:

17       Q.    Do you recall if you bought -- if you picked up

18   the Jarrow product and bought it because you thought for

19   some reason it was superior to the other coconut oil

20   brands that were on the shelf at Sprouts that day?

21       A.    Oh, you put an if --

22           MR. JOSEPH:  Object to form.

23           THE WITNESS:  Yeah, you put an if in there.

24   Can you restate the question?

25   ///



COLLIN SHANKS                                           October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                               33

1    A.    It's so infrequent that I do this, and I'm

2   already eating the pizza under the condition that this

3   is my treat and it's not a regular thing, so no, I do

4   not go into that level of detail because I'm just

5   assuming it's probably not the best thing for me.

6    Q.    Okay.  During the period from 2014 to 2018,

7   say, how many times would you say that you would

8   normally go out for pizza?  How many times a month?

9         MR. JOSEPH:  Object to form.

10        THE WITNESS:  It's hard to say.  I'll go in

11  spurts, right, so I might go four months and not do it,

12  and then maybe I'll have a month where it's two so --

13  BY MS. JENKINS:

14   Q.    Two times?

15   A.    In one month.

16   Q.    Okay.

17   A.    But then maybe I go four without, so it's

18  actually extremely difficult to answer that question --

19   Q.    Okay.

20   A.    -- accurately because it relies on a super,

21  super recording memory, but I just kind of know the

22  general answer to the question, and I think I've

23  answered it as best I can.

24   Q.    Okay.  Do you go to any fast -- during the same

25  period, 2014 through 2018, did you go to any fast food



COLLIN SHANKS                                              October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                      34

1    restaurants?

2         A.    Between 2014 and 2018, yes, I have.

3         Q.    Can you list any of them for me?

4         A.    Sure, In-N-Out, Del Taco.

5         Q.    McDonald's?

6         A.    Hate McDonald's; however, I did try the McRib

7    once probably in that time period, and I didn't like it.

8         Q.    I don't like it either.

9         A.    I don't know what the big deal is.

10              Wienerschnitzel.

11        Q.    What do you eat at Wienerschnitzel?

12        A.    One chili cheese dog with water, no fries,

13   because I know it's --

14        Q.    That's your usual order?

15        A.    I -- in that time period, I've probably been to

16   Der Wienerschnitzel twice.

17        Q.    Okay.

18        A.    Probably just twice in all that time.  And

19   occasionally for some reason I have a strong craving for

20   the salt, the fat and the sugar that I know they put in

21   that nasty hotdog, but sometimes I want that.  And I

22   know it's horrible, so I will just order the one just to

23   get the craving out.

24        Q.    Where do you usually do your grocery

25   shopping -- or let me rephrase that.



1  | Because on a Costco trip, we could be buying for up to

2  | four adults and three minors.  Five adults and two

3  | minors now.

4  | BY MS. JENKINS:

5  |     Q.   Okay.

6  |     A.   So when you say buy, you've got to tighten up

7  | buy.

8  |     Q.   That's funny.  I would --

9  |     A.   You understand what I'm saying?

10 |     Q.   Yeah, I'm just --

11 |     A.   Because if I'm buying a bedroom set for my

12 | sister-in-law, did you buy a bedroom set?  The answer is

13 | yes.

14 |     Q.   Let me rephrase it.  I'm surprised that buy was

15 | the problem.  I thought junk food would be the problem.

16 |     A.   No, not at all, not at all.  So you just

17 | basically have -- maybe don't use buy.  Maybe use

18 | consumed that you purchased.

19 |     Q.   That's where I was going to go.  During the

20 | period from 2014 to 2018, did you buy for your own

21 | consumption what we would consider junk food?

22 |         MR. JOSEPH:  Object to form.  You can answer

23 | the question.

24 |         THE WITNESS:  Now you're defining junk food.

25 | ///



1    BY MS. JENKINS:

2        Q.    See.

3        A.    Okay.  In '14 to '18 for my own personal

4    consumption have I ever bought junk food by my

5    definition and the common definition, the answer would

6    be yes.

7        Q.    What kinds of junk food did you buy during that

8    period?

9        A.    I'm ashamed to say it, but going back to '14, I

10   have bought gummy bears and licorice.

11       Q.    Anything else you can think of?

12       A.    Five years.  I've eaten potato chips.  Want me

13   to keep trying to think?

14       Q.    Anything else you can think of?

15       A.    It's so rare.  I mean, it's so rare because I

16   have such a revulsion -- I mean, like, I would eat Red

17   Vines every day if it wouldn't kill me.  You know what

18   I'm saying?  So you're kind of, like, saying when you

19   are weak?  I'm occasionally weak, and I've bought Red

20   Vines.  Am I proud of it?  No.

21       Q.    It's okay.  You can tell us.  We're not judging

22   you.

23       A.    I really can't -- I mean, there's probably

24   more, but that's what I -- those are the ones that are

25   my biggest temptation that I try to avoid, but I have



COLLIN SHANKS                                    October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                          39

1  succumbed in the five-year window that you're giving me.

2      Q.   Okay.  Going back to 2016 through -- I'm

3  sorry -- yes, 2016 through 2018, which is apparently the

4  period during which you were buying coconut oil --

5      A.   Uh-huh.

6      Q.   -- because you told me your first purchase was

7  in 2016?

8      A.   Uh-huh.

9      Q.   And that was Exhibit 8, the -- not exactly this

10 jar of Jarrow, but it was a jar of Jarrow coconut oil at

11 Sprouts?

12     A.   Uh-huh.

13     Q.   You said you alternated with buying Jarrow

14 coconut oil and Barlean's coconut oil.  Does that sound

15 right?

16     A.   Yes.

17     Q.   Okay.  Where did you buy your first bottle of

18 Barlean's coconut oil?

19     A.   To the best of my memory, it was also Sprouts.

20     Q.   Okay.  Did you buy coconut oil, either Jarrow

21 or Barlean's, at anyplace other than Sprouts?

22     A.   Yes.

23     Q.   Where?

24     A.   The small, like, independent style -- like,

25 they have a name but you can't remember the name,

COLLIN SHANKS                                      October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                  40

1  independent, like, nutritional stores, health food

2  stores, that sort of thing.

3      Q.   Did you go into those stores specifically

4  looking for coconut oil?

5      A.   Generally, on those I'm with my wife, and she's

6  kind of driving that train, so --

7      Q.   What do you mean by driving that train?

8      A.   She's kind of the lead in that, so I'm kind of

9  along for the ride type situation.  And then, like, you

10 know, and then I, like, browse around and maybe I find

11 something I want, but it's kind of like I'm with her.

12     Q.   Okay.

13     A.   But sure, I also purchased it in independent

14 places as well.  And I use the word independent because

15 they're little, family owned, and I can't remember the

16 names.

17     Q.   Do you recall how long after you bought the

18 first jar of Jarrow coconut oil that you purchased a

19 bottle or a jar of Barlean's coconut oil?

20     A.   It was very soon.  In fact, I still had quite a

21 bit of the Jarrow remaining.

22     Q.   What led you to purchase the Barlean's coconut

23 oil while you still had Jarrow coconut oil remaining?

24          MR. JOSEPH:  Object to form.

25          THE WITNESS:  When I first used the Jarrow, the



EXHIBIT F
Page 235

COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              41

1    first thing I did is I fried an egg in it.  And it was

2    okay, but I didn't particularly like the taste because I

3    missed the butter.  So when I went back out, this time I

4    did kind of, like, want to look for an alternative, and

5    then I went back to the coconut oil section and found

6    the Barlean's, specifically the butter flavor.

7    BY MS. JENKINS:

8        Q.   Was this in the same Sprouts where you had

9    purchased the Jarrow coconut oil for the first time?

10       A.   Yeah.  To the best of my memory, it was.  You

11   know, at the time I was doing it, I didn't know I'd be

12   asked about it now, but to the best of my knowledge, it

13   was the same Sprouts.

14       Q.   Okay.  This will be Exhibit 9.

15            (Exhibit 9 marked)

16            MS. JENKINS:  This is from Jarrow?

17            MR. JOSEPH:  I guess you can put them on the

18   top.

19            MS. JENKINS:  Off the record.

20            (Off the record)

21   BY MS. JENKINS:

22       Q.   We're going to refer to this, at least for

23   purposes of this deposition, as Exhibit 9.  This is a --

24   appears to be a jar of Barlean's butter flavored coconut

25   oil, 16 fluid ounces.  Did that come from you?



COLLIN SHANKS                                              October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                      43

1   deposition?

2        A.   Yes.

3        Q.   That's correct?

4        A.   Yes.

5        Q.   Do you have any recollection of when you bought

6   Exhibit 9, the Barlean's coconut oil jar?

7        A.   Very soon after the Jarrow.

8             MR. JOSEPH:  That specific bottle is the

9   question.

10            THE WITNESS:  Oh, not -- so this specific

11  bottle?

12            MS. JENKINS:  Yes.

13            THE WITNESS:  '18.  Sorry.  I keep getting --

14            MR. JOSEPH:  Listen to the question carefully.

15            THE WITNESS:  I'm sorry.

16  BY MS. JENKINS:

17       Q.   How many jars of Barlean's butter flavored

18  coconut oil do you estimate that you bought between 2014

19  and 2018?

20       A.   Specifically butter, not just --

21       Q.   Yes.

22       A.   I would say probably between three to four.

23  Give me that date range that you said?

24       Q.   2014 through 2018.

25       A.   Starting -- answer is correct.



COLLIN SHANKS
TESTONE vs BARLEAN'S ORGANIC OILS

October 14, 2019
44

1    Q.    Okay.  Three to four butter?

2    A.    Yeah.

3    Q.    Did you buy any other flavors of Barlean's

4    coconut oil during the same period?

5    A.    Yes.

6    Q.    What flavor did you buy?

7    A.    The virgin.

8    Q.    How many jars of Barlean's virgin coconut oil

9    did you buy --

10    A.    Three to four.

11    Q.    -- during that period?

12    A.    Yeah.

13    Q.    Wait until I finish my question --

14    A.    Sorry.

15    Q.    -- to make sure you're answering the question

16    that's being asked.  It's hard.

17          Did you continue to buy the Jarrow coconut oil

18    at the same time that you were buying the Barlean's

19    butter flavored coconut oil and the Barlean's virgin

20    coconut oil?

21    A.    I did.

22    Q.    Was there any reason why you continued to buy

23    both brands?

24    A.    This may sound silly, but I'm really precise

25    about how I cook, and there was some things that I



COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                45

1    preferred the Barlean's for and some things I preferred

2    the Jarrow for because they were -- they're not exactly

3    the same.

4        Q.    Just generally, how did they seem to be

5    different to you?

6        A.    It's hard to answer that because this is a

7    creative question because cooking is a creative task.

8        Q.    Uh-huh.

9        A.    Some just held up under -- they had their way

10   of holding up under better conditions.  For one example,

11   butter is best for eggs.  That's one example.

12       Q.    Can you think of anything that the Jarrow

13   coconut oil was better for than the Barlean's virgin

14   coconut oil?

15            MR. JOSEPH:  Object to form.

16            THE WITNESS:  Which one?

17   BY MS. JENKINS:

18       Q.    Was there anything in your opinion that the

19   Jarrow extra virgin coconut oil was better for than the

20   Barlean's extra virgin coconut oil?

21       A.    So you're comparing --

22            MR. JOSEPH:  Object to form.

23            THE WITNESS:  Sorry.  So you're comparing, in

24   your question, the non-butter Barlean's to the

25   non-butter Jarrow?



COLLIN SHANKS                                                        October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                                46

```
 1   BY MS. JENKINS:
 2        Q.   That's correct.
 3        A.   Okay.  And you're asking what product am I
 4   producing where one performed better than the other?
 5        Q.   Yes.
 6        A.   Okay.  Jarrow tended to perform better in
 7   baking, by my estimation.  Now, understand this is
 8   totally subjective.  Someone else may have the opposite.
 9   And it tended to work better with sweet, by my
10   experience.  And the Barlean's non-butter tended to work
11   better with savory.
12        Q.   Okay.
13        A.   Does that make sense?
14        Q.   That's fair.  I understand what you're saying.
15        A.   And, again, a different person can have a
16   totally different opinion.
17        Q.   Would it be fair to say that you purchased your
18   first jar of Barlean's coconut oil because it was butter
19   flavored?
20        MR. JOSEPH:  Objection.  Misstates prior
21   testimony.  Object to form.
22        THE WITNESS:  Can you restate the question?
23   BY MS. JENKINS:
24        Q.   Sure.  You've already testified that in 2016
25   you bought your first jar -- not necessarily this jar,
```



EXHIBIT F
Page 240

COLLIN SHANKS                                                    October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                           47

1  Exhibit 8 -- but your first jar of Jarrow coconut oil?

2      A.   Right.

3      Q.   And that before you had finished that jar, you

4  bought a jar of Barlean's butter flavored coconut oil?

5      A.   Uh-huh.

6      Q.   My question is, did you buy the Barlean's

7  butter flavored coconut oil primarily because it was

8  butter flavored?

9           MR. JOSEPH:  Object to form.

10           THE WITNESS:  The butter attracted me to the

11  jar.  Once I saw the butter, which is what drew my eye

12  because that was -- solved my egg issue, then I did the

13  exact same thing I did with Jarrow.  I read the label

14  because -- and I may be wrong, but in my mind, I would

15  say that not all coconut oils are the same, just like

16  not all gasolines are the same.  Some are 91 octane,

17  some of 87 octane, right?  There's a million examples I

18  can give you.  Peanuts, they probably have varying

19  degrees of salt, right?  So not all peanuts are created

20  equal.  So coming from enjoying cooking and knowing the

21  importance of the various characteristics of a specific

22  base food, the butter attracted me, but then I did the

23  exact same due diligence that I do with all products,

24  especially packaged products, is I read the label up and

25  down like the same way I did for Jarrow, to make sure



COLLIN SHANKS                                    October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                            48

1   that this would be something that I think was safe for

2   me to eat.  And so the answer to your question is the

3   butter is what attracted me, but it was the label as a

4   whole that made me say this is probably a good choice

5   for me, based on what I read.

6   BY MS. JENKINS:

7        Q.   Prior to the time that you bought your first

8   jar of Barlean's coconut oil, had you ever seen any

9   advertising for Barlean's?

10       A.   None that I recall, no.

11       Q.   Had you ever gone to Barlean's website?

12       A.   Prior to purchasing it?

13       Q.   Yes.

14       A.   Not that I recall, no.

15       Q.   So you were not familiar, prior to your first

16  purchase of Barlean's coconut oil, with the name

17  Barlean's?

18       A.   Correct, I think, yes.

19       Q.   Okay.  What on the label attracted you -- or

20  let me rephrase that.

21            What on the label of the butter flavored

22  coconut oil led you to finalize that purchase?

23            MR. JOSEPH:  Objection.  Object to form.  Also,

24  plaintiff does not have a jar of the coconut oil label

25  in front of him.



COLLIN SHANKS                                              October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                    51

```
 1        Q.    Yeah.  I mean -- I guess what I'm asking you
 2   is, there were various labels on Barlean's butter
 3   flavored coconut oil over the period of time that you
 4   were purchasing it.
 5        A.    Okay.
 6        Q.    And I'm asking you if Exhibit 10, by looking at
 7   it, refreshes your recollection as to any other things
 8   on the label which you found attractive at the time that
 9   you were buying that coconut oil?  This is not a test to
10   see if you can figure out what's different from
11   Exhibit 9 and Exhibit 10.
12             MR. JOSEPH:  Asking you if there's anything on
13   here that attracted you to purchase the product,
14   essentially.
15             THE WITNESS:  Okay.  I can do that.
16             MS. JENKINS:  I'm sure you can.
17             THE WITNESS:  "The rich flavor of butter.
18   Butter flavored.  Organic.  Delicious on toast."  Well,
19   I already know that.  "Organic.  No trans or
20   hydrogenated fats.  No coconut flavor or odor.  No GMO.
21   Cholesterol free."  Big.  "Substitute 1.1 for butter."
22   The frying cap is 375.  That would be important to me of
23   course.  The melt rate would be important to me, 76.
24   "Pure.  Organic.  Butter.  Healthy alternative to
25   butter."  Big.  "No trans fat.  Non-GMO.  USDA organic."
```



COLLIN SHANKS                                    October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              52

1   Ya.

2   BY MS. JENKINS:

3       Q.   Okay.

4       A.   In Spanish "ya" means complete.  Sorry.  My

5   wife speaks Spanish.

6       Q.   We're going to mark as Exhibit 11 another label

7   from Barlean's coconut oil butter flavored, 16 ounces.

8            (Exhibit 11 marked)

9            THE WITNESS:  This is different than this one?

10  BY MS. JENKINS:

11      Q.   Not necessarily.  I'm just asking you if

12  there's anything on this exhibit, Exhibit 11, that

13  refreshes your recollection as to any -- anything that

14  was on the label that you relied on in making your

15  purchase?

16           MR. JOSEPH:  Object to form, but essentially

17  the same exercise.

18           THE WITNESS:  Oh, so I'm going to follow the

19  same guidance.

20  BY MS. JENKINS:

21      Q.   Okay.

22      A.   Would it save time if I -- no, probably not

23  because it's probably a different -- is this a different

24  label or not?

25      Q.   It is -- well --



COLLIN SHANKS                                         October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                           53

1        A.    If it's not, then to save time I would just

2    say --

3              MR. JOSEPH:    Please just answer the question

4    asked.

5              THE WITNESS:    Sorry.    "Rich flavor of butter.

6    Organic.    No trans or hydrogenated fats.    No coconut" --

7    strike that.    No, not strike.    "No coconut flavor.    No

8    GMO.    Cholesterol free.    Substitute 1.1 for butter.

9    USDA organic.    Frying 375 cap, 76 below.    Butter.

10   Healthy alternative to butter.    Organic.    Pure.    No

11   trans fat.    USDA organic.    Non-GMO."    Complete.

12   BY MS. JENKINS:

13       Q.    I meant to ask you, you said that the statement

14   cooking and frying under 375 Fahrenheit was important to

15   you.  Why is that important?

16       A.    It's a burn point.    You don't want to burn your

17   oil.  You ruin everything.

18       Q.    I'm not much of a cook.

19       A.    Including your ceiling.

20       Q.    And I think you also mentioned that the melt

21   rate of 76 degrees Farenheit was important.

22       A.    You want to know when it becomes no longer a

23   solid versus a --

24       Q.    Is that important in cooking?

25       A.    It is.



COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                  54

1      Q.   Okay.

2      A.   It is because baking is chemistry basically.

3  Baking is.

4      Q.   I'll take your word for it.

5      A.   Yeah.

6      Q.   Okay.  The next exhibit I think is 13 -- 12.

7           (Exhibit 12 marked)

8  BY MS. JENKINS:

9      Q.   We've marked as Exhibit 12 another Barlean's

10  butter flavored coconut oil label.

11      A.   Okay.

12      Q.   Which I think is a little different from the

13  first two that we looked at.

14      A.   Okay.  Same exercise?

15      Q.   Same exercise.  Is there anything on this label

16  that compelled -- not compelled.  Is there anything on

17  this label that led you to purchase Barlean's coconut

18  oil?

19           MR. JOSEPH:  Object to form.  You can answer.

20           THE WITNESS:  "Our butter flavored coconut oil

21  has all the healthy MCTs of our regular organic coconut

22  oil with a rich buttery taste.  No cholesterol, trans

23  fat or" -- it should be nor -- "hydrogenated fats.

24  Organic.  Substitute 1.1 for butter.  Soft or solid.

25  Goes anywhere butter goes.  Butter flavored.  The health



COLLIN SHANKS                                      October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                            55

1   benefits of coconut oil, the rich taste of butter.  Sub

2   1.1 for butter.  Grill, bake, drizzle, cook.  USDA

3   organic.  Non-GMO.  Tastes like butter."  Complete.

4           MR. JOSEPH:  Just for the record, I just want

5   to note that the witness was using a magnifying glass to

6   examine the exhibits that were used, the labels that

7   were produced.

8           MS. JENKINS:  That's fine.

9   BY MS. JENKINS:

10      Q.   As you sit here today, do you have any reason

11  to believe, other than through conversations with your

12  counsel, that the Barlean's butter flavored coconut oil

13  that you purchased does not contain MCTs?

14      A.   I don't have a reason not to believe that, no.

15      Q.   Did you find that it had a buttery taste?

16      A.   I did.

17      Q.   Do you have any reason to believe as you sit

18  here today that the Barlean's butter flavored coconut

19  oil contains cholesterol?

20          MR. JOSEPH:  Object to form.

21          THE WITNESS:  Do I have to reason to believe --

22  I don't have a reason to not believe that statement, no.

23  BY MS. JENKINS:

24      Q.   So you believe the statement that Barlean's has

25  no cholesterol; is that one way of putting it?  Let me



COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              63

1  product, right?  Because it's got all these wonderful

2  benefits and I'm willing to pay, right, like, a premium

3  for something like that, right?  And this -- almost,

4  like, hey, throw out the butter, throw out the olive

5  oil, throw out -- right?  Because you pick up a brick of

6  butter -- sorry, you pick up a brick of butter, it's not

7  talking about -- it's just butter, right?  And so, like,

8  butter's butter.  It's a fat.  You know, maybe it's --

9  it's okay in moderation, don't go crazy, but this is

10  kind of, like, telling me moderation -- this gestalt, as

11  a whole, I can loosen up some of those levers and

12  moderate less, but the saturated fat is a problem.

13  BY MS. JENKINS:

14      Q.   As you sit here today, you believe that --

15  well, strike that.

16          When you first bought the Barlean's butter

17  flavored coconut oil in 2016, did you realize it was a

18  saturated fat?

19      A.   It's a fat.

20      Q.   Did you look at the label and see that it was a

21  saturated fat?

22      A.   I answered that question before, but I'll

23  answer it again.  I already knew it was a fat.  So I

24  knew it was a fat, but I was finding this to be a

25  healthy fat.  So the fat wasn't important to me because



COLLIN SHANKS                                      October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              64

1    I already knew it was a fat, if that makes sense.  I

2    mean, it's a fat.

3         Q.   Was it important to you to buy a fat that was

4    not a saturated fat when you first bought the Barlean's

5    butter flavored coconut oil?

6         A.   Not all saturated fat is unhealthy.  It's

7    important to have a healthy fat is my answer.

8         Q.   So, to your understanding, a saturated fat can

9    be healthy; is that correct?

10        MR. JOSEPH:  Object to form.  Calls for expert

11   testimony.

12        THE WITNESS:  I wouldn't agree with that

13   exactly.

14   BY MS. JENKINS:

15        Q.   In 2016, was it your intention to stay away

16   from saturated fats?

17        MR. JOSEPH:  Objection.  Vague and ambiguous.

18        THE WITNESS:  You have to tighten up stay away.

19   BY MS. JENKINS:

20        Q.   To not purchase saturated fats for cooking?

21        MR. JOSEPH:  Object to form.  You can answer.

22        THE WITNESS:  I did not have an objective to

23   not purchase saturated fat.

24   BY MS. JENKINS:

25        Q.   What was your understanding in 2016 of the



COLLIN SHANKS                                    October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                          66

```
 1   correct?

 2        A.   Uh-huh.

 3        Q.   That's a yes?

 4        A.   Yes.  Sorry.

 5        Q.   Thank you.  That's all right.  I'm going to

 6   mark as Exhibit 13 a -- you want to take a break?

 7             MR. JOSEPH:  Yes.

 8             MS. JENKINS:  Absolutely.

 9             (Exhibit 13 marked)

10             (Recess)

11   BY MS. JENKINS:

12        Q.   Before we move on to the organic virgin coconut

13   oil, do you have any recollection of what you paid for

14   the 16-ounce size of the butter flavored coconut oil,

15   the Barlean's?

16        A.   Somewhere around $15 would be my best

17   recollection.

18        Q.   Okay.  Exhibit 13 purports to be, and I will

19   represent to you that it is, a label from Barlean's

20   organic virgin coconut oil, 16 fluid ounces.  And we're

21   going to do this all at one time so it's a little easier

22   for you I think.  We're going to mark next as 14 another

23   Barlean's extra virgin coconut oil label.  And we're

24   going to mark as 15 a third Barlean's coconut oil label.

25        A.   Okay.
```



COLLIN SHANKS                                      October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              67

```
 1              (Exhibits 14 and 15 marked)
 2   BY MS. JENKINS:
 3        Q.   And I will represent to you that all three of
 4   these were in use during the period from 2014
 5   through 2018 when you were purchasing Barlean's extra
 6   virgin coconut oil.  If you take a look at Exhibit 13
 7   with your magnifying glass, was there anything on the
 8   label that caused you to buy the Barlean's organic
 9   virgin coconut oil as opposed to the Jarrow extra virgin
10   coconut oil that you had been buying?
11        A.   As opposed?
12        Q.   Well, my understanding is that you first bought
13   Jarrow extra virgin coconut oil.  That was your first
14   coconut oil purchase?
15        A.   Correct.
16        Q.   And your next coconut oil purchase was
17   Barlean's butter flavored coconut oil; correct?
18        A.   Correct.
19        Q.   Let's ask it this way:  Why did you buy the
20   Barlean's organic virgin coconut oil in addition to or
21   instead of the Jarrow extra virgin coconut oil?
22        A.   Because I still had the Jarrow.  I didn't need
23   more at that time.
24        Q.   What made you switch to a different brand of
25   the same product then?
```



1       A.   Not a switch, a concurrent.

2       Q.   Okay.  What made you buy a bottle of Barlean's

3   extra -- or organic virgin coconut oil while you still

4   had Jarrow extra virgin coconut oil at home?

5       A.   I answered that before, but I'll answer that

6   again.

7         (Telephonic interruption)

8   BY MS. JENKINS:

9       Q.   At some point you purchased the Barlean's

10  organic virgin coconut oil even though you had a bottle

11  of unfinished Jarrow extra virgin coconut oil at home;

12  is that correct?

13      A.   Yes.

14      Q.   What made you -- what induced you to make that

15  purchase?

16      A.   I wanted to try an alternative non-butter to

17  Jarrow, like, for the quote/unquote test kitchen, right?

18  My test kitchen.

19      Q.   Okay.  Did you look at any other brands other

20  than Barlean's when you wanted to buy that alternative?

21      A.   We're talking about virgin or butter?

22      Q.   Virgin.

23      A.   Not that I recall, no.

24      Q.   And you already had bought the Barlean's butter

25  flavored by that time; correct?



COLLIN SHANKS                                             October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                     69

1      A.   No, I bought them both at the same time.

2      Q.   You bought them both at the same time?

3      A.   Yeah.

4      Q.   All right.  Taking a look at Exhibit 13, are

5    there any statements on the label that you felt were

6    important to your purchase of the Barlean's organic

7    virgin coconut oil at the time?

8      A.   Same exercise as before?

9      Q.   Yes.

10     A.   "Non-GMO.  Non-hydrogenated.  Organic.

11   Harvested at the peak of flavor.  Lauric acid," so I

12   think lauric acid is untrue.  And also, some of these

13   statements are misleading too.  So they may be true, but

14   they're also misleading.  Sorry.  I got off on a

15   tangent.  I'll continue.

16          MR. JOSEPH:  Just identify the statements.  And

17   to the extent -- just read the full statements, all the

18   words that were important to you.

19          THE WITNESS:  Like before.

20   BY MS. JENKINS:

21     Q.   He doesn't want you mumbling to yourself.

22     A.   Sorry.  Sorry.  "Caprylic acid.  Great source

23   of medium-chain triglyceride.  May be used straight.

24   USDA organic.  Organic.  Cold pressed.

25   Non-hydrogenated.  Non-GMO.  Organic."  Ya.  Continue?



1    Q.    When did you stop buying coconut oil?

2    A.    When I received the e-mail.

3    Q.    From Mr. Joseph's office?

4    A.    Yes.

5    Q.    Prior to you receiving that e-mail, which we

6    marked as -- well, strike that.

7            Prior to receiving the e-mail from Mr. Joseph's

8    office, had you read or heard anything about coconut oil

9    that caused you to question whether or not it was a

10   healthful fat?

11   A.    Not really, no.  Not that I recall, at least.

12   Q.    After you received the e-mail from Mr. Joseph's

13   office, did you do any independent research into the

14   health aspects of coconut oil?

15   A.    Yes, I started -- I started -- I started poking

16   around a little bit.

17   Q.    Okay.

18   A.    Talked to my wife, right?  And she's pretty

19   health conscious and -- yeah, so I started to become

20   more aware of it, yes.

21   Q.    Did you do research on the Internet, for

22   example?

23   A.    Probably.  I don't specifically recall doing

24   something.  I may have gone to the Barlean's website,

25   but most likely -- I'm just saying it tepidly because I



COLLIN SHANKS                                          October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                               79

```
 1   Exhibit 18?
 2        A.   Yes.
 3        Q.   When did you send those to your counsel?
 4             MR. JOSEPH:  Objection.  Vague and ambiguous.
 5             THE WITNESS:  I don't remember the exact date.
 6   BY MS. JENKINS:
 7        Q.   Was it shortly after you received the e-mail
 8   from Mr. Joseph's office in July of 2018?
 9        A.   I think that's fair.
10             MR. JOSEPH:  Objection.  Vague and ambiguous.
11             THE WITNESS:  Sorry.  I think that's fair to
12   say.
13   BY MS. JENKINS:
14        Q.   Okay.  Do you smoke?
15        A.   Tobacco?  No.
16        Q.   Yes.  Have you ever?
17        A.   Yes, I quit.
18        Q.   When did you quit?
19        A.   2011, to the best of my memory.
20        Q.   Okay.  Do you drink alcoholic beverages?
21        A.   I quit, 2011, to the best of my memory.
22        Q.   Okay.  Haven't had one since?
23        A.   Haven't had one since.
24        Q.   Do you vape?
25        A.   Yes.
```



```
 1                  REPORTER'S CERTIFICATION

 2

 3        I, the undersigned, a Certified Shorthand Reporter

 4   of the State of California, do hereby certify:

 5          That the foregoing proceedings were taken before me

 6   at the time and place therein set forth; that any

 7   witnesses in the foregoing proceedings, prior to

 8   testifying, were administered an oath; that a record of

 9   the proceedings was made by me using machine shorthand,

10   which was thereafter transcribed under my direction;

11   that the foregoing transcript is a true record of the

12   testimony given.

13          Further, that if the foregoing pertains to the

14   original transcript of a deposition in a federal case,

15   before completion of the proceedings, a review of the

16   transcript [ X ] was [  ] was not requested.

17        I further certify I am neither financially

18   interested in the action nor a relative or employee of

19   any attorney or any party to this action.

20

21        IN WITNESS WHEREOF, I have subscribed my name this

22   18th day of October, 2019.

23

24        _____

25        Amy L. Craychee, CSR No. 8777
```



```
 1                     DEPOSITION ERRATA SHEET

 2

 3

 4    Our Assignment No. J4517496

 5    Case Caption:  Testone, et al., vs. Barlean's Organic

 6    Oils, LLC

 7

 8

 9         DECLARATION UNDER PENALTY OF PERJURY

10        I declare under penalty of perjury that I have read

11    the entire transcript of my deposition taken in the

12    above-captioned matter or the same has been read to me,

13    and the same is true and accurate, save and except for

14    changes and/or corrections, if any, as indicated by me

15    on the DEPOSITION ERRATA SHEET hereof, with the

16    understanding that I offer these changes as if still

17    under oath.

18        Signed on the _____ day of _____,

19    20_____.

20

21     _____

22               COLLIN SHANKS

23

24

25
```



```
1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change: _____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change: _____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change: _____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change: _____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change: _____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change: _____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change: _____

23

24   SIGNATURE:_____DATE_____

25             COLLIN SHANKS
```



COLLIN SHANKS                                    October 14, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              89

```
 1                    DEPOSITION ERRATA SHEET

 2    Page No._____Line No._____Change to:_____

 3    _____

 4    Reason for change: _____

 5    Page No._____Line No._____Change to:_____

 6    _____

 7    Reason for change: _____

 8    Page No._____Line No._____Change to:_____

 9    _____

10    Reason for change: _____

11    Page No._____Line No._____Change to:_____

12    _____

13    Reason for change: _____

14    Page No._____Line No._____Change to:_____

15    _____

16    Reason for change: _____

17    Page No._____Line No._____Change to:_____

18    _____

19    Reason for change: _____

20    Page No._____Line No._____Change to:_____

21    _____

22    Reason for change: _____

23

24    SIGNATURE:_____DATE_____

25            COLLIN SHANKS
```



# EXHIBIT G

MICHAEL TESTONE
TESTONE vs BARLEAN'S ORGANIC OILS

October 15, 2019
1

```
 1                 UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   MICHAEL TESTONE, COLLIN SHANKS, and  )Case No.
     LAMARTINE PIERRE, on behalf of       )19CV0169 BTM MDD
 5   themselves, all others similarly     )
     situated, and the general public,    )
 6                                         )
                         Plaintiffs,       )
 7                                         )
     vs.                                   )
 8                                         )
     BARLEAN'S ORGANIC OILS, LLC,          )
 9                                         )
                         Defendant.        )
10   _____)

11

12

13              DEPOSITION MICHAEL TESTONE

14                    October 15, 2019

15                        9:21 a.m.

16

17              402 West Broadway, Suite 1550

18               San Diego, California 92101

19

20

21

22

23

24

25           Dalia R. Smith, CSR No. 8486
```



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                            7

1    you, I'm not going being rude.  I'm just trying to make

2    life easier for her.

3         A.  Understood.

4         Q.  The other thing I have to ask you to do is

5    answer audibly.  For example, if I ask you a yes or no

6    question, whatever your response is, if you could say yes

7    or no instead of nodding or shaking your head or saying

8    huh-uh or huh-uh, that would be very helpful.

9         A.  Okay.

10        Q.  If you need a break at any time just ask for it.

11   We'll stop and go off the record and you could do

12   whatever you need to do and then we'll come back on the

13   record.

14        A.  Great.

15        Q.  I'd ask you not to do that while there's a

16   question pending that you haven't answered, if that's

17   okay.

18        A.  Understood.  Yeah.

19        Q.  Okay.  Is there any reason why you feel

20   incapable of giving your best testimony today?

21        A.  No.

22        Q.  You're not on any medication of any kind?

23        A.  No.

24        Q.  What is your current residence address?

25        A.  Current residence address 4429 36th Street at



EXHIBIT G
Page 262

MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              8

1   San Diego.   Zip code is 92116.

2        Q.   Have you lived at any other address since 1914

3   -- 1914.   Sorry.   I'm an old dog.   Since 2014?

4        A.   Since 2014, yes, we lived at couple different

5   addresses.

6        Q.   Could you tell me what those were.

7        A.   3552 32nd Street.   Zip code on that was 92104.

8   And 3761 Herman Avenue.   Zip code for that was 92104 as

9   well.

10       Q.   During what period of time did you live on

11  Herman Avenue?

12       A.   To the best of my recollection it was roughly

13  from, sometime in I guess 2013 until about sometime in

14  2016, roughly.

15       Q.   Did you then move to the 32nd --

16       A.   That's correct.

17       Q.   -- address?

18       A.   And we were there from roughly 2016 until around

19  June 2018, which was when we moved to the most recent

20  address.

21       Q.   How did you first get involved in this

22  litigation?

23       A.   To the best of what I can remember it was an

24  email I received from Paul.

25       Q.   Okay.



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                            13

1        Q.   Okay.  That would be why you're a Bear's fan?

2        A.   Yeah.

3        Q.   Sorry.  I was just marking your accent.

4        A.   That and my rough age.  I was alive for the '85

5    Bears.

6        Q.   Yeah, well, we're not going to talk about that

7    one since I'm a Pat's fan.

8        A.    I'm not a Bears fan anymore.

9    BY MS. JENKINS:

10       Q.   So to your recollection -- And, again, I'm not

11   trying to badger you.  I just want to make sure of your

12   answer.  This is the first communication you received

13   about joining a coconut oil litigation; is that

14   correct?

15       A.   I think so.

16       Q.   Have you been a member of a class in any other

17   coconut oil litigations?

18       A.   No.

19       MR. FITZGERALD:  Objection, vague.

20       THE WITNESS:  No, I have not.

21   BY MS. JENKINS:

22       Q.   Have you ever seen advertisements for other

23   coconut oil litigations inviting you to join a class?

24       A.   Not to the best of my recollection.  There's

25   nothing that stands out to me.



MICHAEL TESTONE                                         October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                    14

1      Q.   Okay.  Did you enter into a retainer agreement
2   with Mr. Joseph's office for this case?
3      A.   I don't understand what that means.
4      Q.   Did you enter into a written agreement where
5   Mr. Joseph's office became your counsel, your attorneys
6   for purposes of this case?
7      A.   Yes.
8      Q.   Do you still have a copy of that?
9      A.   I don't know.
10      Q.   How often do you talk to Mr. Joseph?
11      A.   I would say every couple weeks on average.
12      Q.   Did you review the complaint in this case before
13   it was filed?
14      A.   Yes, I did.
15      Q.   Did you review the entire complaint or just the
16   paragraphs that talks about you?
17      A.   I read the entire complaint.
18      Q.   And you agreed with it?
19      A.   Yes.
20      Q.   Do you understand yourself to be a class
21   representative in this case?
22      A.   Yes.
23      Q.   What class are you representing?
24      A.   The class I am representing would be any
25   consumers in the State of California that purchased



MICHAEL  TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              23

```
 1 │ found one of them?
 2 │      MR. FITZGERALD:  I do, too.
 3 │      MS. JENKINS:  Do you really?
 4 │      MR. FITZGERALD:  A lot of the time.
 5 │      MS. JENKINS:  I'm sorry.  This is off the record.
 6 │                   (Off the record)
 7 │      MS. JENKINS:  Okay.  Back on.
 8 │ BY MS. JENKINS:
 9 │      Q.  Do you have kids?
10 │      A.  Yes.
11 │      Q.  How old are your kids?
12 │      A.  I have one son who is six years old.
13 │      Q.  He doesn't do any cooking, I presume?
14 │      A.  He helps.
15 │      Q.  Does he?
16 │      A.  Yeah.
17 │      Q.  When was the first time that you bought
18 │ anybody's coconut oil?  Any brand.
19 │      A.  Any brand of coconut oil.  So ballpark?
20 │      Q.  Your best estimate.
21 │      A.  Ballpark, I think it was around probably summer
22 │ time of 2012.
23 │      Q.  Okay.
24 │      A.  Because I do remember I was traveling with my
25 │ wife at the time.  We did a pretty big cross country trip
```



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                24

1    and that was the first time I recall, like it actually

2    stands out that we looked for coconut oil and bought any.

3        Q.  Why were you looking for coconut oil during that

4    trip?

5        A.  I believe my wife wanted to find something to

6    use as like a moisturizer more topically.  I believe that

7    was the original purchase.

8        Q.  So she intended to use it externally rather than

9    for cooking?

10       A.  Initially, correct.

11       Q.  Did there come a time when you tried it for

12   cooking as well?

13       A.  Eventually we did try it for cooking.

14   Eventually -- And was about the time I remember us

15   specifically purchasing the Barlean's was when we started

16   using it for more than just topical application.

17       Q.  Do you recall the brand of the first coconut oil

18   that you bought on this cross country trip?

19       A.  I don't.  The original one was purchased at a

20   local store that -- there was like a health centric store

21   in Colorado.

22       Q.  Colorado.  Do you remember the color of the

23   label or anything like that?

24       A.  I don't at all, honestly.

25       Q.  The first time that you purchased the Barlean's,



MICHAEL TESTONE
TESTONE vs BARLEAN'S ORGANIC OILS

October 15, 2019
25

1   was that when you were back home?

2       A.  Correct, that was when we were back in San

3   Diego.

4       Q.  Between the time that you purchased the first

5   coconut oil on the cross country trip and the time that

6   you purchased the Barlean's Coconut Oil for the first

7   time did you buy any other brands of coconut oil?

8       A.  Not to the best of my recollection.

9       Q.  And what's your best estimate about the date

10  that you purchased the first Barlean's Coconut Oil?

11      A.  Ballpark, I would say the first Barlean's was

12  purchased probably late 2012.

13      Q.  Do you recall where you purchased it?

14      A.  Yes.  We purchased it over at Sprouts over in

15  Hillcrest.  Not positive the specific address.  It's the

16  only Sprouts in the neighborhood, though.

17      Q.  That's Okay.  We won't disclose the address.

18      A.  That's good.

19      Q.  Did you go looking for Barlean's Coconut Oil in

20  particular, or just you went into Sprouts with the

21  intention of buying some coconut oil?

22      A.  We --

23      MR. FITZGERALD:  Object to form.

24      THE WITNESS:  We went in intending to purchase

25  coconut oil.  There was no specific coconut oil we were



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              26

1    seeking.

2    BY MS. JENKINS:

3        Q.  Were there a number of different brands of

4    coconut oil available to you at that time in Sprouts?

5        A.  From what I can remember, there was a pretty

6    large selection of coconut oil.

7        Q.  What drew you to the Barlean's to make the

8    purchase?

9        A.  Specifically I remember reading the label, and

10   there was a lot of statements on the label that sort of

11   set the Barlean's apart from everything else.  Everything

12   else we looked at had fairly general generic labeling.

13   It just had ingredients and nutritional information

14   listed, but there really wasn't much narrative on any of

15   the other labels.

16       Q.  I'm going to mark as Exhibit 21.  Appears to

17   be -- Well, I'll represent to you that it is a Barlean's

18   Organic Virgin Coconut Oil label for the 16 fluid ounce

19   size.

20           (Exhibit 21 was marked for identification)

21           Does this label look familiar to you at all?

22       MR. FITZGERALD:  Object to form.

23       THE WITNESS:  It does look relatively familiar.

24   BY MS. JENKINS:

25       Q.  Does it appear to be similar to the label on the



MICHAEL  TESTONE                                        October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              29

```
 1   way of differences.
 2          When you picked up the Barlean's you said you
 3   read the label and it was more informative in some way
 4   than the other labels that you saw at the set at that
 5   time.
 6        A.   It was the only label that contained any
 7   narrative whatsoever on the label.
 8        Q.   Did the other ones just say coconut oil?
 9        A.   Correct.  They just had a brand label.  There
10   was really no story, no narrative whatsoever.
11        Q.   So you were attracted to the narrative, if you
12   will, of the Barlean's label?
13        A.   Well, it provided additional information from
14   what any of the other labels had.
15        Q.   Can you take a look at either of these two
16   Exhibits, 20 or 21.  Twenty-one or 22?  Is that where
17   we're at?
18        MR. FITZGERALD:  Correct.
19        THE WITNESS:  Yes.
20   BY MS. JENKINS:
21        Q.   Tell me if there's any of the statements on
22   these labels that you recall finding attractive to you at
23   the time that you made the first purchase.
24        MR. FITZGERALD:  Object to form.
25        THE WITNESS:  Do you mind if I use that magnifying
```



MICHAEL  TESTONE                                          October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                    30

1   glass?

2   BY MS. JENKINS:

3        Q.  Oh, absolutely.  I brought it for you.

4        A.  I appreciate it.

5        Q.  Sure.

6        A.  Yes.  So left labeling on both looks roughly

7   consistent with to the best of my knowledge what I

8   remember reading on the label.

9        Q.  And that includes statements such as Non-GMO and

10  Fair Trade?

11       A.  Correct, Gluten Free, Non-Hydrogenated.  The

12  organic aspect as well.  And then the part there was more

13  narrative would be the portion just to the right of that.

14  So first it starts with Fresh from the Islands, Hand

15  Selected and Picked Fresh, Harvested at the Peak of

16  Flavor and Nutritional Value.  Cold-Expeller Pressed

17  Fresh.  I recall one time seeing in that information as

18  well a label that stated Freshest in the -- World's

19  Freshest.  I don't see that on either of these labels,

20  though.

21       Q.  Okay.

22       A.  But that right there to me from my perspective

23  as a consumer elevated the Barlean's -- like set it a

24  part from everything else because it does state that the

25  process Harvested at the Peak of Flavor and Nutritional



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                         31

1    Value.  So to me that said that there's something about

2    the process with how it's produced that elevates it from

3    the other stuff that was on the shelf.

4       Q.  What about contains Lauric Acid, was that

5    something you found attractive?

6       A.  I'm not particularly knowledgeable in Lauric

7    Acid.  I don't have a nutritional background, but that

8    was appealing as the way it was presented.  I assume as a

9    consumer that was a selling point in something positive.

10   I didn't really figure you would be advertising negative

11   aspects to the product on the labeling.

12      Q.  But the fact that it contained Lauric Acid was

13   not something that was of particular interest to you?

14      MR. FITZGERALD:  Object to form.

15      THE WITNESS:  It was after I read it because it was

16   positioned in a manner that sounded like a positive

17   health benefit.

18   BY MS. JENKINS:

19      Q.  But you didn't know what Lauric Acid was at the

20   time?

21      A.  Correct.

22      Q.  Would that be true of the Caprylic Acid on the

23   label?  You didn't know what Caprylic Acid was at the

24   time?

25      A.  Yes.



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              32

1        Q.  And Capric Acid, same thing?

2        A.  Yes.

3        Q.  What about Medium Change Triglycerides?  Was

4   that something you were familiar with at the time of your

5   first purchase?

6        A.  Not particularly familiar.  No, I was not.  But,

7   again, it was positioned in a manner that it sounded like

8   it was beneficial.

9        Q.  And, again, it's your recollection that the

10  other brands of coconut oil that you looked at before you

11  made your first Barlean's purchase didn't contain any of

12  these statements, these kinds of statements?

13       MR. FITZGERALD:  Object to form.

14       THE WITNESS:  That is correct.  To the best of my

15  recollection I do not remember seeing any narrative like

16  this on any of the other labeling.

17  BY MS. JENKINS:

18       Q.  Did you take a look at the Supplement Facts that

19  appear on the box on the right side of the label at the

20  time that you were making your first purchase?

21       A.  We did.  I don't remember digging into that as

22  deeply, though.

23       Q.  Did you realize you were buying a fat?

24       A.  The thought didn't really come in at the time

25  that we purchased it.



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              33

1        Q.  At the time that you purchased the first

2    Barlean's Coconut Oil were you aware of any differences

3    between saturated fat and unsaturated fat?

4        A.  No.

5        Q.  What had you used for cooking oil up until the

6    time that you made your first purchase of coconut oil?

7        A.  Up until then we had primarily used olive oil

8    and butter.

9        Q.  After you purchased your first jar of Barlean's

10   Coconut Oil did you continue to use olive oil and butter

11   for cooking?

12       A.  No.  We started using the coconut oil a lot

13   more.  As we read the left portion of the label when we

14   were purchasing it, it highlighted everything.  And then

15   you go down to suggested use, and that's where it says

16   may be used in cooking, baking, or frying, as a spread on

17   toast or muffins.  And we definitely did use it for all

18   those purposes, as well as there was a time when we were

19   putting it in our coffee.  There was a time when we were

20   putting it in smoothies when we consumed those.

21       Q.  How does it taste in coffee?  I'm curious.  Was

22   it good?

23       A.  I don't remember it having a distinct flavor

24   really.

25       Q.  As you sit here today and based on anything



MICHAEL  TESTONE                                        October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                35

 1  BY MS. JENKINS:

 2       Q.  Are there any statements on the label as you sit

 3  here today that you believe to be untrue?

 4       MR. FITZGERALD:  Object to form.

 5       THE WITNESS:  I would highly question most of what's

 6  stated about the coconut oil being Harvested at the Peak

 7  of Flavor and Nutritional Value.  To me that's a very

 8  specific statement, and there's no information to back

 9  that up.

10  BY MS. JENKINS:

11       Q.  Have you done any research yourself which leads

12  you to believe that that statement is not true?

13       A.  Based on the limited research I have done, I

14  would have to see some data to qualify that as being

15  true.

16       Q.  But you haven't seen any data that indicates to

17  you that that statement is false; is that correct?

18       MR. FITZGERALD:  Object to form.

19       THE WITNESS:  I don't understand.

20  BY MS. JENKINS:

21       Q.  Have you seen any data that indicates to you

22  that the statement Harvested at the Peak of Flavor and

23  Nutritional Value on the label is false?

24       MR. FITZGERALD:  Object to form.

25       THE WITNESS:  I don't know.  Again, I don't have any



MICHAEL TESTONE                                    October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              37

1   information going around basically saying that coconut

2   and coconut oil was this super food, this very safe, this

3   wonderful product that you should just put in everything.

4   That you should replace everything.  You know, people

5   were using it to pour oil for their teeth.  People were

6   using it in everything.  Smoothies, coffee.  It was

7   suggested to replace butter in general with that.  And a

8   lot of that information was really missing the warning to

9   go very sparingly with the implementation of it.

10       Q.  Why do you say that that information was missing

11  the warning to go sparingly with it?  What's your basis

12  for saying that?

13       A.  My basis for saying is that is my current

14  knowledge of fat specifically, even the nutritional

15  content of coconut oil is that it should be used very

16  sparingly.  And that's not the manner that I feel the

17  information was presented.

18       Q.  And where did you come by the knowledge that

19  coconut oil is something that should be used very

20  sparingly?

21       A.  My current knowledge concerning the recent, when

22  the American Heart Association came out and stated just

23  that.

24       Q.  How did you become aware of the American Heart

25  Association article?



MICHAEL TESTONE                                          October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                              38

```
 1        A.  I don't recall.  I came across the article

 2   online at some point.  I can't remember what specific

 3   news source it came from though.

 4        Q.  Have you come across any other articles other

 5   than the American Heart Association article that are

 6   critical of the use of coconut oil?

 7        A.  I have.  I can't remember specifically what

 8   media source it came from, but there had been a lot more

 9   articles in recent years that I've read.

10        Q.  Have you read any articles in that same time

11   period which you refer to as the recent years that

12   disagree with the American Heart Association article?

13        A.  No, I have not.

14        Q.  When was the last time that you bought a jar of

15   Barlean's Coconut Oil?  Estimate.

16        A.  Ballpark, I would say early 2018.

17        Q.  Do you recall if you had used all of that last

18   jar before you got the email from Mr. Joseph about this

19   litigation?

20        A.  We -- Yes, we had used all of that jar.

21        Q.  And did you buy any Barlean's Coconut Oil or

22   anybody else's coconut oil after you received the email

23   from Mr. Joseph's office?

24        A.  No.

25        Q.  How many jars in total of Barlean's Coconut Oil
```



MICHAEL TESTONE                                          October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                   39

1   would you estimate that you purchased between late 2012

2   when you bought the first one and early 2018 when you

3   bought the last one?

4        A.  We were going through a lot of -- I mean, I

5   would say we were probably going through two of those

6   jars a month.

7        Q.  Do you recall if you became aware of the

8   American Heart Association article before or after you

9   received the email from Mr. Joseph?

10       A.  To the best of my recollection it was quite

11  awhile before.

12       Q.  Did reading the AHA article cause you to stop

13  using coconut oil?

14       A.  To the best of my recollection from what I

15  remember it did heavily weigh into that decision.

16       Q.  Did you consider contacting Barlean's to try to

17  return the coconut oil for a refund?

18       A.  No.  That thought never occurred to me.

19       Q.  Do you have any recollection of what you paid

20  for a 16 ounce jar of coconut oil on average?  The

21  Barlean's Coconut Oil.

22       A.  No.

23       Q.  Can you give us a ballpark?  Fifty bucks?

24  Hundred bucks?  Twenty bucks?

25       A.  I honestly can't.  I don't really pay much



MICHAEL TESTONE                                October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                           40

1   attention to prices.

2       Q.  And you have no receipts for your purchases of

3   Barlean's Coconut Oil; is that correct?

4       A.  That's correct.  I don't -- I can't think of a

5   single grocery receipt I ever held on to.

6       Q.  And you don't have any half used or partially

7   used jars of Barlean's Coconut Oil at around your house

8   still?

9       A.  No.

10      Q.  What did you go back to using for cooking for

11  fats?

12      A.  Went back to olive oil and butter primarily.

13      Q.  Did you consider butter to be a healthier fat

14  than the coconut oil?

15      MR. FITZGERALD:  Object to form.

16      THE WITNESS:  Again, I'm not a nutrition expert so

17  my current understanding is that fat is fat and should be

18  used sparingly.

19  BY MS. JENKINS:

20      Q.  Do you cook at home most of the time or do you

21  go out from time to time to eat?

22      A.  I cook on most days.

23      Q.  When you guys do go out where do you usually

24  go?

25      A.  I have a six year old so we don't really go out



MICHAEL TESTONE                                              October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                                        44

```
 1              REPORTER'S CERTIFICATION

 2

 3         I, Dalia R. Smith, a Certified Shorthand

 4    Reporter in and for the State of California, do hereby

 5    certify:

 6

 7         That the foregoing witness was by me duly sworn;

 8    that the deposition was then taken before me at the time

 9    and place herein set forth; that the testimony and

10    proceedings were reported stenographically by me and

11    later transcribed into typewriting under my direction;

12    that the foregoing is a true record of the testimony and

13    proceedings taken at that time.

14

15         IN WITNESS WHEREOF, I have subscribed my name

16    this 22nd day of October 2019.

17

18

19

20

21    _____

22    Dalia R. Smith, CSR No. 8486

23

24

25
```



1    DEPOSITION ERRATA SHEET

2    Our Assignment No. J4517570

3    Case Caption:  Michael Testone, Collin Shanks, and
     Lamartine Pierre

4

5

6

7    DECLARATION UNDER PENALTY OF PERJURY

8    I declare under penalty of perjury that I have

9    read the entire transcript of my Deposition taken in the

10   above captioned matter or the same has been read to me,

11   and the same is true and accurate, save and except for

12   changes and/or corrections, if any, as indicated by me on

13   the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16   Signed on the _____ day of _____, 20___.

17

18

19   _____

20   MICHAEL TESTONE

21

22

23

24

25



MICHAEL TESTONE                                      October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                            46

1              DEPOSITION ERRATA SHEET

2   Page No. _____ Line No._____ Change to:_____

3   _____

4   Reason for change: _____

5   Page No. _____ Line No._____ Change to:_____

6   _____

7   Reason for change: _____

8   Page No. _____ Line No._____ Change to:_____

9   _____

10  Reason for change: _____

11  Page No. _____ Line No._____ Change to:_____

12  _____

13  Reason for change: _____

14  Page No. _____ Line No._____ Change to:_____

15  _____

16  Reason for change: _____

17  Page No. _____ Line No._____ Change to:_____

18  _____

19  Reason for change: _____

20  Page No. _____ Line No._____ Change to:_____

21  _____

22  Reason for change: _____

23

24  SIGNATURE:_____ DATE_____

25          MICHAEL TESTONE



MICHAEL  TESTONE                                      October 15, 2019
TESTONE vs BARLEAN'S ORGANIC OILS                            47

1              DEPOSITION ERRATA SHEET

2    Page No. _____ Line No._____ Change to:_____

3    _____

4    Reason for change: _____

5    Page No. _____ Line No._____ Change to:_____

6    _____

7    Reason for change: _____

8    Page No. _____ Line No._____ Change to:_____

9    _____

10   Reason for change: _____

11   Page No. _____ Line No._____ Change to:_____

12   _____

13   Reason for change: _____

14   Page No. _____ Line No._____ Change to:_____

15   _____

16   Reason for change: _____

17   Page No. _____ Line No._____ Change to:_____

18   _____

19   Reason for change: _____

20   Page No. _____ Line No._____ Change to:_____

21   _____

22   Reason for change: _____

23

24   SIGNATURE:_____ DATE_____

25          MICHAEL TESTONE



# EXHIBIT H

**THE LAW OFFICE OF**
**JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

**THE LAW OFFICE OF**
**PAUL K. JOSEPH, PC**
PAUL K. JOSEPH (SBN 287057)
*paul@pauljosephlaw.com*
4125 W. Pt. Loma Blvd. No. 309
San Diego, California 92110
Phone: (619) 767-0356
Fax: (619) 331-2943
***Counsel for Plaintiff and***
***the Proposed Class***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLIN SHANKS, on behalf of himself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>JARROW FORMULAS, INC.<br><br>Defendant. | Case No: 2:18-cv-09437-PA (AFMx)<br><br>**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**<br><br>Judge:      Hon. Percy Anderson<br>Date:       August 26, 2019<br>Time:       1:30 p.m.<br>Court:      9A – 9th Floor |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ...............................................................................1

FACTS & EVIDENCE .......................................................................2

I. The Products' Labels and Formulation were Materially Identical During the Entire Class Period ................................................2

II. The Products Were Misbranded .............................................4

III. The Challenged Claims Were Misleading .............................5

IV. Plaintiff Relied on Jarrow's Misrepresentations ..................7

V. The Class Paid a Premium Due to the Coconut Oil Products' Unlawful and Misleading Labeling Claims Through Common Evidence ................................................................................7

LEGAL STANDARD .......................................................................7

ARGUMENT ....................................................................................8

I. The Requirements of Rule 23(a) are Satisfied ......................8

A. Numerosity .....................................................................8

B. Commonality ..................................................................8

C. Typicality ......................................................................10

D. Adequacy ......................................................................12

II. The Requirements of Rule 23(b)(3) are Satisfied ...............13

A. Predominance ...............................................................13

1. The Class's Claims will be Resolved through Objective Standards and Common Evidence that Apply Classwide ...........13

a. Consumer Fraud .....................................................14

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

b. "Unlawful" Misbranding ...................................................18

c. Application of California Law to a Nationwide
Class is Appropriate ...........................................................19

2. The Class's Price Premium Damages Model is Consistent
with its Theory of Liability, and Capable of Measuring
Classwide Damages ....................................................................20

B. Superiority...........................................................................................24

1. There is no Related Litigation and the Forum is
Appropriate ................................................................................24

2. Class Members Have No Interest in Prosecuting Separate
Actions .......................................................................................24

3. No Manageability Concerns Outweigh the Superiority of
the Class Action Device for Adjudicating the Class's
Claims ........................................................................................25

CONCLUSION .............................................................................................................25

ii

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Hyland's Inc.*,
   300 F.R.D. 643 (C.D. Cal. 2014) ..................................................................19

*Allen v. Similasan Corp.*,
   306 F.R.D. 635 (S.D. Cal. 2015) ..................................................................10

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997) ...........................................................................9, 13, 14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) .................................................................................8, 16

*Ang v. Bimbo Bakeries USA, Inc.*,
   2014 WL 1024182 (N.D. Cal. Mar. 13, 2014) ..............................................18

*Armstrong v. Davis*,
   275 F.3d 849 (9th Cir. 2001) ........................................................................10

*Arroyo v. United States Dep't of Homeland Sec.*,
   2019 WL 2912848 (C.D. Cal. 2019) ...............................................................9

*Bee, Denning, Inc. v. Capital All. Grp.*,
   310 F.R.D. 614 (S.D. Cal. 2015) ....................................................................9

*Berger v. Home Depot USA, Inc.*,
   741 F.3d 1061 (9th Cir. 2014) ......................................................................13

*Bishop v. 7-Eleven, Inc.*,
   651 Fed. Appx. 65 (9th Cir. 2016) ................................................................17

*Bradach v. Pharmavite, LLC*,
   735 Fed. Appx. 251 (9th Cir. 2018) ..............................................................14

*Brazil v. Dole Packaged Foods, LLC*,
   2014 WL 2466559 (N.D. Cal. May 30, 2014) ...............................................11

*Briseno v. ConAgra Foods, Inc.*,
   844 F. 3d 1121 (9th Cir. Jan. 3, 2017) ...........................................................8

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

*Brockey v. Moore*,
   107 Cal. App. 4th 86 (2003) ....................................................................... 14

*Bromfield v. Craft Brew Alliance, Inc.*,
   2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ........................................ 21

*Brown v. Hain Celestial Group, Inc.*,
   2015 WL 3398415 (N.D. Cal. May 26, 2015) ......................................... 18

*Bruno v. Eckhart Corp.*,
   280 F.R.D. 540 (C.D. Cal. 2012) .............................................................. 19

*Bruton v. Gerber Prods. Co.*,
   --- Fed. Appx. ----, 2017 WL 1396221 (9th Cir. Apr. 19, 2017) .......... 18

*Bruton v. Gerber Prods. Co.*,
   2014 WL 172111 (N.D. Cal. Jan. 15, 2014) ........................................... 16

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) .................................................................... 21

*Chacanaca v. Quaker Oats Co.*,
   752 F. Supp. 2d 1111 (N.D. Cal. 2010) ................................................... 17

*Chamberlan v. Ford Motor Co.*,
   223 F.R.D. 524 (N.D. Cal. 2004) .............................................................. 11

*Colgan v. Leatherman Tool Group, Inc.*,
   135 Cal. App. 4th 663 (2006) .............................................................. 14, 20

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ....................................................................... 13, 16, 20

*Culley v. Lincare Inc.*,
   2016 WL 4208567 (E.D. Cal. Aug. 10, 2016) ........................................ 25

*Deposit Guar. Nat'l Bank v. Roper*,
   445 U.S. 326 (1980) ................................................................................... 24

*Des Roches v. California Physicians' Serv.*,
  320 F.R.D. 486 (N.D. Cal. 2017)...................................................................11

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)......................................................................................13

*Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*,
  326 F.R.D. 592 (N.D. Cal. June 26, 2018) ...................................................21

*Gen. Tel. Co. of the Nw. v. EEOC*,
  446 U.S. 318 (1980)........................................................................................8

*Gustavson v. Mars, Inc.*,
  2014 WL 2604774 (N.D. Cal. June 10, 2014)...............................................17

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..................................................passim

*Hale v. State Farm Mut. Auto. Ins. Co.*,
  2016 WL 4992504 (S.D. Ill. Sept. 16, 2016) .................................................9

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992)....................................................................10, 15

*Hawkins v. Kroger Co.*,
  906 F.3d 763 (9th Cir. 2018)..........................................................................4

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013)......................................................................17

*Hoffman v. Blattner Energy, Inc.*,
  315 F.R.D. 324 (C.D. Cal. 2016) ...................................................................8

*In re Arris Cable Modem Consumer Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018).............................................................15, 21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2013 WL 5429718 (N.D. Cal. 2013) .............................................................21

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014)..................................................................10

*In re NJOY, Inc. Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) ...................................................................9

*In re Qualcomm Antitrust Litig.*,
328 F.R.D. 280 (N.D. Cal. 2018) ............................................................................8

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) ...................................................................................14, 16

*Jefferson v. Chase Home Fin.*,
2008 WL 1883484 (N.D. Cal. Dec. 14, 2007) .....................................................14

*Jimenez v. Allstate Ins. Co.*,
765 F.3d 1161 (9th Cir. 2014) ...............................................................................9

*Keele v. Wexler*,
149 F.3d 589 (7th Cir. 1998) .................................................................................9

*Keilholtz v. Lennox Hearth Prods. Inc.*,
268 F.R.D. 330 (N.D. Cal. 2010) .........................................................................19

*Krueger v. Wyeth, Inc.*,
310 F.R.D. 468 (S.D. Cal. 2015) ..........................................................................21

*Kumar v. Salov N. Am. Corp.*,
2016 WL 3844334 (N.D. Cal. July 15, 2016) ......................................................17

*Kurtz v. Kimberly-Clark Corp.*,
312 F.R.D. 482 (E.D.N.Y. Mar. 27, 2017) ..........................................................21

*Kwikset Corp. v. Super. Ct.*,
51 Cal. 4th 310 (2011) .........................................................................................20

*Lambert v. Nutraceutical Corp.*,
870 F.3d 1170 (9th Cir. 2017) .............................................................................20

*Lavie v. Procter & Gamble Co.*,
105 Cal. App. 4th 496 (2003) ..............................................................................14

vi

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

*Levya v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013)........................................................................13, 25

*Lilly v. Jamba Juice Co.*,
   308 F.R.D. 231 (N.D. Cal. 2014) ..................................................................18

*Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001).......................................................................12

*Martin v. Monsanto Co.*,
   2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) ..............................................13

*Martinelli v. Johnson & Johnson*,
   2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) ..............................................21

*Mass. Mut. Life Ins. Co. v. Super. Ct.*,
   97 Cal. App. 4th 1282 (2002) .......................................................................16

*Moyle v. Liberty Mut. Ret. Benefit Plan*,
   823 F.3d 948 (9th Cir. May 20, 2016) ..........................................................15

*Odyssey Wireless, Inc. v. Apple Inc.*,
   2016 WL 7644790 (S.D. Cal. Sept. 14, 2017) ..............................................21

*Opperman v. Path, Inc.*,
   2016 WL 3844326 (N.D. Cal. July 15, 2016) ...............................................19

*Parkinson v. Hyundai Motor Am.*,
   258 F.R.D. 580 (C.D. Cal. 2008) ..................................................................19

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015)...................................................................14, 20

*Racies v. Quincy Bioscience, LLC*,
   2017 WL 6418910 (N.D. Cal. Dec. 15, 2017) ..............................................16

*Rasario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992)........................................................................9

*Rawa v. Monsanto Co.*,
   2018 WL 2389040 (E.D. Mo. May 25, 2018) ..............................................13

*Reid v. Johnson & Jonson,*
   780 F.3d 952 (9th Cir. 2015) .......................................................................... 4

*Rodman v. Safeway, Inc.,*
   2014 WL 988992 (N.D. Cal. 2014) ................................................................ 9

*Rutledge v. Hewlett-Packard Co.,*
   238 Cal. App. 4th 1164 (2015) ..................................................................... 19

*Salvagne v. Fairfield Ford Inc.,*
   254 F.R.D. 321 (S.D. Ohio 2009) ................................................................ 10

*Sanchez-Knutson v. Ford Motor Co.,*
   310 F.R.D. 529 (S.D. Fla. 2015) .................................................................. 22

*Schramm v. JPMorgan Chase Bank, N.A.,*
   2013 WL 7869379 (C.D. Cal. 2013) ............................................................ 23

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
   559 U.S. 393 (2010) ........................................................................................ 8

*Simpson v. Fireman's Fund Ins. Co.,*
   231 F.R.D. 391 (N.D. Cal. 2005) ................................................................ 10

*Staton v. Boeing Co.,*
   327 F.3d 938 (9th Cir. 2003) .......................................................................... 9

*Stearns v. Ticketmaster Corp.,*
   655 F.3d 1013 (9th Cir. 2012) ...................................................................... 16

*Steroid Hormone Prod. Cases,*
   181 Cal. App. 4th 145 (2010) ....................................................................... 16

*Tait v. BSH Home Appliances Corp.,*
   289 F.R.D. 466 (C.D. Cal. 2012) ............................................................ 14, 24

*Todd v. Tempur-Sealy Int'l Inc.,*
   2016 WL 5746364 (N.D. Cal. Sept. 30, 2016) ............................................ 11

viii

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ..................................................................25

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ...........................................................................8, 9

*Wang v. Massey Chevrolet*,
   97 Cal. App. 4th 856 (2002) ...................................................................18

*Werdebaugh v. Blue Diamond Growers*,
   2014 WL 2191901 (N.D. Cal. May 23, 2014) ...........................................20

*Wershba v. Apple Computer, Inc.*,
   91 Cal. App. 4th 224 (2001) ...................................................................19

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008) ..................................................................14

*Yokoyama v. Midland Nat'l Life Ins. Co.*,
   594 F.3d 1087, 1089 (9th Cir. 2010) ........................................................15

*Zakaria v. Gerber Prods. Co.*,
   2016 WL 6662723 (C.D. Cal. 2016) ....................................................22, 23

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir. 2001) ................................................................24

**<u>Statutes</u>**
Cal. Bus. & Prof. Code § 17203 ...................................................................20

Cal. Bus. & Prof. Code § 17535 ...................................................................20

Cal. Civ. Code § 1780(a)(3) .........................................................................20

Fed. R. Civ. P. 23(a)(2) ...............................................................................8

Fed. R. Civ. P. 23(a)(3) .............................................................................10

Fed. R. Civ. P. 23(a)(4) .............................................................................12

Fed. R. Civ. P. 23(b)(3) ..................................................................13, 24

**<u>Other Authorities</u>**
56 Fed. Reg. at 60422 ...................................................................17

58 Fed. Reg. 2302, 2302 (Jan. 6, 1993) ...........................................17

**<u>Regulations</u>**
21 C.F.R. § 101.13(h)(1) ..................................................................4

## **INTRODUCTION**

According to 200 cardiologists representing 29 medical organizations, including the American Heart Association ("AHA") and American College of Cardiology, "we've known for nearly a half century that 'Coconut oil is one of the most potent agents for elevating serum cholesterol levels.'" Ex. 1,[1] Expert Report of Dr. Michael Greger, M.D., FACLM ("Greger Report"), at 7 (citation omitted). The AHA warned in 2017 that, "because coconut oil increases LDL cholesterol, a cause of [cardiovascular disease], and *has no known offsetting favorable effects*, we advise against the use of coconut oil." Dkt. No. 1, Compl. ¶ at 45 (quoting AHA, *Dietary Fats and Cardiovascular Disease*, Circulation (June 15, 2017)).

Despite the overwhelming scientific evidence that consuming coconut oil increases risk of cardiovascular disease—the leading cause of death in the United States—by raising "bad" LDL- and total-cholesterol levels, causing inflammation, and impairing arterial endothelial function, *see* Greger Report at 7-18, Jarrow labeled its Organic Extra Virgin Coconut Oil and Organic Coconut Oil (the "Products") with four claims conveying that the Products are healthy by emphasizing both the presence of supposedly "healthy" Medium Chain Triglycerides ("MCTs"), and the absence of harmful trans fatty acids and hydrogenation (the "Challenged Claims"[2]). Further, the Products' labels—by Jarrow's own admission—violated FDA regulations promulgated expressly to avoid consumer deception.

Plaintiff alleges the Challenged Claims violated California law and caused the Products to be overpriced. He requests that the Court certify a Class of all persons who, since November 6, 2014, purchased in the United States (or alternatively in California, if the Court does not certify a nationwide class), for personal or household use, and not for resale or distribution, any 16 oz. or 32 oz. Jarrow Organic Extra Virgin or Jarrow Regular Coconut Oil whose label did not bear a disclosure statement of the type required by 21 C.F.R. 101.13(h).

---

[1] All exhibit references, "Ex. __" are to the concurrently-filed Declaration of Paul K. Joseph.

[2] These are: (i) "Source of Medium Chain Triglycerides," (ii) "No Trans Fatty Acids (TFAs)," (iii) "No Hydrogenation," and (iv) "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8)."

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

The Court should certify the Class because all the requirements set forth in Rules 23(a) and 23(b)(3) are satisfied. Plaintiff demonstrates Rule 23(a)(1)'s numerosity requirement is satisfied with evidence of millions of units sold. For Rule 23(a)(2) commonality, Plaintiff shows the Challenged Claims were the same to all Class Members, so that determining whether they are misleading to a reasonable consumer, or unlawfully misbranded, will determine Jarrow's liability to all. For typicality, Plaintiff demonstrates all Class Members share the same legal theories, challenge the same conduct, and suffered the same injury, paying a premium for the Products due to the Challenged Claims. And for adequacy, Plaintiff demonstrates he and his counsel have no conflicts with the Class, and will continue vigorously prosecuting the case on its behalf.

Rule 23(b)(3)'s requirements are also satisfied. The predominating common questions are whether the Challenged Claims are misleading or unlawful. These questions can be answered through common evidence and objective standards that do not depend on the situations of individual Class Members. If Jarrow is liable, what it owes the Class can be calculated based on the price premium associated with the Challenged Claims, whether unlawful or misleading. The Class's damages model will use the widely-accepted conjoint analysis method to determine that premium, ensuring any damages awarded are attributable only to Jarrow's conduct creating the legal liability. Finally, class treatment is superior because adjudicating the Class's claims individually is economically infeasible.

## FACTS & EVIDENCE

### I.     The Products' Labels and Formulation were Materially Identical During the Entire Class Period

Since the beginning of the Class Period, Jarrow Formulas has sold Extra Virgin Coconut Oil and "Regular" Coconut Oil, in 16 oz. and 32 oz. containers. Until Jarrow removed the Challenged Claims in response to this lawsuit, each and every unit of the Products bore the following four Challenged Claims, in the same manner: (i) "Source of Medium Chain Triglycerides," (ii) "No Trans Fatty Acids (TFAs)," (iii) "No Hydrogenation," and (iv) "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid

(C-12) and caprylic acid (C-8)." *See* Joseph Decl. ¶¶ 9-60 & Exs. 8-11; *see also* Ex. 6, O'Connor 30(b)(6) Dep. Tr. 44:3-8 (agreeing labels' "basic text [wa]s the same"). Moreover, because coconut oil is a single-ingredient product, the Products' formulation was also always the same throughout the Class Period, with each Product always containing 14 grams of total fat and 13 grams of saturated fat per serving. *See* Exs. 8-11. Finally, other than their coloring, the "Extra Virgin" and "Regular" labels are almost identical—and *are* identical with regard to the Challenged Claims (highlighted in blue below):







Plaintiff alleges that Jarrow is liable because the Challenged Products (1) violate the UCL's "unlawful" prong and (2) violate the CLRA, FAL, and UCL's "fraudulent" prong.

## II.    The Products Were Misbranded

Plaintiff alleges each Challenged Claim is an unauthorized nutrient content claim, each separately rendering the Products misbranded, in violation of the UCL's "unlawful" prong. "No Trans Fatty Acids" and "No Hydrogenation," for example, "characterize the Products' level of trans fat, but the FDA has not defined or authorized nutrient content claims for trans fat," which are therefore unauthorized. Compl. ¶ 82; *Reid v. Johnson & Jonson*, 780 F.3d 952, 962-63 (9th Cir. 2015) ("No Trans Fat" is an unauthorized nutrient content claim); *accord Hawkins v. Kroger Co.*, 906 F.3d 763, 771 (9th Cir. 2018) ("0g trans fat per serving" is an unauthorized nutrient content claim); *cf.* 64 Fed. Reg. 62746, 62762 (Nov. 17, 1999) (FDA "considers statements such as 'no hydrogenated oils' or 'hydrogenated fat free' to be implied [nutrient content] claims that a product is free of trans fatty acids").

"Source of Medium Chain Triglycerides" and "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8)" are also nutrient content claims because they speak to the Products' fat content. *See* Compl. ¶ 75. When making nutrient content claims, foods containing more than 13 grams of total fat or 4 grams of saturated fat per serving must bear a disclosure statement, "See nutrition information for total fat and saturated fat content," *id.* (citing 21 C.F.R. § 101.13(h)(1)). Because Coconut oil is pure fat, the Products were required to make such a statement, Compl. ¶ 78, but did not, rendering them unlawfully misbranded, *see id.* ¶ 80.

4

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

## III. The Challenged Claims Were Misleading

Plaintiff alleges that the Challenged Claims suggest Jarrow's Products are healthy, and that this is misleading because the science demonstrates this is untrue. *See* Compl. ¶¶ 57-59.

Plaintiff's expert Dr. Michael Greger, performed a comprehensive literary review, *see* Greger Report at 3-5, confirming what leading experts have known for decades: consuming coconut oil—which is over 90 percent saturated fat—consistently and unequivocally increases LDL-cholesterol, total cholesterol, inflammation, and impairs critical arterial function. These physiological effects are well understood and there is scientific consensus that they directly increase risk of cardiovascular disease, stroke, and other serious illnesses.

Decades of research establishes with medical certainty that "total and LDL cholesterol blood levels are two of the most important risk factors in predicting coronary heart disease (CHD), with higher total and LDL cholesterol levels associated with increased risk of CHD." *Id.* at 8. And studies on coconut oil consumption "consistently" show it causes "a pronounced negative physiological impact that increases risk of cardiovascular disease." *Id.* "Seven out of seven coconut oil intervention trials resulted in higher LDL levels, demonstrating coconut oil's harmful effects (six out of seven statistically significantly so)." *Id.* Because the increased risk of cardiovascular disease for a given increase in LDL-cholesterol level is so well established, researchers performing a year-long study were able to demonstrate that reducing coconut oil consumption to 0.75 tablespoons, from 2.75 tablespoons per day, lowered participants' LDL cholesterol by 21.8% and total cholesterol by 11.9%, reducing coronary morbidity and mortality risky by 6-8%. *See id.* at 9-10 (citation omitted).

Coconut oil also significantly increases CHD risk by increasing inflammation, and impairing both arterial endothelial function and the anti-inflammatory properties of "good" HDL cholesterol. *Id.* at 15 (citations omitted). And coconut oil's detrimental health effects are not limited to long-term consumption, but are *immediate*. Studies show eating a single meal containing coconut oil can, within hours, "significantly raise cholesterol levels and inhibit arterial endothelial function," both "key risk factors," *id.* at 9 (citations omitted).

The evidence of coconut oil's harmful effects continues to grow. An intervention trial

published this March found participants who consumed 2 tablespoons daily suffered, within a month, an average 14% increase in LDL cholesterol compared to a control group, signifying an even greater risk of coronary death or heart attack." *Id.* at 13-14 (citation omitted). "[U]sing the best available estimate of a 23% change in risk of major vascular events for each mmol/L change in LDL, daily incorporation of under 3 tablespoons of coconut oil in the diet for a period of just six months might be expected to raise the risk of coronary death or heart attack 7%." *Id.* at 12 (citations omitted).

In sum, "[t]he relevant scientific literature demonstrates that coconut oil substantially increases cardiovascular and metabolic disease risk by adversely affecting blood lipids, artery function, and insulin sensitivity." *Id.* at 1. Therefore, "consuming coconut oil is unhealthy, as coconut oil consumption causes significant harm to health and is far more harmful than most substitutes." *Id.*

Dr. Greger's testimony, however, is not the only evidence of deception. Plaintiffs allege that the claim "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12)," is misleading because lauric acid "behaves more as a long-chain fatty acid [in terms of digestion and metabolism] because the majority of it (70%-75%) is absorbed with chylomicrons." Compl. ¶ 59. In what can fairly be characterized a "smoking gun" document, Jarrow's Director of Scientific Affairs advised his group:

> From my perspective and as I have [been] educated with regard to our MCT oil, while it may have some benefits as highlighted by Tom, ***I would not consider lauric acid a true medium-chain fatty acid since it metabolism is closer to longer chain saturates vs. caprylic and capric acids.*** For example, lauric acid is not particularly ketogenic and the majority ingested is absorbed via the lymphatic system (incorporated into chylomicrons), whereas caprylic and capric are absorbed primarily as solubilized free fatty acids into portal circulation for direct transport to the liver . . . .

Ex. 19, JFI7349-50 (emphasis added). During its deposition, Jarrow consistently testified that MCTs differ "in terms of absorption" because "long chain triglycerides are absorbed via chylomicrons" and once in chylomicrons the "they have to be taken up by carnitine" to be metabolized, but short and medium chain fatty acids "can go directly into the liver

6

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

1   mitochondria, directly past the -- the mitochondrial membrane and enter the electron transport

2   chain without being acetylated to a L-carnitine." O'Connor 30(b)(6) Dep. Tr. 91-95.

## IV.   Plaintiff Relied on Jarrow's Misrepresentations

4       Plaintiff Collin Shanks purchased Jarrow Extra Virgin Coconut Oil on several

5   occasions during the Class Period from local health food stores, including Sprouts, in reliance

6   on the Challenged Claims, which led him to believe the product was healthy. As a result, he

7   purchased Jarrow's Extra Virgin Coconut Oil, even though it was more expensive than other

8   cooking oils. *See generally* Shanks Decl.

## V.   The Class Paid a Premium Due to the Coconut Oil Products' Unlawful and Misleading Labeling Claims Through Common Evidence

11       The Class alleges that by using the Challenged Claims, which emphasize the presence

12   of supposedly healthy MCTs and the absence of unhealthy trans and hydrogenated fats, the

13   Products sold a higher prices than they otherwise would have. Compl. ¶ 90. It is well known

14   that consumers are willing to pay more for foods perceived to be healthy. *See id.* ¶ 51 (citing

15   Nielsen's 2015 Global Health & Wellness Survey showing 88% of consumers willing to pay

16   more for healthy foods). Jarrow testified that its consumers—mainly "health food store

17   shoppers"—care about the Challenged Claims. *See* O'Connor 30(b)(6) Dep. Tr. 5224-25,

18   53:24-25, 85:10-11, 83:13-14. To quantify the market price premium associated with the

19   Challenged Claims and calculate damages on a classwide basis, the Class's expert, Dr. J.

20   Michael Dennis designed and will conduct a conjoint survey and analysis. *See generally* Ex.

21   2, July 22, 2019 Expert Report of Dr. J. Michael Dennis ("Dennis Report"). Dr. Dennis has

22   previously performed similar analyses in two other lawsuits challenging as misleading health

23   and wellness claims on coconut oil labels. Dennis Report, Attachments C & D.

## LEGAL STANDARD

25       Under Federal Rule of Civil Procedure 23, "'[a] class action may be maintained' if two

26   conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*,

27   numerosity, commonality, typicality, and adequacy of representation), and it also must fit

28   into one of the three categories described in subdivision (b)." *Shady Grove Orthopedic*

7

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)

MOTION FOR CLASS CERTIFICATION

*Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) . But these are the *only* criteria that must be met. *Briseno v. ConAgra Foods, Inc.*, 844 F. 3d 1121, 1124-26 (9th Cir. 2017). This is because "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *In re Qualcomm Antitrust Litig.*, 328 F.R.D. 280, 294 (N.D. Cal. 2018) (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Although a certification motion requires a district court to conduct a "rigorous analysis" that "[f]requently . . . will entail some overlap with the merits," *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) ["*Dukes*"], the merits may be considered "only" to "determin[e] whether the Rule 23 prerequisites to class certification are satisfied." *Amgen*, 568 U.S. at 466.

## ARGUMENT

### I.     The Requirements of Rule 23(a) are Satisfied

#### A.     Numerosity

"The numerosity requirement imposes no absolute limitations; rather, it 'requires examination of the specific facts of each case.'" *Hoffman v. Blattner Energy, Inc.*, 315 F.R.D. 324, 337 (C.D. Cal. 2016) (citing *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 330 (1980)). "[D]istrict courts in this Circuit have found that classes with as few as 39 members met the numerosity requirement," and while "[t]he Ninth Circuit has not offered a precise numerical standard[,] other District Courts have [] enacted presumptions that the numerosity requirement is satisfied by a showing of 25–30 members." *Id.* Here, Plaintiff has evidence Jarrow sold ████████████████, for estimated retail sales of ███████ ███. Ex. 12; *see also* July 22, 2019 Declaration of Colin Weir ("Weir Declaration"), at ¶ 62, Table 1. Thus, numerosity is satisfied.

#### B.     Commonality

Rule 23(a)(2) is satisfied if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), which means that "the class members have suffered the same injury," so that their claims "depend upon a common contention . . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. "What matters to class certification ... is not the raising of common questions

... but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Arroyo v. United States Dep't of Homeland Sec.*, 2019 WL 2912848, at *9 (C.D. Cal. 2019) (citing *Dukes*, 564 U.S. at 350). . Questions "have that capacity" when they have a "close relationship with the . . . underlying substantive legal test." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). "Where questions common to class members present significant issues that can be resolved in a single adjudication 'there is clear justification for handling the dispute on a representative rather than on an individual basis.'" *Rodman v. Safeway, Inc.*, 2014 WL 988992, at *4 (N.D. Cal. 2014) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

In the Ninth Circuit, "Rule 23(a)(2) has been construed permissively.... The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Arroyo*, 2019 WL 2912848 at *9. (citing *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003)). Common exposure to the same violations creates a "common nucleus of operative facts" sufficient to find commonality. *Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 626 (S.D. Cal. 2015) "[A] common nucleus of operative fact is usually enough to satisfy the commonality requirement," *Rasario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992), which exists "where a defendant has engaged in standardized conduct toward members of the class," *Hale v. State Farm Mut. Auto. Ins. Co.*, 2016 WL 4992504, at *6 (S.D. Ill. Sept. 16, 2016) (citing *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998) (collecting cases)).

Commonality is satisfied here because all class members were exposed to the same four Challenged Claims, *see* Exs. 8-11, and determining whether the those claims are misleading or render the Products misbranded will determine Jarrow's liability to both Mr. Shanks and every other class member. *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1096-98 (C.D. Cal. 2015) (commonality satisfied where all class members were exposed to defendant's product packaging and widespread marketing such that class members' claims arose from common core of salient facts and posed common question whether NJOY statements were false, unfair, deceptive, or misleading (citing *In re*

9

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

*ConAgra Foods, Inc.*, 302 F.R.D. 537, 569 (C.D. Cal. 2014))); *cf. Allen v. Similasan Corp.*, 306 F.R.D. 635, 647-48 (S.D. Cal. 2015) ("Given the uniformity of the efficacy representations, the Court is not persuaded that the small differences in labelling would cause individual issues to predominate.").

### C. Typicality

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3). This means plaintiff's claims "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "In determining whether typicality is met, the focus should be on the defendants' conduct and plaintiff's legal theory," *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) (citation and internal quotation marks omitted).

Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1118 (N.D. Cal. 2018). "This requirement is 'permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical.'" *Id.* (citing *Hanlon*, 150 F.3d at 1029). "In instances where it is alleged that the defendant[] engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent members." *Salvagne v. Fairfield Ford Inc.*, 264 F.R.D. 321, 328 (S.D. Ohio 2009).

Here, all Class Members were exposed to the Products' labeling, which always bore the same four Challenged Claims. *See* Joseph Decl. ¶¶ 9-60, Exs. 8-11. All Class Members were injured in the same manner, losing money because they paid a premium attributable to

the misleading and unlawful Challenged Claims. Plaintiff's claims are therefore typical of the class's claims. *See Hadley*, 324 F. Supp. 3d at 1118; *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010) (finding plaintiff's claim that a mass market product label was misleading arose from the same facts and legal theory as other class members and therefore was typical).

That some members purchased Jarrow's "Regular" Coconut Oil, while plaintiff purchased Jarrow's "Extra Virgin" Coconut Oil does not defeat his typicality as to the purchasers of the Regular Coconut Oil "because the alleged misrepresentation was the same as to each" version. *See Todd v. Tempur-Sealy Int'l Inc.*, 2016 WL 5746364, at *5 (N.D. Cal. Sept. 30, 2016). Here, all four Challenged Statements always appeared on both Products. Even if there was some difference in their labels, "[w]here the challenged conduct is a policy or practice that affects all class members," the court should "not insist that the named plaintiffs' injuries be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs and that the injuries result from the same, injurious course of conduct." *Des Roches v. California Physicians' Serv.*, 320 F.R.D. 486, 504 (N.D. Cal. 2017) (internal quotes and citations omitted).

In *Des Roches*, the district court determined that even though variations occurred in the policies and practices subject to the dispute, changing as often as annually, because the "injury to the named Plaintiffs, like the injury to the absent class members, is that Defendants adjudicated their claims under Guidelines that do not conform to generally accepted standards of car," typicality was satisfied. *Id*. *See also Chamberlan v. Ford Motor Co*., 223 F.R.D. 524, 526 (N.D. Cal. 2004) ("the typicality requirement is satisfied because the named plaintiffs and the members of the proposed class 'all have claims arising from the [same] fraudulent scheme'" (quotation omitted)); *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *9- 10 (N.D. Cal. May 30, 2014) (certifying class of frozen fruit product purchasers since issues of reliance and materiality were common to the class and class representative's claims were typical even though representative purchased just three of ten challenged products).

11

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

### D. Adequacy

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020 (citation omitted).

Plaintiff adequate because he is an injured Class Member with standing, has no conflicts of interest, is aware of and is committed to fulfilling his obligations as Class Representative, and will continue vigorously prosecuting the action on behalf of the Class. Shanks Decl. ¶¶ 1-18. *See In re Brazilian Blowout Litig.*, 2011 WL 10962891, at *5 (C.D. Cal. 2011) (class representatives adequate where they "submitted declarations" stating "they understand their responsibilities as class representatives, that no conflicts exist between their interests and other members of the class, and that they intend to vigorously pursue all claims asserted in this lawsuit"); *c.f. Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) (A plaintiff is adequate if he "understands his duties and is currently willing and able to perform them. The Rule does not require more.").

Plaintiff has also retained counsel with no conflicts and significant experience prosecuting consumer fraud class actions involving the deceptive labeling of foods as healthy. *See* Joseph Decl. ¶¶ 72-77 & Exs. 20-21. This includes numerous actions involving the deceptive labeling of coconut oil as healthy.[3] Plaintiff's counsel also recently obtained class

---

[3] These cases include *Delalat v. Nutiva, Inc.*, No. 4:16-cv-00711-HSG (N.D. Cal.); *Cumming v. BetterBody Foods & Nutrition, LLC*, No. 37-2016-19510-CU-BT-CTL (San Diego Sup. Ct.); *Ducorsky v. Premier Organics*, No. HG16801566 (Alameda Sup. Ct.); *Zemola v. Carrington Tea Company*, No. 17-cv-760-MMA (S.D. Cal.); *Tracton v. Viva Labs, Inc.*, No. 16-cv-2772-BTM (S.D. Cal.); and *Boswell et al. v. Costco Wholesale Corporation, et al.*, No. 8:16-cv-00278-DOC (C.D. Cal.). Plaintiff's counsel also just filed for preliminary approval in *Hunter v. Nature's Way*, No. 3:16-cv-00532-WQH (S.D. Cal.), of a classwide settlement providing a $1.85 million non-reversionary common fund, and injunctive relief for the Class.

12

certification in lawsuit against Kellogg alleging it labeled cereals with health and wellness claims that were deceptive in light of the cereals' high added sugar content. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018). And two years ago, Plaintiff's counsel obtained from the Honorable John F. Walter, a decision certifying a consumer fraud class action against Monsanto, which later settled for a $21.5 million non-reversionary common fund. *See Martin v. Monsanto Co.*, 2017 WL 1115167 (C.D. Cal. Mar. 24, 2017) (Walter, J.) (certifying class); *Rawa v. Monsanto Co.*, 2018 WL 2389040 (E.D. Mo. May 25, 2018) (approving settlement). Thus, Plaintiff's counsel is adequate.

## II.     The Requirements of Rule 23(b)(3) are Satisfied

### A.     Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.*, 521 U.S. at 623; *see also* Fed. R. Civ. P. 23(b)(3). Predominance exists where common questions present "a significant aspect of the case that can be resolved for all members of the class in a single adjudication." *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014) (internal quotation, brackets, and alteration omitted). This includes where classwide "damages stemmed from the defendant's actions that created the legal liability." *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1435 (2013) ["*Comcast*"]). "[W]hen common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022 (quotation omitted).

### 1.     The Class's Claims will be Resolved through Objective Standards and Common Evidence that Apply Classwide

"Considering whether 'questions of law or fact common to class members predominate' begins . . . with the elements of the underlying causes of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

### a. Consumer Fraud

California's FAL, CLRA, and UCL's "fraudulent" prong "prohibit 'not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public,'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quotation omitted). This is "judged by the effect it would have on a reasonable consumer," who is the "ordinary consumer within the target population," *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506-507, 510 (2003), is "not versed in the art of inspecting and judging a product, in the process of its preparation or manufacture," *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 682 (2006), and is not "expected to look beyond misleading representations on the front of the box to discover the truth from the . . . small print," *Williams*, 552 F.3d at 939. "This objective test focuses on the 'reasonable consumer,' […] or, put another way, on whether members of the public are likely to be deceived." *Hadley*, 324 F. Supp. 3d at 1095 (internal quotes and citations omitted). The objective tests for deception and materiality renders claims under the UCL, FAL, and CLRA "ideal for class certification because they will not require the court to investigate class members' 'individual interaction with the product.'" *Bradach v. Pharmavite, LLC*, 735 Fed. Appx. 251, 255 (9th Cir. 2018) (quoting *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) (quotation omitted)); *accord Amchem Prods.*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging consumer . . . fraud").

"[T]he primary evidence in a false advertising case is the advertising itself," *Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003), and "[t]he 'misleading character' of a given representation 'appears on applying its words to the facts.'" *Jefferson v. Chase Home Fin.*, 2008 WL 1883484, at *17 (N.D. Cal. Dec. 14, 2007) (quoting *Colgan*, 135 Cal. App. 4th at 679). "To state a claim under the UCL or the FAL 'based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) ["*Pulaski*"] (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)). A product's packaging is

misleading if it objectively presents "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Brockey*, 107 Cal. App. 4th at 99.

Here, the question of liability is whether the Challenged Claims are likely to deceive. Because the same Challenged Claims appear on every Challenged Product, if Plaintiff demonstrates Jarrow's labeling was likely to deceive under California's objective "reasonable consumer" test, he will have established its liability as to all class members. *See Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1089, 1094 (9th Cir. 2010) ("[T]here is no reason to look at the circumstances of each individual purchase in this case, because the allegations of the complaint are narrowly focused on allegedly deceptive provisions of [defendant's] own marketing . . . and the fact-finder need only determine whether [that marketing] w[as] capable of misleading a reasonable consumer."); *see also In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 349 (N.D. Cal. 2018) ("This inquiry does not require 'individualized proof of deception, reliance and injury." (internal quotes and citation omitted)); *Moyle v. Liberty Mut. Ret. Benefit Plan*, 823 F.3d 948, 964-65 (9th Cir. May 20, 2016) ("[W]here the defendant's representations were allegedly made on a uniform and classwide basis, individual issues of reliance do not preclude class certification." (citing *Hanon*, 976 F.2d at 509 ("We emphasize that the defense of non-reliance is not a basis for denial of class certification."))).

Further, whether the Challenged Claims are misleading can be determined using common evidence in the form of the scientific literature regarding the health effects of consuming coconut oil. *See* Ex. 5, Bowman 30(b)(6) Tr. 68:13-15 (agreeing that the Products' healthfulness can be determined "by reviewing the scientific literature"). While not even necessary at this stage, Plaintiff has already presented such common evidence in the form of Dr. Greger's expert testimony that Jarrow's Coconut Oil Products are not healthy.

While the Class's CLRA claims include an additional element of causation or reliance, "[t]he causation required by the CLRA does not make plaintiffs' claims unsuitable for class treatment because causation as to each class member is commonly proved more likely than not by materiality." *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 482 (C.D. Cal. 2012)

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

1    (quotation omitted). That is because "[a] presumption, or at least an inference, of reliance

2    arises . . . whenever there is a showing that a misrepresentation was material." *Tobacco II*

3    *Cases*, 46 Cal. 4th at 327; *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th

4    Cir. 2012), *abrogated on other grounds by Comcast*, 133 S. Ct. 1426.

5         The materiality of an alleged misrepresentation is also judged by an objective standard.

6    *See Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010); *Racies v. Quincy*

7    *Bioscience, LLC*, 2017 WL 6418910, at *3 (N.D. Cal. Dec. 15, 2017) ("California's consumer

8    protection laws evaluate materiality under a reasonable person standard, not on an

9    individualized basis."). Thus, as the Supreme Court has explained, "because '[t]he question

10   of materiality . . . is an objective one,'" materiality is a "common questio[n]" for purposes

11   of Rule 23(b)(3). *See Amgen*, 568 U.S. at 467-68 (explaining "there is no risk whatever that

12   a failure of proof on the common question of materiality will result in individual questions

13   predominating" because "failure of proof on the element of materiality would end the case

14   for one and for all; no claim would remain in which individual reliance issues could

15   potentially predominate."). Thus, the objective standard for materiality alone makes

16   certification appropriate. *See Hadley*, 324 F. Supp. 3d at 1115; *Mass. Mut. Life Ins. Co. v.*

17   *Super. Ct.*, 97 Cal. App. 4th 1282, 1294 (2002) (materiality is a "common question of fact

18   suitable for treatment in a class action").

19        Further, Plaintiff will be able to present ample evidence the Challenged Claims are

20   material. As a matter of common sense, "consumers rely on health-related claims on food

21   products in making purchasing decisions," *Bruton v. Gerber Prods. Co.*, 2014 WL 172111,

22   at *11 (N.D. Cal. Jan. 15, 2014), which is particularly true here give that "it's a product that's

23   purchased by health food store shoppers," O'Connor 30(b)(6) Dep. Tr. 52:24-25. Second, the

24   FDA's regulations that specifically prohibit Jarrow's use of the challenged nutrient content

25   claims establishes materiality as a matter of law because "the legislature's decision to prohibit

26   a particular misleading advertising practice is evidence that the legislature has deemed that

27   the practice constitutes a 'material' misrepresentation, and courts must defer to that

28   determination." *Rahman v. Mott's LLP*, 2014 WL 6815779, at *7 (N.D. Cal. Dec. 3, 2014)

16

1   (citing *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013) (citation omitted)).[4]

2       Moreover, Jarrow testified that "people seek products that contain MCTs," O'Connor

3   30(b)(6) Dep. Tr. 53:24-25, and that it has "had consumers calling, you know, worried about

4   hydrogenation," *id.* 85:10-11; *see also id.* 83:13-14 (describing calls regarding trans fat and

5   testifying that "some people just . . . want a product without it"). *See also id.* 52:24-25, 77:1-

6   8, 87:2, 89:2-4 (health food shoppers); 53:22-54:2, 55:18-22, 81:16-21, 82:16- 83:25, 85:1-

7   16, 114:18-115:18 (describing consumers inquiries about MCTs, trans fat, and

8   hydrogenation). This indicates consumers place importance on the Challenged Claims, which

9   convey those important aspects of the product—aspects that are important because of their

10  health implications.

11      Finally, if Dr. Dennis's conjoint analysis demonstrates a price premium, this will also

12  evidence materiality. *See Kumar v. Salov N. Am. Corp.*, 2016 WL 3844334, at *8 (N.D. Cal.

13  July 15, 2016) (plaintiff's "expert opinion evidence of a price premium attributable to

14  [challenged] representations" supported materiality).

15

16  ───────────────

    [4] One of the FDA's primary purposes in implementing nutrient content claim regulations was
17  "[t]o ensure that consumers are not misled and are given reliable information." 56 Fed. Reg.
    at 60422; *see also* 58 Fed. Reg. 2302, 2302 (Jan. 6, 1993) ("basic objectives" of the NLEA
18  include "assist[ing] consumers in selecting foods that can lead to healthier diets," and
    "eliminat[ing] consumer confusion by establishing definitions for nutrient content claims that
19  are consistent with the terms defined by the Secretary"). The FDA, for example, requires the
    disclosure statement next to nutrient content claims when foods contain high amounts of fat
20  or saturated fat because "because the Agency has reasoned that the beneficent claim, standing
    alone, would be misleading." *See Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1122
21  (N.D. Cal. 2010); *see also Gustavson v. Mars, Inc.*, 2014 WL 2604774, at *11 (N.D. Cal.
22  June 10, 2014) (Discussing § 101.13(h) and noting that "the FDA has already spoken as to at
    least one of the reasons why Defendants' product labels are allegedly misleading—namely,
23  Defendants' failure to accompany their front-of-package calorie statements with a disclosure
24  directing consumers to consult the nutrition information panel for information about fat
    and/or saturated fat."); *accord Bishop v. 7-Eleven, Inc.*, 651 Fed. Appx. 657, 658 (9th Cir.
25  2016) (Referring to § 101.13(h) and stating, "California's consumer protection statutes render
26  statements actionable which, although not technically false, have a tendency to mislead
    consumers because the statements fail to disclose or direct the consumer's attention to other
27  relevant information." (citations omitted)).
28

1    In sum, with respect to the Class's consumer fraud claims, "common questions will

2  predominate over individual questions" because the Court must decide whether "the

3  challenged health statements were  misleading and material […] according to an objective

4  'reasonable consumer' standard. *Hadley*, 324 F. Supp. 3d at 1115.

5                    **b.    "Unlawful" Misbranding**

6    The UCL's "unlawful" prong "borrows" predicate legal violations and treats them as

7  independently actionable. *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 871 (2002). The

8  Class alleges predicate violations of California's Sherman Law, which has adopted FDA

9  regulations as its own. Compl. ¶¶ 65-67. UCL liability for such misbranding violations does

10  "no[t] require[] that the public be likely to experience deception." *Bruton*, 703 F. Appx, at

11  472. Even if it did, using prohibited nutrient content claims is deceptive as a matter of law.

12  *See Rahman*, 2014 WL 6815779, at *7; *c.f. Brown v. Hain Celestial Group, Inc*., 2015 WL

13  3398415, at *7 (N.D. Cal. May 26, 2015) ("the California legislature's decision . . . to prohibit

14  the sale, labeling, or representation of products as 'organic,' when they contain less than 70%

15  organic ingredients, establishes as a matter of law that violations . . . are 'material'

16  misrepresentations under the UCL.").

17    Accordingly,  resolving these claims requires only applying the regulations to the labels

18  to determine their compliance. Jarrow's liability to the Class under the UCL's "unlawful"

19  prong is a predominating common question because "proving the . . . 'unlawful' prong[] of

20  the UCL . . . do[es] not depend upon any issues specific to individual consumers," *Lilly v.

21  Jamba Juice Co.*, 308 F.R.D. 231, 242 (N.D. Cal. 2014). Rather, "[t]he label is either illegal

22  or it is not," *Ang v. Bimbo Bakeries USA, Inc.*, 2014 WL 1024182, at *8 (N.D. Cal. Mar. 13,

23  2014), and that determination will apply to all Class Members the same. *Compare Rahman*,

24  2014 WL 6815779, at *5 ("[P]laintiff has demonstrated that there are significant questions

25  common to the proposed class, including whether the challenged statement violates relevant

26  FDA regulations as incorporated in the Sherman Law, and whether the challenged statement

27  constitutes an 'unlawful practice' under the UCL."). Thus, Jarrow's liability for misbranding

28

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

is a predominating common question.[5]

### c. Application of California Law to a Nationwide Class is Appropriate

Jarrow has always been incorporated, organized, and existing under the laws of California. *See* Joseph Decl. ¶¶ 70, Ex. 18. California is the its principal place of business, with its headquarters in Los Angeles, and it does not have "any other offices or locations outside of California," Ex. 4, Lipsky 30(b)(6) Dep. Tr. 20:17-21:7. Thus, all of its management activities and labeling decisions occurred in California, and the labeling every Product bears Jarrow's Los Angeles mailing address. *See* Exs. 8-11.

"District courts routinely apply the . . . CLRA[] and . . . UCL[] . . . to nationwide classes." *Bruno v. Eckhart Corp.*, 280 F.R.D. 540, 547 (C.D. Cal. 2012) (collecting cases). In doing so, courts have frequently found that evidence of the type just described satisfies a plaintiff's initial burden of showing that applying California law to a nationwide class is proper, as should the Court here. *See Opperman v. Path, Inc.*, 2016 WL 3844326, at *8-9 (N.D. Cal. July 15, 2016); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 656-57 (C.D. Cal. 2014); *Forcellati v. Hyland's, Inc.*, 876 F. Supp. 2d 1155, 1160 (C.D. Cal. 2012); *Bruno v. Quten Research Inst., LLC*, 280 F.R.D. 524, 538-39 (C.D. Cal. 2011); *Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D. Cal. 2010); *Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 339-40 (N.D. Cal. 2010); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 589 (C.D. Cal. 2008); *see also Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1185-89 (2015); *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001).

---

[5] While this is not a merits motion, here the question will be especially easy to answer because John O'Connor, Jarrow's Manager of Technical (Regulatory) Compliance, testified that the Challenged Products, "based on the contents here, should have" born the disclosure statement "See nutrition information for total fat and saturated fat content," O'Connor 30(b)(6) Dep. Tr. 102:10-103:7. *See also id.* 99:15-103:7, 151:18-152:3 (explaining that the statement "see the -- the nutrition facts panel for total fat and saturated fat content" was added to the labeling and agreeing that was done "to bring them into compliance with FDA regulations").

19

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)

MOTION FOR CLASS CERTIFICATION

### 2. The Class's Price Premium Damages Model is Consistent with its Theory of Liability, and Capable of Measuring Classwide Damages

For class certification, plaintiff must show "damages are capable of measurement on a classwide basis," in a manner "consistent with [his] liability case," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013) (quotation omitted). Plaintiff need only "present a *likely* method for determining class damages," and "it is not necessary to show that this method will work with certainty," *Chavez*, 268 F.R.D. at 379 (emphasis added, quotation omitted).

"The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Comcast,* 569 U.S.. at 38 (citation and emphasis omitted). Here, "[f]or each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm" is that "the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 329 (2011).

The UCL, FAL, and CLRA all "authorize a trial court to grant restitution to private litigants asserting claims under those statutes." *Colgan*, 135 Cal. App. 4th at 694 (citations omitted); *see also* Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(3). "The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014). "This calculation contemplates the production of evidence that attaches a dollar value to the 'consumer impact or advantage' caused by the unlawful business practices." *Id.* (citing *Colgan*, 135 Cal. App. 4th at 700).

"Class wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving. California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017) (quoting *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015)).

Here, Plaintiff alleges Jarrow's misrepresentations and unlawful nutrient content claims increased the products' market price. "[A] methodology that identifies damages that are not the result of the wrong" is an impermissible basis on which to calculate classwide damages. *See Comcast*, 133 S. Ct. at 1434. Here, plaintiff alleges Jarrow is liable based solely making the Challenged Statements. Thus, "[u]nlike the situation in *Comcast*, there is no possibility in this case that damages could be attributed to defendants' acts that are **not** challenged on a class-wide basis because all members of the current class attribute their damages to the" same deceptive practice. *See Krueger v. Wyeth, Inc.*, 310 F.R.D. 468, 482 (S.D. Cal. 2015) (emphasis in original); *accord Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013) (same); *cf. In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2013 WL 5429718, at *22 (N.D. Cal. 2013) ("*Comcast* has no application" where "plaintiffs assert . . . only one theory of antitrust liability and impact"). Here, the Class's conjoint analysis damages model is consistent with their simple theory, and capable of measuring damages classwide.

Conjoint is "a representative survey technique that permits an economist to analyze the value of various product attributes" Weir Declaration ¶ 24, and "is widely-accepted as a reliable economic tool for isolating price premia." *Hadley*, 324 F. Supp. 3d at 1110.[6] Thus, many courts have found false advertising damages measurable on a classwide basis through

---

[6] *See also Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019) ("District courts have . . . certified classes where plaintiffs used conjoint analysis."); *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969 (N.D. Cal. 2018); *In re Arris*, 327 F.R.D. at 366-73 ; *Bromfield v. Craft Brew Alliance, Inc.*, 2018 WL 4952519, at *13-20 (N.D. Cal. Sept. 25, 2018) ; *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 326 F.R.D. 592, 601, 603-606 (N.D. Cal. June 26, 2018); *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2017) (conjoint "a generally accepted method for valuing the individual characteristics of a product"); *Kurtz v. Kimberly-Clark Corp.*, 312 F.R.D. 482, 551 (E.D.N.Y. Mar. 27, 2017) (conjoint a "reliable method[] available for calculating the price premium attributable to a product characteristic"); *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Miller v. Fuhu Inc.*, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) ("courts . . . have accepted" conjoint "as reliable . . . for calculating price premiums on a classwide basis"); *Guido*, 2014 WL 6603730, at *11 (approving conjoint analysis damages model under *Comcast*).

EXHIBIT H
Page 316

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

conjoint analysis, because it is a valid method for isolating the price premium attributable to the misrepresentation. *See, e.g., id.* at 1106 (approving "proposed conjoint analysis"); *Zakaria v. Gerber Prods. Co.*, 2016 WL 6662723, at *14-16 (C.D. Cal. 2016) (For class certification, matching "[t]he theories of liability and proposed methods for calculating damages [is] sufficient," such that, by proposing "using 'conjoint analysis' . . . to calculate the price premium," plaintiff "ha[d] presented a method for calculating damages that is tied to the theory of liability" satisfying *Comcast*); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 539 (S.D. Fla. 2015) ("the Court disagrees that [the class's expert] must have already performed his proposed conjoint analysis for the Court to consider the proffered methodology").

Here, Dr. Dennis designed a conjoint survey and analysis to determine the price premium attributable to the challenged claims. *See* Dennis Report ¶¶ 32-57 (summarizing the steps he will follow to implement the conjoint survey and analysis, including obtaining an appropriate sample of respondents, and engaging in pretesting). Dr. Dennis identifies the product attributes that will be included in the survey (Brand, Container Type, Product Size (amount of coconut oil), Product Type, Label Claims on Products, and Price), the reasons for selecting these attributes. *Id.* ¶¶ 58-85. The attributes selected, and their levels reflect those attributes and levels actually seen in the coconut oil market place, and thus provide survey respondents with an appropriate model of real-world shopping experiences. For example, for the price attribute, Dr. Dennis will select prices that reflect prices paid by actual coconut oil purchasers in the real world, depending on size and type. *See id.* ¶ 97. Finally, Dr. Dennis explains how he will use a market simulator to translate the results of his survey into an estimate of the market price premia attributable to the Challenged Claims, and notes that because the survey will use actual real-world pricing from the class period and the quantity of the units of Challenged Products sold a historical fact, the simulator will appropriately account for both demand-side and supply-side considerations. *See id.* ¶¶ 91-101; *see also id.* ¶ 64 ("The actual real-world pricing of the products reflects the actual number of units sold, the costs of manufacturing, the costs for distribution, advertising, and marketing, and margin,

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
Motion for Class Certification

among other supply-side factors").

As one court recently explained, when these measures are taken, a conjoint analysis is sufficiently reliable to pass muster under *Comcast* and *Daubert*:

> [C]onjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period.

*Hadley*, 324 F. Supp. 3d at 1105.

Once the conjoint analysis reveals the price premia attributable to the Challenged Claims, those premia "can then be multiplied by the number of units purchased by each class member to determine both total and individual damages." *Zakaria*, 2016 WL 6662723, at *16. That is what plaintiff proposes here. The Class's damages expert, Colin Weir, explains that he will be able to apply the price premia Dr. Dennis calculates to the aggregate retail sales to calculate the Class's restitution and damages. Weir Declaration ¶¶ 36-57. Thus, Plaintiff has proposed a reliable method for measuring the price premium attributable to the Challenged Claims, consistent with his theory of liability, satisfying *Comcast*.

Dr. Dennis and Mr. Weir have fully carried out conjoint analyses and calculated price premia for challenged claims in two closely analogous cases involving misleading health and wellness claims on other coconut oil products using the same methods proposed here. Dennis Report, Attachments C & D. In both those matters, each were resolved while class certification was still pending, they were able to determine the marketplace price premia attributable to the challenged claims, showing the analysis can be performed here.

Notably, this method is *identical* for every purchaser. And the amount of damages itself will be identical for every 16 oz. or 32 oz. label of Extra Virgin Coconut Oil or Regular Coconut Oil. In fact, the only individualized damages issue is the number of units a class member purchased, but this is not predominating. *See Schramm v. JPMorgan Chase Bank, N.A.*, 2013 WL 7869379, at *5 (C.D. Cal. 2013). Accordingly, common questions concerning

damages predominate, and the class should be certified. *Compare Hadley*, 324 F. Supp. 3d at 1103-10 (discussing at length appropriateness of conjoint as classwide damages model and rejecting several criticisms by defendant).

## B. Superiority

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," courts consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). "A consideration of these factors requires the court to focus on the efficiency and economy elements of the class action so that cases allowed under [Rule 23(b)(3)] are those that can be adjudicated most profitably on a representative basis." *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001) (quotation omitted). Superiority is satisfied here considering these factors.

### 1. There is no Related Litigation and the Forum is Appropriate

Plaintiff is unaware of any other related litigation. Both he and Jarrow are residents of this district. Accordingly, factors (B) and (C) support superiority.

### 2. Class Members Have No Interest in Prosecuting Separate Actions

Superiority "is met '[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis.'" *Tait*, 289 F.R.D. at 486 (quoting *Wolin*, 617 F.3d at 1175); *see also Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."). Because the Products cost less than $25 on average, Class Members have no interest in controlling individual actions.

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

Case 2:18-cv-09437-PA-AFM Document 86-18 Filed 07/22/19 Page 36 of 41 Page ID #:979
Case 2:18-cv-09437-PA-AFM Document 66-1 Filed 07/24/24 Page 36 of 81 Page ID #:
320 of 435

### 3. No Manageability Concerns Outweigh the Superiority of the Class Action Device for Adjudicating the Class's Claims

This case presents straightforward claims for consumer fraud and misbranding, based on the exact same Challenged Claims made on single-ingredient Products that did not change, and does not present management concerns. Manageability concerns cannot, in any event, scuttle class certification under the rubric of superiority "if no realistic alternative exists," *see Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996); *see also Levya*, 716 F.3d at 514-15. "The Ninth Circuit has recognized that a class action is a plaintiff's only realistic method for recovery if there are multiple claims against the same defendant for relatively small sums." *Culley v. Lincare Inc.*, 2016 WL 4208567, at *8 (E.D. Cal. Aug. 10, 2016). This is the case here, thus adjudicating this case on a class basis is superior.

### CONCLUSION

This is a simple false advertising case involving two products that bore the identical challenged claims, have the same composition. Given the objective "reasonable consumer" standard that applies, Jarrow's liability under each theory of the case can be determined as to all Class Members in a single proceeding. Further, plaintiff has proposed a damages model matching the Class's theories of liability and capable of measuring its classwide damages in accordance with *Comcast*. Because Plaintiff has shown that each of the Requirements of Rule 23(a) and 23(b)(3) are satisfied, the Court should certify the class.

Dated: July 22, 2019            Respectfully submitted,

/s/ Paul K. Joseph

**THE LAW OFFICE OF PAUL K. JOSEPH, PC**
PAUL K. JOSEPH
*paul@pauljosephlaw.com*
4125 W. Point Loma Blvd. #309
San Diego, CA 92110
Phone: (619) 767-0356
Fax: (619) 331-2943

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

1          **THE LAW OFFICE OF JACK FITZGERALD, PC**

2          JACK FITZGERALD

3          *jack@jackfitzgeraldlaw.com*
         TREVOR M. FLYNN

4          *trevor@jackfitzgeraldlaw.com*
         MELANIE PERSINGER

5          *melanie@jackfitzgeraldlaw.com*

6          Hillcrest Professional Building
         3636 Fourth Avenue, Suite 202

7          San Diego, California 92103

8          Phone: (619) 692-3840
         Fax: (619) 362-9555

9          ***Counsel for Plaintiff and the Proposed Class***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Shanks v. Jarrow Formulas, Inc.*, No. 18-cv-9437-PA (AFMx)
MOTION FOR CLASS CERTIFICATION

# EXHIBIT I

EXHIBIT I
Page 322

# Exhibit 1

EXHIBIT I
Page 323

Report of Dr. Michael Greger, M.D. FACLM

Dated July 22, 2019

PREPARED FOR:
The Law Office of Jack Fitzgerald, PC &
The Law Office of Paul K. Joseph, PC

EXHIBIT I
Page 324

# Contents

Introduction ............................................................................................................. 1

    Project Description ............................................................................. 1

    Summary of Opinions ........................................................................ 1

Background .............................................................................................................. 2

    Qualifications .................................................................................... 2

    Prior Expert Testimony ..................................................................... 3

    Compensation .................................................................................... 3

Scope of Project ...................................................................................................... 3

Methodology ........................................................................................................... 4

    Identification and Survey of the Scientific Literature Relevant to Coconut Oil ................................................................................................. 4

    Review of Jarrow' Substantiation ..................................................... 5

    Consideration of Whether Coconut Oil is Generally Healthy, and a Healthy Replacement for Butter, Margarine, Shortening, or Other Cooking Oils ....................................................................................... 6

    Consideration of the Challenged Labeling Statements ..................... 6

Analysis .................................................................................................................. 7

    Heart Health & Cardiovascular Disease ........................................... 7

    Inflammation ..................................................................................... 17

    Body Fat ............................................................................................ 18

Conclusions ............................................................................................................ 19

EXHIBIT I
Page 325

# Exhibits

Curriculum Vitae of Dr. Michael Greger, M.D. FACLM . . . . . . . . . .   Exhibit 1
Materials Considered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Exhibit 2

EXHIBIT I
Page 326

# Introduction

### Project Description

The Law Office of Jack Fitzgerald, PC and The Law Office of Paul K. Joseph, PC (collectively "Plaintiffs' Counsel") have engaged me in connection with the action styled *Shanks v. Jarrow Formulas, Inc.*, No. 16-cv-9437-PA, pending in the Central District of California. Specifically, I have been engaged to:

(a)   Identify, analyze, and summarize relevant scientific and medical literature regarding the physiological effects of coconut oil consumption on the human body;

(b)   Analyze and summarize any additional sources Jarrow Formulas, Inc. ("Jarrow") claims as substantiation for certain statements challenged in this lawsuit, which are made in the labeling of the (i) Organic Extra Virgin Coconut Oil and (ii) Coconut Oil (collectively the "Coconut Oil Products");

(c)   Opine on (i) whether consuming coconut oil is healthy or unhealthy, and (ii) whether coconut oil is a healthy replacement for butter, margarine, shortening, or other cooking oils; and

(d)   Opine on the veracity of the Coconut Oil Products' labeling statements challenged in this lawsuit in light of my review of the scientific evidence.

### Summary of Opinions

The relevant scientific literature demonstrates that coconut oil consumption substantially increases cardiovascular and metabolic disease risk by adversely affecting blood lipids, artery function, and insulin sensitivity.

Given the science, it is my opinion that consuming coconut oil is unhealthy as coconut oil consumption causes significant harm to health and is far more harmful than most substitutes. Accordingly, I believe Jarrow's labeling is false and misleading inasmuch as it states expressly or suggests that the Coconut Oil Products are healthy.

EXHIBIT I
Page 327

# Background

### Qualifications

I graduated from Cornell University School of Agriculture, and Tufts University School of Medicine. I am a physician, licensed as a general practitioner specializing in clinical nutrition. I am a founding member and a Fellow of the American College of Lifestyle Medicine.

I am also a frequent author and speaker. My books include *Bird Flu: A Virus of Our Own Hatching*, *Carbophobia: The Scary Truth Behind America's Low Carb Craze*, and *How Not to Die*, which became an instant New York Times bestseller. My work has been published in peer-reviewed journals including the *American Journal of Preventative Medicine*; *Critical Reviews in Microbiology, Family, and Community Health*; and the *International Journal of Food Safety, Nutrition, and Public Health*.

As an internationally-recognized speaker on nutrition, food safety, and public health issues, I have lectured at the Conference on World Affairs, the National Institutes of Health, and the International Bird Flu Summit, among countless other symposia and institutes, and have also testified before Congressional subcommittees.

I currently serve as Chief Science Officer for a 501(c)(3) nonprofit entity called NutritionFacts.org, which is a science-based, strictly non-commercial website that provides informational videos and articles on the latest evidenced-based nutrition research. Last year alone, I performed comprehensive medical literature searches on scores of topics and downloaded and categorized more than 18,000 scientific journal articles. The wealth of information in these articles and medical literature is extracted, summarized, and presented in free informational videos and articles on the NutritionFacts.org website that are designed to allow lay persons understand and apply the latest evidence-based nutrition research to their daily lives.

I have access to the major online medical databases such as PubMed, Web of Science, and ProQuest, which are considered the customary or standard databases for conducting literary reviews in my profession. I also have access to the National Library of Medicine, the largest medical library in the world. These online databases and the National Library of Medicine afford me extensive access to the world's academic literature. Since I founded NutritionFacts.org, I have personally searched and analyzed research on more than 2,000 health and nutrition topics, including coconut oil, and thus am well versed in literary reviews.

EXHIBIT I
Page 328

My curriculum vitae, attached as <u>Exhibit 1</u>, further describes my professional credentials, including identifying all publications I have authored in the previous 10 years.

### Prior Expert Testimony

The cases in which, during the previous 4 years, I have testified as an expert are:

- *Adam Parker et al. v. Monavie, Inc., et al.,* No. 12-cv-1983-TJH (C.D. Cal.);
- *Hadley v. Kellogg Sales Company*, No. 16-cv-04955-LHK-HRL (N.D. Cal.); and
- *Krommenhock et al. v. Post Foods, LLC.*, No. 16-cv-04958-WHO (N.D. Cal.).

### Compensation

For my work in this matter, I personally received no direct compensation, but a donation of $250 per hour (with travel time billed at half that hourly rate), plus expenses was made to a 501(3)(c) charitable fund on my behalf. That donation is not dependent on the opinions I reach or on the outcome of the litigation.

# Scope of Project

I understand plaintiff alleges that Jarrow, through a variety of labeling statements, advertise their Coconut Oil Products as generally healthy, utilizing "health halo" claims, and allege that this advertising is false and misleading because coconut oil is actually unhealthy.[1]

In the most general terms, I was asked by Plaintiff's Counsel to provide expert opinion on whether coconut oil is generally healthy and, as a result, whether Jarrow's labeling claims stating expressly or suggesting that its Coconut Oil Products are healthy are accurate. This project consisted of four stages.

First, I was asked to conduct a comprehensive survey of the scientific literature to identify any medical literature that studied coconut oil. I was then to review these

---

[1] Dkt. No. 1, Compl. ¶¶ 1, 51-64.

EXHIBIT I
Page 329

studies to determine their likely relevance and reliability, so as to identify a universe of all coconut oil literature to be analyzed and relied upon in forming my opinions.

Second, I was asked to consider any further materials, if not already considered, on which Jarrow has indicated it relied to substantiate any labeling claims plaintiffs challenge in this lawsuit.

Third, I was asked to render an opinion as to whether coconut oil can generally be considered a healthy or unhealthy oil for consumption.

Finally, I was asked to render an opinion, in light of the scientific evidence, as to the veracity of the labeling statements challenged in this lawsuit stating expressly or suggesting that Jarrow's Coconut Oil Products are healthy.

# Methodology

### Identification and Survey of the Scientific Literature Relevant to Coconut Oil

My first task was to perform as exhaustive a review of the literature as reasonably possible, first to identify the relevant scientific and medical literature regarding the physiological effects of coconut oil, then to analyze and summarize it.

In my previous work as an expert in a separate matter involving other coconut oil products, I performed, on August 30, 2016, a Boolean search of the National Library of Medicine's Medical Literature Analysis and Retrieval System Online via PubMed without language or date limits using the search string ("Plant Oils"[Mesh] "cocos"[MeSH Terms]) OR "coconut fat" OR "coconut oil"[Supplementary Concept] OR "coconut oil"[All Fields]). This netted 1,784 results (1,728 of which classified as English, 296 as on humans, 62 as published within the last year, and 44 as reviews).

This was then supplemented with a Web of Science search without language or date limits of their SCI-EXPANDED, SSCI, A&HCI, CPCI-S, CPCI-SSH, BKCI-S, BKCI-SSH, ESCI, and CCR-EXPANDED databases for "coconut oil" in the following categories: Food Science Technology OR Nutrition Dietetics OR Cardiac Cardiovascular Systems OR Biochemistry Molecular Biology OR Parasitology OR Neurosciences OR Pediatrics OR Pharmacology Pharmacy OR Oncology OR Medicine General Internal OR Ophthalmology OR Integrative Complementary

4

EXHIBIT I
Page 330

Medicine OR Dentistry OR Surgery Medicine OR Biology OR Gastroenterology Hepatology OR Behavioral Sciences OR Peripheral Vascular Disease OR Allergy OR Toxicology OR Medicine Research Experimental OR Chemistry Physical OR Tropical Medicine OR Mycology OR Reproductive Biology OR Pathology OR Obstetrics Gynecology OR Urology Nephrology OR Dermatology OR Developmental Biology OR Critical Care Medicine OR Chemistry Medicinal OR Clinical Neurology OR Hematology OR Immunology, netting 1,432 results.

The combined searches identified approximately 2,400 unique articles in the peer-reviewed medical literature. From this list I determined that 160 of the articles were relevant to the questions here based on title and abstract scrutiny. I then downloaded, categorized, and read these articles. Iterative citation searching identified 93 additional sources, which I retrieved and analyzed as well.

Subsequently, on July 9, 2019, I ran another Boolean search, with the same search terms, but limited to only those published after August 29, 2019. From that search, I identified 33 additional relevant articles, which I downloaded and reviewed.

### Review of Jarrow' Substantiation

Following my own review of the literature, I was asked to review any additional sources of potential substantiation identified by Jarrow.

I understand that as part of the discovery in this action, Jarrow was asked to "Identify any study, testing result, scientific or research paper, or other DOCUMENT or information on which YOU rely, or on which YOU relied at any time during the CLASS PERIOD, as a basis for any of the JARROW COCONUT OIL CLAIMS." I understand Jarrow produced several thousands of pages of purportedly relevant documents.

Based on a review of documents produced by Jarrow, I understand Jarrow has identified and/or produced dozens of studies that it purportedly relied on as a basis for the labeling statements plaintiffs challenge on the Coconut Oil Products. I have reviewed and analyzed all of those materials as part of this project (although many of them I had previously reviewed as part of my search). For the reasons set forth below, none of them help Jarrow with respect to the veracity of their label claims or with establishing that coconut oil is healthy.

5

EXHIBIT I
Page 331

### Consideration of Whether Coconut Oil is Generally Healthy, and a Healthy Replacement for Butter, Margarine, Shortening, or Other Cooking Oils

After reviewing and analyzing both the literature my survey located and the sources Jarrow has cited as substantiation for the Coconut Oil Products' labeling claims, I considered two questions in light of the totality of the scientific evidence. First, is coconut oil a healthy, or unhealthy oil? Second, is coconut oil a healthy alternative to other cooking oils? My conclusions in response to these questions are set forth in the Conclusions section below. Those conclusions follow from the detailed analysis of coconut oil's physiological effects, set forth in the Analysis section below.

### Consideration of the Challenged Labeling Statements

To opine about the veracity and accuracy of certain challenged statements made on the labels of the Coconut Oil Products, I reviewed the operative Complaint and exemplars of the labels, and spoke to Plaintiffs' Counsel regarding the labeling statements being challenged in this lawsuit. Based on those conversations, I understand plaintiffs challenge and intend to move for class certification with respect to at least the following labeling claims (or substantially similar claims):

1. "Source of Medium Chain Triglycerides"
2. "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8)"
3. "NO TRANS FATTY ACIDS (TFAs)"
4. "NO HYDROGENATION"

I understand and accept for purposes of rendering my opinion that, even though some labeling statements plaintiffs challenge may be literally true—for example, that the Coconut Oil Products contains no trans fatty acid or may contain MCTs to some degree (since, for instance, all coconut oil contains no trans fat)—plaintiffs allege the labeling statements are nevertheless misleading because they suggest the Coconut Oil Products is healthy, or at least not harmful. I have been informed that literally true labeling statements may be considered deceptive if couched in a manner that is likely to deceive.

6

EXHIBIT I
Page 332

# Analysis

### Heart Health & Cardiovascular Disease

According to 200 of the country's leading experts in cardiovascular diseases, representing 29 national medical organizations including the American Heart Association and the American College of Cardiology,[2] we've known for nearly a half century that "Coconut oil is one of the most potent agents for elevating serum cholesterol level."[3] Studies showing coconut oil raises cholesterol date back to at least 1955.[4]

Randomized controlled studies show that consuming coconut oil has a pronounced negative physiological impact that increases risk of cardiovascular disease, the leading killer of men and women in the US.

It is well known that total and LDL cholesterol blood levels are two of the most important risk factors in predicting coronary heart disease (CHD), with higher total and LDL cholesterol levels associated with increased risk of CHD. Most interventional trials have found coconut oil resulted in higher LDL levels, demonstrating coconut oil's harmful effects.

For example, studies show that within just hours of consumption, coconut oil can significantly raise cholesterol levels[5] and inhibit arterial endothelial function.[6] High

---

[2] Wright IS., *Editorial: Cardiovascular diseases-guidelines for prevention and care resources*, Circulation, 1974;49(3):387-9.

[3] Fowler RL., *Filled milks, coconut oil, and atherosclerosis*, Pediatrics, 1973;51(3):583-4.

[4] Kinsell L., et al., *Letter to the Editor: In Reply to Comments in Nutrition Reviews*, Am. J. Clin. Nutrition, 1955;3:247-53.

[5] Myhrstad MC., et al., *Effect of the fat composition of a single high-fat meal on inflammatory markers in healthy young women*, Brit. J. Nutr. 2011;106(12):1826-35.

[6] Nicholls SJ., et al., *Consumption of saturated fat impairs the anti-inflammatory properties of high-density lipoproteins and endothelial function*, J. Am. Coll. Cardiol. 2006;48(4):715-20.

7

EXHIBIT I
Page 333

total and LDL-Cholesterol levels, and arterial endothelial function are key risk factors for heart disease and predictors of cardiovascular events such as heart attacks, stroke, and death.[7] These studies demonstrate that those who consume coconut oil will suffer adverse physiological effects almost immediately, and these effects are directly related to increased risk of CHD and related events.

Other studies examining the effects of consuming coconut oil in the long term further evidence that coconut oil consumption increases risk of CHD and related events such as heart attacks, stroke, and death. A 62 week intervention study, for instance, that reduced the quantity of coconut fat (CF) in the diet and replaced it with unsaturated fats, showed that reducing coconut oil consumption "results in a lipid profile that is associated with a low cardiovascular risk."[8] In two phases, researchers reduced the amount of coconut fat in the diet from 17.8% of energy (approximately 2.75 tablespoons of coconut oil)[9] to 4.7% (approximately 0.75 tablespoons), which resulted in a 11.9% reduction in total cholesterol and a 21.8% reduction in LDL cholesterol. Based on the well-established linear relationship between cholesterol levels and the incidence of CHD, the authors estimated that "the reduction in coronary morbidity and mortality brought about by the current dietary intervention would be of the order of about 6-8 %."[10]

The medical literature demonstrates that even the medium chain triglyceride (MCT) component of coconut oil may raise cholesterol as much as the longer chain saturated fats also contained in coconut oil.[11] Coconut oil significantly raises total and LDL

---

[7] Matsuzawa, J., et al., *Prognostic Value of Flow-Mediated Vasodilation in Brachial Artery and Fingertip Artery for Cardiovascular Events: A Systematic Review and Meta-Analysis*, J. Am. Heart Assoc. 2015;4(11).

[8] Mendis, S., et al., *Coconut fat and serum lipoproteins: effects of partial replacement with unsaturated fats*, 85 Brit. J. Nutr. 2001; 583.

[9] Based on a 2,000 calorie diet, 17.8% of energy is 356 calories. According to Nutiva's labels, there are 130 calories in each tablespoon of coconut oil, thus 356(calories)/130(calories/tablespoon) = 2.74 tablespoons.

[10] Mendis, *supra* n.8 at 588.

[11] Cater NB., et al., *Comparison of the effects of medium-chain triacylglycerols, palm oil, and high oleic acid sunflower oil on plasma triacylglycerol fatty acids and*

EXHIBIT I
Page 334

"bad" cholesterol compared to olive oil.[12,13] Compared to safflower oil, randomized crossover trials have found that coconut oil significantly raises total and LDL cholesterol in a way similar to tallow (beef fat).[14,15,16] The same was found comparing coconut oil to palm, and especially corn oil.[17] Coconut oil also raises total and LDL cholesterol compared to canola oil.[18] Compared to corn oil, coconut oil can also shift the distribution of apolipoprotein E toward VLDL cholesterol fractions,

---

*lipid and lipoprotein concentrations in humans*, Am. J. Clin. Nutr. 1997;65(1):41-5.

[12] Ng TK., et al., *Dietary palmitic and oleic acids exert similar effects on serum cholesterol and lipoprotein profiles in normocholesterolemic men and women*, J. Am. Coll. Nutr. 1992;11(4)

[13] Voon PT., et al., *Diets high in palmitic acid (16:0), lauric and myristic acids (12:0 + 14:0), or oleic acid (18:1) do not alter postprandial or fasting plasma homocysteine and inflammatory markers in healthy Malaysian adults*, Am. J. Clin. Nutr. 2011;94(6):1451-7.

[14] Cox C., et al., *Effects of dietary coconut oil, butter and safflower oil on plasma lipids, lipoproteins and lathosterol levels*, Eur. J. Clin. Nutr. 1998;52(9):650-4.

[15] Cox C., et al., *Effects of coconut oil, butter, and safflower oil on lipids and lipoproteins in persons with moderately elevated cholesterol levels*, J. Lipid Res. 1995;36:1787-1795.

[16] Reiser R., et al., *Plasma lipid and lipoprotein response of humans to beef fat, coconut oil and safflower oil*, Am. J. Clin. Nutr. 1985;42(2):190-7.

[17] Ng TK., et al., *Nonhypercholesterolemic effects of a palm-oil diet in Malaysian volunteers*, Am. J. Clin. Nutr. 1991;53(4 Suppl.):1015S-1020S.

[18] Mckenney JM., et al., *The effect of supplemental dietary fat on plasma cholesterol levels in lovastatin-treated hypercholesterolemic patients*, Pharmacotherapy 1995;15(5):565-72.

EXHIBIT I
Page 335

another adverse effect.[19] Replacing some coconut oil in the diet with soybean and sesame oil resulted in a significant improvement in cholesterol levels.[20]

One of the latest interventional trials was a four week long randomized, controlled, crossover study comparing the impact of two tablespoons a day of virgin coconut oil versus two daily tablespoons of safflower oil.[21] The new study found that coconut oil appears even worse than previously understood. Prior comparisons to safflower oil found that approximately 3 tablespoons of coconut oil increased LDL about 8%. This new study, utilizing only 2 tablespoons of coconut oil a day, showed about a 14% increase in LDL cholesterol compared to control within a month,[22] signifying an even greater risk of coronary death or heart attack.[23]

---

[19] Fisher EA., et al., *Independent effects of dietary saturated fat and cholesterol on plasma lipids, lipoproteins, and apolipoprotein*, E. J. Lipid Res. 1983;24(8):1039-48.

[20] Mendis S, et al., *Coconut fat and serum lipoproteins: effects of partial replacement with unsaturated fats*, Brit. J. Nutr. 2001;85(5):583-9.

[21] Harris M, et al., *The impact of virgin coconut oil and high-oleic safflower oil on body composition, lipids, and inflammatory markers in postmenopausal women*, J Med Food. 2017;20(4):345-351.

[22] *Id.*

[23] Silverman, et al. *Association between lowering LDL-C and cardiovascular risk reduction among different therapeutic interventions: a systematic review and meta-analysis,* JAMA. 2016;316(12):1289-97.

That coconut oil can also increase HDL levels,[24,25,26,27,28,29] at one time considered "good" cholesterol, does not necessarily indicate a protective effect.[30] The benefits of raising HDL have been called into question in recent years by Mendelian randomization studies[31] and failed interventional trials.[32] "While the meaning of HDL levels remains uncertain," the Harvard Heart Letter concluded, "the role of LDL cholesterol in heart disease is solidly established. High levels of LDL cholesterol have been shown to increase the risk of heart attack, and lowering high LDL can decrease this risk."[33] The National Lipid Association similarly concluded that when it comes to coconut oil: "The increase in HDL-C[holesterol] is of uncertain clinical relevance, but the increase in LDL-C[holesterol] would be expected to have an adverse effect on ASCVD [atherosclerotic cardiovascular disease] risk."[34]

Indeed, the majority of coconut oil intervention trial resulted in higher LDL levels. Thus, as a 2016 review specifically written to assess coconut oil consumption and cardiovascular risk factors in humans concluded, "consuming cis unsaturated fat [non-hydrogenated plant oils] in place of coconut oil is likely to result in substantial

---

[24] Ng TK., et al., *supra* n.12.

[25] Voon PT., et al., *supra* n.13.

[26] Cox C., et al., *supra* n.14.

[27] Cox C., et al., *supra* n.15.

[28] Reiser R., et al., *supra* n.16.

[29] Harris M, et al., *supra* n.21.

[30] Lockyer S., et al., *Coconut oil–a nutty idea?*, Nutr. Bulletin. 2016;41(1):42-54.

[31] Voight BF., et al., *Plasma HDL cholesterol and risk of myocardial infarction: a mendelian randomisation study*, Lancet. 2012;380(9841):572-80.

[32] Hovingh GK., et al. *HDL re-examined*, Curr. Opin. Lipidol. 2015;26(2):127-32.

[33] *High HDL may not protect the heart*, Harvard Heart Letter, September, 2012:6.
[34] Jacobson TA, et al. *National Lipid Association recommendations for patient-centered management of dyslipidemia: part 2*, J Clin Lipidol. 2015;9(6 Suppl):S1-122.e1.

11

EXHIBIT I
Page 337

reductions in the risk of CVD [cardiovascular disease]."[35] On the other hand, using the best available estimate of a 23% change in risk of major vascular events for each mmol/L change in LDL,[36] daily incorporation of under 3 tablespoons of coconut oil in the diet for a period of just six months might be expected to raise the risk of coronary death or heart attack 7%.[37]

The studies cited by Jarrow as substantiation for the Coconut Oil Products labeling claims do not demonstrate that coconut oil is healthy for a variety of reasons, most generally because those studies do not actually look at the physiological effects of human consumption of coconut oil specifically, and the resulting harms alleged in plaintiff's complaint. Nearly all of the provided sources ranged from irrelevant to directly contradicting their claims, for example a paper on the effects of a bacterial antibiotic (staurosporin) on Chinese hamster ovary cells[38] to one that concluded "coconut oil…certainly must be classified as [a] cholesterol-raising fat…."[39]

---

[35] Eyres L. et al., *Coconut oil consumption and cardiovascular risk factors in humans*, Nutr. Rev. 2016;74(4):267-80.

[36] Silverman MG., et al., *Association Between Lowering LDL-C and Cardiovascular Risk Reduction Among Different Therapeutic Interventions: A Systematic Review and Meta-analysis*, JAMA. 2016;316(12):1289-97.

[37] *See* Cox C., et al., *supra* n.15. Subjects in the study ate 39g of total fat from coconut oil for a period of 6 months. Because coconut oil has 14g of total fat per tablespoon, this represents approximately 2.8 tablespoons per day. The label of Defendants' Nature's Way Extra Virgin Coconut Oil recommends consuming 1-4 tablespoons per day.

[38] JFI_1 (Lead zeroes have been dropped from each citation to Jarrow's production documents) (Lin L, Lin A, Knopf J, *Cystolic phospholipase A2 is coupled to hormonally regulated release of arachidonic acid*, Proc. Natl. Acad. Sci. USA, 1992; 89:6147-6151)

[39] JFI_1272 (Denke M, Grundy S, *Comparison of effects of lauric acid and palmitic acid on plasma lipids and lipoproteins1-3*, Am J Clin Nutr, 1992; 56:895-8)

EXHIBIT I
Page 338

Jarrow purportedly relies on studies about nicotine dependence,[40] whether ketones implicate treatments for Alzheimer's Disease,[41] or the amount and type of dietary fat generally required for optimal carotenoid absorption[42] (for which coconut oil was found to be significantly worse than all of the 5 other oils tested).

Two articles are just about the chemical properties of virgin coconut oil compared to different ways of refining coconut oil[43,44] and some studies appear to have nothing to do with coconut oil at all. One irrelevant study looks at the effects of arachidonic acid on mouse fat cell precursors[45] and I_14 and JFI_19 two of them make no

---

[40] JFI_744 (Anggadierdja K, Barlian A, Pinang Y, Anggraeny D, *Virgin Coconut Oil Prevents Nicotine Dependence and Relapse*, International Journal of Pharmacology, 2011; 7(5):664-669)

[41] JFI_770 (Cunnane S, Courchesne-Loyer A, St-Pierre V, Vandenberghe C, Pierotti T, Fortier M, Croteau E, Castellano C, *Can ketones compensate for deteriorating brain glucose uptake during aging? Implications for the risk and treatment of Alzheimer's disease*, Ann. N.Y. Acad. Sci., 2016; 1367:12-20)

[42] JFI_7975 (Mashurabad P, Palika R, Jyrwa Y, Bhaskarachary K, Pullakhandam R, *Dietary fat composition, food matrix and relative polarity modulate the micellarization and intestinal uptake of carotenoids from vegetables and fruits*, J Food Sci Technol, 2017; 54(2):333-341)

[43] JFI_1570 (Marina A, Che Man Y, Nazimah S, *Chemical Properties of virgin Coconut Oil, J am Oil Chem Soc*, 2009; 86:301-307)

[44] JFI_1638 (Srivastava Y, Semwal A, Majumdar A, *Quantitative and qualitative analysis of bioactive components present in virgin coconut oil*, Cogent Food & Agriculture, 2016; 2:1164929)

[45] JFI_6 (Mater M, Thelen A, Jump D, *Arachidonic acid and PGE2 regulation of hepatic lipogenic gene expression*, Journal of Lipid Research, 1999; 40:1045-1052)

13

EXHIBIT I
Page 339

mention of coconut oil at all.[46,47] One study only discussed replacing butter and margarine with safflower oil.[48]

Further, some of the studies equivocated on the evidence to a degree so as not to be of any relevance. For instance, Jarrow relies on one study which merely recognized some need "for further elucidation of the more nuanced relationship between different dietary fats and health" but that also confirmed that "[t]hese findings do not alter current dietary recommendations to reduce saturated fat intake in general[]."[49]

Some went beyond equivocation to document the hazards of coconut oil. One article detailed studies showing coconut oil had negative effects on LDL cholesterol,[50] and although another[51] used "fresh coconut" as opposed to coconut oil, it still found a significant increase in LDL cholesterol.

---

[46] JFI_14 (Jump D, *The Biochemistry of n-3 Polyunsaturated Fatty Acids*, The Journal of Biological Chemistry, 2002; 277(11):8755-8758)

[47] JFI_19 (Leaf A, *Historical overview of n-3 fatty acids and coronary heart disease1-3*, Am J Clin Nutr, 2008; 87:197S-80S)

[48] JFI_1341 (Ramsden C, Zamora D, Leelarthaepin B, Majchrzak-Hong S, Faurot K, Suchindran C, Ringel A, Davis J, Hibblen J, *Use of dietary linoleic acid for secondary prevention of coronary heart disease and death: evaluation of recovered data from the Sydney Diet Heart study and updated meta-analysi*s, BMJ, 2013; 346:e8707)

[49] JFI_7533 (Khaw K, Sharp S, Finikarides L, Afzal I, Lentjes M, Luben R, Forouhl N, *Randomised trial of coconut oil, olive oil or butter on blood lipids and other cardiovascular risk factors in healthy men and women*, BMJ Open, 2018; 8: e020167)

[50] JFI_920 (Panth N, Abbot K, Dias C, Wynne K, Garg M, *Differential effect of medium- and long- chain saturated fatty acids on blood lipid profile: a systematic review and meta-analysis*, Am J Clin Nutr, 2018; 108:675-687)

[51] JFI_1373 (Nagashree R, Manjunath N, Indu M, Ramesh M, Venugopal V, Sreedhar P, Pavithra N, Nagendra H, *Effect of a Diet Enriched with Fresh Coconut Saturated Fats on Plasma Lipids and Erythrocyte Fatty Acid Composition in Normal Adults*, J Am Coll Nutr, 2017; 36(5):330-334)

14

EXHIBIT I
Page 340

Two are merely online opinion pieces[52,53] one of which written by the author of the popular press book "The Coconut Oil Miracle," and many of the studies looked at the biological effects of coconut oil consumption in rats.[54,55,56,57] or mice.[58] This is problematic because "[d]ietary modification in rodents appears to have limited translatable benefit…" for human metabolic disease.[59]

---

[52] JFI_1031 (Fife, B, *The Coconut Oil Miracle: Where is the Evidence?* http://www.coconutresearchcenter.org/The%20Coconut%20Oil%20Miracle-Where%20is%20the%20Evidence.htm)

[53] JFI_1662 (Masterjohn C, *Why you don't need vegetable oil in your carrot cake and milk shake to protect your arteries[blog], Myth: One High-Saturated Fat Meal Can Be Bad*. 2006, Aug 20. [accessed 2018 Dec. 6])

[54] JFI_744 (Anggadierdja K, Barlian A, Pinang Y, Anggraeny D, *Virgin Coconut Oil Prevents Nicotine Dependence and Relapse*, International Journal of Pharmacology, 2011; 7(5):664-669)

[55] JFI_846 (Nevin K, Rajamohan T, *Influence of virgin coconut oil on blood coagulation factors, lipid levels and LDL oxidation in cholesterol fed Sprague-Dawley rats, European e-Journal of Clinical Nutrition and Metabolism*, 2008; 3:e1-e8)

[56] JFI_868 (Hamsi M, Othman F, Das S, Kamisah Y, Thent Z, Qodriyah H, Zakaria Z, Emran A, Subermaniam K, Jaarin K, *Effect of consumption of fresh and heated virgin coconut oil on the blood pressure and inflammatory biomarkers: An experimental study in Sprague Dawley rats*, Alexandria Journal of Medicine, 2015; 51:53-63)

[57] JFI_1457 (Narayanankutty, A, Palliyil D, Kuruvilla K, Raghavamenon A, *Virgin coconut oil reverses hepatic steatosis by restoring redox homeostasis and lipid metabolism in male Wistar rats*, DOI: 10.1002/jsfa.8650)

[58] JFI_1415 (Lim-Sylianco C, Guevara A, Sylianco-Wu L, *Antigenotoxicity of Dietary Coconut Oil*, Science Diliman 1991)

[59] Lai M, et al. *You are what you eat, or are you? The challenges of translating high-fat-fed rodents to human obesity and diabetes*. Nutr Diabetes. 2014;4:e135.

Finally, several of Jarrow's relied-upon studies[60,61,62,63] are irrelevant because they looked at medium-chain triglycerides rather than coconut oil. As noted in a recent review on coconut oil consumption and cardiovascular risk factors:

> "Research on manufactured medium-chain triglycerides in the literature cannot be applied to coconut oil because the triglycerides predominant in coconut oil are different in their structure, absorption, and metabolism . . . . It is therefore inaccurate to consider coconut oil to contain either predominantly medium-chain fatty acids or predominantly medium-chain triglycerides. Thus, the evidence on medium-chain triglycerides cannot be extrapolated to coconut oil."[64]

"In summary," the 2016 review concluded, there is "no evidence that coconut oil should be viewed differently from other sources of dietary saturated fat with regard to dietary recommendations."[65]

Another recent review entitled similarly concluded:

---

[60] JFI_735 (Lyudinina A, Ivankova G, Bojko E, *Priority use of medium-chain fatty acids during high-intensity exercise in cross country skiers*, Journal of the International Society of Sports Nutrition, 2018; 15:57)

[61] JFI_770 (Cunnane S, Courchesne-Loyer A, St-Pierre V, Vandenberghe C, Pierotti T, Fortier M, Croteau E, Castellano C, *Can ketones compensate for deteriorating brain glucose uptake during aging? Implications for the risk and treatment of Alzheimer's disease*, Ann. N.Y. Acad. Sci., 2016; 1367:12-20)

[62] JFI_786 (Thevenet J, De Marchi U, Domingo J, Christinat N, Bultot L, Lefebvre G, Sakamoto K, Descombes P, Masoodi M, Wiederkehr A, *Medium-chain fatty acids inhibit mitochondrial metabolism in astrocytes promoting astrocyte-neuron lactate and ketone body shuttle systems*, FASEB Journal, 2018; 16(30): 1913)

[63] JFI_1256 (Huang C, Altimova Y, Meyers T, Ebersole J, *Short- and medium-chain fatty acids exhibit antimicrobial activity for oral microorganisms*, Arch Oral Biol. 2011; 56(7):650-654)

[64] Eyres L. et al., supra n.35.

[65] *Id.*

Case 3:19-cv-04317-PRB-WGC Document 36-48 Filed 07/22/24 Page 343 of 435
343 of 435
Case 3:19-cv-04317-PRB-WGC Document 36-48 Filed 07/22/24 Page 21 of 20 Page ID.6565 Page 343

"Popular belief holds that coconut oil is healthy, a notion not supported
by scientific data. Coconut oil is an edible oil with a very high total
SAFA content (80 %). A common misconception is that the SAFA in
coconut oil are mainly medium chain fatty acids, which are metabolized
differently from long-chain SAFA. Actually, coconut oil is mainly
C12:0 lauric acid and C14:0 myristic acid, which have potent LDL-C-
raising effects. Coconut oil should therefore not be advised for people
who should or want to reduce their risk of CHD."[66]

When coconut oil is put to the test in interventional trials, it raises LDL cholesterol,
a leading risk factor for the number one killer of men and women. As Dr. Walter
Willet, chair of nutrition at Harvard, has said, "Feeding studies in humans . . . show
that coconut oil substantially elevates LDL (bad) cholesterol."[67] While coconut oil
is healthier than trans fats, he said, "coconut and coconut oil can't be considered
heart-healthy foods."[68]

In the *Journal of the American College of Cardiology* the American College of
Cardiology's Prevention of Cardiovascular Disease Council summed up their views
on coconut oil, including virgin coconut oil, with a single word: "Avoid."[69]


### Inflammation

Coconut oil appears to have a pro-inflammatory effect in humans, raising plasma
leukotriene $B_4$ levels compared to olive oil.[70] Within 6 hours after a meal containing
coconut oil, the anti-inflammatory properties of HDL are impaired, and within 3

---

[66] Zock PL, et al. *Progressing insights into the role of dietary fats in the prevention
of cardiovascular disease*, Curr Cardiol Rep. 2016;18(11):111.

[67] Willett WC., *Ask the doctor. I have heard that coconut is bad for the heart and
that it is good for the heart. Which is right?*, Harvard Heart Letter, 2006;17(1):8.

[68] *Id.*

[69] Freeman AM, et al. *Trending cardiovascular nutrition controversies*, J Am Coll
Cardiol. 2017;69(9):1172-1187.

[70] Voon PT., et al., *Virgin olive oil, palm olein and coconut oil diets do not raise
cell adhesion molecules and thrombogenicity indices in healthy Malaysian adults*,
Eur. J. Clin. Nutr. 2015;69(6):712-6.

EXHIBIT I
Page 343

hours flow-mediated dilation may also be impaired.[71] Flow-mediated dilation is a measure of artery function and, as such, is a key predictor of cardiovascular events such as heart attacks, stroke, and death.[72] Nicholls et al. found that human arterial function can be significantly impaired within hours of consuming coconut oil.[73]

In sum, the evidence demonstrates coconut oil consumption has a pro-inflammatory effect, further increasing risk of CHD and related events.

### Body Fat

There was no difference in appetite measures or food intake of subjects who consumed coconut oil when compared to subjects to consumed dairy or beef fat,[74] though did lower appetite measures compared to olive oil. This does not appear to translate into improvements in body fat, however.[75] The only placebo-controlled studies on coconut oil and anthropometric measures found no significant difference in waist circumference.[76,77] In one, insulin resistance significantly increased in the coconut oil group despite a low-calorie diet and the encouragement of 50 minutes of exercise a day.[78] Insulin resistance is a characteristic of obesity, and associated with

---

[71] Nicholls SJ., et al., *supra* n.6.

[72] Matsuzawa, J., et al., *supra* n.7.

[73] Nicholls SJ., et al., *supra* n.6.

[74] Poppitt SD., et al., *Fatty acid chain length, postprandial satiety and food intake in lean men*, Physiol. Behav. 2010;101(1):161-7.

[75] Valente FX, et al. *Effects of coconut oil consumption on energy metabolism, cardiometabolic risk markers, and appetitive responses in women with excess body fat.* Eur J Nutr. 2018;57(4):1627-1637.

[76] Harris M, et al. *supra* n.21.

[77] Assunção ML., et al., *Effects of dietary coconut oil on the biochemical and anthropometric profiles of women presenting abdominal obesity*, Lipids. 2009;44(7):593-601.

[78] *Id.*

EXHIBIT I
Page 344

an increased incidence in type 2 diabetes, coronary heart disease, polycystic ovarian syndrome, and hypertension.[79]

# Conclusions

The scientific community has known for more than a half century that coconut oil consumption adversely impacts cardiovascular risk by raising blood cholesterol levels. The majority of studies subsequently published in the peer reviewed medical literature have since validated this initial assessment. Coconut oil has also has been shown to have a pro-inflammatory effect in humans, to impair artery function within hours of consumption, and to worsen insulin resistance, a pathological condition considered a precursor to type 2 diabetes. At the same time, claims regarding purported benefits of consuming coconut oil on abdominal fat remain unsupported by the peer-reviewed medical literature.

Therefore, based on the best available scientific evidence, it is my opinion that:

(1)  Consuming coconut oil is not healthy;

(2)  The Coconut Oil Products labeling claims stating or suggesting the products are healthy are false or misleading.

Dated: July 22, 2019

_____
Dr. Michael Greger, M.D. FACLM

---

[79] Lebovitz HE., *Insulin resistance: definition and consequences*, Exp. Clin. Endocrinol. Diabetes, 2001;109 Suppl. 2:S135-48.

19

EXHIBIT I
Page 345

# EXHIBIT J

# Exhibit 2

REDACTED VERSION OF DOCUMENT PROPOSED
TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLIN SHANKS, on behalf of himself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>JARROW FORMULAS, INC.<br><br>Defendant. | Case No. 18-cv-9437 |

# DECLARATION AND EXPERT REPORT OF

# J. MICHAEL DENNIS, PH.D.

# JULY 22, 2019

MAY REFERENCE MATERIALS DESIGNATED "CONFIDENTIAL" OR "HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, J. Michael Dennis, Ph.D., declare as follows:

## INTRODUCTION AND SUMMARY OF PROPOSED METHOD

1. I have been retained by counsel for Plaintiff in the matter of the named Plaintiff Collin Shanks versus Jarrow Formulas, Inc. ("Defendant"). If called upon to testify, I would and could testify competently to all such subject matter in this Declaration and Expert Report. My expert opinions stated in my declaration and expert report represent my opinions and only my opinions.

2. I am a survey expert with extensive experience in conducting consumer surveys on behalf of private and public clients. I also have extensive experience as an expert in the litigation context, with my surveys being accepted as reliable in dozens of cases.

3. Along with Mr. Colin Weir, an expert in economics, I have been retained to provide a proposed method for calculating damages in this matter on a class-wide basis, and if ultimately called upon to do so, perform the analysis, which will measure the market price premium attributable to the challenged claims in this matter.

4. The market price premium attributable to the challenged claims can be determined through a conjoint survey, which will generate a set of thousands of data points that can utilized by a market simulator that incorporates real-world demand and supply factors based on both the survey data and independent real world historical information regarding the coconut oil market. In my expert report, I use the terms "conjoint survey" and "price premium survey" interchangeably.

5. Conjoint methodology has been widely accepted by courts as being capable of measuring the price premium associated with challenged labeling representations in false advertising class actions in accordance with the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). This is because when the results of a reliable conjoint survey are used in conjunction with a market simulator that incorporates both demand and supply side factors (such as pricing, historical sales, and competitor products), the actual marketplace price premium associated with the challenged claim can be estimated. This market price premium can then be used to calculate class-wide damages.

6.  While I have not been asked to fully execute the survey (i.e., collect survey responses and calculate the price premium associated with the challenged claims), I have fully performed conjoint surveys in two highly relevant and analogous coconut oil cases *Jones v. Nutiva*, 4:16-cv-00711-HSG (N.D. Cal.) and *Hunter v. Nature's Way LLC*, 3:16-cv-00532-WQH-AGS (S.D. Cal.). Having fully performed the analysis in those matters provides invaluable insight into the coconut oil market and coconut oil consumers, in both California and the United States. This experience and knowledge provide a strong basis for the proposed conjoint design in this matter.

## BRIEF DESCRIPTION OF CONJOINT ANALYSIS SURVEYS

7.  As explained in more depth below, conjoint analysis is a survey methodology that is capable of isolating and measuring the value of n individual product attribute. Although it has gained wide acceptance in litigation over the past several years following *Comcast*, conjoint analysis has been widely used and accepted in industry for decades. Choice-based conjoint, which is the specific methodology I will use, is the most widely used type of conjoint survey.[1] Over 18,000 conjoint surveys are estimated to be take place each year in commercial applications.[2] Specifically, choice-based conjoint is a standard marketing research technique for quantifying consumer preferences for products and for the component features that make up a product.[3] Conjoint analysis can be used to break down the value of a conceptual feature

---

[1] *See* generally, the Sawtooth Software technical papers on choice-based conjoint available at http://www.sawtoothsoftware.com/support/technical-papers.  See Orme, 2014; Orme and Chrzan, 2017), Sawtooth Software Technical Paper Series, 2009, 2017.

[2] Orme, 2014, p. 143.

[3] Orme, 2014.

3

into its component parts. Conjoint surveys are used widely in industry and government.[4] Conjoint is widely accepted by courts as a reliable methodology.[5]

8.    In a conjoint survey, survey participants are presented with a "choice exercise" in which they are typically shown a set of 3 or 4 hypothetical products and asked to choose which of the products, if any, they would purchase. The hypothetical products in conjoint surveys are typically comprised of 6 to 8 "attributes" that reflect attributes that consumers consider in making purchasing decisions. For consumer-packaged goods, attributes that consumers typically consider in their purchasing decisions include things like product brand, packaging claims, product size and, of course, price.

---

[4] While conjoint surveys have been common in market research since 1990s for product development and other purposes, it is increasingly used in the public sector.  For instance, the Food and Drug Administration uses the approach in regulatory benefit-risk assessments.  (F. Reed Johnson and Mo Zhou, 2016, "Patient Preferences in Regulatory Benefit-Risk Assessments: A US Perspective).  In another example, public health planners are increasingly using choice-based conjoint to collect public input in health service planning, healthcare finance debates, and the treatment choices of individual patients, among other uses. Charles E. Cunningham, Ken Deal, and Yvonne Chen, December 2010, "Adaptive Choice-Based Conjoint Analysis: A New Patient-Centered Approach to the Assessment of Health Service Preferences."

[5] *See*, *e.g.*, *Dzielak v. Whirlpool Corp.*, 2017 WL 1034197, at *6-8 (D.N.J. Mar. 17, 2017) (finding related methodology "passes muster under the *Daubert* considerations," including its "relationship to other established reliable techniques (particularly, the conjoint analysis technique of which it is a part)"); *In re: Lenovo Adware Litig.*, 2016 WL 6277245 (N.D. Cal. 2016) (certifying class where damages model was based on conjoint analysis); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1027-31 (C.D. Cal. 2015) (concluding an expert's "conjoint analysis is, at this stage, sufficiently reliable to be used in calculating class-wide damages"); *Guido v. L'Oreal USA, Inc.*, 2014 WL 6603730, at *4-8 (C.D. Cal. 2014) (collecting cases and finding conjoint analysis satisfied class certification requirements of *Comcast*); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1020-26 (N.D. Cal. 2013) (denying motion to exclude conjoint analysis) *Microsoft Corp. v. Motorola, Inc.*, 904 F. Supp. 2d 1109, 1119-20 (W.D. Wash. 2012) (conjoint analysis survey was "admissible as relevant under FRE 401 and 402 and . . . sufficiently reliable under FRE 702 and *Daubert*");  *see also Khoday v. Symantec Corp.*, No. 11-180 (JRT/TNL), (2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *Microsoft v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017).

9. For each product attribute, there are various "levels" of the attribute. For example, if a conjoint was considering golf balls, attributes might be model and brand, performance, and price.[6] The levels of the brand attribute might be "Pro V1, by Titlest," "Eclipse+, by Golfers, Inc.", "Long Shot, by Performance Plus," "RZN by Nike," "High-Flyer, by Smith and Forester." The levels for the performance attribute might be that the ball drives 20 yards farther than the average ball, 15 yards, 10 yards, 5 yards, or 0 yards.

10. The levels for each product attribute are systematically randomized so that the hypothetical product choices respondents are presented with will have a mix of products with different combinations of attribute levels. Therefore, one choice exercise presented to respondents might look like the following.

**Sawtooth Example of a Standard Choice-Based Conjoint Task Displayed to Respondents**



---

[6] The example here comes from Sawtooth Software Technical Paper Series. Sawtooth is one of the leading software providers for market simulators for conjoint analysis and is considered a leading authority regarding conjoint analysis. *See* Sawtooth Software Technical Paper Series, 2017, "The CBC System for Choice-Based Conjoint Analysis," p.9.

11. Based on respondents' choice of a specific product (or selecting no product) their preferences for specific attributes and the attribute levels are revealed. By having each survey respondent repeat the choice task 12 to 20 separate times (each with a unique set of products with systematically varied levels of the attributes) and having a statistically significant number of survey respondents (typically in the hundreds), the choices made by survey respondents will provide thousands of data points from which the market price premium attributable to a particular attribute can ultimately be determined.

12. This is done by the use of a market simulator that not only includes the survey data (demand-side factors) but also supply-side factors such as historical sales and pricing. When performed in this manner, a reliable estimate of the real-world market price premium attributable to a product attribute can be calculated.

13. For example, using the above survey and a proper market simulator might reveal that there is only a $0.05 market price premium for golf balls that drive 5 yards farther than the average golf ball but a $2.00 market price premium for golf balls that drive 20 yards farther than the average golf ball.

## BACKGROUND AND QUALIFICATIONS

14. I have been personally involved in the design and conduct of hundreds of statistical surveys using the internet mode of data collection over the last 18 years, including the kind of consumer surveys described in this report.

15. Designing and conducting surveys about the opinions, perceptions, attitudes, preferences, and values of consumers, voters, members of associations, and citizens is a service that I have provided for my customers for more than 20 years.

16. I am currently a Senior Vice President at NORC in Chicago, IL. I lead the online panel survey research business for NORC. NORC is one of the premier survey research organizations in the United States. Affiliated with the University of Chicago, NORC has conducted research for Federal, foundation, and academic clients for 75 years, and is responsible for some of the most prestigious survey projects in the U.S, including the General Social Survey and the Survey of Consumer Finance. Prior to joining NORC in December 2014, I was a Managing Director at GfK (which acquired my employer Knowledge Networks in 2012). GfK is the fifth largest market research firm worldwide, offering research services

6

in 90 countries.  I have worked as a survey research expert for more than 20 years, authoring more than 60 articles, conference and seminar papers, or book chapters.  I am recognized as an expert in survey research methods.  I am a frequent speaker at the annual meetings of the American Association for Public Opinion Research ("AAPOR") and the American Statistical Association.  In recognition of my expertise in online surveys, I was appointed to be a member of the AAPOR Task Force on Online Panels that published recommendations for researchers regarding online surveys.

17. During the period 2000 to 2013, I managed all the online panel research conducted by Knowledge Networks (acquired by GfK in January 2012) on behalf of federally funded principal investigators who conduct health, economic, social, and political research.  When I began at Knowledge Networks as the Vice President of Operations and Survey Research in 2000, I was responsible for leading survey research for the company and for developing the probability-based KnowledgePanel, which was the core company asset for Knowledge Networks.  As part of the start-up of Knowledge Networks, I also designed and implemented approximately 20 internally funded surveys in the areas of health, finance, public policy, and consumer research, and oversaw the scientific direction and operational management of the construction of KnowledgePanel.

18. In 2001, I founded the client-facing business unit "Government & Academic Research" for Knowledge Networks.  In the role of Managing Director, I oversaw a staff of more than 50 researchers.  I advised clients on the design of all phases of their survey research projects, including sample design, questionnaire design, quality control procedures, and data analysis. The research I conducted has had to meet the high-quality standards maintained by federal sponsors of statistical surveys funded by agencies such as the U.S. Centers for Disease Control and Prevention, the Environmental Protection Agency, and the National Science Foundation.  I have been the principal investigator for studies funded by the U.S. National Science Foundation.  My opinions have been quoted in The Wall Street Journal, The New York Times, Crain's Chicago Business, and Business Week.

19. Before joining Knowledge Networks, I was a Senior Scientist at Abt Associates, where I managed the data collection for the largest random digit dialing telephone survey in the United States, the National Immunization Survey, which was funded by the U.S. Centers for Disease Control and Prevention with management support from the National Center for

Health Statistics.  I also led other survey studies funded by the National Institute on Alcohol Abuse and Alcoholism, the National Cancer Institute, the Social Security Administration, and the White House Office of National Drug Control Policy.

20. I also have extensive experience as a survey expert in the litigation context.

21. I have designed and conducted consumer surveys that have been accepted by courts in the following cases:

- *Price [Miles] v. Philip Morris*. In the Circuit Court, Third Judicial Court, Madison County, Illinois. Case No. 00 L 0112.

- *Zill v. Sprint*. County of Alameda, Superior Court of the State of California. Case No. RG03114147.  Collectively the "cellphone unlocking cases."

- *Ebin v. Kangadis Food Inc.* U.S. District Court for the Southern District of New York. Case No. 1:13-cv-02311.

- *Sachs and Alden v. Toyota Motor Corporation*.   Superior Court of the State of California, County of Los Angeles.  Case No. BC443701.

- *Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*.   United States District Court for the District Of New Jersey. Civil Action No. 2:11-cv-6973 (KM) (SCM).

- *Geanacopoulos v. Philip Morris, USA*. Commonwealth of Massachusetts Superior Court. Civil Action No. 98-6002-BLSI.

- *Scotts EZ Seed Litigation*. U.S. District Court for the Southern District of New York. Case No. 12-CV-4727 (VB) (PED).

- *Dzielak v Whirlpool.*  U.S. District Court District of New Jersey.  Case No. 12-cv-00090 (D.N.J.).

- *Pettit v. Procter & Gamble [RE: Flushable Wipes]*.  U.S. District Court for the Northern District of California. Case No. 3:15-CV-02150-RS.

- *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.* United States District Court, Northern District of California, San Jose Division. Case No. 5:17-cv-01027-BLF.

22. I have participated in the design and execution of price premium studies using conjoint methodology and analysis in the context of litigations. These cases include, but are not limited to, *Brown v. The American Tobacco Company; Craft v. Philip Morris; Jones v. Nutiva; Hunter v. Nature's Way; Fitzhenry-Russell v. Dr. Pepper Snapple Group; Brenner v. Procter & Gamble Co.; Martinelli v. Johnson & Johnson and McNeil Nutritionals*; *Gregorio v. The Clorox Company*. I have also participated in the design and execution of other price premium studies using non-conjoint approaches in *Price [Miles] v. Philip Morris; Zill v. Sprint; Ebin v. Kangadis Food Inc.*; *Sachs and Alden v. Toyota Motor Corporation*; *Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*; *Geanacopoulos v. Philip Morris, USA.*; *Scotts EZ Seed Litigation*; *Dzielak v Whirlpool.*

23. In addition, I have designed and conducted consumer perception surveys in *Price v. Philip Morris, Zill v. Sprint, Otto v. Abbott Laboratories, Ebin v. Kangadis, Scotts EZ Seed Litigation, Pettit v. Procter & Gamble [RE: Flushable Wipes]*, and *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.*

24. I have testified on more than forty occasions as an expert witness since 2002, both in deposition and at trial.

25. The cases in which I have testified as an expert, either at deposition or trial, during the last four years are:

   A. August 21, 2015.  Expert Deposition.  *Lynne Avram v. Samsung Electronics America, Inc. and Lowe's Home Centers*.   In the United States District Court for the District Of New Jersey. Civil Action No. 2:11-cv-6973 (KM) (SCM).
   B. September 18, 2015.  Expert Deposition. *Scott Miller v. Fuchu, Inc. and Fuhu Holdings, Inc*. In the United States District Court of California, Western Division.  Case No. 14-cv-6119 CAS-AS.
   C. November 9-10, 2015.  Expert Testimony at Trial.  *Thomas Geanacopoulos v. Philip Morris, USA*. Commonwealth of Massachusetts Superior Court. Civil Action No. 98-6002-BLSI.
   D. February 5, 2016.  Expert Deposition.  *Miner v Philip Morris Companies, Inc. and Philip Morris, Incorporated*.  In the Circuit Court of Pulaski County, Arkansas Sixth Division Case No. 60CV03-4661.
   E. February 12, 2016.  Expert Deposition.  *Scotts EZ Seed Litigation*.   Case No. 12-CV-4727 (VB) (PED) (S.D.N.Y.).
   F. March 8, 2016. Expert Deposition.  *Dzielak v Whirlpool*.  Case No. 12-cv-00090 (D.N.J.).
   G. March 18, 2016.  Expert Deposition.  *Darisse v. Nest Labs, Inc*. Case No. 5:14-cv-01363. U.S. District Court of Northern California.
   H. March 22. 2016.  Expert Testimony at Trial.  *Larsen (formerly Craft) v. Philip Morris*, Missouri Circuit Court, Twenty-Second Judicial Court.  Case No. 002-00406-02.

9

I. May 5, 2016.  Expert Deposition.  *Miner v Philip Morris Companies, Inc. and Philip Morris, Incorporated*.  In the Circuit Court of Pulaski County, Arkansas Sixth Division Case No. 60CV03-4661.

J. August 29, 2017. Expert Deposition. *Jones et al. v. Nutiva*. Case No. 3-16-cv-00711-HSG. United States District Court for the Northern District of California.

K. October 17, 2017. Expert Deposition.  *Brenner v The Procter & Gamble Co*. Case No.: 8:16-1093-JLS-JCG. United States District Court for the Central District of California.

L. October 23, 2017. Expert Deposition.  *Dean et al v Colgate-Palmolive Co*. Case No. 5:15-CV-00107. United States District Court for the Central District of California.

M. November 13, 2017.  Expert Deposition. *Joann Martinelli et al v. Johnson & Johnson and McNeil Nutritionals, LLC*. Case No. 2:15-cv-01733-JAM-DAD.  United States District Court, Eastern District of California.

N. November 21, 2017. Expert Deposition. *Strumlauf et al v. Starbucks Corporation*.  Case No. 4:16-cv-C1306-YGR.  United States District Court, Northern District of California.

O. December 11, 2017.  Expert Deposition.  *In re: AMLA LITIGTATION*.  Civil Action No. 1:16-cv-06593 (JSR). United States District Court, Southern District of New York.

P. January 19, 2018.  Expert Deposition. *Williams-Sonoma Song-Beverly Act Cases*. Superior Court of the State of California, County of San Francisco. Case No. JCCP 4611.

Q. April 13, 2018.  Expert Deposition. Fitzhenry-Russell, et al. v. Dr. Pepper Snapple Group, Inc., Dr Pepper/Seven Up, Inc., and Does 1-50, Case Nos. 5:17-cv-00564-NC (lead); 5:17-02341-NC (consolidated). United States District Court, Northern District of California.

R. June 22, 2018.  Expert Deposition. *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc., et al.*  Case No. 5:17-cv-01027-BLF. United States District Court, Northern District of California, San Jose Division.

S. August 21, 2018. Expert Deposition. *Anne De Lacour et al. v. Colgate-Palmolive Co., and Tom's of Maine Inc.*  United States District Court of New York. 16 Civ. 8364 (RA) (AJP).

T. September 5, 2018. Expert Deposition. *Suzanna Bowling et al. v. Johnson & Johnson and McNeil Nutritionals, LLC.*  U.S. District Court, Southern District of New York. Case No. 1:17-cv-03982.

U. September 10, 2018. Expert Deposition.  *Dzielak et al. v. Whirlpool*. U.S. District Court, District of New Jersey.  Civil Action No. 2:12-cv-00089-KM-JBC.

V. October 26, 2018. Expert Deposition. *Ryan Porter and Haarin Kwon v. NBTY, Inc., United States Nutrition, Inc., Healthwatchers (DE), Inc., et al.* U.S. District Court, Northern District of Illinois. Civil Action No. 15-cv-11459.

W. October 30, 2018. Expert Deposition. *Browning and Basile et al. v. Unilever United States, Inc.* U.S. District Court, Central California. Case No. 8:16-CV-2210-AG-KES.

X. February 14, 2019.  Expert Deposition. *Erin Allen et al. v. Conagra Foods Inc.* U.S. District Court, Northern District of California, Case No. 3:13-CV-01279-VC.

Y. June 21, 2019. Expert Deposition. *Joseph Gregorio, et al. v The Clorox Company*. U.S. District Court, Northern District of California. Case No. 4:17-cv-03824-PJH.

26. My current *curriculum vitae* is attached as Attachment A.

27. Plaintiff's counsel has retained my services at the hourly rate of $425. My compensation is not contingent on the results of my work or any outcome of the litigation.

28. Previous to my engagement as a consultant to the Plaintiff in this litigation, I had never purchased any Jarrow Formulas products. Since my engagement, I have purchased Defendant's products for research purposes only.

## SCOPE OF MY EXPERT REPORT

29. I understand that Plaintiff challenges several claims on Jarrow Formulas coconut oil products (the "Products")[7] as misleading to reasonable consumers and because they render the Products misbranded. Plaintiff alleges that Defendant was able to obtain a price premium on the Products as a result its use of these misleading and illegal claims on the labeling of the Products. According to Plaintiff, he and other class members have suffered economic loss because, due to Defendant's misleading and unlawful labeling claims, he and other class members paid an inflated price (premium) when purchasing the Products. Plaintiff challenges the following claims as false and misleading, or as unlawful (the "Challenged Claims"):

    a. "Source of Medium Chain Triglycerides";

    b. "No Trans Fatty Acids (TFAs)";

    c. "No Hydrogenation"; and

    d. "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8)."

30. I was asked by Plaintiff's counsel to prepare a declaration and expert report that documents how I will design, conduct, and report on reliable price premium survey to measure whether the challenged claims on the Products cause any market price premium to be paid by Class Members, and, if so, the amount of the price premium. I understand Plaintiff's counsel might ask me at a later date to conduct the price premium study and prepare an expert report that documents my methodology and expert opinions. I am prepared to and will conduct the price

---

[7] *See*, generally, the Complaint, Dkt. 1, filed November 6, 2018 ("Complaint"). The Jarrow Formulas products challenged in this lawsuit by Plaintiff include the following: (a) Extra Virgin Coconut Oil, and (b) "Regular" Coconut Oil.

premium study, as documented below, if requested by Plaintiff's counsel.  I reserve the right
to make modest modifications to the design of my price premium survey to incorporate new
information that I acquire as part of the research process.

31. I understand that my price premium study will need to provide reliable price premium

information for the proposed California class and national class, defined as:

> All persons in California and the United States who, since November 6, 2014,
> purchased any Jarrow Organic Extra Virgin or Regular Coconut Oil Product in
> 16- and 32-fluid ounce containers for personal or household use (not for resale or
> distribution purposes) without the disclosure statement required by 21 C.F.R.
> 101.13(h) on the labeling (the "Challenged Products").

### OVERVIEW OF WORK THAT I WILL PERFORM IN CONDUCTING
### A PRICE PREMIUM SURVEY

32. Based on my knowledge and expertise in the fields of survey research and consumer market
research, if requested by Plaintiff's counsel, I will design and conduct a reliable price
premium survey.  The price premium survey, as indicated by its name, will measure the
market price premium, if any, that is attributable to the challenged claims used by Defendant
on its Products.  The price premium survey will also provide evidence of the extent to which
the challenged claims are material to consumers' purchasing decisions.  I will conduct price
premium survey in eight sequential steps, as summarized here and explained in detail further
below.

33. First, to ensure my survey provides an appropriate model for ultimately determining the
market price premium attributable to the challenged claims, I will review and consider the
various materials and documents relating to the Jarrow products and the coconut oil market
to ensure that my survey provides an appropriate model of the real-world marketplace. Such
documents may include, but are not limited to Defendant's deposition testimony, any market
research made available to me through the discovery process, the labeling of the Products
and the labeling of competitor products, retail sales and transaction data for the proposed
class period for the state of California and nationwide, online searches for retail price
information for the Products, and information from in-person visits to brick-and-mortar
stores selling the Products and competing products. As described below, many of these
documents have already been obtained from Jarrow or elsewhere.  My attached list of

considered materials shows the documents that are already available to me for the design of a reliable conjoint survey (Attachment B).  I have the necessary documents required for me to design and execute a reliable conjoint survey to measure the price premium, if any, that is attributable to the challenged claims. I reserve the right, nevertheless, to consider additional documentation obtained from third-parties and Defendant that may provide additional bases for my conjoint survey design.

34. Second, to further ensure the accuracy and reliability of my survey, I will select a survey sample of consumers that will ensure that the responses to my survey will be generalizable to the proposed classes.

35. Third, I will design the conjoint survey questionnaire based on my review of the various materials noted above and based on my twenty-five years of experience in survey research, among other things. In designing the conjoint survey, I will consider supply-side factors and real-world market transaction information from consumer transaction data for the Products and competing products.

36. Fourth, I will retain a survey vendor to program the survey questionnaire that I designed so that it can be conducted online.

37. Fifth, to test whether respondents understood the questionnaire, I will conduct cognitive ("one on one") interviews with coconut oil consumers using my price premium survey.

38. Sixth, after making any changes to the survey based on my cognitive interviews and review of the survey, I will pretest the survey with consumers.

39. Seventh, I will compile the data from the completed interviews, review the data to assess the quality of the survey data, and analyze the interviews.

40. Finally, I will write the declaration and expert report based on the price premium survey I conducted.

41. In the paragraphs below, I describe the methodologies and document the steps that I will take to design and implement the price premium survey.

## METHODOLOGICAL CONSIDERATIONS FOR THE PRICE PREMIUM SURVEY

42. My consumer survey will follow best practices and methodological principles established and accepted by professional survey researchers in the United States and elsewhere.  My

13

survey will conform to survey research guidelines and practices documented in the foundational textbooks and methodological writings in the survey research discipline.[8] As evidence of the solidity of the survey research profession, these best practices and principles are now continued and transmitted to future generations of researchers via three major universities with Ph.D.-level survey research programs (University of Nebraska, Lincoln; University of Michigan; and University of Maryland).

43. I will design and conduct the price premium survey in conformance with best practices for litigation surveys as documented by Professor Shari Seidman Diamond of Northwestern University in her "Reference Guide on Survey Research."[9] My survey will employ sound methodology, in light of the considerations documented by Robert Groves et al. in their survey research textbook, Survey Methodology (Second Edition), by Peter Marsden and James Wright in the Handbook of Survey Research (Second Edition), by Norman Bradburn et al in Asking Questions, by Roger Tourangeau et al. in The Psychology of Survey Response, and by marketing scientists specializing in price premium surveys and analysis (Green and Srinivasan, 1990; Orme, 2014; Orme and Chrzan, 2017; Sawtooth Software Technical Paper Series, 2009, 2017), among others.[10]

44. In conducting the price premium survey for this litigation, I will follow the same practices that I have followed outside of litigation, for example, research for a company seeking to understand how consumers perceive or understand information on their labeling or marketing statements. I will follow the same practices that guided me in conducting my other surveys that have been accepted by the courts. My surveys have survived all *Daubert* challenges.

45. I will design the price premium survey in consultation with Plaintiff's damages expert, Mr. Colin Weir. The data from my price premium survey will provide a source of data for Mr. Weir to analyze and calculate the amount of economic damages suffered by class members that is specifically attributable to the challenged claims used by Defendant on its Products.

---

[8] *See* Fowler (2013); Groves et al. (2011); Marsden & Wright (2010); and Schuman & Presser (1981).

[9] Shari Seidman Diamond (2011) "Reference Guide on Survey Research," Reference Manual on Scientific Evidence (Third Edition).

[10] *See* Attachment B for the complete citations.

46. **<u>Study Target Population</u>**. I will define the study target population using best survey
practices and to reflect members of the proposed nationwide and California classes. From
this target population, an appropriate sample of survey respondents will be randomly
selected. When a target population and sample are appropriately defined and selected, the
results of the survey will provide a reliable measurement of the price premium, if any, paid
by members of the proposed classes in California and nationwide, and ultimately a market
price premium. To do so, I will draw on my experience in conducting similar surveys
measuring the price premium for challenged claims on the coconut oil products in the *Nutiva*
and *Nature's Way* matters. Having twice already fully performed similar conjoint price
premium surveys in these matters, I have accumulated valuable experience and information
regarding sampling of coconut oil purchasers. I will further determine what sampling
changes, if any, are warranted by my research and review of Jarrow's internal documents,
market research, sales data, and other sources of information specific to the present litigation.
I expect, broadly speaking, that my survey will target a population of non-institutionalized
adults age 18 and over, residing in the state of California or nationwide, who had purchased
coconut oil in the past 12 months for personal or household use at price points comparable to
the Jarrow Formulas products. I have found this to be the appropriate target population in
*Nutiva* and *Nature's Way* based on study of the defendants' market research, my market scan
of the competitive landscape, and my qualitative research where I personally interviewed
purchasers of coconut oil products.[11] I expect to exclude consumers if all of their recent-year
purchases of coconut oil had been only from membership-only club warehouse chains (like
Costco or Sam's Club, because such stores usually only provides customers with a single
product option for a given product type rather than a typical selection of assorted brands). I
expect to include coconut oil purchasers who purchased coconut oil in health food stores,
consistent with Defendant's understanding of the retail channel used by Jarrow consumers.[12]
Within this study target population of recent-year coconut oil purchasers, a subset consists of

---

[11] I document the basis of my definition of the study target population in my expert reports in
*Jones v. Nutiva*, 4:16-cv-00711-HSG (N.D. Cal.) and *Hunter v. Nature's Way LLC*, 3:16-cv-
00532-WQH-AGS (S.D. Cal.). I confirmed the appropriateness of my definition of the study
target population through qualitative interviews with purchasers of coconut oil.

[12] John O'Connor 30(b)(6) Deposition Tr., July 17, 2019, p.52.

the actual purchasers of Jarrow Formulas coconut oil.  I will select this particular study target population (including the Jarrow Formulas subset) because such a population corresponds to the relevant consumer market (consumers of coconut oil in California and nationwide).

47. **Screening Survey.** My price premium survey will begin with a screening section of the survey to identify a representative sample of consumers for participating in the substantive sections of the main survey, where I will administer the price premium survey.

48. To qualify for the price premium surveys, respondents must answer a series of screening survey questions. The screening questions are mapped to the definition of the study target population. To qualify for the price premium survey, the respondents will need to meet all of the following conditions: be a U.S. resident; be at least age 18; did not take a survey about cooking oil products (including coconut oil) in the past 30 days; purchased household coconut oil products in the past 12 months; and purchased either Jarrow Formulas coconut oil or a competing brand. In addition, to qualify for the survey, the consumer must not select a fictitious brand name product that I will insert in the response list of coconut oil products. Also, the respondents must answer that they purchased products from retail channels besides membership-only club warehouse chains like Costco. Respondents must also be willing to answer the survey questions by themselves and without asking for the help of others.

49. Therefore, my sampling approach is premised on surveying adult U.S. consumers who are actual and recent purchasers of Jarrow Formulas coconut oil or competing coconut oil brands. My sampling approach assures that my respondents are personally familiar with the category of coconut oil products because of their own purchasing history. In designing the sample, I will consider my experience as an expert in using product category sampling in my past surveys accepted by the courts. Product category sampling is common in market research because of a recognition that consumers of one product in the subcategory (e.g., Colas) are representative of consumers of the overall category (e.g., Carbonated Soft Drinks).[13] Use of the product category concept in market research has its parallels in the actual marketplace. Retailers rely on the product category concept by grouping like products

---

[13] *See* Scott M. Smith and Gerald S. Albaum, <u>An Introduction to Marketing Research</u>, 2010, p.124.

near each other on shelving in brick-and-mortar stores (such as hair shampoo or hair conditioners) and online retailers follow the same principle.

50. **Steps Taken to Disguise Survey Objectives from the Respondents.** For my price premium survey, I will take certain steps to avoid a potential risk for the reliability of the study that would result from respondents answering the survey questions strategically to either help or hurt Defendant's interests. I will camouflage the survey objectives to address the risk of strategic responses. First, with respect to the screening section of the survey, my screening questions will include a wide variety of household and food product types ranging from laundry care to insect and pest control to food products like spices and dietary supplements. For cooking oil and oils applied topically, my filter questions will also similarly cover a broad range of products ranging from olive oil, vegetable oil, and other oils.  I will also include in the survey a broad assortment of brands of coconut oil brands.  By casting a wide net for the types of household and food products and brands, I will disguise the research objectives from the respondents. In addition, my price premium survey will include both challenged and non-challenged claims in order to distract the respondent from focusing on only the challenged claims. I will use my cognitive interviews to test whether I succeeded in my efforts to disguise the survey questions and its objectives.

51. **Randomizations in the Survey to Control for Potential Order Effects.** As in my coconut oil surveys conducted in the *Nutiva* and *Nature's Way* litigations, I will make extensive use of randomizations in the survey questionnaire to control for the potential impact on survey responses that could result from the order in which respondents are asked to answer certain questions or exposed to stimuli in my survey. The randomizations will include, but are not limited to, the following:  randomizing response lists or the order of response options; randomizing the order of the presentation of any visual stimuli; and in the survey where respondents make product choices (i.e., the conjoint survey), randomizing the order in which respondents will be shown the product images, the descriptions from the front of the product, and other product features.  I describe the conjoint methodology later in my expert report.

## COGNITIVE INTERVIEWS

52. To inform my design of the price premium questionnaire, I will conduct one-on-one cognitive interviews with consumers who are members of the study target population. I will

17

conduct approximately ten cognitive interviews lasting approximately 40 minutes on average. The cognitive interviewing methodology will provide me an opportunity to determine whether respondents interpreted my survey questionnaires in the manner that I intended and to identify areas for improving the clarity of my survey questions. In my litigation research consulting practice, I routinely conduct cognitive interviews simply because it is a best practice for survey development. But ultimately I conduct the cognitive interviews because the survey respondents are the ultimate judge of whether the survey questions are clear, unbiased, and make sense to them as consumers.

53. To prevent error in surveys, cognitive interviewing is the gold-standard methodology for testing survey questionnaires with respondents. According to one of the foremost experts in cognitive interviewing, Gordon Willis and his co-author:

> Cognitive interviewing is an evidence-based, qualitative method specifically designed to investigate whether a survey question—whether attitudinal, behavioral, or factual in nature—fulfills its intended purpose. The method relies on interviews with individuals who are specifically recruited. These individuals are presented with survey questions in much the same way as survey respondents will be administered the final draft of the questionnaire. Cognitive interviews are conducted before data collection (pretesting), during data collection, or even after the survey has been administered, as a quality assurance procedure.[14]

54. Cognitive interviewing is a much more involved and thorough procedure than simple pretesting, which does not involve any question-by-question conversation about the respondent's thought process in forming an answer to a survey question. Cognitive interviewing, when conducted properly, occurs before the pretest stage.

55. In the cognitive interviews, I will show real consumers the actual price premium survey questions on their computer screens and asked for their feedback on each survey question as they took the survey. I will speak directly with each respondent on the telephone while the respondent views my computer screen over the web from their home. Respondents will share with me their thought process as they answer each survey question verbally (telling me which response to enter into the survey.)

---

[14] Gordon B. Willis and Anthony R. Artino, Jr. What Do Our Respondents Think We're Asking? Using Cognitive Interviewing to Improve Medical Education Surveys. J Grad Med Educ. 2013 Sep; 5(3): 353–356.

56. The cognitive interviews will help me to determine whether I need to make any changes to my survey so that it will be clear and understandable to the respondents. These cognitive interviews will help me to assess the extent to which the respondents fully understood the survey questions, that they were engaged in a hypothetical shopping experience focused on making the coconut oil product choices, and had all the information needed to make the requested choices. My cognitive interview respondents will help me confirm that my conjoint survey provided a realistic replication of the marketplace for coconut oil products and that my selection of attributes took into account the factors that were important to coconut oil consumers when making product choices. Respondents will also provide me insight on whether the price range in the conjoint survey is sensible and consistent with their purchasing experience.

57. I will also use the cognitive interviews to determine whether the respondents perceived that my survey has an agenda related to the litigation or to any current events or controversies in the news.

## CONJOINT SURVEY METHODOLOGY QUESTIONNAIRE

58. The price premium survey will use the choice-based conjoint methodology, which is the same methodology that I used in the *Nutiva* and *Nature's Way* litigations. (For the purposes of my declaration, I use interchangeably the expressions "price premium survey" and "conjoint survey.")

59. Conjoint surveys take advantage of the fact that consumers are profoundly familiar with the task of shopping – comparing products, evaluating them, and making choices. Consumers are accustomed to making choices in their real-world shopping experiences. An industry leader in conjoint analysis tools observes:

> Choice-based conjoint analysis has attracted much interest in the marketing research field. There are several reasons for its position as the most widely used conjoint-related approach today: The task of choosing a preferred concept is similar to what buyers actually do in the marketplace. Choosing a preferred product from a group of products is a simple and natural task that everyone can understand.[15]

---

[15] Sawtooth Software Technical Paper Series, 2017, "The CBC System for Choice-Based Conjoint Analysis," p.2.

60. Prior to the adoption of choice-based conjoint in marketing research, it was common for researchers to ask respondents to rank and rate new product concepts and features. Choice-based conjoint, in contrast, asks the respondent to express their preferences by choosing from sets of concepts (such as product profiles). As such, the respondent experience in answering choice-based conjoint surveys is similar to what buyers actually do in the marketplace – that is, choosing a preferred product from a group of products.

61. Following best practices, I will design the conjoint survey to provide the respondents (i) the appropriate decision-making context for answering the choice questions, (ii) instructions for how to compare the coconut oil product profiles and answer the choice questions, and (iii) clear descriptions of the attributes themselves. The conjoint survey I will design and implement for this study, in my expert opinion, will be relatively simple from a survey perspective and cognitively easy for respondents compared to standard market research conjoint surveys. The basis for this opinion is as follows:

- The survey sample will be restricted to actual recent purchasers of coconut oil products. I will interview consumers that have recently experienced making purchases of coconut oil products. Therefore, the conjoint survey will have personal relevance to the respondents.

- Because I have already conducted two conjoint surveys involving coconut oil products (in *Nutiva* and *Nature's Way*), I have already researched the product features that are important and relevant to coconut oil purchasers, providing me data-based insight on the selection of attributes to include in my conjoint survey for the *Jarrow Formulas* litigation.

- Typical conjoint surveys can have six to eight attributes for the respondents to consider. I expect to design the survey to limit the cognitive burden on the respondents by showing only six attributes to the respondents. The attributes will be brand, container type, product type, product size, label claims (descriptors), and price. To reduce cognitive burden, I expect to show only two to four claims on each product.

- Some conjoint surveys will present four product profiles for each choice task. My survey will present only three, which will reduce the cognitive burden on the survey respondent and generally will make it easier for the respondent to process the presented product choices.

- Conjoint surveys often have 12 to 20 choice tasks for the respondent to consider and decide which products they prefer. My survey will be on the low end of the usual range with only 12 choice tasks for each respondent. The result will be more reliable data since there will be less potential for respondents to experience fatigue in answering the choice questions.

- Respondents will be provided a "None of these" option in the conjoint survey; therefore, respondents will not be forced to select one of the three product profiles. Respondents not having a preference for a product presented to them in the conjoint survey will have the option to select "None of these."

62. These steps are generally accepted techniques in the field to prevent excessive cognitive burden on respondents and produce reliable responses from conjoint surveys.

63. In designing the conjoint survey, I will consider and include numerous real-world, supply-side factors for the products at issue, so that my survey will accurately measure the price premium attributable to the challenged claims, *i.e.*, the intersection between demand-side factors (willingness to pay) and supply-side factors (willingness to sell), to determine the actual effect of the challenged claim on market price. The actual real-world pricing of the products reflects the actual number of units sold, the costs of manufacturing, the costs for distribution, advertising, and marketing, and margin, among other supply-side factors. I will take into account the fact that this product is sold in a well-developed, longstanding, and competitive market, through a variety of retail outlets. Further, I will take into account the fact that the quantity supplied of Defendant's and competitors' products is a known fact and is fixed as a matter of history

64. My price premium survey will include market-based price points for the Defendant's Products and its competitors based on actual real-world prices that consumers have paid for the coconut oil products. The actual real-world pricing of the products reflects the actual number of units sold, the costs of manufacturing, the costs for distribution, advertising, and marketing, and margin, among other supply-side factors. Defendant has produced sales numbers for the Products at issue on a month-by-month basis and also provided its best estimates of the retail sales for the Products.[16] Defendant has also provided information regarding its cost of manufacturing (cost of goods sold), profit margins, and advertising

---

[16] *See* Lipsky 30(b)(6) Depo., Exs. 1, 18-19.

expenditures.[17]

65. My price premium survey will also incorporate other market-based attributes besides price, such as actual competing products in the marketplace identified by Defendant. Defendant has identified a number of primary competitors including ███████████████████ ████████████████████████.[18] I will use real product brand logos and actual wording of label claims used on actual real-world coconut oil products.

66. The conjoint survey will be based on relevant product "attributes." An "attribute" is a product feature such as brand, price, size, or a descriptor on the product labeling.   For each attribute, there will be various "levels" of the attribute. For instance, "Jarrow Formulas" is a level for the "Brand" attribute, while "16 fl. oz." and "32 fl. oz." are levels for the "Product Size" attribute. Each attribute in the conjoint survey has two or more levels.

67. In the actual choice tasks, respondents will be shown three different products with randomized levels of the attributes. Based on their choice of a specific product (or selecting no product) their preferences for specific attributes and levels will be revealed. By having each survey respondent repeat the choice task twelve separate times, and having a statistically significant number of survey respondents, the choices made by survey respondents will provide a data set from which the market price premium attributable to the challenged claims can ultimately be determined. As noted, respondents will also be provided a "none of these" option. Each product will be distinguished by the combination of attributes and levels. While each product is described by the same attributes (e.g., brand, price, etc.), the actual levels for each attribute will be randomly displayed. Therefore, the respondent will make product selections based on comparing coconut oil products that have in common or are different in terms of brand, price, label claims, and other attributes.

68. The choice-based-conjoint design for this conjoint survey will be based on at least 50 versions with each version having 12 choice tasks that will be shown respondents. A conjoint survey respondent will be randomly assigned to a version having 12 choice tasks. Each choice task will contain three different products for the respondent to consider and to make a choice about which one they would buy (or select "none of these").  Therefore, there will be

---

[17] *Id. See also* Lipsky 30(b)(6) Depo. Tr. pp.166-171.

[18] Lipsky 30(b)(6) Deposition Tr. p.94.

approximately 1,800 possible products sets shown the respondent in my conjoint survey (50 versions x 12 choice tasks X 3 product concepts). A respondent will be asked to make 12 product choices in the course of the survey. For my conjoint survey, for which I expect to collect approximately 1,000 interviews, I expect my survey to collect approximately 12,000 product choices from coconut oil consumers (i.e., 1,000 interviews multiplied by 12 product choices).

69. To illustrate with an example, below is a choice task for a respondent. The example is from the conjoint survey I conducted in the *Nature's Way* matter. The three available products and the "None of these" option are clearly specified. Each product is defined by attributes and levels, which vary from product to product. The choice exercise is intuitive for consumers as it closely mimics the real-world shopping experience of comparing products that differ in terms of brand, container type, product size, label claims, and price.

**Example of a Choice Task for a Respondent in the Price Premium Survey**



70. By making product choices across 12 choice tasks, the respondent reveals his or her value for the attributes (*e.g.*, price sensitivity, loyalty to a specific brand, appeal of specific claims on labels, etc.).  The elegance of the conjoint design is that it encourages respondents to make

decision trade-offs in considering various combinations of attributes and levels (for instance, by weighing their loyalty to a specific brand versus their sensitivity to price).

## THE CONJOINT SURVEY QUESTIONNAIRE

71. The conjoint survey will have two sections. First, there will be the information provision section of the survey where I provide descriptions of all the attributes and levels. In this section, I provide the respondents the information they will need to make product choices in the actual conjoint survey. For each attribute in the survey, I describe the attribute comprehensively on its online screen. By the conclusion of the information provision section, the respondents have the necessary information to understand the differences in the products that I will be showing them in the actual choice tasks.  The second section of the conjoint survey consists of the twelve choice tasks that I will show the respondents.

72. In designing any conjoint survey, the selection of the attributes is among the most consequential design decisions that the researcher will make that will result in reliable price premium information.[19] In determining which attributes to include in the conjoint survey, I will consider the information previously described, including but not limited to:  the research I conducted previously in preparing the conjoint surveys in *Nutiva* and *Nature's Way* litigations; Defendant's deposition testimony and internal documents, the labeling of the Products, competitors' product labels, retail sales and transaction data for the proposed class period for the state of California and nationwide, online searches for advertised retail price information for the Products and competitors' products, information from in-person visits to brick-and-mortar stores selling the Products and competing products, among other sources of information, including third-party discovery. Based on the research I conducted in the *Nutiva* and *Nature's Way* matters, and the testimony of Defendant's representatives and other documents on my Attachment B List of Considered Materials, I expect my conjoint survey to have the following attributes:

- Brand,
- Container Type,

---

[19] Bryan Orme, 2002, "Formulating Attributes and Levels in Conjoint Analysis," Sawtooth Software Research Paper Series, 2002, p.1.

- Product Size (amount of coconut oil),
- Product Type,
- Label Claims on Products, and
- Price.[20]

Next, I describe briefly each attribute.

73. With respect to the brand attribute, I will show the respondents the actual brand logos from the Jarrow Formulas Products and from products that compete with Jarrow Formulas.[21] I will feature at least five brands in my conjoint survey to mimic the actual real-world marketplace and which Defendant has identified as competing brands. By displaying the actual product logos on the top row of the choice screens, I will provide a visual to help respondents to consider brand as an attribute in my price premium survey. Examples of product logos are shown below.



74. The product logos are important because they will help the respondents to rely on their personal experience with the coconut oil products in making their product choices in the price premium survey. For instance, in making their choices, respondents can consider whether they prefer the taste or cooking efficacy of any given brand with which they have personal experience. Moreover, by including the brand attribute in the choice screens as logos, the "brand equity" of the brand will be reflected in respondents' answers to my choice questions since the brand logos enable the respondent to factor in any family history, inertia,

---

[20] Some of label claims in the conjoint survey will be the challenged claims. The rest will not be challenged claims but will instead be distractor labels. Defendant's deposition testimony includes Thomas Bowman, 30(b)(6) Deposition Tr., July 17, 2019; Rory Lipsky 30(b)(6) Deposition Tr., July 16, 2019; John O'Connor 30(b)(6) Deposition Tr., July 17, 2019.

[21] Lipsky 30(b)(6) Deposition Tr. p. 94 ██████████████████████████████
████████████████████████████████████

nostalgia, or personal traditions regarding the brand.[22]  I will also consider the insights provided to me by the cognitive interview respondents.

75. The container type attribute will have only two levels, plastic or glass, reflecting the market reality of actual coconut oil products that consumers can purchase. Including this attribute is based both on my past market research (in the *Nutiva* and *Nature's Way* matters) indicating many consumers place importance on container type, and ██████████████████████ ██████████████████████████████[23] Moreover, including this attribute helps to reflect the actual marketplace for coconut oils and to disguise the research objectives from the respondents.

76. The amount of coconut oil or product size attribute will be included in my conjoint survey because it is a driver of price and because the damages model could require separate valuation estimates for the 16-ounce and the 32-ounce Products.[24] I will use the product sizes of 16 and 32 ounces corresponding to the product sizes of the Challenged Products. Similarly, I will use the product type attribute (Regular versus Extra Virgin) as these are two differentiated products sold by the Defendants' in the marketplace.[25]

77. The below table (shown on the next page) provides a list of the non-price and non-labeling-claims attributes that I will use in my conjoint survey, subject to changes based on new information made available to me and subject to the the findings from my cognitive interviews with respondents. Taken altogether, these attributes—combined with the price and

---

[22] Market researchers commonly refer to "brand equity" or "brand-specific effect" as the component of consumer preference that is not explained by "objectively measured attributes" (such as the features of a product). *See* Park and Srinivasan, 1994, p.272.

[23] John O'Connor 30(b)(6) Deposition Tr., July 17, 2019, pp.39-41.

[24] I also conditioned price on product size in my conjoint surveys conducted in the *Nature's Way* and *Nutiva* litigations.

[25] John O'Connor 30(b)(6) Deposition Tr., July 17, 2019, p.80.

EXHIBIT J
Page 373

claims attributes—will provide respondents marketplace-realistic product choices in my conjoint survey.

**Non-Price and Non-Labeling-Claims Attributes and Levels for the Conjoint Survey**

| Attributes | Levels |
|---|---|
| **Brand** | Nature's Way<br>Nutiva<br>Spectrum<br>Jarrow Formulas<br>Barlean's |
| **Container** | Glass<br>Plastic |
| **Product Size** | 16 ounces<br>32 ounces |
| **Product Type** | Regular<br>Extra Virgin |

78. The label claims attribute in the conjoint survey will consist of the specific challenged claims as well as non-challenged claims that were used by Jarrow Formulas and competing products during the class period on their 16-ounce and 32-ounce packaging. In the conjoint survey, a product profile will display two to four randomly selected claims from the total pool of approximately 12 claims. By showing the respondents random subsets of challenged and non-challenged claims, the analysis can measure the value associated with each of the claims, including the challenged claims. I will select the non-challenged claims to include in my conjoint survey that were present on Jarrow Formulas and competitors' coconut oil products sold during the class period and that are important to consumers. The non-challenged claims will be included to present a balanced range of claims to the respondents (often called "distractor" variables). Consequently, the analysis of the importance of the challenged claims controls for and takes into account the fact that in real-life shopping experiences the consumers were presented with both challenged and non-challenged claims.

79. While I will use my cognitive interviews and review of competitors' product labels to confirm the final selection of product claims to include in the survey, based on my

experience from the *Nature's Way* and *Nutiva* surveys as well as Defendant's testimony,[26] I anticipate using the following product claims:

**Challenged Claims to be Tested**

| |
|---|
| "Source of Medium Chain Triglycerides" |
| "No Trans Fatty Acids (TFAs)" |
| "No Hydrogenation" |
| "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8)." |

**Non-Challenged Claims to be Tested[27]**

| |
|---|
| "Certified Organic" |
| "Ideal for Cooking" |
| "Expeller Pressed" or "Cold Pressed" |
| "Solvent free" |
| "Neutral Taste Neutral Flavor" |
| "Rich & Full Coconut Flavor" |
| "Non-GMO" |

80. The final attribute to document is the price attribute. For each product shown to respondents in my conjoint survey, price will be conditional on the level for the product size shown to the respondents because of the real-world market price differences between the Defendant's 16-ounce and 32-ounce products and competitors' products of these sizes or sizes proximate to them. Furthermore, I will condition the price for the 16-ounce and 32-ounce products by whether the product type is Extra Virgin or Regular coconut oil. Conditioning the price by both product size and product type attributes (Extra Virgin versus Regular) is appropriate because of the real-world pricing differences observed for this matrix of four products.

81. The price differences across the four product combinations are significant. While subject to further verification, based on the sales information provided by Defendant, the approximate

---

[26] John O'Connor 30(b)(6) Deposition Tr., July 17, 2019, pp. 75, 76, 78, 79-80, 107, 128

[27] These claims serve an important purpose of "distracting" the respondent to disguise the study research objectives.

retail prices during the Class Period for the Extra Virgin Coconut Oil 16-ounce and 32-ounce sizes were $████ and $████, respectively. The approximate retail prices during the Class Period for the Regular Coconut Oil 16-ounce and 32-ounce sizes were $████ and $████ respectively.[28]

82. While I use the above numbers provided by Defendant for purposes of illustration, I will verify those numbers and ensure the numbers actually used as price points in my conjoint survey are based on actual historical sales data of Defendant's products and competitors' products that occurred during the class period. As such, these historical sales reflect the supply-side factors operating during the class period.

83. I have reviewed the Defendant's internal sales records and estimates of sales.[29] I understand that Mr. Colin Weir, Plaintiff's damages expert, has reviewed the retail sales data for the Challenged Products for the class period. I have been asked to accept the Defendant's internal estimates of retail sales in designing the conjoint survey. However, I will update the design of my conjoint survey, including the price points in my conjoint survey analysis, should forthcoming information indicate that actual historical sales differ from the currently available information.

84. Subject to the above-noted condition, I expect my conjoint survey to use the price points shown in the table below (or price points that are proximate).  In addition to relying on historical sales data, I will test the price points in cognitive interviews with coconut oil purchasers to determine whether the price points are sensible to the respondents in the context of the products (product type by product size) shown in the conjoint survey. By using these price points, I will assure that the price ranges in the conjoint survey reflect the actual prices set in the marketplace by both supply and demand factors for the Challenged Products and for the competitor brands included in the conjoint survey. Moreover, by using these price points, I will assure that the price ranges are sufficiently wide to support analysis of consumers' sensitivity to price.

---

[28] The average retail prices are calculated from Defendant's data in JFI 8029. I reserve the right to adjust the estimated retail prices that will be used in my survey and analysis based on further analysis of the actual retail prices seen in the marketplace during the class period.

[29] See, e.g., Rory Lipsky 30(b)(6) Deposition Exs. 1 (JFI 8029), 18, 19.

**Prices Points for Products Shown Respondents in the Conjoint Survey**

| Product Type | Regular | | Extra Virgin | |
|---|---|---|---|---|
| **Product Size** | **16 oz.** | **32 oz.** | **16 oz.** | **32 oz.** |
| Level 1 | $4.00 | $7.00 | $6.00 | $10.00 |
| Level 2 | $6.00 | $10.50 | $9.00 | $13.50 |
| Level 3 | $8.00 | $14.00 | $12.00 | $17.00 |
| Level 4 | $10.00 | $17.50 | $15.00 | $20.50 |
| Level 5 | $12.00 | $21.00 | $18.00 | $24.00 |

85.  Below is an illustration (not an actual survey) of a conjoint choice task that will be shown to respondents. The respondent has the opportunity to select any of the three products for purchase or else select "None of these." Each of the 12 choice tasks shown a respondent is unique to the respondent.

**If these were your only options at the store, which of these COCONUT OIL products would you purchase in real life?**

| | PRODUCT A | PRODUCT B | PRODUCT C |
|---|---|---|---|
| Brand | nutiva NURTURE VITALITY™ | Jarrow FORMULAS | Nature's Way |
| Container Type | Glass | Plastic | Plastic |
| Product Size | 16 ounce | 32 ounce | 16 ounce |
| Product Type | Regular | Extra Virgin | Extra Virgin |
| Label Claims on Product | No Hydrogenation Neutral Taste Neutral Flavor | Certified Organic Ideal for Cooking Source of Medium Chain Non-GMO | No Trans Fatty Acids (TFAs) Rich & Full Coconut Flavor Expeller Pressed |
| Price (not including tax) | $6.00 | $20.00 | $15.00 |
| Select one for purchase | O | O | O |
| None of these | | O | |

**INTERVIEW SAMPLE SIZES & DATA COLLECTION**

86. **Conjoint Survey Interview Sample Size.** I expect to collect at least 1,000 completed conjoint interviews, with 500 interviews from the state of California and 500 from the rest of the U.S. In doing so, I will substantially exceed industry best practices for sample size. Industry guidelines recommend having at least 150 respondents for a given segment participating in the conjoint survey and at least at least 300 conjoint interviews in total for

robust quantitative research.[30]

87. **Survey Data Collection**. As I did in the *Nutiva* and *Nature's Way* conjoint surveys, I intend to retain Dynata (formerly Research Now Survey Sampling Inc.) to provide me with the online survey vendor services for programming the questionnaires, providing the respondent sample, and for collecting the survey data. Based on my experience in the industry, the Dynata online panel sample is regarded as among the most credible and reliable non-probability online panel having the necessary scale for this study, which involves collecting a substantial number of interviews on a relatively low-incidence consumer segment. Dynata will program my survey questionnaire into an online survey under my active supervision. The actual survey data will be collected using survey software and servers operated by Dynata.

88. **Blinded Research Design**. As a precaution against the potential risk for bias, the research objectives and study sponsor will not be disclosed to the survey respondents or to the survey firm that is recruiting the survey respondents for my conjoint survey.

89. **Online Data Collection**. All the survey interviewing will be conducted via self-administration of the survey. Because there will not be an actual personal interviewer administering the survey, my survey will avoid the potential risk of "self-presentation" or "social desirability" bias that can occur in surveys administered by actual human interviewers. Moreover, the absence of an interviewer also helps to avoid the potential risk of so-called "demand artifacts" that can occur when respondents answer the survey questions in ways that they perceive the interviewer would favor.

90. **Pretest Survey**. After the completion of the cognitive interviews but before I conduct the main data collection, I will conduct a pretest of the conjoint survey in order to test the survey with a representative sample of members of the study target population. The pretest survey is, in a sense, a dress rehearsal for the data collection. The pretest will be conducted online using the same sampling and data collection procedures that I will subsequently employ for the full data collection. I will conduct the pretest for the following purposes: (i) for quality control and quality assurance testing of the survey instrument, (ii) to validate that the survey questionnaire was programmed correctly to my specifications, (iii) to identify any survey

---

[30] Bryan Orme, 2010, "Sample Size Issues in Conjoint Analysis."
https://www.sawtoothsoftware.com/download/techpap/samplesz.pdf.

questions that were unclear to respondents, and (iv) to analyze the data to identify any problems, such as unexpected missing data.

## **PRICE PREMIUM SURVEY ANALYSIS**

91. To calculate any price premium solely attributable to the challenged claims, I will conduct the analysis of the choice-based conjoint survey data using Sawtooth Software Lighthouse Studio. Sawtooth Software is the industry leader in market research for conjoint data collection and analysis software.

92. To calculate the price premium statistics, I will conduct an analysis called a "market simulation." Market simulations using conjoint data are a staple in marketing research science. Market simulations are a common deliverable at the conclusion of a choice-based conjoint study. Sawtooth's authors explain that:

> the simulator is used to convert raw conjoint (partworth utility) data into something much more managerially useful: simulated market choices. Products can be introduced within a simulated market scenario and the simulator reports the percentage of respondents projected to choose each product. A market simulator lets an analyst or manager conduct what-if games to investigate issues such as new product design, product positioning, and pricing strategy. Market simulators are commercially available or can be constructed using spreadsheet programs.[31]

93. In short, a market simulation tool is a "choice laboratory" for testing multiple real-world possibilities (e.g., the price premium paid estimates for products with and without each of the challenged claims) and supports the estimation of preferences across consumer segments.

94. With respect to the analysis tools needed to analyze the survey data, the raw data created by a conjoint survey is fundamentally different from a non-conjoint survey data obtained through a direct-questioning methodology that is typical in a marketing or public opinion survey. In a conventional survey data set, survey answers such as "yes" and "no" are coded into "1" and "2," making possible a straightforward count of survey responses. No "modeling" of the data is required to draw inferences. In contrast, a conjoint study leads to a set of utilities or part-

---

[31] Bryan Orme, Sawtooth Software, on "Market Simulators for Conjoint Analysis." https://www.sawtoothsoftware.com/download/techpap/introsim.pdf. Also, Joel Huber et al., 2006. "Dealing with Product Similarity in Conjoint Simulations."

worths that quantify the value respondents' place on each level of each attribute (*e.g.*, for each price level for the price attribute). To draw inferences from the utility data, conjoint analysis leverages Bayesian statistics (technically, Hierarchical Bayesian modeling) to provide individual respondent-level models. The price premium survey results that will be presented in my expert report are calculated using part-worth utilities calculated in the Sawtooth Lighthouse Studio employing Hierarchical Bayesian models. The Sawtooth market simulation for calculating the price premium will be based on a randomized first choice or share of preference method.

95. Market simulation will provide a statistically robust estimate of the price premium that reasonable consumers paid as a result of each of the challenged claims. The price premium is the fraction of the total price paid by consumers for Defendant's Products sold in class period in California and nationwide that is attributable to a challenged claim. For instance, a price premium of 10% for a challenged claim on a Product sold for $10.00 is the same as stating that $1.00 of the Product price is attributable to the premium paid for the challenged claim. In this example, the purchaser would need to be presented a 10% discount for the Product without the challenged claim to have the same market value as the Product with the challenged claim.

96. The design of my conjoint survey and my market simulation will allow me to calculate the price premium attributable to each of the challenged claims for the marginal consumer, that is, the additional price that the marginal consumer would pay for the product with a challenged claim. As explained by Nobel Prize winner Daniel McFadden and his co-authors, the price premium of the "infringing feature" (in this case, a challenged claim) is the same as the willingness to pay of the marginal consumer that can be identified by offering respondents a "no buy" option in the conjoint survey.[32] I will provide respondents such a "no buy" option in the form of a "none of these" option in the choice sets shown the respondents in the price premium survey. By using this procedure, and by further taking into account the supply-side factors as discussed above, I will identify the marginal consumer as a class member who is indifferent between the market price of Defendant's Products with a

---

[32] Lisa Cameron, Michael Cragg and Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," Law360, October 16, 2017.

challenged claim and the same product without the challenged claim.

97. In calculating the price premium statistics, I will select price points for the market simulations that correspond to the actual prices paid by consumers for the Defendant's Products during the class period using IRI or other sales data obtained during the discovery process. By using the actual prices paid by consumers, I am incorporating into my market simulation both demand- and supply-side factors that determine actual, real-world transaction prices. I will use the actual prices paid by class members in California and separately in the U.S., and also for each of the litigated Defendant's Products.

98. My price premium statistics will be reported by me in both absolute dollars and cents and by a percentage of the price paid by class members.

99. I will also conduct a number of verifications to ensure the quality of the data obtained including, for example, statistical sensitivity tests to determine whether the price premium statistics are significantly influenced by the length of time that respondent spent on the survey.

100.   My price premium statistics will be accurately generalizable to all of Defendant's Products sold during the proposed class period in California and nationwide.

101.   To enable replication of the prime premium statistics, I will attach to my expert report all of the necessary data that are required to replicate my analysis.

## **CONCLUSION**

102.   If requested by Plaintiff's counsel to conduct a price premium survey, I will draw on my 18 years in designing and conducting online surveys and my 25 years of experience in survey research to design and produce reliable consumer perceptions and price premium surveys.  I will follow a rigorous protocol for developing the survey questionnaire using cognitive interviews and pretesting.  I will carry out a series of quality control and quality assurance measures to confirm that the respondents understood the survey questions.  I will design the survey sample to identify a representative sample of consumers whose responses are generalizable to the proposed classes.  I will process, analyze, and report on my conjoint survey to measure the price premium, if any, attributable to the challenged claims.

103.   In my expert opinion, my price premium survey will provide a reliable and accurate

measurement of the extent to which there is a marketplace price premium attributable to the challenged claims for the proposed classes.  My price premium survey will be able to show without ambiguity whether consumers paid a price premium for Defendant's Products because of the challenged claims, and, if so, a quantitative measure of the economic loss experienced by class members.

104.    The facts and data that I considered in this report are cited herein and listed in my attached list of considered materials (Attachment B).  I reserve the right to modify my opinions if I am provided additional information, and to supplement them, if necessary, to respond to criticisms or objections from the opposing party.

---

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.  Executed in E. Palo Alto, California on July 22, 2019.

J. MICHAEL DENNIS, PH. D

July 22, 2019

DATE

# EXHIBIT K

# Exhibit 3

REDACTED VERSION OF DOCUMENT PROPOSED TO BE
FILED UNDER SEAL

EXHIBIT K
Page 384

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

COLLIN SHANKS, on behalf of himself, all others similarly situated, and the general public,

                                    Plaintiff,

v.

JARROW FORMULAS, INC.,

                                    Defendant.

Case No. 18-cv-9437-PA (AFMx)

Declaration

of

**COLIN B. WEIR**

July 22, 2019

MAY REFERENCE MATERIALS DESIGNATED "CONFIDENTIAL" OR "HIGHLY

CONFIDENTIAL -- ATTORNEYS' EYES ONLY" UNDER PROTECTIVE ORDER

I, Colin B. Weir, declare as follows:

I am Vice President at Economics and Technology, Inc. ("ETI"), One Washington Mall, 15th Floor, Boston, Massachusetts 02108. ETI is a research and consulting firm specializing in economics, statistics, regulation and public policy.

## I. QUALIFICATIONS, BACKGROUND, AND EXPERIENCE

1.     I hold a Masters of Business Administration, with honors, from the High Technology program at Northeastern University, Boston, Massachusetts. I hold a Bachelor of Arts degree cum laude in Business Economics from The College of Wooster, Wooster, Ohio. I have provided expert testimony before federal and state courts, the Federal Communications Commission, and state regulatory commissions, and have contributed research and analysis to numerous ETI publications and expert testimony at the state, federal, and international levels. I have consulted on a variety of consumer and wholesale products cases, calculating damages relating to food products, household appliances, herbal remedies, health/beauty care products, electronics, furniture, and computers. My Statement of Qualifications, which outlines my professional experience, publications, and record of expert testimony, is attached hereto as Exhibit 1. This includes a list of all cases in which, during the previous four years, I have testified as an expert at trial or by deposition. Prior to joining ETI, I worked at Stop and Shop Supermarkets for a period of seven years, working as a cash department head, grocery/receiving clerk, and price-file maintenance head.

2.     Contained in Exhibit 1 is a list of numerous litigations in which I have participated in the design, execution and/or determination of the economic suitability of conjoint surveys, or have been found by the court to have expertise in conjoint analysis. These cases include, but are not limited to *Jones v. Nutiva (false advertising of coconut oil); Hunter v. Nature's Way (false advertising of coconut oil); Looper v. FCA; Sanchez-Knutson v. Ford Motor Company; Belfiore*



Declaration of Colin B. Weir
July 22, 2019
Page 2 of 21

*v. Procter and Gamble; Kurtz v. Kimberly Clark; In re Scotts EZ Seed Litigation; In re:*
*ConAgra Foods (false advertising of cooking oil); In re: Arris Cable Modem; Hadley vs. Kellogg*
*(false advertising of health of breakfast cereal); and Martinelli v. Johnson & Johnson (false*
*advertising of health of butter substitute).*

3.      I received graduate level training in conjoint analysis as part of my MBA.  I take
continuing education in advanced conjoint design, execution, and analysis through Sawtooth
Software, a leading provider of conjoint analysis software.

## II. ENGAGEMENT

4.      I provide this declaration in connection with the case filed by Collin Shanks on
behalf of similar-situated consumers ("Plaintiffs") in the above-captioned action against Jarrow
Formulas, Inc. ("Defendant").  I make this declaration based upon my own personal knowledge
and, if called as a witness in this action, I would be able to competently testify as to the facts and
opinions set forth herein.

5.      I have been advised by Counsel for Plaintiffs that individuals purchased certain
Jarrow Formula Coconut Oil Products[1] that were labeled with various Health Claims ("the
Claims").[2]  I have been further advised that Plaintiffs allege that these Claims are false and
misleading to reasonable consumers and therefore should not have been made.  I have been
asked by Counsel for Plaintiffs to ascertain whether it would be possible to determine damages
on a class-wide basis using common evidence, and if so, to provide a framework for the
calculation of damages suffered by the proposed class of consumers as a result of the allegedly
false and misleading Claims.

---

[1] The Jarrow Formula products challenged in this lawsuit by the Plaintiffs include at least the following: (a) Organic
Extra Virgin Coconut Oil, and (b) Coconut Oil, of various sizes.

[2] *See, generally,* the Complaint, filed November 6, 2018 ("Complaint").  I understand the following statements are
being challenged in this litigation: 1) "Source of Medium Chain Triglycerides;" 2) "No Trans Fatty Acids (TFAs);"
3) "No Hydrogenation;" 4) "Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-
12) and caprylic acid (C-8)," ("the Health Claims").



Declaration of Colin B. Weir
July 22, 2019
Page 3 of 21

6.    ETI is being compensated at the rate of $695 per hour for my work on this case.  The opinions expressed in this declaration are my own, and my compensation is not dependent upon the substance of these opinions or the outcome of the litigation.

7.    The documents, data and other materials that I relied upon in forming my opinions are identified throughout my report and in Exhibit 2, attached hereto.  In addition, I have relied upon my educational background and more than 15 years of experience.

### III.  THE ALLEGED MISREPRESENTATION

8.    Plaintiffs' allegations center on Defendant's labeling of its Products with various Health Claims.  Plaintiffs allege that these Claims are misleading, deceptive and/or unlawful, and therefore should not have been made.

**Product Differentiation**

9.    In economics, the concept of product differentiation can be summarized as the introduction of product attributes that allows the consumer to differentiate between otherwise similar products, with the goal of increasing sales and profits.[3]

10.    Defendant appears to understand the concept of product differentiation.  Defendant also appears to understand that the Health Claims are a product attribute that will differentiate their Products from competitors, allowing Defendant to charge a premium for this attribute and derive higher revenues and profits therefrom.

11.    Jarrow Manager of Research and Development and Manager of Technical Compliance and Support (including regulatory), and corporate representative John O'Connor

---

[3] Case, Fair & Oster, Principles of Microeconomics, 9th Edition, 2009, at 305-316, 449.  Product differentiation can still have an impact in the marketplace when competitors use similar claims.  A product that does not offer salient features or attributes that competitors do offer becomes "negatively differentiated," which can result in corresponding price decreases and presents the incentive offer the attribute to eliminate such negative differentiation.

Declaration of Colin B. Weir
July 22, 2019
Page 4 of 21

testified that Jarrow uses labeling claims to differentiate its products.  "Q.  Why was that statement placed on the label?  A.  To differentiate from the other products that we sell."[4]

12.  O'Connor further testified that Jarrow is "a product that is purchased by health food store shoppers."[5]  "Our -- we have a very specific clientele. They're health food store shoppers."[6]

13.  O'Connor acknowledged that, unsurprisingly, health food store shoppers are more concerned with health.

> Q. What is specific about health food store shoppers?
>
> A. Well, health food store shoppers are more educated. They tend to read more about dietary supplements and the kind of items that are sold in health food stores. Often people who go to Whole Foods aren't the same shoppers who shop at Ralphs or some of the other major markets.
>
> Q. And are they more focused on health?
>
> A. I certainly -- I imagine some are.
>
> They want -- they want full disclosure. That's really what they -- they want. I remember -- you know, going back many years, they wanted full disclosure even before a lot of -- you know, going back to the 1980s, I remember they wanted full disclosure on labels.[7]

14.  O'Connor also testified that consumers clamor for products that contain MCT (Medium Chain Triglycerides, which I understand are a type of fatty acid present in coconut oil) -- including Jarrow.  "Oh, I know that people seek products that contain MCTs.  They've called and asked for products -- not only do they call for our coconut oil, they call for MCT oil."[8]

---

[4] Deposition of John O'Connor, July 17, 2019, at 80.

[5] *Id.,* at 52.

[6] *Id.*, at 87.

[7] *Id.*, at 87-88.

[8] *Id.*, at 53-54.



ECONOMICS AND
TECHNOLOGY, INC.

Declaration of Colin B. Weir
July 22, 2019
Page 5 of 21

Q.  Okay. All right. Looking further down, it says "source of medium chain triglycerides." Do you see that?

A. Yeah.

Q. Why was that statement placed on the label?

A. Well, because we know that consumers are looking for medium chain triglycerides.[9]

15.   Mr. O'Connor made similar admissions about the use of "No Trans Fats" Claims.

Q Okay. What about the claim, "no trans-fatty acids." Why was that placed on the label?

A. Well, because that's been in the news for several years now. There's been cities, you know, like New York City banned trans fats, so it's just -- it's just something consumers, you know, asked, you know, does this product contain trans fat? So we just try to put -- be descriptive of what the product has or doesn't have.

Q. So consumers care whether or not a product has trans fat?

A.  Well, I imagine some do.[10]

16.   O'Connor acknowledged that consumers call Jarrow to confirm that the product contains no trans fats.[11]

17.   Similarly, O'Connor acknowledged that the "no hydrogenation" was used because consumers were "worried about hydrogenation" and that consumers were calling in to address these concerns.[12]

---

[9] *Id*., at 81.

[10] *Id*., at 82-83.

[11] *Id*.

[12] *Id*., at 85.



Declaration of Colin B. Weir
July 22, 2019
Page 6 of 21

18.  Finally, O'Connor agrees that he would not consider a product that increases risk of cardiovascular disease to be healthy.

> Q. Okay. Would you consider a product that increases your risk of cardiovascular disease to be healthy?
>
> A. Would I consider a product that increases the risk of cardiovascular disease to be health -- healthy? No.
>
> Q. Why not?
>
> A. Because it increases your risk of cardiovascular disease.[13]

19.  In addition, Jarrow publishes Quick Reference Guides about the Products.  These guides clearly seek to differentiate the Products -- one section is entitled "What Distinguishes this Product?"  These documents highlight the Products as being a source of MCTs and as being non-hydrogenized.[14]

20.  Defendant appears to understand that these Claims constitutes a product attribute that will differentiate the Products from competitors, allowing Defendant to charge a premium for this attribute and derive higher revenues and profits therefrom.

## IV.  FRAMEWORK FOR DAMAGES

21.  As a threshold matter, it is my opinion that it is possible to determine class-wide damages in this case using Defendant's own available business records, third-party records, and industry resources.

22.  Below, I propose the use of conjoint analysis to calculate Price Premium Damages (wherein consumers would receive the value of the price premium they paid solely as a result of

---

[13] Id., at 166.

[14] JFI_00008081-8088.



Declaration of Colin B. Weir
July 22, 2019
Page 7 of 21

Defendant's conduct of labeling their Products with the Claims). This methodology can determine the damages for any given claim or set of claims, across any prescribed time period, and across geographic regions, given any of the possible liability scenarios that may arise in this litigation.

## V.  CALCULATION OF THE PRICE PREMIUM:
### CONJOINT ANALYSIS

23.  In this litigation, price premium damages for the Class are the portion of the market price of the Products solely attributable to Defendant's misrepresentations.

24.  Conjoint analysis is a representative survey technique that permits an economist to analyze the value of various product attributes.[15]  Conjoint analysis can be used to determine market valuation/attribute information for a given product or attribute.  Conjoint analysis is founded on rigorous statistical and economic principles, and is not required to be used as part of a traditional marketing program.[16]  Indeed, conjoint analysis has been used in litigation contexts to calculate damages for years.[17]

---

[15] Conjoint analysis as a discipline is quite broad, and can be used to facilitate many other sorts of research beyond the specific application that I discuss here.

[16] *See, e.g.,* Sawtooth Software technical papers, available online at http://www.sawtoothsoftware.com/support/technical-papers; *When "All Natural" May Not Be*, Analysis Group Forum (Winter 2013) http://www.analysisgroup.com/forums/winter-2013/when-all-natural-may-not-be/ (last accessed August 1, 2016).

[17] *Applying Conjoint Analysis to Legal Disputes: A Case Study*, Wind, Yoram, *et al.*; *See, e.g., Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10 (D. Minn. March 13, 2014); *Sanchez-Knutson v. Ford Motor Company*, 310 F.R.D. 529, 538-39 (S.D. Fl. 2015); *In re: Lenovo Adware Litigation*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Guido v. L'Oreal, USA, Inc.*, 2014 WL 6603730, at *5, *10-*14 (C.D. Cal. July 24, 2014); *Brown v. Hain Celestial Group, Inc.*, 2014 WL 6483216, at *19 (N.D. Cal. Nov. 18, 2014); *Microsoft v. Motorola, Inc.*, 904 F.Supp.2d 1109, 1119-20 (W.D. Wa. 2012); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015); *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1022 & n.6 (N.D. Cal. 2013); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 2018 WL 3126385 (N.D. Cal. June 26, 2018); *In Re Arris Cable Modem Consumer Litig.*, 2018 WL 3820619, at *25-*31 (N.D. Cal. Aug. 10, 2018); *Hadley v. Kellogg Sales Co.*, 2018 WL 3954587, at *11-*16 (N.D. Cal. Aug. 17, 2018); *Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at *3-4 (E.D. Cal. Mar. 29, 2019).



Declaration of Colin B. Weir
July 22, 2019
Page 8 of 21

25. It is well known that conjoint analysis has a long history of use in the consumer goods industry.[18]

26. In a typical conjoint analysis, survey panelists are confronted with various choices of product attributes, prices, and other alternatives, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof.

27. Through conjoint analysis, by systematically varying the attributes of the product and observing how respondents react to the resulting product profiles, one can statistically gather information about a product's various attributes.

28. Statistical methods (including regression analysis) are then applied to the survey responses to calculate attribute value.[19]

29. Conjoint analysis has a long history of use in industry and is widely accepted and relied upon by enterprises such as Procter & Gamble, Microsoft, General Motors, Ford, and Google.[20] Conjoint is also widely respected by academics and is a regular part of the curriculum at universities world-wide, such as Duke, Ohio State, Northeastern, the University of South Australia, NYU, and the University of California.

30. Conjoint analysis can, and indeed has, been used to analyze the value and importance of product claims, such as the health Claims. One recent study used conjoint analysis to determine "whether health claims (claims of health-promoting effects) of food products positively influence product price and consumer choices."[21] Prior to conducting the conjoint survey, the study finds that "[i]n general, consumers consider health and wholesomeness

---

[18] *Getting Started with Conjoint*, Bryan Orme, 2014, at 144.

[19] *See, e.g.*, *Getting Started With Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Research Publishers 2014 ("Getting Started With Conjoint").

[20] *Id.*

[21] *Estimating Consumers' Willingness to Pay for Health Food Claims: A Conjoint Analysis*, Mitsunori Hirogaki, International Journal of Innovation, Management and Technology, Vol. 4, No. 6, December 2013.



Declaration of Colin B. Weir
July 22, 2019
Page 9 of 21

as important aspects of food quality." The study then uses choice-based conjoint analysis to measure the effects of various product attributes on the price of a single product, green tea. The study examines only four product attributes: health claim, country of origin, the size of the product, and price. The study finds that the health claim on green tea is a positive, statistically significant purchase driver, and results in a price premium of approximately 20%.

31. In light of proposed FDA standardized front-of-pack nutrition labeling standards, another study sought "to estimate the relative contribution of declared amounts of different nutrients to the perception of the overall 'healthfulness' of foods by the consumer."[22] The study determined that claims such as "this product has no saturated fat," "this product is fat free," and "this product is low in total fat" were among the 22 most important nutrient content claims. The study concludes that "Conjoint analysis can lead to a better understanding of how consumers process information about the full nutrition profile of a product, and is a powerful tool for the testing of nutrient content claims."

32. An application of conjoint analysis to orange juice was used to evaluate which attributes of orange juice consumers value most. Results of the study showed that vitamin C content was the most important purchase driver besides price.[23]

33. The use of conjoint analysis in similar applications is too extensive to document exhaustively here.

34. Conjoint analysis, as a survey tool, does not rely on an existing data set for its analysis because it relies on data generated through the survey process. Common conjoint analysis software would permit the administration of a representative sample survey, and the analysis of the results therefrom.

---

[22] *Testing Consumer Perception of Nutrient Content Claims Using Conjoint Analysis*, Drewnowski, Adam *et al.*, Public Health Nutrition: 13(5), 688–694.

[23] *Evaluation of Packing Attributes of Orange Juice on Consumers' Intention to Purchase by Conjoint Analysis and Consumer Attitudes Expectation*, Gadioli, I. L. et al., Journal of Sensory Studies 28 (2013):57-65.



Declaration of Colin B. Weir
July 22, 2019
Page 10 of 21

35.  No individualized analyses, or Class-Member-specific inquiry will be required.  All relevant data needed to complete the conjoint analysis will be Class-wide, common evidence.

**Price Premium: The Dennis Conjoint Survey**

36.  I have been provided with, and have reviewed, a copy of the Declaration and Expert Report of J. Michael Dennis, Ph.D. dated July 22, 2019 ("Dennis Declaration").  Dr. Dennis is Senior Vice President at NORC in Chicago, IL and is a recognized expert in the design and implementation of online consumer statistical surveys with more than 20 years experience conducting such surveys at leading institutions.[24]

37.  I worked with Dr. Dennis to develop parts of the survey.

38.  Among other things, the Dennis Report discusses the process by which Dr. Dennis designed a preliminary conjoint analysis and market simulation of Jarrow Products with the Claims ("Dennis Survey").

39.  Dennis proposes to measure the price premium (measured in percentage terms) at the time and point of sale solely attributable to the Claims through the use of a Label Claims attribute and price along with several distractor attributes.[25]  Dennis' survey includes market-based price points derived from actual retail pricing data, which I have also reviewed.[26]  Dennis has also taken into account the fact that the number of Jarrow Products sold is a known fact, and is fixed as a matter of history.[27]

40.  In addition to these factors that influenced Dennis' survey design, after the completion of the survey, the results will be calculated using Hierarchical Bayes regression.[28]

---

[24] Dennis Declaration at paras 14-26.

[25] *Id*., at paras 77-80.

[26] *Id*., at paras 80-85.

[27] *Id*., at paras 63.

[28] *Id*., at para. 94.

Declaration of Colin B. Weir
July 22, 2019
Page 11 of 21

The use of Hierarchical Bayes regression provides for, among other factors, the ability to estimate better market-level results from a conjoint survey and market simulator.

41.  After reviewing the Dennis Report, the methodology underlying Dennis' conjoint survey, and the documentary evidence relied upon by Dennis and incorporated into the survey design, it is my opinion that Dennis' conjoint survey is properly designed to measure the price premium paid due solely to the presence of the Claims on the Products.  The survey is especially economically suitable given Dennis' use of market based prices, and considerations given as to the fixed quantity of Jarrow Products sold that are part of the Class definition.

42.  The survey sample will include at least 1,000 completed responses to the survey.[29] The sample will be drawn in such a manner that the results of the survey will be projectable to the class, and the results of the survey will provide a reliable and accurate measurement of the market price premium solely attributable to the challenged Claims used by Defendant on their Jarrow Products.[30]

43.  As discussed below, the results of this survey may be used as an input in my Price Premium Damages calculation.

44.  I have relied on conjoint surveys, and the work of Dr. Dennis, to determine damages in other litigations.[31]

**Supply-Side Considerations**

45.  I understand that Dr. Dennis considered and accounted for supply-side factors in the determination of his price premium survey design.[32]

---

[29] *Id*., at para 86.

[30] *Id*., at paras 34, 100, and 102.

[31] *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413-15 (S.D.N.Y. 2015);  *Dzielak v. Maytag*, 2017 WL 1034197, at *6 (D. NJ. March 17, 2017); *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017); *Dei Rossi v. Whirlpool Corp.*, No. 2:12-cv-00125-TLN-CKD, 2015 U.S. Dist. LEXIS 55574 (E.D. Cal. Apr. 27, 2015); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 2018 WL 3126385 (N.D. Cal. June 26, 2018).



Declaration of Colin B. Weir
July 22, 2019
Page 12 of 21

46.  I have also considered supply-side factors in my determination of a framework for damages.  First, unlike in a Lanham Act or intellectual property litigation where a but-for quantity of sales may need to be determined, in this litigation, the historic number of units sold is a fact and, in this litigation, it would be antithetical to the concept of class definition to suggest that the quantity supplied be anything other than the actual number of units sold by Defendant.

47.  Furthermore, if one were to assume, *arguendo*, that Defendant would not have lowered its price in concert with demand (indicating that Defendant priced above the market clearing price), then the economic outcome would be that many or all of the purchases would not have take place at all.  As such, the price premium to be developed by Dr. Dennis will be inherently conservative measures.

48.  It is also an economic perversion for a defendant engaged in a litigation (with an obvious conflict of interest) to simply state that it would never have adjusted its prices or would not have adjusted them enough so as to meet demand, and therefore damages should be set at zero or something less than actual economic damages.  If that were permitted, any defendant could simply postulate its way out of economic damages.

49.  I worked closely with Dr. Dennis to ensure that his survey was appropriately designed to measure the true market value of the price premium attributable to the Claims.

50.  Dr. Dennis and I had several discussions concerning the design of his survey where I provided input based upon economic concepts, and real-world retail sales and market data.  We also had several discussions concerning the results of his survey and how they should be interpreted and applied.

51.  One of the most important and most frequent topics of discussion between Dr. Dennis and myself was the data on actual sales of the Products in the real-world marketplace.  These real-world transactions occurred at prices that *already* reflect the supply-side factors then

---

[32] Dennis Declaration, at paras 63-64, and 80-85.

Declaration of Colin B. Weir
July 22, 2019
Page 13 of 21

extant in the marketplace. I understand that Dr. Dennis relied upon these historical data in

setting the prices to be used in his conjoint survey. We also discussed that variability in pricing

both at the wholesale and retail level showed that Defendant's and retailers' pricing was

responsive to changing market forces.

52. Another important supply-side factor that Dr. Dennis and I discussed was the fact

that the quantity of the Products supplied is a known quantity, and fixed as a matter of history.

53. We discussed that Defendant does not control the retail price paid by consumers.

54. Another important supply-side factor that Dr. Dennis and I discussed was the fact

that, as I discuss below, the market for the Products was an "ordinary" market, subject to

competitive pressures that both Defendant and retailers identified as risks to their business.

55. Many major grocery retailers identify a willingness to adjust prices in response to

changing economic conditions and consumer preferences.


- Kroger:

  **COMPETITIVE ENVIRONMENT**

  The operating environment for the food retailing industry continues to be
  characterized by intense price competition, aggressive expansion, increasing
  fragmentation of retail and online formats, entry of non-traditional competitors
  and market consolidation. We have developed a strategic plan that we believe
  provides a balanced approach that will enable us to meet the wide-ranging
  needs and expectations of our customers in this challenging economic
  environment. However, the nature and extent to which our competitors
  implement various pricing and promotional activities in response to increasing
  competition, including our execution of our strategic plan, and our response to
  these competitive actions, can adversely affect our profitability. Our
  profitability and growth have been, and could continue to be, adversely
  affected by changes in the overall economic environment that affect consumer
  spending, including discretionary spending.[33]

---

[33] The Kroger Co. 2016 10-K Annual Report filed with the US Securities and Exchange Commission.



- Publix:

  ***Increased competition and low profit margins could adversely affect the Company.***

  The retail food industry in which the Company operates is highly competitive with low profit margins. The Company's competitors include national and regional supermarket chains, independent supermarkets, supercenters, membership warehouse clubs, mass merchandisers, dollar stores, drug stores, specialty food stores, restaurants, convenience stores and online retailers. The Company's ability to attract and retain customers is based primarily on quality of goods and service, price, convenience, product mix and store location.

  As a result of the highly competitive environment, traditional supermarkets, including the Company, face business challenges. There has been a trend in recent years for traditional supermarkets to lose market share to nontraditional competitors. The Company's ability to retain its customers depends on its ability to meet the business challenges created by this highly competitive environment. There can be no assurance that the Company will be able to meet these challenges. In addition, the Company believes it will face increased competition in the future from existing and potentially new competitors and its financial condition and results of operations could be impacted by the pricing, purchasing, advertising or promotional decisions made by its competitors as well as competitor format innovation and location additions.[34]

- Safeway:

  ***Competitive Industry Conditions***

  We face strong competition from traditional grocery retailers, non-traditional competitors such as supercenters and club stores, as well as from specialty and niche supermarkets, drug stores, dollar stores, convenience stores and restaurants. Increased competition may have an adverse effect on profitability as the result of lower sales, lower gross profits and/or greater operating costs.

  Our ability to attract customers is dependent, in large part, upon a combination of location, quality, price, service, selection and condition of assets. In each of these areas, traditional and non-traditional competitors compete with us and may successfully attract our customers to their stores by aggressively matching or exceeding what we offer. In recent years, many of our competitors have increased their presence in our markets. Our responses to competitive pressure, such as additional promotions and increased advertising, could

---

[34] Publix Super Markets, Inc. 2016 10-K Annual Report filed with the US Securities and Exchange Commission.

Declaration of Colin B. Weir
July 22, 2019
Page 15 of 21

adversely affect our profitability.  We cannot guarantee that our actions will succeed in gaining or maintaining market share.  Additionally, we cannot predict how our customers will react to the entrance of certain non-traditional competitors into the grocery retailing business.

Because we face intense competition, we need to anticipate and respond to changing consumer demands more effectively than our competitors.  We strive to achieve and maintain favorable recognition of our unique private-label brands, effectively market our products to consumers, competitively price our products and maintain and enhance a perception of value for consumers.  Finally, we need to source and market our merchandise efficiently and creatively.  Failure to accomplish these objectives could impair our ability to compete successfully and adversely affect our growth and profitability.[35]

- SuperValu:

**Competition**

Wholesale and Retail each operate in a highly competitive environment.

Wholesale competes directly with a number of traditional and specialty grocery wholesalers and retailers that maintain or develop self-distribution systems.  Supervalu believes it competes in this business on the basis of price, quality, assortment, schedule and reliability of deliveries and services, service fees and distribution facility locations.

Principal competition for Supervalu's Retail segment comes from traditional grocery retailers, including regional and national chains and independent grocery store operators, and non-traditional retailers, such as supercenters, membership warehouse clubs, specialty supermarkets, hard discount stores, dollar stores, online retailers, convenience stores, drug stores and restaurants.  Supervalu's ability to differentiate itself from its competitors and create an attractive value proposition for its customers is dependent upon a combination of price, quality, customer service, convenience, e-commerce offerings, assortment, in-stock levels, brand perception, store location and conditions, in-store marketing and merchandising and promotional strategies.

Supervalu believes that the success of its Wholesale and Retail segments is dependent upon the ability of its own stores, as well as the stores of wholesale customers it supplies, to compete successfully.  Supervalu also competes to attract and maintain licensed and franchised operators to operate stores to which it provides wholesale distribution and services. This competition

---

[35] Safeway Inc. 2015 10-K Annual Report filed with the US Securities and Exchange Commission.



Declaration of Colin B. Weir
July 22, 2019
Page 16 of 21

generally takes the form of alternative investment formats, such as a potential or existing licensee's investment in fast food restaurants, dollar stores, specialty supermarkets, drug stores and other potential investments.

Recent and ongoing consolidation within the grocery industry has resulted in, and is expected to continue to result in, increased competition, including from some competitors that have greater financial, marketing and other resources than Supervalu.[...]

**Supervalu faces intense competition.**

The grocery business is intensely competitive, and the recent and ongoing consolidation within the grocery industry is expected to result in increased competition, including from some competitors that have greater financial, marketing and other resources than Supervalu. The grocery industry is characterized by relatively small operating margins, and as competition in certain areas intensifies and as the industry continues to consolidate, Supervalu's results of operations may be negatively impacted through a loss of sales and reductions in gross margins. See "Business—Competition" for a discussion of the competitive environment.

If Supervalu is unable to appropriately respond to competition and execute on its initiatives to improve the competitive position or profitability of Supervalu, and differentiate Supervalu's offerings, Supervalu's sales, financial condition and results of operations may be adversely affected.[...]

**Competitive Environment**

The United States grocery business is highly competitive and management expects operating results will continue to be impacted by the effects of operating in a highly competitive and price-sensitive marketplace. In fiscal 2017, Supervalu's Retail segment was impacted to a greater degree than anticipated by price competition, competitive store openings and a challenging sales and operating environment. This environment contributed to lower sales from identical retail stores, which impacted gross profit and operating earnings. These factors affecting the Retail segment are expected to impact fiscal 2018 as well.[36]

- Ahold Delhaize (Stop & Shop):

  **Competitive environment and economic conditions (S)**

---

[36] SuperValu Inc. 2016 10-K Annual Report filed with the US Securities and Exchange Commission.



Declaration of Colin B. Weir
July 22, 2019
Page 17 of 21

Changes to the competitive landscape and a weak macroeconomic climate without appropriate response could threaten Ahold Delhaize's ability to achieve its strategic objectives

Key risk Drivers

• Consumer value perception (price, assortment, quality)

• Changing customer behavior (e.g., online shopping) and competition

• Lack of distinctiveness

• Consumer purchasing power under pressure

• Inflationary forces impacting cost of goods sold

• Pressure on margin[37]

• Walmart

*We face strong competition from other retailers and wholesale club operators (whether through physical retail, digital retail or the integration of both), which could materially adversely affect our financial performance.*

The retail business is highly competitive. Each of our segments competes for customers, employees, store and club sites, products and services and in other important aspects of its business with many other local, regional, national and global retailers and wholesale club operators, as well as other national and international internet-based retailers and retail intermediaries.

Where necessary, to compete effectively with competitors who price merchandise at points lower than the prices we set under our EDLP philosophy, we will lower our prices on goods for sale. A failure to respond effectively to competitive pressures and changes in the retail markets could materially adversely affect our financial performance.[38]

56.   In addition to these factors that influenced Dr. Dennis' survey design, after the completion of the survey, the results were calculated using Hierarchical Bayes regression.[39]  The

---

[37] Ahold Delhaize Annual Report 2016.

[38] Wal-mart Stores, Inc., 2016 10-K Annual Report filed with the US Securities and Exchange Commission.

[39] Dennis Declaration, at para. 94.



ECONOMICS AND
TECHNOLOGY, INC.
EXHIBIT K
Page 402

Declaration of Colin B. Weir
July 22, 2019
Page 18 of 21

use of Hierarchical Bayes regression provides for, amongst other factors, the ability to estimate better market-level results from a conjoint survey and market simulator.

57.   The proper use of supply-side factors, individually or in combination, as I have discussed above, permits the Dennis Survey to estimate a marketplace outcome -- the price premium that prevailed due to Defendant's use of the challenged Claims.

## VI.  TOTAL SALES OF THE PRODUCTS

58.   I have been provided with myriad sales data, as described below.[40]

59.   I have been provided with Jarrow's internal sales records and retail sales estimates.[41]

60.   I have also been provided with retail sales of the Products from IRI for the period October 2014 through June 2019.  This data includes dollar and unit sales measures for the some of the Jarrow Products both nationwide and for the state of California.

61.   For purposes of illustration, I have been asked to accept Jarrow's internal estimates of retail sales.  However, there is evidence that Jarrow's estimates of retail sales are too low.  For example, the Jarrow data estimates an average retail price for 16 ounce Jarrow Extra Virgin in 2018 to be ███.  But that same product is for sale on Jarrow's own website for $12.95.[42]  There are numerous similar examples.[43]

62.   I have summarized the unit and dollar sales of the Products below in Table 1.

---

[40] I have also been informed by Counsel for Plaintiffs that they are in the process of issuing additional subpoenas to obtain additional retail sales data.  I would anticipate supplementing my opinions if such additional data so warrants.

[41] JFI_00008029; Lipsky Deposition, Exhibits 18-19.

[42] https://jarrowonline.com/products/coconut-oil-extra-virgin-16-fl-oz-473-ml-liquid (last accessed July 20, 2019).

[43] For example, the IRI data shows the average nationwide price of the 16 ounce regular products to be ███ compared to Jarrow's 2018 estimate of ███.  GNC is currently selling the 16 ounce extra virgin product for $14.99 as compared with Jarrow's 2018 estimate of ███.  Amazon's price for the same product is $12.11, and $8.87 for the regular product.  *See*, jarrowonline.com; amazon.com; gnc.com; google.com; IRI Data.



Declaration of Colin B. Weir
July 22, 2019
Page 19 of 21

| TABLE 1. Sales Data Summary November 2014 - October 2018[44] | | | |
|---|---|---|---|
| Product | Units | Dollar Sales | Average Price |
| **California** | | | |
| Coconut Oil 16oz | ■ | ■ | ■ |
| Coconut Oil 32oz | ■ | ■ | ■ |
| Extra Virgin Coconut Oil 16oz | ■ | ■ | ■ |
| Extra Virgin Coconut Oil 32oz | ■ | ■ | ■ |
| California Total | ■ | ■ | ■ |
| **Nationwide** | | | |
| Coconut Oil 16oz | ■ | ■ | ■ |
| Coconut Oil 32oz | ■ | ■ | ■ |
| Extra Virgin Coconut Oil 16oz | ■ | ■ | ■ |
| Extra Virgin Coconut Oil 32oz | ■ | ■ | ■ |
| Nationwide Total | ■ | ■ | ■ |
| Source: Jarrow Internal Estimates; census.gov[45] | | | |

_____

[The remainder of this page is intentionally left blank]

---

[44] Counsel for Plaintiffs has asked me to assume this date range for the class period. My analysis can be updated to reflect any time period certified by the Court.

[45] California data has been estimated using data from census.gov. I can estimate sales using other statistical metrics reported by the U.S. Bureau of Economic Analysis (e.g., Real GDP, or Personal Consumption Expenditures on Nondurable Goods).



Declaration of Colin B. Weir
July 22, 2019
Page 20 of 21

## VII.  CALCULATION OF PRICE PREMIUM

## DAMAGES

63.  This litigation calls for a Price Premium damages calculation:

- Price Premium Damages -- wherein consumers would receive the difference between the market value (purchase price) of the Products (with the Claims) and the market value of the Products (without the Claims), at the time and point of sale

**Price Premium Damages**

64.  After completing all of the work as discussed above, the final calculation of total price premium damages in this litigation will be as follows.

65.  With the price difference due to the Claim determined on a percentage basis, the calculation of class-wide damages for any Product will be:

$$\%Price\ Premium\ Factor: Claim \times \$Units\ Sold\ = Damages$$

66.  This calculation can be performed on a class-wide basis, Nationwide or across different geographies, and for any defined time period, including the proposed Class Period(s) in this litigation.

## VIII.  RESERVATION OF RIGHTS

67.  My testimony is based upon the information and data presently available to me. Additional, different and/or updated data including market research data may be obtained in advance of trial.  I therefore reserve the right to amend or modify my testimony.



Declaration of Colin B. Weir
July 22, 2019
Page 21 of 21

VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief, and that this declaration was executed at Boston,

Massachusetts, this 22nd day of July, 2019.

Colin B. Weir

# EXHIBIT L

EXHIBIT L
Page 407

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICHAEL TESTONE, COLLIN SHANKS, and LAMARTINE PIERRE, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>BARLEAN'S ORGANIC OILS, LLC<br><br>Defendant. | Case No. 19-cv-0169-JLS-BGS |

# EXPERT REPORT OF
# STEPHANIE PLANCICH, PH.D.

**22 APRIL 2021**

EXHIBIT L
Page 408

# Table of Contents

I.    Summary of Assignment and Opinion.............................................................1

II.   Qualifications and Materials Relied Upon ....................................................4

III.  Background ......................................................................................................4

IV.   Mr. Weir's Proposed Use of Results from a Conjoint Survey Will Not and Cannot
      Measure Any Alleged "Price Premium" or Class-Wide Damages.............................6

      A.   Market Prices Are Determined by Supply and Demand, but a Conjoint Survey Looks Only at
           Consumer Preferences ..........................................................................................7

      B.   A Positive Willingness to Pay for an Attribute Often Does Not Translate into a Price Premium
           ...............................................................................................................................9

      C.   Flaws with Dr. Dennis' Proposed Conjoint Survey ...........................................10

V.    There Is No Market Evidence of Any Price Premium Associated with the Challenged
      Claims ..............................................................................................................12

      A.   Barlean's Does Not Consider the Challenged Claims When Setting Wholesale Prices .......12

      B.   Mr. Weir Incorrectly Asserts that Barlean's Used the Challenged Claims to Differentiate Its
           Coconut Oil Products ...........................................................................................13

      C.   Mr. Weir Does No Analysis of the Drivers of Barlean's Sales or Wholesale Prices and Has
           Minimal Retail Price Data ...................................................................................15

      D.   Consumer Survey Indicates Customers Do Not Purchase Based on the Challenged Claims18

VI.   Conclusion ......................................................................................................20

EXHIBIT L
Page 409

# I.    Summary of Assignment and Opinion

1.      In connection with the above-captioned matter, I was asked by counsel for Barlean's Organic Oils, LLC ("Barlean's" or "the Company") to review and evaluate the Declaration of Colin Weir (the "Weir Declaration").[1]  Mr. Weir asserts that he can estimate class-wide "price premium" damages to purchasers of Barlean's Coconut Oil products over any class period due to the presence of certain "Challenged Claims" on the product labels.[2]  I was asked to opine on whether Mr. Weir's proposed formulaic use of purported "price premium" results from a conjoint survey described in the Declaration and Expert Report of J. Michael Dennis (the "Dennis Report"), in combination with Barlean's product sales, will yield a reliable estimate either of the aggregate damages owed to the putative class of purchasers of Barlean's Coconut Oil products or to any individual class member.[3]

2.      On the basis of my review of documents and data in this case, as well as my education and experience, I conclude that Mr. Weir's proposed methodology cannot measure any alleged price premium or class-wide damages for the following reasons:

a)    The methodology proposed by Mr. Weir cannot measure the market price impact of the Challenged Claims on the prices of the Barlean's Coconut Oil products.  Conjoint surveys are designed to capture consumers' relative valuations of various product attributes. Standalone results from such a survey cannot be used to determine whether the inclusion or removal of any attribute (such as the presence of the Challenged Claims on the label) would have an impact on market price.

b)    Directly contradicting an assertion made and relied on by Mr. Weir, testimony indicates that wholesale prices of Barlean's Coconut Oil products were not based on any of the

---

[1] Declaration of Colin B. Weir, March 1, 2021.

[2] Weir Declaration, ¶¶59-61. *See*, ¶197 of First Amended Complaint, *Michael Testone, Collin Shanks, and Lamartine Pierre v. Barlean's Organic Oils, LLC*, United States District Court of Southern District of California, Case No. 19-cv-0169-JLS-BGS, September 3, 2019 ("First Amended Complaint"), for Challenged Claims; Barlean's Coconut Oil products include:  Barlean's Organic Virgin Coconut Oil, Barlean's Organic Culinary Coconut Oil, and Barlean's Butter Flavored Coconut Oil ("Barlean's Coconut Oil" or "Barlean's Coconut Oil products").

[3] Declaration and Expert Report of J. Michael Dennis, Ph.D., March 1, 2021.

EXHIBIT L
Page 410

Challenged Claims on the label.  Instead, the Company set wholesale prices as a function of input costs, margin targets, customer characteristics, and customer relationships with the Company.[4]  Relative to competitors, the Company believes its products to be differentiated because of Barlean's company brand, not any specific product claim.[5]  While consumers pay retail rather than wholesale prices, no evidence has been offered to demonstrate that a premium for the Challenged Claims was added at the retail level.  Indeed, Mr. Weir has done no analysis of the retail market for Barlean's Coconut Oil products or generated any evidence of a "price premium" associated with the Challenged Claims at the retail level.

c)  Mr. Weir proposes to copy the estimated "price premium" from Dr. Dennis' survey and paste it into a damages formula, multiplying it by Barlean's Coconut Oil sales.[6]  Dr. Dennis has not yet conducted a conjoint survey of the specific claims challenged in this matter or for the Barlean's Coconut Oil products at issue in this case.  As such, it is not possible to evaluate whether his methodology will generate results consistent with marketplace realities.  Best practices in estimation require that the results of the analysis are benchmarked against available real-world data; because neither Mr. Weir nor Dr. Dennis have conducted a conjoint survey, it is not possible to conduct such benchmarking here.[7]

d)  I also understand from the Expert Report of Sarah Butler (the "Butler Report") that the potential survey method put forward by Dr. Dennis is based on flawed assumptions and would not provide a reliable estimate of the extent to which consumers were misled by the

---

[4] Deposition of John Puckett, December 19, 2019 ("Puckett Deposition"), pp. 56, 67-68. 74.

[5] Puckett Deposition, p. 86.

[6] Weir Declaration, ¶60.

[7] *See, e.g.*, *Best Practices in Quantitative Methods,* edited by Jason Osborne, Sage Publications, 2008 and *Reference Manual on Scientific Evidence,* Reference Guide on Statistics, David H. Kaye and David A. Freedman, Third Edition, 2011.  *See also, Doing Survey Research: A Guide to Quantitative Methods*, Peter M. Nardi, Second Edition, Pearson, 2006.

EXHIBIT L
Page 411

Barlean's label or relied upon the Challenged Claims when making purchase decisions.[8] Dr. Dennis' proposed model fails to incorporate other sources of information or perceptions that consumers have about coconut oil that are unrelated to the label. His model also fails to replicate the actual marketplace conditions under which consumers would evaluate Barlean's Coconut Oil products. Consequently, should Mr. Weir plug these "price premiums" into his calculation of alleged damages, his results will also be flawed and unreliable.

e) Finally, not only have Plaintiffs failed to provide any market evidence of a connection between the Challenged Claims and price, but the consumer survey presented in the Butler Report shows that the Challenged Claims had no material impact on consumer demand.[9] The survey provides evidence about the reasons consumers purchase coconut oil products—including consumers' intended uses of coconut oil, why they first purchased coconut oil, how they learned about coconut oil generally, and how they learned about Barlean's Coconut Oil products in particular. The results of the survey show that the majority of consumers did not find the Challenged Claims on the Barlean's Coconut Oil product labels to be material to their purchase decision. Microeconomic theory indicates that consumers will have positive demand for products with attributes or claims they assign value to—or receive "utility" from—and will be willing to pay for such attributes. If consumers do not find an attribute to be valuable, it will not have an impact on their willingness to pay for the product. Here, a large majority of consumers indicated that the Challenged Claims on the label were immaterial to their purchase decision and so did not affect their demand.

---

[8] Expert Report of Sarah Butler, April 20, 2021, Section VII.

[9] Butler Report, Section VI.

EXHIBIT L
Page 412

## II.      Qualifications and Materials Relied Upon

3.      I am a Director at NERA Economic Consulting ("NERA") and have been with the firm

since 2002.  Prior to joining NERA, I received a B.Sc. (Economics) from the London School of

Economics ("LSE") and Ph.D. in Economics from the Massachusetts Institute of Technology ("MIT").

At both LSE and MIT, I took courses in microeconomics that covered consumer theory (including how

consumers decide which products to buy given their preferences, product attributes, product prices and

budget constraints) and producer theory (including how firms decide which products to sell and at what

prices).  At MIT, I taught course sections in microeconomics and macroeconomics.  My CV is attached as

Exhibit A.

4.      NERA is being compensated for my time in this matter at an hourly rate of $675.

Members of my team who have provided assistance in this matter are being billed by NERA at their

customary hourly rates.  Neither NERA's compensation, nor my own, is in any way contingent upon the

outcome of this proceeding.  Throughout this report, I have used the terms "I" and "my" to refer to work

performed by me and/or others under my direction.

5.      At NERA, I have been retained as an economic expert on consumer class actions,

securities class actions and employment class actions.  In the course of these assignments, I am frequently

asked to analyze issues related to class certification and damages, including whether a formulaic method

can be used to estimate damages on a class-wide basis.  I frequently work with large datasets involving

pricing and sales data.

6.      A complete list of the documents I relied upon is provided in Exhibit B.

## III.     Background

7.      Mr. Weir was advised by Plaintiffs' counsel that Barlean's Coconut Oil products were

labeled with various health claims alleged to be false and misleading.  These alleged Challenged Claims

include:

EXHIBIT L
Page 413

Background

a)  "Nature's Most Versatile Superfood";

b)  "COCONUT OIL: A SMART FAT";

c)  "A natural source of medium chain triglycerides (MCTs) coconut oil boosts the metabolism, supports the heart and immune system and provides quick energy";

d)  "Harvested at the Peak of Flavor and Nutrition";

e)  "Harvested at the peak of flavor and nutritional value";

f)  "Coconut Oil Nutrition[:] -Contains Lauric Acid, Caprylic Acid, & Capric Acid -Natural Source of Medium Chain Triglycerides";

g)  "Coconut Oil Nutrition[:] -Rich in Lauric Acid & Caprylic Acid -Great Source of Medium Chain Triglycerides";

h)  "The ultimate cooking oil for health-conscious gourmets. As versatile as it is delicious, Barlean's Organic Culinary Coconut Oil is ideal for sautéing, stir-frying and baking, or as a dairy-free butter substitute";

i)  "NO TRANS FAT OR CHOLESTEROL";

j)  "HEALTHY ALTERNATIVE TO BUTTER";

k)  "All the health benefits of coconut oil, now with the rich flavor of butter";

l)  "No Trans or Hydrogenated Fats";

m)  "Cholesterol Free";

n)  "THE HEALTH BENEFITS OF COCONUT OIL, THE RICH TASTE OF BUTTER";

o)  "SUB 1:1 FOR BUTTER";

p)  "we're bringing a whole new flavor to healthy eating";

q)  "Our butter flavored coconut oil has all the healthy MCTs of our regular organic coconut oil, with a rich, buttery taste";

r)  "No cholesterol, trans fats or hydrogenated fats"; and

EXHIBIT L
Page 414

Case 3:19-cv-00169-RBM-BGS    Document 81-1    Filed 04/22/21    PageID.6637    Page 415 of 435

Mr. Weir's Proposed Use of Results from a Conjoint Survey Will
Not and Cannot Measure Any Alleged "Price Premium" or Class-
Wide Damages

     s)   "Substitute 1:1 for butter."[10]

8.     Mr. Weir was asked "to ascertain whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by the proposed class of consumers as a result of the allegedly false and misleading Claims."[11]  The products he references are "Organic Virgin Coconut Oil," "Refined Coconut Oil (Culinary/Gourmet)," and "Butter Flavored Coconut Oil" of various sizes.[12]

9.     One of the lead plaintiffs, Collin Shanks, testified that there is no specific claim on the label that he believes to be untrue.[13]  Instead, I understand that Mr. Shanks alleges that the Challenged Claims collectively gave a misleading impression.[14]

## IV.    Mr. Weir's Proposed Use of Results from a Conjoint Survey Will Not and Cannot Measure Any Alleged "Price Premium" or Class-Wide Damages

10.     According to *The Reference Manual on Scientific Evidence*, damages are the amount of compensation needed to place the plaintiff in the same economic position that she would have occupied if the unlawful act had never occurred.[15]  In theory, this compensation could be calculated on an individualized basis, determining the difference between the value expected and the value received or the price paid and the value received by each putative class member.  As Mr. Weir acknowledges, however, such individualized analysis is not required in a class action setting.[16]  Instead, to estimate any damages

---

[10] First Amended Complaint, ¶197.

[11] Weir Declaration, ¶5.

[12] Weir Declaration, footnote 1.

[13] Deposition of Collin Shanks, October 14, 2019 ("Shanks Deposition"), p. 59.

[14] Factual information about the nutritional content of the Coconut Oil products is included on the back of the product label. Consumers in the Butler Report survey indicated that they would look for the facts panel on the back of the product label if they wanted to understand nutritional information. *See*, Butler Report, Table 10.

[15] *Reference Manual on Scientific Evidence*, Reference Guide on Estimation of Economic Damages, Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, Third Edition, 2011, p. 432.

[16] Weir Declaration, ¶31.

EXHIBIT L
Page 415

Case 3:19-cv-00169-RBM-BGS    Document 81-1    Filed 04/22/21    PageID.6638    Page 416 of 435

Mr. Weir's Proposed Use of Results from a Conjoint Survey Will Not and Cannot Measure Any Alleged "Price Premium" or Class-Wide Damages

using the "price premium" approach, Plaintiffs need to compare the actual market price that consumers paid for the Barlean's products to the market price that the products would have commanded absent the challenged statements on the labels (the "but-for" market price).[17]  For the reasons below, Mr. Weir's proposed model cannot be used to make this comparison.

### A.  Market Prices Are Determined by Supply and Demand, but a Conjoint Survey Looks Only at Consumer Preferences

11.    Mr. Weir proposes to take the results of Dr. Dennis' conjoint survey and use any purported "price premium" associated with the Challenged Claims to calculate aggregate damages. Conjoint survey cannot be used to estimate the market price of the Barlean's Coconut Oil products absent the Challenged Claims, however, because (at best) the tool analyzes only one side of the marketplace. More specifically, economic theory shows that prices are determined by the interaction of supply and demand.[18]  While demand for a product is determined by the preferences of consumers, producers determine the wholesale price and quantity of a product and consider many factors when setting prices, including: production costs, margin targets, competitors, and type of retailer.[19]

12.    Any model designed to estimate market prices must consider how prices are set by suppliers as well as consumer demand.  Conjoint analysis, however, is a demand-side tool that only looks at subjective relative preferences for product attributes, at best providing an estimate of how consumers' willingness to pay might change with a labeling change.  It does not and cannot provide an estimate of the price that Barlean's Coconut Oil products would have commanded in the market absent the Challenged Claims.

---

[17] The use of the singular "market price" is a simplification that should not be interpreted to mean that prices for a given product do not vary by, *e.g.*, product type and size, geographic region, type of retailer, time period and promotional activity.  As noted below, Barlean's does not set the retail market price of its Coconut Oil products, which might vary across these dimensions.

[18] *See, e.g., Principles of Microeconomics*, N. Gregory Mankiw, Seventh Edition, 2015.

[19] For Barlean's, Mr. Puckett testified that these factors were relevant in production decisions. *See*, Puckett Deposition, pp. 56, 67-68.

EXHIBIT L
Page 416

13.    Experts in conjoint analysis make it clear that a conjoint model alone cannot generate an estimate of market equilibrium prices.  For example, Dr. Greg Allenby and his co-authors caution:

> [A] conjoint survey, in and of itself, is not adequate to form the basis for equilibrium firm profit calculations. Not only must we calibrate demand for products, but we must also compute industry equilibria.  This requires measures of costs, a demand system not only for the focal product but also for the major competing products, and an equilibrium concept.[20]

14.    Practitioners also make clear the limitations of conjoint surveys as a tool to predict market shares and price sensitivity to particular product attributes:

> [C]onjoint utilities cannot account for many real world factors that shape market shares, such as length of time on the market, distribution, out-of-stock conditions, advertising, effectiveness of sales force, and awareness.  Conjoint analysis predictions also assume that all relevant attributes that influence share have been measured.  Therefore, the share of preference predictions usually should not be interpreted as market shares, *but as relative indications of preference.*[21]
> [Italics added.]

15.    Although Mr. Weir claims that both he and Dr. Dennis have considered supply-side factors, Mr. Weir has presented no analysis of the Barlean's cost structure or the factors used by the firm to set pricing.  Mr. Weir asserts that his reliance on actual sales of the data "*already* reflect the supply-side factors then extant in the marketplace."[22]  But Mr. Weir performs no analysis of the determinants of these historical prices, and, as described below, testimony in this matter indicates that historical supply decisions made by Barlean's were unrelated to any claims on the label.

16.    Mr. Weir asserts that he and Dr. Dennis "discussed" supply-side factors in developing and implementing the conjoint survey.  Mr. Weir specifically claims that they concluded that "variability in

---

[20] Greg Allenby, Jeff Brazell, John R. Howell, and Peter E. Rossi, "Valuation of Patented Product Features," *Journal of Law and Economics* 57, No. 3 (August 2014), p. 630.

[21] *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*, Bryan K. Orme, Third Edition, Research Publishers LLC, 2014, p. 108.

[22] Weir Declaration, ¶47.

EXHIBIT L
Page 417

pricing showed that retailers' pricing was responsive to changing market forces."[23]  Mr. Weir presents no empirical analysis of this retail data, nor does he show that retail pricing was affected in any way by the Challenged Claims in this matter.  In addition, Mr. Weir does no analysis of wholesale pricing, and so has presented no empirical basis to assert that wholesale pricing was affected by the Challenged Claims.  Again, as described below, testimony of Barlean's representatives indicates that the Challenged Claims did *not* affect pricing, but, instead, that pricing was determined as a function of input costs and the competitive market for the product.

### B.  A Positive Willingness to Pay for an Attribute Often Does Not Translate into a Price Premium

17.    To my knowledge, neither Dr. Dennis nor Mr. Weir has conducted any conjoint or other survey to provide evidence about whether the Challenged Claims are either misleading or material to consumers.  As such, it is not evident that their proposed method will identify any relative consumer preferences or willingness to pay any positive premium related to the Challenged Claims.

18.    Assuming for the sake of argument only that they could demonstrate such preferences, it would not support a conclusion that any price premium for the Challenged Claims existed in the market.  For example, a hypothetical conjoint survey on soft drinks might find that consumers relatively prefer and would be willing to pay a premium of $1 for "cola" flavor compared to a drink with a "black cherry" flavor.  Yet, in the marketplace, sodas are typically "line priced" by manufacturers so that the market prices *do not* differ by the beverage flavor.  As this example highlights, despite the estimated difference in the willingness to pay estimated by the conjoint survey, the resulting market price is exactly the same for each flavor.  As Sedjo and Swallow explain:

> A major finding is that there are reasonable circumstances in which some portion of consumers is willing to pay a price premium but a premium (price differential) will not arise in the market.  An implication of the findings is that even if surveys

---

[23] *Ibid*.

EXHIBIT L
Page 418

Mr. Weir's Proposed Use of Results from a Conjoint Survey Will
Not and Cannot Measure Any Alleged "Price Premium" or Class-
Wide Damages

that indicate that consumers are willing to pay a premium are correct, this is not a sufficient condition to generate a premium in the market.[24]

19.     Even if Dr. Dennis' proposed conjoint survey were to find some positive willingness to pay for the Challenged Claims, without more sophisticated modeling that takes into account how Barlean's and its competitors set prices, it is simply not possible for Dr. Dennis or Mr. Weir to conclude that these preferences translated into a price premium.

## C.  Flaws with Dr. Dennis' Proposed Conjoint Survey

20.     While Dr. Dennis has not conducted any conjoint survey related to Barlean's products or the Challenged Claims in this case, I understand from the Butler Report that there are flaws with his proposed survey design.  Critically, the methodology put forward by Dr. Dennis cannot be used to determine whether consumers' knowledge about and preferences for Barlean's Coconut Oil Products come from some source other than the label.[25]

21.     Moreover, while Dr. Dennis' conjoint survey purports to estimate the subjective consumer preferences that affect demand for coconut oil with alternative labels, it can only estimate relative preferences for the attributes included in his model.  There are other demand-side factors that affect the market prices for coconut oil that he does not propose to consider in his proposed conjoint survey and so would not necessarily be taken into account in Mr. Weir's damages methodology.  For example, some consumers purchased coconut oil for use in beauty applications during the alleged class period.[26]  The results of the Butler Survey indicate that nearly 70% of Barlean's purchasers typically use

---

[24] *See*, Roger A. Sedjo and Stephen K. Swallow, "Voluntary Eco-Labeling and the Price Premium," *Land Economics* 78, No. 2 (2002), p. 282.

[25] Butler Report, Section VII.A.

[26] *See*, *e.g.*, "Coconut Oil For Skin, Hair, Body: 6 Things To Know About The Super Ingredient," Simone Kitchens, HuffPost.com, February 8, 2015, https://www.huffpost.com/entry/coconut-oil-benefits_n_1625631, accessed April 16, 2021; "I Tried 9 Coconut Beauty Hacks For a Week So You Don't Have To," Emily Rekstis, Self.com, February 19, 2016, https://www.self.com/story/coconut-oil-beauty-hacks, accessed April 16, 2021; "23 Beauty Uses for Coconut Oil: Hair, Skin & Body Hacks," Christa Joanna Lee, TeenVogue.com, December 12, 2017, https://www.teenvogue.com/story/beauty-uses-for-coconut-oil, accessed April 16, 2021; "30 Coconut Uses for Beauty: Unexpected Hair & Skin Benefits," Kristi Kellogg and POPSugar, Allure.com, December 20, 2017, https://www.allure.com/story/beauty-uses-for-coconut-oil, accessed April 16,

EXHIBIT L
Page 419

coconut oil for hair or skin care purposes.[27]  In fact, Plaintiff Testone testified that the intended use for his first coconut oil purchase was as a topical moisturizer.[28]  Both testimony of Barlean's representatives and internal documents indicate that the Company was aware of coconut oil uses for "hair care, skin care, [pulling]," among other topical uses.[29]  In addition, Barlean's has indicated that only the butter-flavored and culinary oils are sold as food products, while the virgin coconut oil products are sold as supplements.[30]  These demand-side factors are absent from the Dennis proposed conjoint survey and left unaddressed by Mr. Weir.

22.    Plaintiff Colin Shanks indicated that he first purchased Barlean's because he was looking for a butter-flavored coconut oil to fry an egg in because he did not like the flavor of the other coconut oil brand he had been using.[31]  After his initial purchase, he continued to buy *both* coconut oil brands because they differed in their culinary applications; one fared better in sweeter baked goods, the other better with savory.[32]  To the extent that the taste, texture, or composition of the coconut oil products were drivers of purchase for consumers as they were for Mr. Shanks, Dr. Dennis' survey as proposed will ignore these demand-side factors, which are similarly unaddressed by Mr. Weir.

23.    Mr. Weir proposes to copy the results of the Dennis survey and paste these into his damages model.  As such, any flaws in the Dennis analysis will flow directly into Mr. Weir's model and cause his damages estimate to be similarly flawed.

---

2021; "12 ways to use coconut oil for your hair, skin, and face," Kate Winick and Bryanna Cappadona, Today.com, June 6, 2018, https://www.today.com/style/coconut-oil-hair-skin-face-12-beauty-benefits-t128320, accessed April 16, 2021.

[27] Butler Report, Section VI.B.

[28] Deposition of Michael Testone, October 15, 2019, pp. 23-24.

[29] Puckett Deposition, p. 24; BAR026051.

[30] Puckett Deposition, pp. 93-94.

[31] Shanks Deposition, p. 41.

[32] Shanks Deposition, pp. 44-46.

EXHIBIT L
Page 420

## V.    There Is No Market Evidence of Any Price Premium Associated with the Challenged Claims

24.    Mr. Weir has put forward no empirical analysis of the market for Barlean's Coconut Oil Products, and he fails to consider available testimony and evidence about the Company's pricing strategy, which indicates pricing is unrelated to any claims on the product label.

### A.  Barlean's Does Not Consider the Challenged Claims When Setting Wholesale Prices

25.    John Puckett, former President and COO of Barlean's, testified that the Barlean's pricing strategy for its Coconut Oil Products was unaffected by any claim on the label, and that labels were designed by the marketing, quality, and regulatory departments.[33]  Instead, Mr. Puckett indicated that pricing decisions made by Barlean's for the Coconut Oil Products were driven by costs of goods sold and target margins in light of market competition.  This testimony is consistent with economic theory, which posits that firms will set prices to maximize profits as a function of market competition and costs.[34]

26.    Specifically, Mr. Puckett testified about the methods by which the Company develops wholesale prices.  The Company evaluates market prices of other coconut oil producers and determines the likely wholesale price that would support a 40% mark-up on targeted retail prices.[35]  In addition, the Company's wholesale pricing takes into consideration its supply costs, and it attempts to maintain consistent profit margins relative to these costs over time.[36]  Mr. Puckett acknowledges that margins may vary by customer type; for example, margins are lower for products sold to large retailers like Sam's Club as opposed to independently owned stores in the natural channel.[37]  In addition, Barlean's negotiated

---

[33] *See*, *e.g.*, Puckett Deposition, p. 37.

[34] *See*, *e.g.*, *Principles of Microeconomics*, N. Gregory Mankiw, Seventh Edition, 2015.

[35] Puckett Deposition, p. 68.

[36] Puckett Deposition, pp. 55-56.

[37] Puckett Deposition, p. 56.

EXHIBIT L
Page 421

wholesale prices with specific retailers directly, with price negotiations related to sales volumes, not any claims on the labels.[38]

27.    These supply costs and differentiated supply channels drive wholesale pricing but are unrelated to any alleged Challenged Claims.

## B.  Mr. Weir Incorrectly Asserts that Barlean's Used the Challenged Claims to Differentiate Its Coconut Oil Products

28.    Mr. Weir asserts that Barlean's "understand[s] that the Health Claims are a product attribute that will differentiate their Products from competitors," and he cites to the testimony of John Puckett, former President and COO, in support of this assertion.[39]  However, testimony from Mr. Puckett directly contradicts this claim.

29.    The Barlean's Coconut Oil products made up a small portion of the Company's revenues—less than 2% of revenue for Barlean's in 2018 came from coconut oil products, and this percentage decreased over time.[40]  As this product line was a relatively small segment of its business, Barlean's never performed any consumer research, surveys, or consumer perception analyses of its Coconut Oil products for the purposes of labeling or marketing.[41]

30.    Instead, Barlean's views itself more generally as a family owned, nearly 50-year old, high-end brand that supplies health supplements.[42]  Any differentiation of the Company's products was based on this Company-wide identity rather than on specific label claims, and Coconut Oil Product prices were not set to price-compare against other primary coconut oil competitors.[43]

---

[38] Puckett Deposition, p. 74.

[39] Weir Declaration, ¶¶10-16.

[40] Puckett Deposition, pp. 41-42.

[41] Puckett Deposition, pp. 95-96.

[42] Puckett Deposition, pp. 81-82, 92-93.  See, "Our Story," Barleans.com, https://www.barleans.com/our-story, accessed April 16, 2021.

[43] Puckett Deposition, pp. 81-82.

EXHIBIT L
Page 422

31. Other aspects of the Company's pricing strategy also focused on its overall brand, not Coconut Oil Products specifically. For example, its promotional product support for natural channel retailers was on the "actual brand," not any Coconut Oil Product.[44]

32. Mr. Weir quotes the Puckett Deposition, noting that Mr. Puckett testified:

> Q. Do you use the term "organic" to differentiate your product from other coconut oils?
> A. Outside of the organic arena, yes.
> Q. Okay. Does -- do organic oils -- do they sell for a higher price than nonorganic coconut oils?
> A. Most of the time, absolutely.
> Q. Okay. Do you know what the markup is for products bearing the organic claim?
> A. Sometimes it can be anywhere from 30 to 50 percent.[45]

Mr. Puckett was explicitly testifying about the term "organic" on the label, which I understand is not a Challenged Claim in this litigation.[46] The term "organic" is a regulated designation tied to federal guidelines.[47] In addition, organic designation will also impact the production cost of the product. These factors differentiate the organic label from the Challenged Claims. Moreover, for the reasons described above, to the extent that any "markup" is associated with the organic claim, the demand-side-only methodology proposed by Mr. Weir would fail to measure the supply side impact of the costs related to organic versus non-organic coconut oil production on prices.

33. Finally, Mr. Weir points to Mr. Puckett's testimony that Barlean's customers are focused on health and wellness.[48] However, Mr. Puckett was referring to the customers of the brand as a whole, not specifically purchasers of Barlean's Coconut Oil products, sales of which represent less than 2% of

---

[44] Puckett Deposition, p. 121.

[45] Weir Declaration, ¶11.

[46] Puckett Deposition, p. 138.

[47] "USDA certified organic foods are grown and processed according to federal guidelines addressing, among many factors, soil quality, animal raising practices, pest and weed control, and use of additives. Organic producers rely on natural substances and physical, mechanical, or biologically based farming methods to the fullest extent possible," "Organic 101: What the USDA Organic Label Means," Miles McEvoy, USDA.gov, March 13, 2019, https://www.usda.gov/media/blog/2012/03/22/organic-101-what-usda-organic-label-means, accessed March 19, 2021.

[48] Weir Declaration, ¶13.

EXHIBIT L
Page 423

revenue for the company.[49]  Mr. Puckett testified that Barlean's has done no such analysis of purchasers of Barlean's Coconut Oil products to know consumer preferences for purchasing coconut oil.[50]

## C. Mr. Weir Does No Analysis of the Drivers of Barlean's Sales or Wholesale Prices and Has Minimal Retail Price Data

34.    Mr. Puckett testified that a primary driver of wholesale pricing was the costs of supply and that these supply costs had remained generally stable over the period since 2015, at least in part because Barlean's was able to change suppliers to keep costs relatively steady.[51]  A review of the average wholesale price data is consistent with this testimony.  See Figure 1.

---

[49] Puckett Deposition, pp. 41-42.

[50] Puckett Deposition, pp. 95-96.

[51] Puckett Deposition, p. 78.

EXHIBIT L
Page 424

There Is No Market Evidence of Any Price Premium Associated with
the Challenged Claims

**Figure 1**
**Barlean's Coconut Oil Products**
**National Wholesale Sales**
**2015 - 2018**

| Year (1) | Wholesale Sales (2) | Unit Sales (3) | Average Wholesale Price (4) (2)/(3) |
|---|---|---|---|
| *I. Organic Coconut Oil 16oz* | | | |
| 2015 | $ 1,469,484 | 158,092 | $ 9.30 |
| 2016 | 802,227 | 86,919 | 9.23 |
| 2017 | 647,511 | 74,233 | 8.72 |
| 2018 | 356,122 | 42,821 | 8.32 |
| **Total** | **$ 3,275,344** | **362,065** | **$ 9.05** |
| *II. Organic Coconut Oil 32oz* | | | |
| 2015 | $ 355,848 | 25,070 | $ 14.19 |
| 2016 | 245,733 | 16,352 | 15.03 |
| 2017 | 214,304 | 13,652 | 15.70 |
| 2018 | 126,273 | 8,112 | 15.57 |
| **Total** | **$ 942,158** | **63,186** | **$ 14.91** |
| *III. Organic Culinary Coconut Oil* | | | |
| 2015 | $ 60,725 | 7,134 | $ 8.51 |
| 2016 | 64,811 | 6,821 | 9.50 |
| 2017 | 52,925 | 5,711 | 9.27 |
| 2018 | 27,367 | 4,594 | 5.96 |
| **Total** | **$ 205,828** | **24,260** | **$ 8.48** |
| *IV. Butter Flavored Coconut Oil 16oz* | | | |
| 2015 | $ - | - | $ n.a. |
| 2016 | 94,531 | 17,916 | 5.28 |
| 2017 | 221,238 | 32,084 | 6.90 |
| 2018 | 119,580 | 16,901 | 7.08 |
| **Total** | **$ 435,349** | **66,901** | **$ 6.51** |
| *V. Butter Flavored Coconut Oil 32oz* | | | |
| 2015 | $ - | - | $ n.a. |
| 2016 | - | - | n.a. |
| 2017 | 6,426 | 693 | 9.27 |
| 2018 | - | - | n.a. |
| **Total** | **$ 6,426** | **693** | **$ 9.27** |

**Notes and Sources**
- Data are from "2020-0303 Barlean's Testone Third
   Supplemental REsponses to Rogs with Exhibits.pdf" response no. 5

EXHIBIT L
Page 425

There Is No Market Evidence of Any Price Premium Associated with
the Challenged Claims

**Figure 2**
**Barlean's Coconut Oil Products**
**Margins - National**
**2015 - 2018**

| Year (1) | Wholesale Sales (2) | Direct Material Costs (3) | Margin (4) [(2)-(3)]/(2) | |
|---|---|---|---|---|
| *I. Organic Coconut Oil 16oz* | | | | |
| 2015 | $ 1,469,484 | $ 539,621 | 63.28 | % |
| 2016 | 802,227 | 279,520 | 65.16 | |
| 2017 | 647,511 | 233,521 | 63.94 | |
| 2018 | 356,122 | 115,952 | 67.44 | |
| **Total** | **$ 3,275,344** | **$ 1,168,614** | **64.32** | **%** |
| *II. Organic Coconut Oil 32oz* | | | | |
| 2015 | $ 355,848 | $ 161,702 | 54.56 | % |
| 2016 | 245,733 | 105,470 | 57.08 | |
| 2017 | 214,304 | 88,055 | 58.91 | |
| 2018 | 126,273 | 40,777 | 67.71 | |
| **Total** | **$ 942,158** | **$ 396,004** | **57.97** | **%** |
| *III. Organic Culinary Coconut Oil* | | | | |
| 2015 | $ 60,725 | $ 24,541 | 59.59 | % |
| 2016 | 64,811 | 23,464 | 63.80 | |
| 2017 | 52,925 | 19,646 | 62.88 | |
| 2018 | 27,367 | 10,978 | 59.89 | |
| **Total** | **$ 205,828** | **$ 78,629** | **61.80** | **%** |
| *IV. Butter Flavored Coconut Oil 16oz* | | | | |
| 2015 | $ - | $ - | n.a. | % |
| 2016 | 94,531 | 55,002 | 41.82 | |
| 2017 | 221,238 | 98,498 | 55.48 | |
| 2018 | 119,580 | 36,105 | 69.81 | |
| **Total** | **$ 435,349** | **$ 189,605** | **56.45** | **%** |
| *V. Butter Flavored Coconut Oil 32oz* | | | | |
| 2015 | $ - | $ - | n.a. | % |
| 2016 | - | | n.a. | |
| 2017 | 6,426 | 2,096 | 67.38 | |
| 2018 | - | - | n.a. | |
| **Total** | **$ 6,426** | **$ 2,096** | **67.38** | **%** |
| *VI. All Products* | | | | |
| 2015 | $ 1,886,057 | $ 725,864 | 61.51 | % |
| 2016 | 1,207,302 | 463,456 | 61.61 | |
| 2017 | 1,142,404 | 441,816 | 61.33 | |
| 2018 | 629,342 | 203,812 | 67.62 | |
| **Total** | **$ 4,865,105** | **$ 1,834,948** | **62.28** | **%** |

**Notes and Sources**
- Data are from "2020-0303 Barlean's Testone Third
  Supplemental REsponses to Rogs with Exhibits.pdf" response no. 5

EXHIBIT L
Page 426

There Is No Market Evidence of Any Price Premium Associated with
the Challenged Claims

35.  The Barlean's Cocount Oil Product margins, as defined by the difference between wholesale prices and the costs of goods sold, have also been relatively stable from 2015 to 2018, the period over which data was produced.[52]  See Figure 2.

36.  Mr. Weir has done no analysis of drivers of wholesale pricing or demonstrated any connection between the alleged Challenged Claims and wholesale prices, nor has he analyzed drivers of retail prices—which are not determined or even tracked by Barlean's—in any market.[53]  Though he asserts that he has reviewed "market-based price points derived from actual retail pricing data," which Dennis relies on for his proposed survey, Mr. Weir has not produced any such analysis.[54]  Additionally, Mr. Weir notes that he has been provided with IRI data containing retail sales of the alleged Barlean's Products from January 2015 through January 2021.[55]  However, he has provided no analysis of this data to demonstrate that it is representative of Barlean's sales nationally or in specific states or across channels.  The majority of the Barlean's sales are made in the natural channel, often to independent retailers, and this channel may not be included in data produced by IRI.[56]  As such, Mr. Weir has provided no analysis to ensure he has a representative sample of actual retail prices to utilize in Dr. Dennis' survey or total sales for his proposed damages formula.

### D.  Consumer Survey Indicates Customers Do Not Purchase Based on the Challenged Claims

37.  Not only does the evidence presented above show that Barlean's does not set its prices based on any Challenged Claim on the label, but the consumer survey presented in the Butler Report also

---

[52] The 32oz Butter Flavored and 32oz Virgin Coconut Oil products were both discontinued some time in 2017/2018.  Puckett Deposition, pp. 19, 21.

[53] Puckett Deposition, p. 71: "Q….So with regard to retail pricing -- and I'm talking about direct to the end user, end consumer, so basically from your Sprouts to the consumer -- does Barlean's ever track the average retail price in that respect? A. No."

[54] Weir Declaration, ¶35.

[55] Weir Declaration, ¶55.

[56] Puckett Deposition, pp. 72-75.

EXHIBIT L
Page 427

shows that the Challenged Claims are not material drivers of purchasing decisions.[57]  If the alleged Challenged Claims are not material to consumers, they will not affect consumer demand, and thus, per microeconomic theory, cannot impact market prices.

38.      The Butler Report consumer survey provides evidence about the reasons consumers purchase coconut oil products.  Survey respondents indicated that they learned about coconut oil products from internet research, family or friends, or magazines, and intend to use the products for a variety of uses, including hair and skin care.[58]  In answering a closed-ended question, 89 percent of all survey respondents indicated that they were not influenced by the claims at issue on the product label in any way.[59]  83 percent of Barlean's purchasers did not indicate that their purchase was influenced by statements or descriptions on the product label.[60]  In addition, the results of the survey allow Ms. Butler to conclude that, contrary to Plaintiff's assertions, consumers are not misled by Barlean's and purchasing coconut oil because of information on the product label or brand website, but rather are influenced by many other sources of information.[61]

39.      Microeconomic theory indicates that consumers will have positive demand for products with attributes or claims they assign value to—or receive "utility" from—and will be willing to pay for such attributes.  If consumers do not find an attribute to be valuable, it will not have an impact on their willingness to pay for the product so will not affect demand.  Here, there is direct evidence that the majority of consumers do not find the Challenged Claims to be material drivers of purchase behavior.  If consumers either have no opinion about or are not misled by any particular Challenged Claim, such a claim will have no impact on consumer demand because consumers' preferences and willingness to pay are unaffected by the Claim.

---

[57] Butler Report, Section VI.

[58] Butler Report, Section VI.A.

[59] *Ibid.*

[60] Butler Report, Table 12.

[61]  Butler Report, Section VI.A.

EXHIBIT L
Page 428

40.    Thus, not only do Mr. Weir and Dr. Dennis fail to present any empirical support for Plaintiffs' hypothesis that the Challenged Claims affected consumer preferences and demand, but the Butler Report provides substantial empirical evidence to the contrary.  Market prices are determined by the interaction of supply and demand.  In this case, there is no evidence that either side of the market— either producer supply or consumer demand—was affected by the Challenged Claims or, therefore, that the Challenged Claims have any impact on prices.

## VI.    Conclusion

41.    Based on my expertise and my review of the evidence in this matter, it is my opinion that the formulaic approach proposed by Mr. Weir will not generate a reliable estimate of aggregate damages to putative class members or to any individual class member.

42.    My opinions and conclusions as expressed in this report are to a reasonable degree of professional certainty.  My work is ongoing, and my opinions will continue to be informed by any additional material that becomes available to me.

43.    I declare under penalty of perjury under the laws of the United States that the foregoing report is a true and correct summary of my opinions.

_____                              4/22/2021

Stephanie Plancich, Ph.D.                                               Dated

EXHIBIT L
Page 429

Exhibit A

# Stephanie Plancich
## Director

## Education

**Massachusetts Institute of Technology**
Ph.D., Economics, 2002

**London School of Economics, University of London**
B.Sc., Economics (Hons. First Class), 1995

## Professional Experience

| | |
|---|---|
| | **NERA Economic Consulting** |
| 2021- | Director |
| 2012-2021 | Associate Director/Vice President |
| 2005-2012 | Senior Consultant |
| 2002-2005 | Consultant<br>Responsible for projects in the areas of securities and finance and mass torts. |
| 2000-2002 | **Massachusetts Institute of Technology**<br>Teaching Assistant<br>Taught undergraduate courses in macroeconomics and microeconomic theory. |
| 1999 | **National Bureau of Economic Research**<br>Research Assistant<br>Analyzed life insurance and actuarial data for Professor Jeffrey Brown, John F. Kennedy School of Government, Harvard University. |
| 1996-1998 | **SAFECO Mutual Funds**<br>Dealer Services Analyst, Registered Shareholder Services Representative (passed Series 6 and 63 exams)<br>Facilitated transactions between Funds and large broker-dealer clients. Provided customer service to shareholders, with a special emphasis on individual retirement plans. |

EXHIBIT L
Page 430

## Testimony and Reports (4 years)

Expert Report for Defendants in a confidential arbitration under the Institute for Conflict Prevention and Resolution, New York, New York, March 2021.

Deposition Testimony and Expert Report before the United States District Court, Northern District of California in *Thomas Bailey v. Rite Aid Corporation,* February/January 2021.

Deposition and Response Report before the Supreme Court of the State of New York County of New York in *National Union Fire Insurance Company of Pittsburgh, Pa. v. Fresenius Medical Care Holdings, Inc.,* January 2021/October 2020.

Reply Report before the State of North Carolina County of Mecklenburg in *Buckley, LLP v. Series 1 of Oxford Insurance Company NC, LLC*, November 2020.

Deposition and Rebuttal Report before the United States District Court Central District of California Western Division in *Toya Edwards et al. v, Wal-Mart, Inc*., January/February 2020.

Deposition and Declarations before the United States District Court, Eastern District of New York in *Maria Vecchio vs. Quest Diagnostics Inc., Examone World Wide, Inc., and Examone LLC,* January 2020/December/September 2019.

Expert Report before the Superior Court of New Jersey, Law Division, Essex County in *Pia Wilson v. New Jersey Transit, James Schworn, Anthony Bak, Ed Baska, and Robert Lavell*, November 2019.

Deposition, Reply, and Expert Reports before the Supreme Court of the State of New York, County of New York in *Perella Weinberg Partners LLC, et al. v. Michael A. Kramer, Derron S. Slonecker, Joshua S. Scherer, and Adam W. Verost,* September/October/November 2019.

Expert Reports before the United States District Court, Central District of California in *Collin Shanks et al. v. Jarrow Formulas, Inc*., August/November 2019.

Testimony and Reply Report in confidential arbitration, *Jennifer Medici v. Charter Communications, Inc.*, October 2019.

Expert Report for Defendants in a confidential arbitration under the Center for Public Resources Rules for Non-Administered Arbitration, New York, New York, November 2018.

Rebuttal reports before the Superior Court of New Jersey Law Division, Bergen County in *Raymond Bailey et al., v. Time Warner Cable Enterprise, LLC*, March 2018.

EXHIBIT L
Page 431

## Publications and Presentations (10 years)

"Trends in Wage and Hour Settlements: 2019 Update," (Dr. Stephanie Plancich and Janeen McIntosh) NERA Publication, June 2020.

"Trends in Wage and Hour Settlements: 2015 Update," (co-author) NERA Publication, July 2015.

"Cutting Edge Issues in Age Discrimination and the Aging Workforce," panel discussion at the *8th Annual Labor and Employment Law Conference*, hosted by the ABA Section of LEL: Los Angeles, CA. November 2014.

"Product Liability for 2014 and Beyond," hosted by The Knowledge Congress, a web-based broadcast, New York, New York, September 2014.

"Consumer Class Action Settlements: 2010 – 2013 – Settlements Increasing, With a Focus on Privacy," (co-author) NERA Publication, June 2014.

"Trends in Wage and Hour Settlements: 2013 Update," (co-author) NERA Publication, November 2013.

"Trends in Wage and Hour Settlements: 2012 Update," (co-author) NERA Publication, March 2013.

"Current Use of Economic Analyses in Class Certification," presented at Seyfarth Shaw LLP, Boston, Massachusetts, December 2012.

"Economic Analyses of Suitability Claims," as part of a panel titled, "The New FINRA Suitability Rule: Implementation, Enforcement, and Litigation," presented at the Dorsey & Whitney LLP, Securities and Financial Services Fall Conference, Minneapolis, MN, November 2012.

"Wage and Hour Litigation in Canada: Use of Statistics in Class Certification Analyses," presented at International Employment Law: A 2012 Perspective, hosted by The Knowledge Congress, a web-based broadcast, New York, New York, October 2012.

"National Trends in Asbestos Litigation," a panel discussion presented at the Asbestos Litigation Conference: A National Overview and Outlook Credit Crisis, San Francisco, California, September 2012.

"Damage Estimation in Wrongful Termination Cases: Impact of the Great Recession," (co-author), NERA Publication, March 2012.

"Trends in Wage and Hour Settlements: 2011 Update," (co-author), NERA Publication, March 2012.

EXHIBIT L
Page 432

"Understanding and Mitigating the Influence of Gender Differences in Negotiation Effectiveness," presented at Jackson Lewis LLP, Chicago, Illinois, January 2012.

"Trends in Mass Torts Litigation, Through 2011 and Beyond," presented at The Product Liability and Environmental Law Seminar, hosted by McGivney & Kluger, P.C., New York, NY, October 2011.

"Samples and Surveys in Wage and Hour Litigation," presented at Winston & Strawn LLP, Chicago, Illinois, June 2011.

"2011 and Beyond: Predicting Mass Tort Litigation, Focus on Pharmaceutical Torts," presented at EECMA Spring 2011 Meeting and Conference, hosted by the Emerging and Environmental Claims Managers Association, Captiva Island, FL May 2011.

"Recent Trends in Wage and Hour Settlements," (co-author), NERA Publication, March 2011.

March 2021

EXHIBIT L
Page 433

## Exhibit B

## Materials Relied Upon

– First Amended Complaint, *Michael Testone, Collin Shanks, and Lamartine Pierre, on behalf of themselves, all others similarly situated, and the general public, Plaintiffs v. Barlean's Organic Oils, LLC Defendant*, United States District Court of Southern District of California, Case No. 19-cv-0169-JLS-BGS, September 3, 2019.

– Declaration and Expert Report of J. Michael Dennis, Ph.D., March 1, 2021.

– Declaration of Colin B. Weir, March 1, 2021.

– Expert Report of Sarah Butler, April 20, 2021.

– Deposition of John Puckett, December 19, 2019.

– Deposition of Collin Shanks, October 14, 2019.

– Deposition of Michael Testone, October 15, 2019.

– Allen, Mark A., Robert E. Hall, and Victoria A. Lazear. "Reference Guide on Estimation of Economic Damages." In *Reference Manual on Scientific Evidence*. 3rd ed. The National Academies Press, 2011.

– Allenby, Greg M., Jeff Brazell, John R. Howell, and Peter E. Rossi. "Valuation of Patented Product Features." *Journal of Law and Economics* 57, no. 3 (August 2014): 629-663.

– Barleans.com. "Our Story." Accessed April 16, 2021. https://www.barleans.com/our-story.

– Kaye, David H., and David A. Freedman. "Reference Guide on Statistics." In *Reference Manual on Scientific Evidence*. 3rd ed. The National Academies Press, 2011.

– Kitchens, Simone. "Coconut Oil for Skin, Hair, Body: 6 Things to Know About the Super Ingredient." HuffPost.com, February 8, 2015. Accessed April 16, 2021. https://www.huffpost.com/entry/coconut-oil-benefits_n_1625631.

– Lee, Christa Joanna. "23 Beauty Uses for Coconut Oil: Hair, Skin & Body Hacks." TeenVogue.com, December 12, 2017. Accessed April 16, 2021. https://www.teenvogue.com/story/beauty-uses-for-coconut-oil.

– Mankiw, N. Gregory. *Principles of Microeconomics*. 7th ed. Cengage Learning, 2015.

– McEvoy, Miles. "Organic 101: What the USDA Organic Label Means." USDA.gov, March 13, 2019. Accessed March 19, 2021. https://www.usda.gov/media/blog/2012/03/22/organic-101-what-usda-organic-label-means.

– Nardi, Peter M. "Designing Research: Concepts, Hypotheses, and Measurement." In *Doing Survey Research: A Guide to Quantitative Methods*. 2nd ed. Pearson Education, 2006.

– Orme, Bryan K. *Getting Started with Conjoint Analysis: Strategies for Product Design and Pricing Research*. 3rd ed. Research Publishers LLC, 2014.

– Osborne, Jason, ed. *Best Practices in Quantitative Methods*. Sage Publications, 2008.

– PopSugar and Kristi Kellogg. "30 Coconut Uses for Beauty: Unexpected Hair & Skin Benefits." Allure.com, December 30, 2017. Accessed April 16, 2021. https://www.allure.com/story/beauty-uses-for-coconut-oil.

EXHIBIT L
Page 434

–   Rekstis, Emily. "I Tried 9 Coconut Beauty Hacks for a Week So You Don't Have To." Self.com, February 19, 2016. Accessed April 16, 2021. https://www.self.com/story/coconut-oil-beauty-hacks.

–   Sedjo, Roger A., and Stephen K. Swallow. "Voluntary Eco-Labeling and the Price Premium." *Land Economics* 78, no. 2 (May 2002): 272-284.

–   Winick, Kate and Bryanna Cappadona. "12 Ways to Use Coconut Oil for Your Hair, Skin, and Face." Today.com, June 6, 2018. Accessed April 16, 2021. https://www.today.com/style/coconut-oil-hair-skin-face-12-beauty-benefits-t128320.

–   BAR026051

–   Wholesale Data:

  o   Defendant's Third Supplemental Responses to Interrogatories 1, 5 and 7 of Plaintiffs' First Set of Interrogatories, March 3, 2020 ("2020-0303 Barlean's Testone Third Supplemental REsponses to Rogs with Exhibits.pdf").

EXHIBIT L
Page 435